# 24-2251

## United States Court of Appeals
## for the Second Circuit

CIVIL RIGHTS CORPS, CYNTHIA GODSOE, NICOLE SMITH FUTRELL, DANIEL S. MEDWED, JUSTIN MURRAY, ABBE SMITH, STEVEN ZEIDMAN,

*Plaintiffs-Appellees,*

v.

HECTOR D. LASALLE, in his official capacity Presiding Justice of the Second Judicial Department of the Appellate Division of the Supreme Court of the State of New York,

*Defendant-Appellant,*

GEORGIA PESTANA, Personal Capacity, STEVEN STEIN CUSHMAN, in his official capacity Corporation Counsel of the City of New York,

*Defendants.*

*(caption continues inside front cover)*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLANT

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
STEPHEN J. YANNI
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellant
28 Liberty Street
New York, NY 10005
(212) 416-6184

Dated: December 4, 2024

*(caption continues from front cover)*

MELINDA KATZ, Personal Capacity and in her official capacity the District Attorney of Queens County, ANDREA E. BONINA, Personal Capacity and in her official capacity Chair of State of New York Grievance Committee for the Second, Eleventh and Thirteenth Judicial Districts, DIANA MAXFIELD KEARSE, Personal Capacity and in her official capacity Chief Counsel of the State of New York Grievance Committee for the Second, Eleventh and Thirteenth Judicial District,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................iv

PRELIMINARY STATEMENT .......................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 4

ISSUES PRESENTED ........................................................................ 4

STATEMENT OF THE CASE .............................................................5

    A.   History of Attorney Discipline in England and the
United States ............................................................................5

    B.   History of Attorney Discipline in New York State ................ 12

    C.   New York's Current Procedures for Attorney
Disciplinary Matters ............................................................ 16

    D.   Confidentiality of Attorney Disciplinary Proceedings
and Records ........................................................................... 22

    E.   Plaintiffs' Complaints to the Attorney Grievance
Committee and This Litigation ............................................ 24

STANDARD OF REVIEW ................................................................ 30

SUMMARY OF ARGUMENT .......................................................... 30

ARGUMENT .................................................................................... 34

POINT I

    PLAINTIFFS' FIRST AMENDMENT CLAIM IS UNRIPE BECAUSE
THEY NEVER APPLIED TO ACCESS CONFIDENTIAL PROCEEDINGS
AND RECORDS ........................................................................... 34

i

**Page**

POINT II

ABSTENTION IS REQUIRED TO PREVENT FEDERAL INTERFERENCE
WITH STATE DISCIPLINARY PROCEEDINGS .............................................. 40

    A.    Federal Courts Must Refrain from Interfering with
          State Attorney Disciplinary Processes. ................................... 40

    B.    Abstention Is Required Under *O'Shea* and Its Progeny. ....... 43

          1.    The district court's order affects the substance
                  of state disciplinary decisions.......................................... 45

          2.    The district court's order encourages continued
                  federal-court intervention................................................ 47

          3.    The district court's order undermines state courts'
                  ability to manage their own records................................ 49

          4.    Plaintiffs have alternative avenues of relief. ................. 50

POINT III

THERE IS NO FIRST AMENDMENT RIGHT OF ACCESS TO
ATTORNEY DISCIPLINARY PROCEEDINGS AND RECORDS ....................... 51

    A.    Committee Dispositions........................................................ 53

          1.    History and experience provide no support for
                  public access to committee dispositions. ........................ 54

          2.    Logic does not support public access to committee
                  dispositions. ..................................................................... 62

    B.    Second Department Proceedings and Records...................... 66

          1.    History and experience provide no support for
                   public access to formal disciplinary proceedings. ........... 66

ii

**Page**

2.  Logic does not support public access to formal
    disciplinary proceedings. ................................................. 70

CONCLUSION ......................................................................... 73

# TABLE OF AUTHORITIES

**Cases**                                                               **Page(s)**

*74 Pinehurst LLC v. New York,*
59 F.4th 557 (2d Cir. 2023) ...................................................................38-39

*American Sav. Bank, FSB v. UBS Fin. Servs. Inc.,*
347 F.3d 436 (2d Cir. 2003) ................................................................. 39

*Anonymous J. v. Bar Ass'n of Erie Cnty.,*
515 F.2d 435 (2d Cir. 1975) ................................................................. 41

*Anonymous Nos. 6 & 7 v. Baker,*
360 U.S. 287 (1959) ........................................................................ 14, 59

*Attorney Grievance Comm'n of Md. v. A.S. Abell Co.,*
294 Md. 680 (1982) ............................................................................ 65

*Center for Nat'l Sec. Stud. v. United States Dep't of Just.,*
331 F.3d 918 (D.C. Cir. 2003) .......................................................... 52, 59

*Chinese Am. Citizens All. of Greater N.Y. v. Adams,*
116 F.4th 161 (2d Cir. 2024) ............................................................... 30

*Coffran v. Board of Trs. of N.Y.C. Pension Fund,*
46 F.3d 3 (2d Cir. 1995) ...................................................................... 35

*Courthouse News Serv. v. Brown,*
908 F.3d 1063 (7th Cir. 2018) .........................................................49-50

*Courthouse News Serv. v. Gabel,*
No. 21-3098 (2d Cir.) .......................................................................... 49

*Courthouse News Service v. Planet,*
750 F.3d 776 (9th Cir. 2014) ............................................................... 49

*Disability Rts. N.Y. v. New York,*
916 F.3d 129 (2d Cir. 2019) ....................................................... passim

| Cases | Page(s) |
|---|---|

*Doe v. Office of Pro. Med. Conduct,*
   81 N.Y.2d 1050 (1993) ................................................................ 69

*Douglas Oil Co. v. Petrol Stops Nw.,*
   441 U.S. 211 (1979)............................................................62-63, 65

*El Vocero de P.R. (Caribbean Int'l News Corp.) v. Puerto Rico,*
   508 U.S. 147 (1993)............................................................... 53

*First Amend. Coal. v. Judicial Inquiry & Rev. Bd.,*
   784 F.2d 467 (3d Cir. 1986) ................................................... 61

*Globe Newspaper Co. v. Superior Ct. for Cnty. of Norfolk,*
   457 U.S. 596 (1982)..............................................................51-53

*Hartford Courant Co. v. Carroll,*
   986 F.3d 211 (2d Cir. 2021) ................................................... 72

*Hartford Courant Co. v. Pellegrino,*
   380 F.3d 83 (2d Cir. 2004) ..................................................... 52

*Houchins v. KQED, Inc.,*
   438 U.S. 1 (1978)................................................................... 51

*In re Application of the N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials,*
   577 F.3d 401 (2d Cir. 2009) ...................................... passim

*In re Grand Jury Subpoena,*
   103 F.3d 234, 237 (2d Cir. 1996) .......................................... 70

*In re Search of Fair Fin.,*
   692 F.3d 424 (6th Cir. 2012)................................................. 52

*In re Special Proc.,*
   373 F.3d 37 (1st Cir. 2004) ................................................... 59

*Kaufman v. Kaye,*
   466 F.3d 83 (2d Cir. 2006) .......................................... 42, 49

**Cases**                                             **Page(s)**

*Kentucky Press Ass'n v. Kentucky*,
454 F.3d 505 (6th Cir. 2006) ............................................................. 36

*Knick v. Township of Scott*,
588 U.S. 180 (2019) ........................................................................ 37

*Lacewell v. Office of Comptroller of Currency*,
999 F.3d 130 (2d Cir. 2021) ....................................................... 30, 34

*Marchi v. Board of Coop. Educ. Servs. of Albany*,
173 F.3d 469 (2d Cir. 1999) .......................................................... 35

*Matter of Capoccia*,
59 N.Y.2d 549 (1983) ..................................................................... 63

*Matter of Cooper*,
22 N.Y. 67 (1860) ............................................................................ 6

*Matter of Johnson Newspaper Corp. v. Melino*,
77 N.Y.2d 1 (1990) .................................................................. 63, 69-70

*Matter of Kelly*,
59 N.Y. 595 (1875) ........................................................................ 13

*Matter of Percy*,
36 N.Y. 651 (1867) ........................................................................ 13

*Matter of Tuck*,
180 A.D. 924 (1st Dep't 1917) ...................................................... 14

*McLaughlin v. Philadelphia Newspapers, Inc.*,
465 Pa. 104 (1975).................................................................... 63-64

*Mendez v. Banks*,
65 F.4th 56 (2d Cir. 2023)............................................................. 34

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
457 U.S. 423 (1982) ................................................................ 41, 50

**Cases**                                         **Page(s)**

*Miles v. Wesley,*
  801 F.3d 1060 (9th Cir. 2015) ............................................................ 50

*National Park Hosp. Ass'n v. Department of Interior,*
  538 U.S. 803 (2003) ........................................................................... 34

*New York C.L. Union v. Grandeau,*
  528 F.3d 122 (2d Cir. 2008) .............................................................. 39

*New York C.L. Union v. New York City Transit Auth.,*
  684 F.3d 286 (2d Cir. 2012) ................................................... 51-53, 65

*Newsday LLC v. County of Nassau,*
  730 F.3d 156 (2d Cir. 2013) .............................................................. 51

*North Jersey Media Grp., Inc. v. United States,*
  836 F.3d 421 (3d Cir. 2016) ......................................................... 52, 60

*North Jersey Media Grp. v. Ashcroft,*
  308 F.3d 198 (3d Cir. 2002) .............................................................. 65

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) .................................................................... passim

*Oglala Sioux Tribe v. Fleming,*
  904 F.3d 603 (8th Cir. 2018) ............................................................ 44

*Oklahoma Observer v. Patton,*
  73 F. Supp. 3d 1318 (W.D. Okla. 2014) ............................................ 72

*Patsy v. Board of Regents of Fla.,*
  457 U.S. 496 (1982) ........................................................................... 37

*People ex rel. Karlin v. Culkin,*
  248 N.Y. 465 (1928) .............................................................. 14, 59, 61

*Press-Enterprise Co. v. Superior Ct. of Cal.,*
  464 U.S. 501 (1984) ........................................................................... 51

| Cases | Page(s) |
|---|---|

*Press-Enterprise Co. v. Superior Ct. of Cal.*,
 478 U.S. 1 (1986)................................................................51-52

*R. v. Visitors to the Inns of Court
 ex parte Calder*, 2 All ER 876, 889 (Q.B. 1992) ...................6

*Richmond Newspapers, Inc. v. Virginia*,
 448 U.S. 555 (1980).............................................53, 66, 69

*Saxton v. Stowell*,
 11 Paige Ch. 526 (N.Y. Ch. 1845) ......................................13

*Simmonds v. INS*,
 326 F.3d 351 (2d Cir. 2003) ....................................35, 39-40

*Spargo v. New York State Comm'n on Jud. Conduct*,
 351 F.3d 65 (2d Cir. 2003) ...................................................50

*Sprint Commc'ns, Inc. v. Jacobs*,
 571 U.S. 69 (2013)..........................................................40-41

*United States v. HSBC Bank USA, N.A.*,
 863 F.3d 125 (2d Cir. 2017) ................................................61

*United States v. Kincaide*,
 119 F.4th 1074 (6th Cir. 2024) ......................................52, 69

*United States v. R. Enters., Inc.*,
 498 U.S. 292 (1991)..............................................................61

*Wallace v. Kern*,
 520 F.2d 400 (2d Cir. 1975) ................................................40

*Wayte v. United States*,
 470 U.S. 598 (1985)..........................................................60-61

*Williamson County Reg'l Plan. Comm'n v. Hamilton Bank of
 Johnson City*,
 473 U.S. 172 (1985)..............................................................37

**Cases**      **Page(s)**

*Younger v. Harris,*
   401 U.S. 37 (1971) ................................................................ 41

**Statutes**

*Federal*

28 U.S.C.
   § 1291 ................................................................................ 4
   § 1331 ................................................................................ 4

42 U.S.C. § 1983 ..................................................................... 4

*New York*

Ch. 946, 1895 N.Y. Laws 796 .................................................. 14

Ch. 295, 1921 N.Y. Laws 1017 ................................................ 14

Ch. 649, 1945 N.Y. Laws 1371 ................................................ 15

Ch. 675, 1945 N.Y. Laws 1456 ................................................ 15

N.Y. Civ. P. Code §§ 67-81 (1876) .......................................... 13

N.Y. Jud. Law
   § 90(2) ......................................................................... 16, 21
   § 90(7) ............................................................................ 16
   § 90(10) ..................................................................... passim
   § 487 .............................................................................. 68

*Other Jursidictions*

Iowa Code Ann. § 34.4 ............................................................ 11

Statute of Westminster I 1275, 3 Edw. c. 29 ........................... 5

| **Rules** | **Page(s)** |
|---|---|

*Federal*

2d Cir. R. 46.2(b)(6) ............................................................. 12

D. Conn. R. 83.2(c)(4) ........................................................ 12

D. Vt. Att'y Disciplinary R. 7(c) ...................................... 12

N.D.N.Y. R. 83.3(b) ........................................................... 12

S.D.N.Y. & E.D.N.Y. R. 1.5(d)(3) ................................... 12

W.D.N.Y. Local R. Civ. P. 83.3(b)(1) ............................. 12

*New York*

Rules of the Appellate Division, Second Department (22 N.Y.C.R.R.)
§ 691.4 ............................................................................. 17

Rules of Professional Conduct (22 N.Y.C.R.R. pt. 1200) .......................... 16

Rules for Attorney Disciplinary Matters (22 N.Y.C.R.R.)
pt. 1240.............................................................................. 16
§ 1240.2 ............................................................................ 20
§ 1240.4 ............................................................................ 17
§ 1240.5 ............................................................................ 17
§ 1240.7 .................................................................... passim
§ 1240.8 .......................................................... 17, 21, 45, 62
§ 1240.18 ................................................................ 22-23, 35

*Other Jurisdictions*

Ala. R. Disciplinary P. R. 30 ........................................... 11

Del. Lawyers R. Disciplinary P. 13 .................................. 11

Fla. State Bar R. 3-7.1....................................................... 11

N.H. Sup. Ct. R. 37(20)..................................................... 11

Ore. State Bar R. of P. 1.7(b)............................................ 11

W.V. R. Lawyer Disciplinary P. 2.6 ................................ 11

**Rules**                                                     **Page(s)**

*Model*

Model Rules for Lawyer Disciplinary Enf't r. 10(A)(5)
(ABA July 20, 2020) ...................................................... 64

Model Rules for Lawyer Disciplinary Enf't r. 11(G)
(ABA July 15, 2020) ...................................................... 64

**Miscellaneous Authorities**

ABA, *2018 Survey on Lawyer Discipline Systems* (July 2020),
https://www.americanbar.org/content/dam/aba/administrativ
e/professional_responsibility/2018sold-results.pdf ........................... 45

ABA, *2021 Survey on Lawyer Discipline Systems* (Nov. 2023),
https://www.americanbar.org/content/dam/aba/administrativ
e/professional_responsibility/sold-survey/2021/2021-sold-
report-final.pdf................................................................. 45

ABA, *Lawyer Regulation for a New Century: Report of the
Commission on Evaluation of Disciplinary Enforcement*
(Sept. 18, 2018),
https://www.americanbar.org/groups/professional_responsibi
lity/resources/report_archive/mckay_report/ .................................... 11

ABA, *Problems and Recommendations in Disciplinary
Enforcement* (1970) ............................................ 9-11, 64, 71

ABA, *Profile of the Legal Profession 2024: Demographics* (2024),
https://www.americanbar.org/news/profile-legal-
profession/demographics/.................................................... 69

Carol Rice Andrews, *Standards of Conduct for Lawyers:
An 800-Year Evolution*, 57 SMU L. Rev. 1385 (2005)...................... 5-9

Charles W. Wolfram, *Toward a History of the Legalization of
American Legal Ethics—I. Origins*,
8 U. Chi. L. Sch. Roundtable 469 (2001). ........................................ 7, 67

**Miscellaneous Authorities**                                   **Page(s)**

David R. Papke, *The Legal Profession and Its Ethical Responsibilities: A History* 29, *in Ethics and the Legal Profession* (Michael Davis & Frederick A. Elliston, eds., 1986)............................8

George Martin, *Causes and Conflicts: The Centennial History of the Association of the Bar of the City of New York 1870-1970* (1970)......................................................9, 13-14

Gillian E. Metzger, *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873, 881 (2005)....................................44

James Willard Hurst, *Lawyers in American Society 1750-1966*, 50 Marq. L. Rev. 594 (1967) ...............................................8

Jonathan Rose, *The Legal Profession in Medieval England: A History of Regulation*, 48 Syracuse L. Rev. 1 (1998) ....................5-6

Leslie C. Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1 (2007) ................................. passim

Mark Lipnickey, *The English Roots of American Legal Regulation: An Examination of Early Legal Regulation in Virginia, Massachusetts, and New York*, 34 Geo. J. Legal Ethics 1131 (2021) .....................................6

Mary M. Devlin, *The Development of Lawyer Disciplinary Procedures in the United States*, 7 Geo. J. Legal Ethics 911 (1994) ...............................7-8, 11

Michael S. McGinniss, *Sending the Message: Using Technology to Support Judicial Reporting of Lawyer Misconduct to State Disciplinary Agencies*, 2013 J. Pro. Law. 37 (2013) ...........................11

N.Y. State Comm'n on Statewide Att'y Discipline, *Enhancing Fairness and Consistency, Fostering Efficiency and Transparency* (2015), https://ww2.nycourts.gov/sites/default/files/document/files/2020-10/AttyDiscFINAL9-24-1.pdf .......................................15

**Miscellaneous Authorities**                                    **Page(s)**

*The Power to Disbar*, 29 Legal Observer J. Juris. 37 (1844).....................6

Roscoe Pound, *The Lawyer from Antiquity to Modern Times* (1953)......6-7

T.W. Tempany, *The Legal Profession in England—Its History,
   Its Members, and Their Status*, 19 Am. L. Rev. 677 (1885).................6

## PRELIMINARY STATEMENT

The Appellate Division of the Supreme Court of New York is responsible for attorney discipline. To carry out this function, each of the four departments of the Appellate Division appoints one or more attorney grievance committees to screen complaints of attorney misconduct, conduct investigations, and determine whether to authorize the prosecution of formal disciplinary proceedings. The committees may also choose to dismiss unfounded complaints, refer matters to an alternate forum, or impose private admonitions or advisements.

For the past eighty years, the New York Legislature has mandated that attorney discipline matters remain confidential unless the Appellate Division sustains the charges and imposes public discipline, or authorizes disclosure for good cause. This confidentiality rule encourages the participation of witnesses, limits the reputational harm to respondents subjected to unfounded complaints, and prevents the disclosure of privileged and sensitive personal information.

In 2021, six law professors filed complaints against twenty-one prosecutors who had obtained convictions that courts later reversed for prosecutorial misconduct (the "Complaints"). The attorney grievance

committee staff responsible for screening and investigating the Complaints informed the professors that any resulting proceedings would remain confidential because the professors, having merely relayed publicly available information, lacked standing to participate and receive updates on that basis. Afterward, the professors never applied to access these confidential records by invoking the good-cause exception.

Instead, the professors (together with a nonprofit organization) filed this federal action asserting a First Amendment right of access to the proceedings and records associated with their Complaints. The U.S. District Court for the Southern District of New York (Marrero, J.) granted summary judgment to plaintiffs and entered a declaratory judgment creating a qualified public right of access to any attorney grievance committee dispositions related to the Complaints and any resulting formal disciplinary proceedings in the Second Department. This Court should reverse.

*First*, plaintiffs' First Amendment claim is unripe. Plaintiffs have never attempted to use the available statutory means for requesting access to confidential attorney disciplinary records: a good-cause applica-

tion. Absent a ruling denying plaintiffs access to the information they seek, there is no concrete dispute ripe for adjudication.

*Second*, abstention is required to prevent federal intrusion into state proceedings. The district court's order effectively precludes the State from imposing private discipline and even requires publishing dismissals of unfounded complaints, which would make New York a national outlier. The order's further requirement that on-the-record findings justify the continued confidentiality of any disciplinary proceeding or record invites continued federal-court interference. Given that plaintiffs could have raised their constitutional concerns in state court, principles of federalism and comity require abstention.

*Third*, the district court's decision was wrong on the merits. There is no public right of access to committee dispositions, which result from investigations and not formal trial-type process. The committee's investigatory process has been confidential since its inception, and today most States maintain the confidentiality of disciplinary matters until the initiation of formal proceedings. Requiring the publication of committee dispositions would intrude on and impair the disciplinary process.

The district court similarly erred in finding a right of access to the Second Department's formal disciplinary proceedings and related records. Here too, there is no clear history of openness dating to the Founding; by the mid-twentieth century, nearly all States held such proceedings in private. Over time, many States decided to open these proceedings to the public, but others did not. The Constitution does not dictate how States must resolve this policy question.

## JURISDICTIONAL STATEMENT

Plaintiffs assert claims under 42 U.S.C. § 1983, and the district court had jurisdiction over those claims under 28 U.S.C. § 1331. On August 21, 2024, defendant Hector D. LaSalle, Presiding Justice of the Appellate Division, Second Department, timely filed a notice of appeal from the district court's judgment. (J.A. 994.) This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1. Whether plaintiffs' First Amendment claim is unripe, where plaintiffs never used available statutory means to apply for access to attorney disciplinary proceedings or records.

4

2. Whether abstention is required to prevent federal interference in the state attorney disciplinary process.

3. Whether the district court erred in declaring a qualified public right of access to confidential attorney grievance committee dispositions and formal attorney disciplinary proceedings and records.

## STATEMENT OF THE CASE

### A. History of Attorney Discipline in England and the United States

From medieval England through present day America, attorney discipline has not consistently been carried out entirely in public or in private. Rather, public access varied over time depending on the enforcement body and the form of the proceeding.

In 1275, England enacted the first statute regulating the conduct of lawyers, which prohibited "Deceit or Collusion in the King's Court."[1] Violations were tried before a judge or a jury of lawyers,[2] and judges were

---

[1] Statute of Westminster I 1275, 3 Edw. c. 29; Carol Rice Andrews, *Standards of Conduct for Lawyers: An 800-Year Evolution*, 57 SMU L. Rev. 1385, 1394-95 (2005).

[2] Jonathan Rose, *The Legal Profession in Medieval England: A History of Regulation*, 48 Syracuse L. Rev. 1, 60-61 & n.263 (1998).

5

responsible for imposing discipline because "no separate disciplinary authorities and regulatory agencies existed."[3] By the seventeenth century, however, the Inns of Court trained barristers (i.e., courtroom lawyers) and were responsible for their discipline.[4] Applications for disbarment were "taken in private,"[5] and visiting judges reviewed those decisions "in private and not in court."[6] While lawyers other than barristers remained subject to regulation by Parliament and courts,[7] few disciplinary proceedings were brought through the 1700s.[8] Instead, "development and

---

[3] *Id.* at 41.

[4] *See Matter of Cooper*, 22 N.Y. 67, 90 (1860); Roscoe Pound, *The Lawyer from Antiquity to Modern Times* 99-101 (1953); Mark Lipnickey, *The English Roots of American Legal Regulation: An Examination of Early Legal Regulation in Virginia, Massachusetts, and New York*, 34 Geo. J. Legal Ethics 1131, 1135 (2021).

[5] T.W. Tempany, *The Legal Profession in England—Its History, Its Members, and Their Status*, 19 Am. L. Rev. 677, 700 (1885); *see also The Power to Disbar*, 29 Legal Observer J. Juris. 37, 37 (1844) (referencing disbarment proceedings before "secret" tribunals).

[6] *R. v. Visitors to the Inns of Court ex parte Calder*, 2 All ER 876, 889 (Q.B. 1992), *appeal allowed on other grounds*, 2 All ER 876, 898, 908 (Ct. Appeal 1993).

[7] Pound, *supra*, at 100.

[8] Andrews, *supra*, at 1407-08.

oversight of standards of conduct and discipline were better achieved later, through self-governance by lawyers."[9]

Across the Atlantic, the regulation of lawyers in colonial America was disorganized and sporadic.[10] Indeed, attorney discipline in the United States was a rarity before the twentieth century, invoked only in extreme cases.[11] The few regulations that existed resembled those in England.[12] "American courts during the colonial and post-revolutionary period generally did not discipline attorneys to the degree necessary to develop uniform standards of conduct."[13] Attorneys were regulated through ad hoc proceedings in open court conducted as equity suits or contempt proceedings.[14] Otherwise, lawyers might meet casually to

---

[9] *Id.* at 1408.

[10] Charles W. Wolfram, *Toward a History of the Legalization of American Legal Ethics—I. Origins*, 8 U. Chi. L. Sch. Roundtable 469, 471 (2001).

[11] Andrews, *supra*, at 1417 & nn.222-223, 1438 & n.401; Pound, *supra*, at 185.

[12] Andrews, *supra*, at 1414, 1422-23.

[13] *Id.* at 1417.

[14] Wolfram, *supra*, at 474-76; Mary M. Devlin, *The Development of Lawyer Disciplinary Procedures in the United States*, 7 Geo. J. Legal Ethics 911, 912 (1994).

"administer informal discipline to their fellow members on the basis of incidents that occurred that day in court."[15]

States began moving away from ad hoc lawsuits toward more organized disciplinary models that included private proceedings. Local bar associations began to proliferate in the late 1800s in response to "concerns about the lack of professional control."[16] The American Bar Association (ABA), established in 1878, promulgated the Canons of Legal Ethics in 1908, which twenty-three States adopted within two years.[17] For the first time, rules of conduct evolved from "vague or aspirational statements into clear and absolute standards."[18] From 1850 to 1900, the legal profession grew from 22,000 to 114,000 practitioners.[19]

Increased disciplinary enforcement arrived with "the transformation of many state bar associations, in the mid-twentieth century, from being

---

[15] James Willard Hurst, *Lawyers in American Society 1750-1966*, 50 Marq. L. Rev. 594, 602 (1967).

[16] Devlin, *supra*, at 918.

[17] *Id.*

[18] Andrews, *supra*, at 1452.

[19] David R. Papke, *The Legal Profession and Its Ethical Responsibilities: A History* 29, 35, *in Ethics and the Legal Profession* (Michael Davis & Frederick A. Elliston, eds., 1986).

merely voluntary professional organizations into 'integrated' or 'unified' bar associations, in which lawyer membership is mandatory."[20] States began to situate disciplinary authority in state bar associations or court agencies.[21] Bar associations regularly investigated complaints, held hearings, and recommended to courts whether discipline should be imposed.[22]

These disciplinary proceedings were generally closed to the public. Most States "direct[ed] that the existence of a disciplinary proceeding be kept confidential until a trial has been held, the charges have been found sustained and the record filed in the court having disciplinary jurisdiction."[23] Only a few states allowed full public disclosure upon the filing of an initial complaint.[24] States allowing disclosure were generally "those

---

[20] Andrews, *supra*, at 1451-52.

[21] *Id.* at 1452.

[22] *See, e.g.*, George Martin, *Causes and Conflicts: The Centennial History of the Association of the Bar of the City of New York 1870-1970*, at 361-63 (1970); Leslie C. Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1, 14 (2007).

[23] ABA, *Problems and Recommendations in Disciplinary Enforcement* 138 (1970) (hereinafter "Clark Report").

[24] *Id.*

that provide[d] for trial of the charges by one or more judges rather than by referees, trial committees or a disciplinary commission."[25]

In 1970, the ABA's seminal report on the state of attorney discipline recommended centralizing disciplinary authority in state courts while maintaining the confidentiality of disciplinary proceedings.[26] The ABA recommended that disciplinary proceedings remain confidential "until hearings have been held and the charges sustained by the trial authority," unless the proceeding was based on the conviction of a crime or the respondent attorney waived confidentiality.[27] The ABA observed that premature disclosure of disciplinary charges "may itself result in irreparable harm to the attorney," whereby the attorney's "practice may be diminished, if not substantially destroyed, by the resulting lack of confidence of old and new clients, judges before whom he has to appear and fellow attorneys with whom he must negotiate."[28] Finally, to discour-

---

[25] *Id.*

[26] *Id.* at xiv-xvi, 138.

[27] *Id.* at 138.

[28] *Id.* at 139.

age the wholesale dismissal of complaints involving minor misconduct, the report recommended confidential admonitions.[29]

Although the ABA later recommended making disciplinary charges public after a finding of probable cause,[30] as of 1982, "only nine states provided public access to lawyer disciplinary hearings."[31] Over time, States continued to adjust their respective policies. Today, at least four States maintain the confidentiality of attorney disciplinary matters until formal charges are sustained,[32] while most remaining States maintain confidentiality of attorney disciplinary matters only until a finding of probable cause.[33] This Court's rules make all attorney disciplinary

---

[29] *Id.* at 93-96.

[30] ABA, *Lawyer Regulation for a New Century: Report of the Commission on Evaluation of Disciplinary Enforcement* (Sept. 18, 2018) (Recommendation 7). (For sources available online, full URLs appear in the Table of Authorities. All websites were last visited December 4, 2024.)

[31] Devlin, *supra*, at 928.

[32] *See* N.Y. Jud. Law § 90(10); Ala. R. Disciplinary P. R. 30; Del. Lawyers R. Disciplinary P. 13; Iowa Code Ann. § 34.4.

[33] Levin, *supra*, at 21; Michael S. McGinniss, *Sending the Message: Using Technology to Support Judicial Reporting of Lawyer Misconduct to State Disciplinary Agencies*, 2013 J. Pro. Law. 37, 81 (2013). A few States provide public access to certain records before a finding of probable cause. *See* Fla. State Bar R. 3-7.1; N.H. Sup. Ct. R. 37(20); Ore. State Bar R. of P. 1.7(b); W.V. R. Lawyer Disciplinary P. 2.6.

proceedings and records presumptively confidential, as do the rules of the district courts in this circuit. *See* 2d Cir. R. 46.2(b)(6) ("All matters referred to, all proceedings conducted by, and all records possessed by the Committee remain confidential, unless the Grievance Panel orders otherwise, or the Committee acts under (b)(2)(B) or (b)(7).").[34]

## B. History of Attorney Discipline in New York State

Attorney discipline in New York followed the trajectory that played out across the nation. The earliest disciplinary proceedings were conducted in public and resembled civil litigation, but that model was

---

[34] *See also* S.D.N.Y. & E.D.N.Y. R. 1.5(d)(3) ("Complaints, and any files based on them, shall be treated as confidential unless ordered otherwise by the chief judge for good cause shown or in accordance with paragraph (d)(5) below."); N.D.N.Y. R. 83.3(b) ("Complaints or grievances, and any related documents, shall be treated as confidential. Discipline shall be imposed only upon order of the Court, and the Court, in its discretion, shall determine whether the order will be made available to the public, or published, or circulated."); W.D.N.Y. Local R. Civ. P. 83.3(b)(1) (same); D. Conn. R. 83.2(c)(4) ("Grievance cases shall be considered sealed and shall not be a record open to the public unless and until public discipline is ordered."); D. Vt. Att'y Disciplinary R. 7(c) (except to inform local bar authority of misconduct, "all proceedings of the Committee involving disciplinary action towards an attorney shall remain confidential unless or until the Court orders otherwise").

abandoned in favor of organized disciplinary investigations and proceedings that were largely confidential.

Prior to 1895, the General Term of the Supreme Court of New York had the authority to discipline attorneys. (J.A. 965.) *E.g.*, *Matter of Percy*, 36 N.Y. 651, 651 (1867). New York courts adjudicated these matters as equity suits or contempt proceedings, which were often initiated by a private complainant. *See, e.g.*, *Matter of Kelly*, 59 N.Y. 595, 596 (1875); *Saxton v. Stowell*, 11 Paige Ch. 526, 526-27 (N.Y. Ch. 1845). (J.A. 958.) In addition to the possibility of court-imposed disbarment, attorneys guilty of certain offenses were liable in damages to any party they injured and could be found guilty of a misdemeanor. N.Y. Civ. P. Code §§ 67-81 (1876). These adversarial proceedings were "of a public nature and *quasi* criminal." *Matter of Kelly*, 59 N.Y. at 596. As of 1870, New York had no formal code of ethics governing attorney conduct and largely relied on traditions of "legal etiquette."[35]

In 1895, shortly after New York established the Appellate Division of the Supreme Court, the Legislature assigned to the four departments

---

[35] Martin, *supra*, at 59.

13

of the Appellate Division exclusive control over attorney discipline. Ch. 946, 1895 N.Y. Laws 796, 800-01. (J.A. 965.) By the early twentieth century, New York courts had power to authorize confidential investigations into suspected attorney misconduct. *See People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 478-79 (1928); *Anonymous Nos. 6 & 7 v. Baker*, 360 U.S. 287, 294 (1959). And in place of adversarial proceedings initiated by private complainants, the Legislature authorized the Appellate Division to appoint local bar associations and district attorneys to prosecute attorney disciplinary matters. *See* Ch. 295, 1921 N.Y. Laws 1017, 1017-18 (reproduced at J.A. 936-937); *Matter of Tuck*, 180 A.D. 924, 924 (1st Dep't 1917). (*See also* J.A. 975.)

In 1909, the New York State Bar Association adopted the ABA's canons of professional ethics.[36] With these developments, the number of disciplinary complaints skyrocketed. In 1897, the Association of the Bar of the City of New York received thirty-five complaints against lawyers; in 1920, it received 847.[37] From the outset, the association "adopted

---

[36] Martin, *supra*, at 373.

[37] *Id.* at 364.

procedures to keep the proceedings secret" until it took allegations of misconduct to a court.[38]

In 1945, the Legislature consolidated the Appellate Division's statutory authority over attorney discipline at § 90 of the Judiciary Law. Ch. 649, 1945 N.Y. Laws 1371, 1380-83. (*See* J.A. 884-885, 888-893.) The Legislature also mandated that attorney disciplinary proceedings and related documents remain confidential unless and until the charges are sustained. Ch. 675, 1945 N.Y. Laws 1456, 1457 (reproduced at J.A. 918.) The bill jacket contained documents explaining that this confidentiality rule would protect attorneys from unsupported allegations of misconduct, guard against the unwarranted disclosure of sensitive personal information, and encourage cooperation in disciplinary proceedings. (*See* J.A. 634, 643-644.) In the decades that followed, the New York legal community has debated the rule,[39] but the Legislature has chosen to maintain its longstanding policy of confidentiality.

---

[38] Levin, *supra*, at 15.

[39] *See* N.Y. State Comm'n on Statewide Att'y Discipline, *Enhancing Fairness and Consistency, Fostering Efficiency and Transparency* 71 (2015) (describing confidentiality as "most difficult and divisive" issue).

15

### C. New York's Current Procedures for Attorney Disciplinary Matters

Today, the Appellate Division of the Supreme Court of New York remains responsible for the oversight and discipline of New York attorneys, N.Y. Jud. Law § 90(2), and "may appoint any attorney . . . to conduct a preliminary investigation and to prosecute any disciplinary proceedings," *id.* § 90(7). Attorney conduct is primarily measured by the Rules of Professional Conduct (22 N.Y.C.R.R. pt. 1200), which all four departments of the Appellate Division have adopted (J.A. 965). In 2016, the departments jointly adopted the Rules for Attorney Disciplinary Matters (22 N.Y.C.R.R. pt. 1240) ("Statewide Rules"). (J.A. 966.)

Under the Statewide Rules, each department appoints one or more attorney grievance committees. The Second Department has three grievance committees; this case involves only one of them: the Attorney Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts. The purpose of the grievance committees is to protect the public "by enforcing the provisions of the Rules of Professional Conduct," thereby ensuring the integrity and competence of the legal profession. (J.A. 524.) In the Second Department, the Court appoints the committee members and Presiding Justice Hector D. LaSalle appoints the chief attorney and

16

other staff. Rules of App. Div., 2d Dep't (22 N.Y.C.R.R.) § 691.4(b)(1); 22 N.Y.C.R.R. §§ 1240.4-1240.5. (J.A. 860, 969.) The chief attorney and staff attorneys, as counsel to the committee, investigate allegations of attorney misconduct, present findings and make recommendations to the committee, and prosecute disciplinary matters on the committee's behalf. (J.A. 863.)

Attorney disciplinary matters proceed in three distinct steps. First, the chief attorney and staff screen any incoming complaint for jurisdictional and substantive sufficiency. Second, the chief attorney and staff investigate complaints that survive that screening and present the results to the committee, which can (inter alia) dismiss the complaint, impose a private admonition or advisement, or authorize a formal disciplinary proceeding. Third, the committee prosecutes a formal disciplinary proceeding in the Appellate Division where one has been authorized, and ultimately the Appellate Division considers whether to impose public discipline. *See* 22 N.Y.C.R.R. §§ 1240.7-1240.8.

**Initial screening.** At the screening stage, the chief attorney and staff review the complaint to ensure that the committee has jurisdiction (i.e., the complaint concerns allegations of misconduct against a New

17

York attorney) and that venue is proper (i.e., the respondent's principal office is within the committee's geographic boundary). (J.A. 971.) The chief attorney may decline to investigate a complaint that (inter alia) does not allege professional misconduct, contains allegations related to another pending legal action or proceeding, or seeks a legal remedy more appropriately obtained in another forum. 22 N.Y.C.R.R. § 1240.7(d)(1)(i). (J.A. 972.)

The chief attorney also determines if the complainant has standing under Second Department policy (J.A. 912), and is thus entitled to receive updates concerning the status of the proceedings and to seek review of committee dispositions, *see* 22 N.Y.C.R.R. § 1240.7(d)(1)(i), (d)(2)(i)-(ii), (d)(3), (e)(3)-(4). A complainant lacks standing absent some connection to the respondent or personal knowledge of the underlying facts and circumstances. Accordingly, there is no standing where the complainant "is simply relaying to the Committee information that the complainant learned from some other source." (J.A. 912.) In these circumstances, an investigation may not be authorized based on the complaint alone; instead, the chief attorney determines whether there are sufficient grounds to open a sua sponte investigation, which the committee must authorize. (J.A. 361-362, 912.) *See* 22 N.Y.C.R.R. § 1240.7(a)(1).

18

Most complaints the committee receives are from attorneys' clients. The committee also receives complaints from the Lawyers' Fund for Client Protection, judges, opposing counsel, and members of the public. (J.A. 864.)

**Investigation and committee review.** If the committee or chief attorney determines that an investigation is warranted, the respondent must submit a written response. The chief attorney and staff may interview witnesses, obtain documents, and request subpoenas. 22 N.Y.C.R.R. § 1240.7(b). At the conclusion of the investigation, the chief attorney and staff issue a written report to the committee with factual findings, applicable law, and a recommended disposition. (J.A. 973.) The chief attorney and staff discuss the investigation with committee members at regularly scheduled meetings, during which the committee can ask questions or request further investigation. (J.A. 867.)

The committee's investigation then culminates in one of several dispositions. The committee may dismiss the complaint, refer the matter for resolution in an alternate forum, or refer the respondent to a diversion program. 22 N.Y.C.R.R. § 1240.7(d)(2)(i)-(iii). The committee may also issue a letter of advisement where "the respondent has engaged in conduct requiring comment that, under the facts of the case, does not warrant

19

imposition of discipline." *Id.* § 1240.7(d)(2)(iv). Or the committee may issue an admonition if it finds, "by a fair preponderance of the evidence, that the respondent has engaged in professional misconduct, but that public discipline is not required to protect the public, maintain the integrity and honor or the profession, or deter the commission of similar misconduct."[40] *Id.* § 1240.7(d)(2)(v). Finally, the committee may authorize the chief attorney to prosecute a formal disciplinary proceeding where "there is probable cause to believe that the respondent engaged in professional misconduct warranting the imposition of public discipline, and that such discipline is appropriate to protect the public, maintain the integrity and honor of the profession, or deter others from committing similar misconduct." *Id.* § 1240.7(d)(2)(vi).

If the committee votes to dispose of a matter, the chief attorney and staff prepare a closing letter reflecting the committee's disposition. (J.A. 867.) The complainant and respondent are notified of the committee's

---

[40] Letters of advisement and admonitions, while nonpublic, may be considered by the committee or court in any future disciplinary proceedings. 22 N.Y.C.R.R. § 1240.2(b), (i).

decision and, in certain circumstances, may seek review or reconsideration. 22 N.Y.C.R.R. § 1240.7(e).

**Formal proceedings.** A formal disciplinary proceeding commences with the committee's filing of a petition and notice of petition in the Appellate Division. *Id.* § 1240.8(a)(1). After the respondent answers the petition, the parties provide statements setting forth the disputed and undisputed facts and exchange relevant discovery. *Id.* § 1240.8(a)(1)-(3). The court may then refer the matter to a referee for a hearing to resolve any disputed issues. The referee files with the court a "written report setting forth the referee's findings and recommendations." *Id.* § 1240.8(b)(1). "Formal disciplinary charges may be sustained when the referee finds, by a fair preponderance of the evidence, each essential element of the charge." *Id.*

The parties may ask the Appellate Division to "affirm or disaffirm the referee's report." *Id.* The Appellate Division may dismiss the charges, remand to the committee for the imposition of private discipline, or impose public discipline such as censure, suspension, or disbarment. *Id.* § 1240.8(b)(1)-(2); *see* N.Y. Jud. Law § 90(2). (J.A. 956-957.)

21

### D. Confidentiality of Attorney Disciplinary Proceedings and Records

Generally, under New York law, "all papers, records, and documents . . . upon any complaint, inquiry, investigation or proceeding relating to the conduct or discipline of an attorney or attorneys, shall be sealed and be deemed private and confidential." N.Y. Jud. Law § 90(10). And proceedings before the committee or the Appellate Division "shall be closed to the public." 22 N.Y.C.R.R. § 1240.18(c).

However, New York law provides for public access to state attorney disciplinary records and proceedings under certain circumstances. For example, when the Appellate Division sustains formal disciplinary charges and imposes public discipline, the records and documents related to the proceeding "shall be deemed public records." N.Y. Jud. Law § 90(10). An attorney respondent may also elect to waive confidentiality. (J.A. 967.) And members of the public may obtain access to attorney disciplinary investigations, proceedings, and records by applying to the Appellate Division and showing good cause for the requested access. *See* N.Y. Jud. Law § 90(10).

Good-cause applications are directed to the presiding justice of the Appellate Division and must specify: "(1) the nature and scope of the

22

inquiry or investigation for which disclosure is sought; (2) the papers, records or documents sought to be disclosed, or the proceedings that are sought to be opened; and (3) other methods, if any, of obtaining the information sought, and the reasons such methods are unavailable or impractical." 22 N.Y.C.R.R. § 1240.18(d).

From 2013 to 2023, the Second Department received approximately 160 good-cause applications. (J.A. 855.) Most applications sought orders permitting disclosure to law enforcement agencies conducting parallel investigations into potentially criminal conduct by the respondent attorney. Some applications sought disclosure to other federal and state disciplinary authorities. But applications from members of the public unconnected to an investigation were rarely made. (J.A. 855.) As a result, the Second Department has not had much opportunity to rule on good-cause applications from members of the public.

### E. Plaintiffs' Complaints to the Attorney Grievance Committee and This Litigation

In May 2021, six law professors (the individual plaintiffs here) submitted twenty-one Complaints against current and former Queens County prosecutors, which were consolidated before the Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts. The professors had no connection to the prosecutors or personal knowledge regarding the attorneys' alleged conduct. Rather, the professors had found published judicial decisions involving the prosecutors in which courts had reversed criminal convictions for prosecutorial misconduct. (J.A. 66-68, 98, 939-940.)

The chief attorney acknowledged receipt of the Complaints and informed the professors that any resulting investigations would remain confidential under Judiciary Law § 90 "unless they resulted in public discipline imposed by the Appellate Division." (J.A. 98.) Because the Complaints were "based on information derived from public sources," any resulting investigation would need to be initiated by the committee sua sponte. (J.A. 98.) The professors understood this response to mean that they "would not be treated as 'complainants'" under the Statewide Rules and thus would not receive certain updates concerning the committee's

24

investigations that are provided to complainants. (J.A. 940.) Although the professors were thus similarly situated to any other member of the public, they did not file a good-cause application or seek information about the process for doing so. (J.A. 977-978.)

Instead, in November 2021, the professors (together with a nonprofit organization) filed this federal lawsuit against Justice LaSalle, as well as other state and local officials who were later voluntarily dismissed.[41] (J.A. 51-91.) As relevant here, plaintiffs alleged that Judiciary Law § 90(10) violates the First Amendment to the federal Constitution by infringing on a purported public right of access to attorney disciplinary proceedings and records.[42] (J.A. 85-87.) Plaintiffs sought a declaration

---

[41] The complaint also named as defendants the chairperson and chief attorney of the New York Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts; the New York City Corporation Counsel; and the Queens County District Attorney. (J.A. 51.) Plaintiffs voluntarily dismissed their claims against these defendants. (J.A. 247, 992.)

[42] Plaintiffs voluntarily dismissed three other claims asserting constitutional and statutory violations. (J.A. 247.) The district court granted summary judgment to plaintiffs on a further claim that Judiciary Law § 90(10) violates the Free Speech Clause to the extent it prohibits members of the public who submit complaints to the committee from publishing those complaints and certain administrative communications received from the committee. (J.A. 227-236.) Justice LaSalle maintained

(continued on the next page)

that Judiciary Law § 90(10) is unconstitutional as applied to deny plaintiffs access to the records or proceedings related to complaints of prosecutorial misconduct they "have filed or may file," and an injunction prohibiting Justice LaSalle from enforcing the statute. (J.A. 89-90.) In 2022 and 2023, plaintiffs filed approximately thirty additional complaints against current and former New York prosecutors. (J.A. 978.)

The U.S. District Court for the Southern District of New York (Marrero, J.) granted in part plaintiffs' motion for summary judgment, denied Justice LaSalle's cross-motion, and entered a declaratory judgment in plaintiffs' favor. (S.A. 1-118.)

*First*, the district court determined that the case was ripe despite plaintiffs' conceded failure to file a good-cause application. (S.A. 38-45.) The court relied on the chief attorney's determination that plaintiffs lacked standing to participate as complainants and to receive certain updates provided to complainants. But the court did not explain how plaintiffs' standing as complainants was relevant to their claim that they

―――――――――

that the law does not prohibit such publication (Mem. of Law in Opp'n to Pls' Mot. for Partial Summary J. 9-10, 25 (Mar. 31, 2022), ECF No. 78), and this claim is not at issue in this appeal.

26

had been denied a *public* right of access to such information. (*See* S.A. 39.) The district court also concluded that a good-cause application would have been futile merely because the Appellate Division has historically received very few applications from the public and therefore has not had occasion to grant many such applications. (*See* S.A. 41-42.)

*Second*, the district court determined that abstention was unwarranted. (S.A. 52-63.) The court determined that a public right of access to disciplinary proceedings and records would not risk interference in state disciplinary proceedings, even though the court's ruling could give rise to federal oversight over the extent of access granted and the state court's recordkeeping policies. (*See* S.A. 59-63.) The court reasoned that federal courts would not be unduly burdened by future proceedings concerning public access, without weighing the attendant burden on state courts. (*See* S.A. 63.)

*Third*, on the merits, the district court ruled in part for plaintiffs. As to the chief attorney's dispositions, including decisions not to pursue investigations, the court determined that neither history nor logic supported a right of access. (S.A. 109-112.) The court cited the established tradition of conducting investigations "*ex parte* and out of public view."

(S.A. 111.) And it determined that maintaining secrecy of the chief attorney's investigations promoted "investigative flexibility" and "protects respondent attorneys from malicious or otherwise unsubstantiated accusations." (S.A. 111.)

Nevertheless, the district court declared a public right of access to any committee dispositions associated with plaintiffs' 2021 Complaints. (S.A. 94-109.) The court determined that, although a "close question," the committee's work was adjudicatory as opposed to prosecutorial, supporting a right of access. (S.A. 96.) The court reached this conclusion despite acknowledging that bar associations and grievance committees have long maintained the confidentiality of disciplinary matters and have imposed forms of private discipline. (*See* S.A. 103-104.) As a matter of logic, the court found that releasing the committee's dispositions—including those finding no misconduct at all—would allow for greater public scrutiny and rejected the concern that publication would harm attorneys' reputations. (S.A. 106-108.)

Similarly, the district court declared a public right of access to any formal disciplinary hearings and related documents associated with plaintiffs' 2021 Complaints. (S.A. 77-93.) The court acknowledged that

"historical evidence concerning attorney discipline going back to the founding is sparse" (S.A. 80) yet concluded that proceedings to disbar or suspend attorneys have traditionally been public (S.A. 77-82). The court considered it irrelevant that early attorney disciplinary proceedings were prosecuted by private parties as equity suits or contempt proceedings, and that this model largely has been abandoned. (*See* S.A. 78, 82-83). In addition, the court determined that public access to formal disciplinary proceedings would promote confidence in the justice system, notwith-standing that confidentiality measures protect respondents from unfounded accusations, encourage witness cooperation, prevent the disclosure of privileged and sensitive personal information, and increase administrative flexibility. (*See* S.A. 84-92.)

In addition to establishing a qualified right of access to committee dispositions and formal disciplinary proceedings and related records, the district court declared that plaintiffs' access to the proceedings and records related to their 2021 Complaints "may not be restricted absent specific, on-the-record findings." (S.A. 118.) The district court's declaratory judgment did not address the additional complaints against prosecutors that plaintiffs filed while this action was pending. (S.A. 117-118.)

29

## STANDARD OF REVIEW

This Court reviews de novo the district court's determinations on ripeness, *Lacewell v. Office of Comptroller of Currency*, 999 F.3d 130, 140 (2d Cir. 2021), and abstention, *Disability Rts. N.Y. v. New York*, 916 F.3d 129, 133 (2d Cir. 2019). This Court also reviews de novo the district court's grant of summary judgment to plaintiffs. *Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 170 (2d Cir. 2024).

## SUMMARY OF ARGUMENT

I. Plaintiffs' First Amendment claim does not meet the requirements for constitutional or prudential ripeness. Judiciary Law § 90(10) and its implementing regulations allow members of the public to apply for access to confidential disciplinary proceedings and records by demonstrating good cause. It is undisputed that plaintiffs never submitted a good-cause application. Absent a ruling denying plaintiffs public access to the information they seek, there is no concrete First Amendment dispute ripe for adjudication. In concluding otherwise, the district court conflated constitutional ripeness with the doctrine of administrative exhaustion; incorrectly exempted plaintiffs from the good-cause-application process based on the chief attorney's unrelated finding that plaintiffs lacked

30

standing to receive updates as complainants; and mistakenly credited plaintiffs' conclusory allegations of futility.

II. Alternatively, abstention is required under *O'Shea v. Littleton*, 414 U.S. 488 (1974), which prohibits undue federal interference in state-court procedures. *See Disability Rts.*, 916 F.3d at 136. The district court declared a presumptive right of public access to all committee dispositions, Second Department proceedings, and Second Department records. Although the court purported to limit its ruling to plaintiffs' 2021 Complaints, the order's effect is likely to extend much further considering that plaintiffs have already filed thirty additional complaints. Recognizing a presumptive right of public access to committee dispositions effectively precludes the State from issuing private admonitions or advisements under state law absent satisfaction of additional criteria imposed by the district court's order. And the district court's mandate that officials make on-the-record findings to overcome this presumption will improperly inject federal courts into supervising the state disciplinary process. Accordingly, principles of federalism and comity require abstention, particularly when plaintiffs have a state-court forum for their constitutional claim.

III. Neither experience nor logic supports the First Amendment right of access that plaintiffs assert. *See In re Application of the N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 409 (2d Cir. 2009).

A. There is no public right of access to committee dispositions. The committee process has been confidential since its inception, consistent with the longstanding tradition of conducting preliminary investigations in private. Today, most States maintain the confidentiality of disciplinary matters at least until there has been a finding of probable cause, and most States utilize private discipline. Contrary to the district court's determination, the relevant question is not whether committee dispositions are appropriately labeled as adjudicatory but whether the type of work performed by the committee, i.e., deciding whether to authorize the prosecution of a formal disciplinary proceeding, has historically been public. It has not. In any event, the committee's work is primarily investigatory and prosecutorial.

As a policy matter, opening committee dispositions to the public would undercut New York's ability to privately advise or admonish attor-

neys, subject respondents to unwarranted reputational harm, and intrude on the investigative process.

B. There is also no right of access to the Second Department's formal disciplinary proceedings and related records. There is sparse historical evidence on the openness of such proceedings, and attorneys were rarely subjected to discipline before the twentieth century. Once attorney disciplinary proceedings proliferated in the mid-twentieth century, nearly all States held those proceedings in private. Over time, many States chose to make the proceedings public at an earlier stage. Others did not in order to safeguard confidential information, protect against irreparable harm to attorneys' reputations, and allow for greater administrative flexibility. The Constitution allows for this variation in policy and does not demand public access.

# ARGUMENT

## POINT I

### PLAINTIFFS' FIRST AMENDMENT CLAIM IS UNRIPE BECAUSE THEY NEVER APPLIED TO ACCESS CONFIDENTIAL PROCEEDINGS AND RECORDS

"Ripeness is a constitutional prerequisite to exercise of jurisdiction by federal courts." *Mendez v. Banks*, 65 F.4th 56, 60 (2d Cir. 2023) (quotation marks omitted), *cert. denied*, 144 S. Ct. 559 (2024). "For a cause of action to be ripe, and therefore justiciable, it must present a real, substantial controversy, not a mere hypothetical question." *Id.* (quotation marks omitted). In this regard, constitutional ripeness overlaps with Article III standing, "most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical." *Lacewell v. Office of Comptroller of Currency*, 999 F.3d 130, 149 (2d Cir. 2021) (quotation marks omitted). "A claim is not ripe if it depends upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Mendez*, 65 F.4th at 60 (quotation marks omitted).

In addition to constitutional ripeness, courts also consider whether there are "prudential reasons for refusing to exercise jurisdiction." *National Park Hosp. Ass'n v. Department of Interior*, 538 U.S. 803, 808

34

(2003) (quotation marks omitted). This doctrine of prudential ripeness asks "(1) whether an issue is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld." *Simmonds v. INS*, 326 F.3d 351, 359 (2d Cir. 2003).

Here, plaintiffs' claims are unripe for judicial review—both as a constitutional and prudential matter—because no government entity has denied them public access to the information they seek. Judiciary Law § 90(10) and its implementing regulations provide for applications by members of the public "to unseal confidential documents or records, or for access to proceedings that are closed," 22 N.Y.C.R.R. § 1240.18(d), based on good cause. Yet plaintiffs never submitted a good-cause application to access the attorney disciplinary files or proceedings at issue here. (J.A. 861, 978.) Absent a ruling on whether Judiciary Law § 90(10) bars plaintiffs' access to the information they seek as members of the public, there is no definite and concrete dispute as required to demonstrate the ripeness of plaintiffs' as-applied claims. *See Marchi v. Board of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478 (2d Cir. 1999); *Coffran v. Board of Trs. of N.Y.C. Pension Fund*, 46 F.3d 3, 4 (2d Cir. 1995) (per curiam).

Courts have dismissed claims on ripeness grounds under similar circumstances. For example, the Sixth Circuit rejected as unripe a news organization's claim that a state law unconstitutionally denied the media access to certain juvenile proceedings. *Kentucky Press Ass'n v. Kentucky*, 454 F.3d 505, 509 (6th Cir. 2006). The law permitted access only to persons with "a direct interest in the case or in the work of the court" or "for good cause." *Id.* (quotation marks omitted). Because the plaintiff never petitioned for access under this provision, it remained unresolved "whether Kentucky law, as interpreted by the Kentucky courts, completely closes juvenile proceedings and records to the media." *Id.* at 510. Here, plaintiffs similarly cannot show that Judiciary Law § 90(10) denied them access to the materials they seek where they have not even tried to utilize available options for doing so.

In reaching the opposite conclusion, the district court made three critical errors. *First*, the district court conflated Article III's requirement to demonstrate ripeness with the doctrine of administrative exhaustion. The court concluded that requiring plaintiffs to file a good-cause application would impose an improper exhaustion requirement on plaintiffs' § 1983 claim. (S.A. 40-41.) But the problem here is not that plaintiffs

36

failed to exhaust state remedies to redress a completed constitutional violation. Rather, the problem is that plaintiffs have not sustained any First Amendment injury because they have not been denied access to attorney disciplinary records under the statute. Accordingly, the district court misplaced its reliance (S.A. 40-41) on *Knick v. Township of Scott*, which expressly distinguished between demonstrating a completed constitutional violation (which is required to demonstrate ripeness) and exhausting state procedures to remedy such a violation (which is not).[43] *See* 588 U.S. 180, 187-88 (2019); *see also Williamson County Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 192-93 (1985), *overruled on other grounds by Knick*, 588 U.S. 180.

*Second*, the district court incorrectly held that the case was ripe because the chief attorney had informed plaintiffs that any investigations into their allegations, which derived solely from publicly available sources, would be initiated by the committee sua sponte and remain confidential unless the Appellate Division imposed public discipline. (*See* S.A. 39; *see*

---

[43] The other cases on which the district court relied (S.A. 40-41) are similarly inapposite. *See, e.g.*, *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 498, 516 (1982) (plaintiff not required to raise discrimination claim before state agency as prerequisite to federal action).

*also* J.A. 98.) The fact that plaintiffs lacked standing to receive status updates as *complainants* does not mean that they were denied access as *members of the public* when they never attempted to use the good-cause application process available to the public. Put another way, whether plaintiffs should have obtained access as a party to the disciplinary proceeding is irrelevant to their First Amendment claim based on a purported right of public access.

For similar reasons, the district court was wrong to rely on a letter the professors sent to the committee nearly a year after filing this action. (*See* S.A. 39.) In that letter, the professors did not assert a public right of access but rather requested an update on the status of their Complaints based on their purported complainant status, notwithstanding the chief attorney's determination months earlier that they lacked standing to receive additional information. (*See* J.A. 987.)

*Third*, the district court mistakenly credited plaintiffs' conclusory assertion that submitting a good-cause application would have been futile. (*See* S.A. 41-42.) Speculation that a good-cause application would have been denied because few applications have been granted in the past is inadequate to demonstrate futility. *See, e.g.*, *74 Pinehurst LLC v. New*

*York*, 59 F.4th 557, 565 (2d Cir. 2023), *cert. denied*, No. 22-1130, 2024 WL 674658 (Feb. 20, 2024). In any event, relatively few good-cause applications have been granted because so few applications have been filed at all. Over the past ten years, the Second Department has received an average of just sixteen good-cause applications per year and has rarely received applications from members of the public without a connection to the investigation. (J.A. 855.)

Prudential ripeness concerns further warrant dismissal to allow plaintiffs to submit a good-cause application and to allow the Second Department to rule on the confidentiality of its own records in the first instance. If plaintiffs' application is granted, their claims here will become moot. *See Simmonds*, 326 F.3d at 360. If the application is denied, plaintiffs can present their constitutional concerns to the New York courts, allowing this Court to avoid deciding a novel constitutional issue of first impression. *See New York C.L. Union v. Grandeau*, 528 F.3d 122, 131 (2d Cir. 2008); *American Sav. Bank, FSB v. UBS Fin. Servs. Inc.*, 347 F.3d 436, 440 (2d Cir. 2003). The mere possibility that plaintiffs' application could be denied does not create "a direct and immediate dilemma" or

other hardship justifying this Court's intervention. *See Simmonds*, 326 F.3d at 360 (quotation marks omitted).

## POINT II

### ABSTENTION IS REQUIRED TO PREVENT FEDERAL INTERFERENCE WITH STATE DISCIPLINARY PROCEEDINGS

Alternatively, dismissal is required on abstention grounds. Although federal courts are generally obliged to decide cases within the scope of their federal jurisdiction, the Supreme Court has recognized "certain instances in which the prospect of undue interference with state proceedings counsels against federal relief." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013).

### A. Federal Courts Must Refrain from Interfering with State Attorney Disciplinary Processes.

Under the Supreme Court's decision in *O'Shea* and its progeny, federal courts have "'no power to intervene in the internal procedures of the state courts' and cannot 'legislate and engraft new procedures upon existing state . . . practices.'" *Disability Rts.*, 916 F.3d at 136 (quoting *Kaufman v. Kaye*, 466 F.3d 83, 86 (2d Cir. 2006)); *see O'Shea*, 414 U.S. at 500; *Wallace v. Kern*, 520 F.2d 400, 404-05 (2d Cir. 1975).

40

Abstention under *O'Shea* is rooted in principles of federalism and comity and derives from the Supreme Court's decision in *Younger v. Harris*, 401 U.S. 37 (1971), which provides that federal courts cannot intrude into state criminal or civil enforcement proceedings, or into "civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 78 (quotation marks omitted). These federalism principles apply fully to state attorney disciplinary proceedings, which implicate a State's "extremely important interest in maintaining and assuring the professional conduct of the attorneys it licenses." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 434 (1982); *see also Anonymous J. v. Bar Ass'n of Erie Cnty.*, 515 F.2d 435, 437 (2d Cir. 1975) (per curiam).

However, unlike abstention under *Younger*, abstention under *O'Shea* applies in the absence of a pending state proceeding.[44] "In *O'Shea*, the plaintiffs sought to enjoin state court judges from carrying out allegedly unconstitutional policies and practices relating to bond setting,

---

[44] To the extent there exist pending state proceedings related to plaintiffs' Complaints, abstention would be appropriate under *Younger*. The existence or status of any such proceedings, however, is confidential under Judiciary Law § 90(10).

41

sentencing, and jury fees in criminal cases." *Disability Rts.*, 916 F.3d at 134. The Supreme Court concluded that abstention was warranted because "an injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials," represents "nothing less than an ongoing federal audit of state criminal proceedings which would indirectly accomplish the kind of interference that *Younger v. Harris* and related cases sought to prevent." *O'Shea*, 414 U.S. at 500 (citation omitted).

This Court has repeatedly applied *O'Shea* in civil contexts involving the operations of state courts. *See Disability Rts.*, 916 F.3d at 134. For example, this Court has abstained under *O'Shea* in cases raising federal statutory and constitutional challenges to state-court judicial-assignment procedures, *Kaufman*, 466 F.3d at 86, and the manner in which state guardianship proceedings are conducted, *Disability Rts.*, 916 F.3d at 130-31. In these cases, the availability of other avenues of relief, including a state-court forum for challenging the state law, weighed heavily in favor of abstention. *Disability Rts.*, 916 F.3d at 137; *Kaufman*, 466 F.3d at 87; *see also O'Shea*, 414 U.S. at 502.

**B.     Abstention Is Required Under *O'Shea* and Its Progeny.**

In this case, abstention is required under *O'Shea* and *Disability Rights* to protect against undue federal interference in state disciplinary proceedings. Plaintiffs sought and obtained a sweeping declaratory judgment establishing a presumptive right of access to all committee dispositions, Second Department proceedings, and Second Department records related to the Complaints they filed in 2021. (S.A. 117-118.) The court also directed that "Plaintiffs' access to the proceedings and records . . . may not be restricted absent specific, on-the-record findings by either the Committee or the Second Department" sufficient to overcome that presumption. (S.A. 118.)

Although the district court purported to limit the declaration to plaintiffs' 2021 Complaints, its effect is already likely to extend much further. For example, plaintiffs filed nearly thirty additional complaints against current and former New York prosecutors in 2022 and 2023. (J.A. 978.) And their complaint in this case demands access to the disciplinary records and files related to "any similar complaints that they may file." (J.A. 87.) The district court did not address these additional complaints, and it reasoned that future cases challenging the confiden-

43

tiality of disciplinary proceedings may arise under different facts. But the court's decision did not purport to turn on any case-specific factors besides the Complaints' allegations of prosecutorial misconduct. (*See* S.A. 59.) Thus, at minimum, the district court's reasoning extends to all attorney disciplinary proceedings and records involving prosecutors, including the dozens of additional complaints plaintiffs have already filed. And if this Court were to affirm the district court's order, stare decisis would have the practical consequence of establishing a presumptive public right of access to all such proceedings and records. *See, e.g.*, Gillian E. Metzger, *Facial Challenges and Federalism*, 105 Colum. L. Rev. 873, 881 (2005) ("[S]tare decisis means successful as-applied challenges often generate results that are not specific to a particular challenger.")

As a result, the effect of the district court's order will be to improperly "legislate and engraft new procedures" upon New York's existing state attorney disciplinary process in at least three ways. *See Disability Rts.*, 916 F.3d at 136 (quotation marks omitted); *see also Oglala Sioux Tribe v. Fleming*, 904 F.3d 603, 611-12 (8th Cir. 2018).

### 1. The district court's order affects the substance of state disciplinary decisions.

The district court's order will alter the substantive criteria used to determine the appropriate remedy in attorney disciplinary matters. New York law gives attorney grievance committees and the Appellate Division discretion to assess whether private or public discipline is warranted based on the facts of the case.[45] *See* 22 N.Y.C.R.R. §§ 1240.7(d)(2)(iv)-(v), 1240.8(b)(2). But under the district court's order, state decisionmakers can no longer render private dispositions—such as referrals to diversion programs, admonitions, and letters of advisement—without also making "on-the-record findings" that the criteria for overcoming the First Amendment right of access are satisfied. (S.A. 118.) Indeed, absent such findings, all of these dispositions are presumptively public. (*See* S.A. 117-118.)

For example, to issue a letter of advisement, it is no longer enough for the committee to determine "that the respondent has engaged in conduct requiring comment that, under the facts of the case, does not warrant

---

[45] The vast majority of States authorize private discipline or warnings. *See* Levin, *supra*, at 20; *see also, e.g.*, ABA, *2021 Survey on Lawyer Discipline Systems* 20-23 (Nov. 2023); ABA, *2018 Survey on Lawyer Discipline Systems* 17-20 (July 2020).

imposition of discipline."[46] *See* 22 N.Y.C.R.R. § 1240.7(2)(iv). The federal court has now ordered that the committee must also find that maintaining privacy would "serve higher values that would be prejudiced by disclosure"; the "restrictions on disclosure are no more extensive than necessary"; and "alternatives to restriction have been considered and would not reasonably protect those higher values." (S.A. 118.)

Conditioning the confidentiality of disciplinary records on these new requirements thus interferes with a substantive component of the disciplinary process: the severity of the discipline to be imposed. The district court's view that plaintiffs have not sought to "discipline any attorney more harshly" (S.A. 55) ignores the personal and professional consequences that attend the publication of dispositions, including outright dismissals of meritless accusations, that would otherwise remain private. Injecting a presumption in favor of publication will profoundly undermine the availability of a private admonition or advisement as an

---

[46] According to the Chair of the Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts, a letter of advisement is appropriate "when, for example, conduct represents a first-time offense, unintentional mistake, and delayed but not withheld services." (J.A. 846.)

ultimate outcome in future disciplinary proceedings and undermine exist-ing decisions to impose these dispositions in proceedings that have already concluded. The concerns animating *O'Shea* are at their highest where, as here, plaintiffs seek an order "aimed at controlling or preventing the occurrence of specific events that might take place" in state proceedings. 414 U.S. at 500.

### 2.    The district court's order encourages continued federal-court intervention.

Each of the on-the-record findings mandated by the district court would be subject to second-guessing by federal courts. As the district court acknowledged, future disputes could arise over the extent of access ulti-mately granted to the plaintiffs here (S.A. 63), and the same disputes are exceedingly likely to arise when others demand the same right of access that the district court ordered. This is precisely the sort of federal intru-sion into state-court proceedings that *O'Shea* guards against. The commit-tee and Second Department will be subject to "case-by-case oversight" by the federal courts whenever plaintiffs (or others) contend that the committee or Second Department did not properly conclude that the

purported presumptive right of access has been overcome. *See Disability Rts.*, 916 F.3d at 135-36.

The district court brushed aside this intrusion into state proceedings because the resulting burden on *federal* courts "would be no more onerous" than typical civil litigation. (S.A. 63.) But abstention principles protect against the "interruption of *state* proceedings"—not the attendant burdens on federal courts that arise from their interference. *See O'Shea*, 414 U.S. at 500 (emphasis added). Repeated federal-court supervision of state determinations about whether to issue confidential dispositions in a particular case would be highly burdensome on state courts and their agencies.

The district court was mistaken to suggest (S.A. 58) that its imposition of declaratory rather than injunctive relief mitigated any potential federal interference in state proceedings. As this Court has observed, "'ordinarily a declaratory judgment will result in precisely the same interference with and disruption of state proceedings that the long-standing policy limiting injunctions was designed to avoid.'" *Disability Rts.*, 916 F.3d at 137 (quoting *Samuels v. Mackell*, 401 U.S. 66, 72 (1971)). That is so because, among other reasons, "any remedy fashioned by the

48

state" to comply with the declaratory judgment "would then be subject to future challenges in the district court." *Kaufman*, 466 F.3d at 87.

### 3. The district court's order undermines state courts' ability to manage their own records.

The district court's order will require the committee and Second Department to revamp its recordkeeping practices and to change how formal disciplinary proceedings are conducted to facilitate public access. For example, committee dispositions and records are not docketed or maintained by the Second Department clerk's office. (J.A. 853.) And formal disciplinary proceedings before referees are not publicly calendared or held in open court. The district court's order thus impinges on state courts' "significant interest in running their own clerks' offices and setting their own filing procedures."[47] *Courthouse News Serv. v. Brown*, 908 F.3d 1063,

---

[47] The repeated and substantive interference in the attorney disciplinary process caused by the district court's order distinguishes this case from *Courthouse News Service v. Planet*, which involved a news service's assertion of a right of immediate public access to newly filed civil complaints. *See* 750 F.3d 776, 791 (9th Cir. 2014). (*See* S.A. 61-63.) For the same reason, the current case is unlike *Courthouse News Service v. Gabel*, No. 21-3098 (2d Cir.), which is pending before this Court and which also involves an alleged right of immediate public access to newly filed civil complaints. In any event, the Seventh Circuit abstained in a case arising under facts identical to *Planet*. *See Brown*, 908 F.3d at 1071.

1071 (7th Cir. 2018); *see Miles v. Wesley*, 801 F.3d 1060, 1065 (9th Cir. 2015) (abstention avoids federal courts dictating "where, when, and how different types of cases should be heard").

### 4. Plaintiffs have alternative avenues of relief.

Finally, "abstention here is supported by the 'availability of other avenues of relief.'" *Disability Rts.*, 916 F.3d at 137 (quoting *O'Shea*, 414 U.S. at 504). Principles of comity and federalism require federal courts to consider the availability of an adequate state forum in deciding whether to abstain, and federal courts cannot presume that "state courts will not safeguard federal constitutional rights." *Middlesex*, 457 U.S. at 431. Plaintiffs here may assert their federal constitutional claim in state court and, if necessary, seek review by the U.S. Supreme Court. *See Disability Rts.*, 916 F.3d at 137; *Spargo v. New York State Comm'n on Jud. Conduct*, 351 F.3d 65, 77 (2d Cir. 2003). The district court contravened these principles when it concluded that a state-court forum was unavailable based on the mere possibility that a state court would reach a different conclusion on the merits of plaintiffs' First Amendment claim. (*See* S.A. 62 n.17.)

## POINT III

### THERE IS NO FIRST AMENDMENT RIGHT OF ACCESS TO ATTORNEY DISCIPLINARY PROCEEDINGS AND RECORDS

As a general rule, there is no "First Amendment guarantee of a right of access to all sources of information within government control." *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978). The Supreme Court has determined, however, that there is a qualified right of access to certain criminal court proceedings, including criminal trials. *Globe Newspaper Co. v. Superior Ct. for Cnty. of Norfolk*, 457 U.S. 596, 603-06 (1982) (trials); *Press-Enterprise Co. v. Superior Ct. of Cal.*, 464 U.S. 501, 505-13 (1984) (voir dire); *Press-Enterprise Co. v. Superior Ct. of Cal.*, 478 U.S. 1, 13 (1986) (*Press-Enterprise II*) (preliminary hearings). This Court has extended a qualified right of access to civil trials and related proceedings and records, and to certain administrative proceedings. *New York C.L. Union v. New York City Transit Auth.*, 684 F.3d 286, 298, 300-01 (2d Cir. 2012) (*NYCLU*); *see Newsday LLC v. County of Nassau*, 730 F.3d 156, 163-64 (2d Cir. 2013). By contrast, there is no right of access to grand jury matters, prosecutors' investigatory materials, cooperation agreements,

or pretrial discovery, for example. *See, e.g.*, *Press-Enterprise II*, 478 U.S. at 9-10 (discussing grand-jury proceedings).[48]

To determine whether a qualified right of access attaches, the Court considers two factors: (1) "whether the place and process have historically been open to the . . . public," and (2) "whether public access plays a significant positive role in the functioning of the particular process in question." *NYCLU*, 684 F.3d at 297 (quotation marks omitted). Together, these considerations are commonly referred to as the "experience and logic test."[49] *See id.*

On the question of experience, courts consider whether the place and process were open at the time of the Founding and whether "the presumption of openness has remained secure" since that time. *Globe Newspaper*

---

[48] *See also United States v. Kincaide*, 119 F.4th 1074, 1078 (6th Cir. 2024) (cooperation agreements); *North Jersey Media Grp., Inc. v. United States*, 836 F.3d 421, 434 (3d Cir. 2016) (pretrial discovery); *In re Search of Fair Fin.*, 692 F.3d 424, 431 (6th Cir. 2012) (search warrant applications); *N.Y. Times Co.*, 577 F.3d at 410 & n.4 (wiretap applications); *Center for Nat'l Sec. Stud. v. United States Dep't of Just.*, 331 F.3d 918, 934, 936 (D.C. Cir. 2003) (investigatory documents).

[49] A qualified right of access also applies to "written documents submitted in connection with judicial proceedings that themselves implicate the right of access." *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 93 (2d Cir. 2004) (quotation marks omitted).

*Co.*, 457 U.S. at 605. A qualified right of access attaches, for example, where there exists an "unbroken, uncontradicted history" of openness. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 573 (1980) (plurality op.). In making this assessment, the Court "does not look to the particular practice of any one jurisdiction, but instead to the experience in that *type* or *kind* of hearing throughout the United States." *El Vocero de P.R. (Caribbean Int'l News Corp.) v. Puerto Rico*, 508 U.S. 147, 150 (1993) (quotation marks omitted).

On the question of logic, courts consider "whether openness enhances the ability of the government proceeding to work properly and to fulfill its function." *NYCLU*, 684 F.3d at 302. "This inquiry requires an understanding of what the function of a particular process is and an evaluation of the role of openness in it." *Id.*

## A.    Committee Dispositions

The district court erred in concluding that there is a qualified right of access to attorney grievance committee dispositions, including dismissals, referrals to diversion programs, letters of advisement, and admonitions. There is no established tradition of publishing these materials. Rather, there is an established tradition of maintaining the

53

confidentiality of these dispositions, which the committee may impose without finding probable cause that misconduct has occurred warranting public discipline. Contrary to the district court's finding, committee dispositions are not adjudicatory in nature but rather represent the culmination of the investigatory process and involve substantial prosecutorial discretion. Moreover, opening committee dispositions to the public would have harmful, rather than positive, effects on the disciplinary process by severely undercutting the State's ability to impose private discipline, subjecting respondent attorneys to unwarranted reputational harm, and intruding on the investigative process.

### 1. History and experience provide no support for public access to committee dispositions.

There is no historical tradition of publishing all decisions of state authorities responsible for investigating alleged attorney misconduct. Rather, these investigatory authorities have long been authorized to maintain the confidentiality of their dispositions.

As explained (*supra* at 8-9), formalized investigations of attorney misconduct were not commonplace until States adopted detailed professional standards in the early twentieth century and state bar associations

began to proliferate.[50] States, including New York, initially tasked bar associations with investigating allegations of attorney misconduct, and these inquiries were private. New York was not unique in this regard; most States kept investigations confidential until a trial had been held and the formal disciplinary charges were sustained. See *supra* at 9, 14-15.

From the time when bar associations were first endowed with formal investigatory powers (such as subpoena power), they were also authorized to resolve inquiries by imposing private discipline. (S.A. 104.) Consistent with the ABA's approval of private discipline, this tradition of confidentiality continued as many States centralized investigatory authority within their court systems, and the tradition continues today. See *supra* at 10-12. "All but a few jurisdictions impose private discipline, and in many jurisdictions, it is the type of discipline most often imposed."[51] "[T]he sanction and the proceedings themselves are maintained as

_____

[50] As the district court noted, New York established the first known committee to address complaints against attorneys in 1727, but the scope of the committee's work is unclear, and it is unknown whether the committee held proceedings in public or published dispositions. (*See* S.A. 103-104 n.22.)

[51] Levin, *supra*, at 20.

confidential and typically cannot be accessed by the public."[52] Indeed, "in most jurisdictions, the discipline process is confidential from the time that an individual complainant contacts the discipline agency until and unless probable cause is found," meaning that dismissals, referrals to diversion programs, and other lesser forms of discipline remain confidential.[53] The district court's order creating a public right of access to committee dispositions contravenes this experience and would make New York a national outlier.

The district court accepted much of the foregoing evidence (*see* S.A. 103-104) and should have stopped there and concluded that there is no history of openness when it comes to committee dispositions. Instead, the district court reasoned that the committee's work was more adjudicatory than investigatory (S.A. 96) and on that basis analogized committee dispositions to the determinations made by courts after formal disciplinary proceedings, such as decisions to disbar or suspend an attorney (S.A. 102-103). The district court determined that a purported history of openness in such formal proceedings was sufficient to support a right of

---

[52] *See id.*

[53] *See id.* at 21.

56

access to committee dispositions—even though committee dispositions are issued prior to the commencement of formal disciplinary proceedings. (*See* S.A. 102-103.) This approach was fundamentally flawed in several ways.

At the outset, the district court conflated two distinct phases of the disciplinary process. Formal disciplinary proceedings occur only after the grievance committee determines there is probable cause to believe that the respondent attorney committed misconduct warranting public discipline. The history of these formal proceedings has little to no bearing on the antecedent committee review process. And because the preliminary work of attorney grievance committees has been private since their inception, plaintiffs failed to establish a history of openness for committee dispositions and there is no First Amendment right of access. *See N.Y. Times Co.*, 577 F.3d at 410 (no qualified right of access to wiretap applications, which "have been subject to a statutory presumption *against* disclosure" since their inception).

In concluding that the committee's dispositions are adjudicatory in nature, the district court fundamentally misunderstood the role of attorney grievance committees. The purpose of the committees is to investigate

and prosecute violations of the Rules of Professional Conduct. (J.A. 524, 863.) And the chief attorney and the committee work together to discharge the committee's enforcement mission. The committee works through the chief attorney and staff to review and investigate complaints of attorney misconduct, and the committee itself has the power to commence investigations sua sponte in the absence of a complaint. 22 N.Y.C.R.R. § 1240.7. After the chief attorney has prepared an investigatory report for the committee's consideration, the committee members discuss those findings with the chief attorney and staff and may request further investigation. It is then the chief attorney and staff that prepare a letter memorializing the disposition and the committee's reasoning. And any formal disciplinary proceeding is brought in the committee's name. See *supra* at 17, 19-21. Throughout this process, the committee is by no means "a neutral party," as the district court found (S.A. 99), but rather works with the chief attorney and staff to advance important investigatory and enforcement priorities.

Relying on the committee's investigatory and prosecutorial functions, the district court correctly declined to declare a right of access to the chief attorney's dispositions, such as dispositions declining to investigate com-

plaints or transferring complaints to another forum. The court correctly observed that "investigative inquiries have a long history of being conducted *ex parte* and out of public view" (S.A. 111). *See, e.g.*, *Karlin*, 248 N.Y. at 477-79; *Anonymous Nos. 6 & 7*, 360 U.S. at 294. In this respect, the district court recognized the relevance of the well-established history of maintaining the confidentiality of preindictment proceedings and investigatory materials. *See N.Y. Times Co*, 577 F.3d at 410 & n.4; *Center for Nat'l Sec. Stud. v. United States Dep't of Just.*, 331 F.3d 918, 934 (D.C. Cir. 2003); *In re Special Proc.*, 373 F.3d 37, 46-47 (1st Cir. 2004). As the district court found, decisions by the chief attorney not to investigate a complaint "are similar to a letter from a criminal prosecutor declining to prosecute a case, which is private correspondence." (S.A. 110.)

The district court erred, however, in attempting to distinguish the committee's dispositions from those of the chief attorney. It is not the case that the chief attorney's dispositions involve no "substantive decision about what the appropriate action is for a grievance complaint." (*See* S.A. 110.) To the contrary, the applicable regulations provide that the chief attorney may decline to investigate if she concludes, e.g., that "the allegations, if true, would not constitute professional misconduct," or the

respondent is not subject to the committee's jurisdiction. 22 N.Y.C.R.R. § 1240.7(d)(1)(i). The chief attorney also has discretion to refer complaints "to a suitable alternative forum" such as a bar association committee or mediation. *Id.* § 1240.7(d)(1)(ii). These dispositions are no different in kind—and no less final—than the committee's decisions to dismiss a complaint, refer a complaint to an alternate forum, or issue a letter of advisement for conduct that "does not warrant imposition of discipline."[54] *See id.* § 1240.7(d)(2)(i)-(iv).

The committee's decision to issue private discipline in the form of an admonition rather than pursue a formal disciplinary proceeding also involves a classic exercise of prosecutorial discretion. The assessment of whether a formal proceeding is required to protect the public, deter misconduct, and "maintain the integrity and honor of the profession," *id.* § 1240.7(d)(2)(vi), closely resembles prosecutors' discretion to weigh a case's strength, deterrence value, the government's enforcement prior-

---

[54] Nor is there any evidence that committee dispositions are maintained as "permanent records" while chief attorney dispositions are not. (*See* S.A. 98.) In any event, neither type of disposition is filed with the court, which is a "significant consideration" in determining a right of access. *See North Jersey Media Grp.*, 836 F.3d at 434.

ities, and the government's enforcement plan, *Wayte v. United States*, 470 U.S. 598, 607 (1985). And there is no history of unfettered public access to documents concerning alternatives to prosecution that are not filed with the court. *Cf. United States v. HSBC Bank USA, N.A.*, 863 F.3d 125, 135-37 (2d Cir. 2017) (monitor's report on compliance with deferred prosecution agreement was not a judicial document subject to a presumptive right of access because courts lack supervisory power over such agreements).

The committee also shares characteristics of a grand jury, which "inquire[s] into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred." *See United States v. R. Enters., Inc.*, 498 U.S. 292, 297 (1991). Like a grand jury, the committee decides whether to authorize a formal disciplinary proceeding or decline to pursue the matter further—a uniquely investigatory and prosecutorial function. *Cf. Karlin*, 248 N.Y. at 478-79. And just as a grand jury cannot try or sentence the defendant, the committee cannot disbar or suspend attorneys on its own accord. *See First Amend. Coal. v. Judicial Inquiry & Rev. Bd.*, 784 F.2d 467, 473 (3d

Cir. 1986) (judicial review board's proceedings resembled those of grand jury).

None of the district court's reasons for rejecting these comparisons to grand juries and prosecutorial entities are persuasive. The fact that the committee considers witness interviews does not distinguish its work from that of prosecutors and investigators, who routinely interview witnesses in deciding how to proceed. Nor does the committee's investigatory process "resemble[] an adversarial trial." (*See* S.A. 97.) No formal hearing takes place until after the committee has determined to authorize a formal disciplinary action. *See* 22 N.Y.C.R.R. §§ 1240.7(d)(2)(vi), 1240.8. And the fact that the committee may impose alternative remedies without authorizing a formal disciplinary proceeding (*see* S.A. 100) does not render irrelevant the long history of maintaining the confidentiality of preindictment matters, *see Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218-19 (1979).

## 2. Logic does not support public access to committee dispositions.

The district court also erred in concluding that a right of access to committee dispositions would benefit the committee's review process.

New York's confidentiality rule recognizes that an attorney's "professional reputation[,] 'once lost, is not easily restored'" and thus guards against the irreparable harm that could result from the publication of unfounded accusations. *Matter of Johnson Newspaper Corp. v. Melino*, 77 N.Y.2d 1, 11 (1990) (quoting *Karlin*, 248 N.Y. at 478); *see also Matter of Capoccia*, 59 N.Y.2d 549, 554 (1983); *McLaughlin v. Philadelphia Newspapers, Inc.*, 465 Pa. 104, 114 (1975). Similar considerations justify the secrecy of grand jury proceedings. *See Douglas Oil*, 441 U.S. at 219. Yet the district court's order requires the publication of all committee dispositions—many of which involve no finding that misconduct has occurred (i.e., dismissals, referrals, and advisements, 22 N.Y.C.R.R. § 1240.7(d)(2)(i)-(iv)). (*See* S.A. 107-108.)

The district court mistakenly concluded that the publication of a dismissal or referral would not risk damaging an attorney's reputation because it would not reflect a finding of misconduct. (*See* S.A. 107-108.) The mere fact that accusations were lodged in the first place can severely damage an attorney's professional reputation. And the publication of referrals to a diversion program, for example, may reveal sensitive personal and medical information. These considerations rightly gave the

63

district court "pause" (S.A. 106) and should have tipped decidedly against declaring a right of public access to committee dispositions.

The district court's ruling will further undermine the committee's process by effectively prohibiting the use of private discipline—which most States utilize (see *supra* at 45 n.45)—absent on-the-record findings mandated by the court's order. Confidentiality is critical to the rehabilitative goal of private discipline and also protects the public by allowing the committee to flag minor misconduct that might not otherwise warrant a formal disciplinary proceeding. *See McLaughlin*, 465 Pa. at 114-15. Contrary to the district court's contention that "no evidence" shows that private discipline benefits attorney regulation (S.A. 105), the ABA report on which the district court relied for that proposition expressly approved of private discipline to guard against the dismissal of complaints involving minor misconduct.[55] And the ABA's current model rules continue to provide for private discipline,[56] and referrals to alternate forums.[57] Open-

---

[55] Clark Report, *supra*, at 93-94.

[56] Model Rules for Lawyer Disciplinary Enf't r. 10(A)(5) (ABA July 20, 2020).

[57] Model Rules for Lawyer Disciplinary Enf't r. 11(G) (ABA July 15, 2020).

ing these dispositions to the public does not enhance the disciplinary process, *see NYCLU*, 684 F.3d at 302, where the committee has deliberately concluded that public discipline is inappropriate.

Publishing committee dispositions would also undermine the committee's investigations. Knowing that the committee's dispositions will become public may dissuade prospective witnesses from voluntarily coming forward during the investigatory process. *See Douglas Oil*, 411 U.S. at 219. And the assurance of confidentiality encourages witnesses to provide full and frank information to the committee and its investigators. *Id.* In addition, publishing dispositions would risk disclosure of sensitive material. Committee dispositions can contain personal information, such as "medical, mental health, alcohol abuse, substance abuse, and family issues," as well as attorney-client privileged information. (J.A. 850.)

Together, these considerations far outweigh the purported need for greater public scrutiny (*contra* S.A. 106), which could be said of "public access to *any* government affair," *see North Jersey Media Grp. v. Ashcroft*, 308 F.3d 198, 217 (3d Cir. 2002); *see also Attorney Grievance Comm'n of Md. v. A.S. Abell Co.*, 294 Md. 680, 689 (1982) ("[A]ny enhancement of public confidence resulting from the disclosure of complaints against

attorneys, which have been found to be baseless or not serious enough to warrant a public reprimand, is vastly outweighed by the detrimental effect such disclosure would have on an attorney's reputation.").

## B.  Second Department Proceedings and Records

The district court similarly erred in finding a right of access to the Second Department's formal disciplinary proceedings and records.[58] There is no clear history of openness dating to the Founding for such proceedings, and state practice has varied widely based on legislators' reasonable policy judgments.

### 1.  History and experience provide no support for public access to formal disciplinary proceedings.

Formal attorney disciplinary proceedings have not been public throughout their evolution, as required to support a constitutional right of public access. *See Richmond Newspapers*, 448 U.S. at 564 (plurality op.). Founding-era evidence concerning the openness of attorney disciplin-

---

[58] The district court extended a qualified right of access to "documents that 'are derived from or are a necessary corollary of the capacity to attend'" disciplinary proceedings. (S.A. 93 (quoting *Newsday*, 730 F.3d at 164).) Accordingly, if this Court reverses the district court's holding as to Second Department proceedings, it must also reverse as to the related records.

ary proceedings is "sparse," as the district court acknowledged. (S.A. 80.) The historical record shows that attorneys were rarely disciplined from the time of the Revolution to the twentieth century, nor did there exist extensive codes of conduct. See *supra* at 7-8.

Today's formal attorney disciplinary proceedings—often prosecuted by agencies responsible for enforcing a wide-ranging code of conduct applicable to thousands of lawyers—have no clear historical analog. Although attorney disbarment proceedings were carried out in public in early American history, that is because such proceedings were a species of regular civil litigation rather than a part of a formal disciplinary process. One attorney would typically sue another attorney in court alleging misconduct, or a court would initiate a contempt-style proceeding based on misconduct it observed firsthand during a litigation already proceeding before it. See *supra* at 7, 13.[59] (J.A. 958; S.A. 78.)

Although this type of attorney-versus-attorney proceeding has a modern-day analog, it is distinct from formal attorney-disciplinary proceedings brought by attorney grievance committees—which developed

---

[59] *See also* Wolfram, *supra*, at 474-76.

67

separately. In New York, the Judiciary Law creates a cause of action against an attorney who is "guilty of any deceit or collusion . . . with intent to deceive the court or any party"; "[w]illfully delays his client's suit with a view to his own gain; or, willfully receives any money or allowance for or on account of any money which he has not laid out." N.Y. Jud. Law § 487. But disbarment and other forms of attorney discipline are now imposed through a separate process, rendering the former types of proceedings poor historical referents.[60]

Over time, formal attorney disciplinary proceedings developed on their own track. Codes of conduct and widespread attorney discipline became commonplace in the early-to-mid-twentieth century. With this expanded enforcement activity, by 1970, most States conducted formal disciplinary proceedings in private. Holding disciplinary proceedings in private was not a novel concept; it in fact mirrored the historical practice of the English Inns of Court. See *supra* at 6.

---

[60] The distinct features of modern disciplinary proceedings are not merely "formalistic," as the district court found, but rather reflect the fundamentally different "kind of work" involved in widescale regulation of attorney conduct. (*See* S.A. 82 (quoting *NYCLU*, 684 F.3d at 299).)

68

The district court was therefore mistaken to conclude that New York's decision to make disciplinary proceedings confidential in 1945 represented a departure from "national norms." (S.A. 83.) Indeed, New York's practice was well within contemporaneous norms. Although many States later adjusted their practices to make formal disciplinary proceedings public upon a finding of probable cause, some did not. New York, which today accounts for more than fourteen percent of American attorneys,[61] has for decades maintained the confidentiality of these proceedings. *See Doe v. Office of Pro. Med. Conduct*, 81 N.Y.2d 1050, 1052 (1993); *Matter of Johnson Newspaper Corp.*, 77 N.Y.2d at 7-8. This Court and the federal district courts in this circuit also maintain the confidentiality of attorney disciplinary matters. See *supra* at 11-12 & n.34.

Plaintiffs thus failed to establish the "unbroken, uncontradicted history" of openness that courts have identified in other contexts. *See Richmond Newspapers*, 448 U.S. at 573 (plurality op.). Rather, different jurisdictions have had "different policies that provide varying levels of

---

[61] ABA, *Profile of the Legal Profession 2024: Demographics* (2024). New York has the single largest population of lawyers in the country and the greatest concentration of lawyers relative to population of any State. *See id.*

public access." *See United States v. Kincaide*, 119 F.4th 1074, 1081 (6th Cir. 2024). This history makes clear that the Constitution does not mandate a uniform approach requiring full public access.

### 2. Logic does not support public access to formal disciplinary proceedings.

Maintaining the confidentiality of formal attorney disciplinary proceedings advances multiple public purposes that would be severely undermined by a presumptive right of public access.

New York's policy of confidentiality "safeguard[s] information that a potential complainant may regard as private or confidential" and encourages the participation of witnesses. *See Matter of Johnson Newspaper Corp.*, 77 N.Y.2d at 10; *see also In re Grand Jury Subpoena*, 103 F.3.d 234, 237 (2d Cir. 1996). It also protects against the "irreparable harm to a professional's reputation resulting from unfounded accusations." *Matter of Johnson Newspaper Corp.*, 77 N.Y.2d at 11. One memorandum contained in the bill jacket for Judiciary Law § 90 explained that aggrieved clients are frequent complainants. (*See* J.A. 644; *see also* J.A. 634-635 (Letter from Presiding Justice of the Second Department in Support of Judiciary Law § 90).) And opposing counsel or litigants may

have the incentive to weaponize the grievance committee process to extract leverage. (*See* J.A. 864 (noting that the committee receives complaints from opposing counsel).)

The ABA's 1970 report on the state of attorney discipline echoed these sentiments.[62] Although the ABA later changed its view on the issue, and many States chose to make formal disciplinary proceedings public, New York reasonably reached a different conclusion. In addition to the considerations outlined above, maintaining the confidentiality of formal disciplinary proceedings allows for greater administrative flexibility (*see* S.A. 90) and protects the reliance interests of New York's many attorneys.

The district court minimized these concerns, opining that open proceedings would allow for greater public scrutiny. (S.A. 90-92.) At minimum, however, plaintiffs were required to demonstrate "a good reason why [their] preferred public policy . . . is more compelling than [New York's] preferred policy of favoring confidentiality and privacy," and they failed to do so. *See N.Y. Times Co.*, 577 F.3d at 410. As the district court's

---

[62] *See* Clark Report, *supra*, at 139-40.

opinion amply demonstrates, each argument in favor of openness was met with a countervailing argument in favor of confidentiality. (*See* S.A. 87-93.) This policy dispute is appropriately left to the political process; engagement in a pure policy debate "would largely abandon the appropriate limits on the judicial function and put the court in the position of making legislative policy choices." *Oklahoma Observer v. Patton*, 73 F. Supp. 3d 1318, 1328 (W.D. Okla. 2014).

Finally, the district court placed great weight on the fact that plaintiffs' Complaints concerned prosecutors. (S.A. 89, 91.) But "the right of access to court proceedings and records depends on the nature of the proceeding, not on the personal characteristics of the litigant." *Hartford Courant Co. v. Carroll*, 986 F.3d 211, 219 (2d Cir. 2021). The fact that the Complaints at issue here relate to alleged prosecutorial misconduct might be relevant to a good-cause application (had plaintiffs filed one), but it is irrelevant to the existence of a constitutional right of public access. The district court erred in concluding otherwise.

## CONCLUSION

This Court should vacate the district court's judgment and remand with instructions to dismiss. Alternatively, this Court should reverse the district court's grant of summary judgment to plaintiffs.

Dated:  New York, New York
        December 4, 2024

                                    Respectfully submitted,

                                    LETITIA JAMES
                                      *Attorney General*
                                      *State of New York*
                                    Attorney for Appellant


                              By:   */s/ Stephen J. Yanni*
                                    STEPHEN J. YANNI
                                    Assistant Solicitor General

BARBARA D. UNDERWOOD                 28 Liberty Street
  *Solicitor General*                New York, NY 10005
JUDITH N. VALE                       (212) 416-6184
  *Deputy Solicitor General*
STEPHEN J. YANNI
  *Assistant Solicitor General*
     *of Counsel*

73

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,512 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

 /s/ *Emily Paule*