# 24-2251

## United States Court of Appeals

*for the*

## Second Circuit

---

CIVIL RIGHTS CORPS, CYNTHIA GODSOE, NICOLE SMITH FUTRELL,
DANIEL S. MEDWED, JUSTIN MURRAY, ABBE SMITH,
STEVEN ZEIDMAN,

*Plaintiffs-Appellees,*

– v. –

HECTOR D. LASALLE, in his official capacity Presiding Justice of the Second
Judicial Department of the Appellate Division of the Supreme Court of the State
of New York,

*Defendant-Appellant,*

*(For Continuation of Caption See Inside Cover)*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## BRIEF FOR PLAINTIFFS-APPELLEES

---

GREGORY L. DISKANT
PATTERSON BELKNAP WEBB & TYLER LLP
*Attorneys for Plaintiffs-Appellees*
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

March 5, 2025

 (800) 4-APPEAL • (378925)

GEORGIA PESTANA, Personal Capacity, STEVEN STEIN CUSHMAN, in his official capacity Corporation Counsel of the City of New York, MELINDA KATZ, Personal Capacity and in her official capacity the District Attorney of Queens County, ANDREA E. BONINA, Personal Capacity and in her official capacity Chair of State of New York Grievance Committee for the Second, Eleventh and Thirteenth Judicial Districts, DIANA MAXFIELD KEARSE, Personal Capacity and in her official capacity Chief Counsel of the State of New York Grievance Committee for the Second, Eleventh and Thirteenth Judicial District,

*Defendants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, Plaintiff-Appellee Civil Rights Corps certifies that it is not a publicly held corporation, has no parent corporation, and that no publicly held corporation owns any portion of its stock.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................... 1

ISSUES PRESENTED ............................................................. 2

STATEMENT OF THE CASE ................................................... 3

    A.   New York Fails To Discipline Rogue Prosecutors ..................... 3

    B.   The Law Professors File Twenty-One Grievance Complaints Against Bad Prosecutors ........................................ 6

    C.   Appellant's Obsession with Keeping Information about the Complaints and the Grievance Proceedings Secret ........... 8

    D.   Adjudicatory Grievance Proceedings in the Second Department are All Secret ...................................................... 13

        1.   Dispositions by the Grievance Committee ..................... 14

        2.   Formal Disciplinary Proceedings in the Appellate Division ................................................................ 17

        3.   Secrecy & Good Cause ................................................... 18

    E.   The District Court's Order ...................................................... 21

STANDARD OF REVIEW ....................................................... 22

SUMMARY OF ARGUMENT ................................................... 23

ARGUMENT ........................................................................... 24

POINT I
This Case Is Ripe For Decision ................................................. 24

POINT II
*O'Shea* Abstention Is Not Warranted In This Case ................. 30

    A.   The Relief Granted Does No More Than Necessary to Comply with the First Amendment ........................................ 33

B.   The Relief Granted Differs in Nature and Scope than that Contemplated by O'Shea .................................... 36

C.   The Relief Granted Does Not Undermine the State's Ability to Manage Their Records ............................ 38

D.   The Possibility of Alternative Avenues of Relief Is Not Sufficient To Warrant Abstention ........................... 41

POINT III
There Is A Qualified Right Of Access To The Disciplinary Proceedings Of The 21 Prosecutors ........................................ 42

A.   Disciplinary Proceedings in The Grievance Committee and The Appellate Division Are Judicial Proceedings ........... 43

B.   Experience & Logic Confirm a Presumptive Right of Public Access to Disciplinary Proceedings Involving the 21 Prosecutors ........................................................ 47

     1.   Experience: There is a Deeply Rooted History of Openness for Attorney Disciplinary Proceedings ........... 49

          a.   Attorney Discipline in the Courtroom ................ 50

          b.   Secret Discipline by Grievance Committee ........... 52

          c.   Trial-Type Proceedings in the Appellate Division ................................................ 58

          d.   Adjudicative Decisions by the Grievance Committee. ........................................... 59

     2.   Logic: Public Access Would Play a Significant Positive Role in Prosecutor Discipline. ........................... 63

CONCLUSION .......................................................... 67

iii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*ABC, Inc. v. Stewart,*
  360 F.3d 90 (2d Cir. 2004) .................................................................. 61

*Anonymous v. Ass'n of the Bar of City of N.Y.,*
  515 F.2d 427 (2d Cir. 1975) ............................................................... 46

*In re Aretakis,*
  791 N.Y.S.2d 687 (App. Div. 2005) .............................................. 19, 28

*Bessemer Tr. Co. v. Branin,*
  618 F.3d 76 (2d Cir. 2010) ................................................................. 23

*California First Amend. Coal. v. Woodford,*
  299 F.3d 868 (9th Cir. 2002) .............................................................. 51

*In re Capoccia,*
  453 N.E.2d 497 (N.Y. 1983) ......................................................... 19, 28

*Coffran v. Bd. of Trs. Of N.Y.C. Pension Fund,*
  46 F.3d 3 (2d Cir. 1995) ..................................................................... 30

*Courthouse News Serv. v. Brown,*
  908 F.3d 1063 (7th Cir. 2018) ............................................................ 41

*Courthouse News Serv. v. Gabel,*
  No. 21-3098 .................................................................................. 41, 42

*Courthouse News Serv. v. Gabel,*
  No. 21-cv-132, 2021 WL 5416650 (D. Vt., Nov. 19, 2021) ........... 41, 42

*Courthouse News Serv. v. Gilmer,*
  48 F.4th 908 (8th Cir. 2022) ............................................................... 41

*Courthouse News Serv. v. New Mexico Admin. Off. of Cts.,*
  53 F.4th 1245 (10th Cir. 2022) ..................................................... 35, 41

*Courthouse News Serv. v. O'Shaughnessy,*
  2022 WL 17476835 (S.D. Ohio Dec. 22, 2022) .................................. 41

iv

*Courthouse News Serv. v. Omundson*,
  No. 16-cv-8742, 598 F. Supp. 3d 929 (D. Idaho Apr. 14, 2022) .......... 41

*Courthouse News Serv. v. Planet*,
  750 F.3d 776 (9th Cir. 2014) ........................................................ 39, 41

*Courthouse News Serv. v. Schaefer*,
  2 F.4th 318 (4th Cir. 2021) ................................................................ 41

*Courthouse News Serv. v. Tingling*,
  2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) ...................................... 41

*D.C. Ct. of Appeals v. Feldman*,
  460 U.S. 462 (1983) .......................................................................... 45

*In re Demetriades*,
  58 F.4th 37 (2d Cir. 2023) .......................................................... 47, 68

*Detroit Free Press v. Ashcroft*,
  303 F.3d 681 (6th Cir. 2002) ............................................................ 51

*Doe v. Rosenberry*,
  255 F.2d 118 (2d Cir. 1958) ............................................................. 45

*Dombrowski v. Pfister*,
  380 U.S. 479 (1965) .......................................................................... 33

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
  282 F.3d 83 (2d Cir. 2002) ............................................................... 26

*Edison Co. v. Public Serv. Comm'n*,
  447 U.S. 530 (1980) .......................................................................... 68

*El Vocero de Puerto Rico v. Puerto Rico*,
  508 U.S. 147 (1993) .......................................................................... 51

*Erdmann v. Stevens*,
  458 F.2d 1205 (2d Cir. 1972) ........................................................... 46

*F.T.C. v. Standard Fin. Mgmt. Corp.*,
  830 F.2d 404 (1st Cir. 1987) ............................................................ 66

v

*Fed. Election Comm'n v. Akins,*
    524 U.S. 11 (1998)................................................................ 26

*Globe Newspaper Co. v. Superior Ct.,*
    457 U.S. 596 (1982)............................................................. 49

*In re Grand Jury Subpoena,*
    103 F.3d 234 (2d Cir. 1996) ................................................ 36

*Hardy v. Equitable Life Assurance Soc'y of United States,*
    697 F. App'x 723 (2d Cir. 2017) .................................... 49, 63

*Hartford Courant Co., LLC v. Carroll,*
    986 F.3d 211 (2d Cir. 2021) ............................................... 50

*Hartford Courant Co. v. Pellegrino,*
    380 F.3d 83 (2d Cir. 2004) ........................................... 33, 34

*Hill v. Comm. on Pro. Standards of the Third Jud. Dep't,*
    5 A.D.3d 835.................................................................... 38

*Imbler v. Pachtman,*
    424 U.S. 409 (1976)............................................................. 5

*Matter of Johnson Newspaper Corp. v. Melino,*
    564 N.E.2d 1046 (N.Y. 1990) ............................................. 67

*Joy v. North,*
    692 F.2d 880 (2d Cir. 1982) ............................................... 43

*Karlin v. Culkin,*
    248 N.Y. 465 (N.Y. 1928) .................................................. 54

*Kaufman v. Kaye,*
    466 F.3d 83 (2d Cir. 2006) ................................................. 32

*In re Kelly,*
    59 N.Y. 595 (1875) ....................................................... 52, 63

*Kentucky Press Ass'n v. Kentucky,*
    454 F.3d 505 (6th Cir. 2006)......................................... 29, 30

*In re Kurtzrock*,
138 N.Y.S.3d 649 (App. Div. 2020) ........................................ 20, 29, 40

*Landmark Commc'ns, Inc. v. Virginia*,
435 U.S 829 (1978) .................................................................. 37, 68

*Lugosch v. Pyramid Co. of Onondaga*,
453 F.3d 110, 126 (2d Cir. 2006) ............................................ 27, 30

*Marchi v. Bd. of Coop. Educ. Servs. of Albany*,
173 F.3d 469 (2d Cir. 1999) .......................................................... 30

*Martinez v. Cap. One Bank, N.A.*,
No. 10-CV-8028 (RJS), 2016 WL 54686 (S.D.N.Y. Jan. 4,
2016) ............................................................................................ 48

*McNeese v. Bd. of Ed. For Cmty. Unit Sch. Dist. 187*,
373 U.S. 668 (1963) ...................................................................... 42

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*,
457 U.S. 423 (1982) .............................................................. 3, 4, 46

*Mosby v. Ligon*,
418 F.3d 927 (8th Cir. 2005) ..................................................... 46, 64

*N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*,
684 F.3d 286 (2d Cir. 2012) ................................................. *passim*

*In re N.Y. News, Inc.*,
495 N.Y.S.2d 181 (App. Div. 1985) ................................................ 19

*Nat'l Org. for Marriage, Inc. v. Walsh*,
714 F.3d 682 (2d Cir. 2013) ................................................. *passim*

*New Orleans Pub. Serv., Inc. v. Council of New Orleans*,
491 U.S. 350 (1989) ...................................................................... 31

*O'Shea v. Littleton*,
414 U.S. 488 (1974) .............................................................. *passim*

*People v. Bell*,
143 N.Y.S.3d 840 (N.Y. Sup. Ct. 2021) ........................................... 8

*People v. Lawrence,*
  Case No. 1095B-2012 (Sup. Ct. Suffolk Cnty. Feb. 15, 2018) ........... 21

*Press-Enterprise Co. v. Super. Ct.,*
  478 U.S. 1 (1986) ....................................................... *passim*

*Press-Enterprise Co. v. Super. Ct.,*
  464 U.S. 501 (1984) ................................................. 49, 65

*Public Citizen v. Dep't of Just.,*
  491 U.S. 440 (1989) ........................................................ 26

*Revitalizing Auto Communities Env't Response Tr. v. Nat'l
  Grid USA,*
  10 F.4th 87 (2d Cir. 2021) ................................................. 23

*Richmond Newspapers, Inc. v. Virginia,*
  448 U.S. 555 (1980) .................................................. *passim*

*In re Rowe,*
  604 N.E.2d 728 (N.Y. 1992) ............................................... 3

*Schnabel v. Trilegiant Corp.,*
  697 F.3d 110 (2d Cir. 2012) .............................................. 35

*In re Spencer,*
  122 N.Y.S. 190 (1st Dep't 1910) ...................................... 52, 63

*Sprint Commc'ns, Inc. v. Jacobs,*
  571 U.S. 69 (2013) .................................................... 31, 32

*United States v. Erie Cnty.,*
  763 F.3d 235 (2014) ...................................................... 37

*Weiss v. New York,*
  No. 22-2326-CV, 2024 WL 2837623 (2d Cir. June 5, 2024) .............. 23

*Westmoreland v. CBS, Inc.,*
  752 F.2d 16 (2d Cir. 1984) ............................... 43, 44, 49, 65

*Wiener v. Weintraub,*
  22 N.Y.2d 330 (1968) ................................................. 45, 52

*Youmans v. Smith,*
    153 N.Y. 214 (1897) ........................................................ 53

*Zwickler v. Koota,*
    389 U.S. 241 (1967) ..................................................... 33, 43

## Statutes and Regulations

42 U.S.C. § 1983 ................................................... *passim*

New York Judiciary Law §90(10) .................................... *passim*

New York Judiciary Law §90(2) ........................................ 18

22 N.Y.C.R.R. §1240.2(e) .......................................... *passim*

22 N.Y.C.R.R. §1240.7 ............................................. *passim*

22 N.Y.C.R.R. §1240.8 ............................................. *passim*

## Other Authorities

ABA Commission on Evaluation of Disciplinary Enforcement,
    *Lawyer Regulation for a New Century: Report of the*
    *Commission on Evaluation of Disciplinary Enforcement* 33,
    34-38 (1992) .......................................................... 54

ABA, Model Rules of Lawyer Disciplinary Enforcement Rules
    10D, Commentary, 16A (2020) ....................................... 56

Attorney Grievance Committee Supreme Court, Appellate
    Division First Judicial Department, 2023 Annual Report ............... 10

DAVID BRAND, *Three Wrongfully Convicted Queens Men Freed*
    *After 'Egregious' Violations by Trial Prosecutors*, Queens
    Daily Eagle (Mar. 5, 2021) ............................................ 7

DAN CLARK, *N.Y.'s prosecutor watchdog panel finally begins its*
    *work – 7 years later,* Times Union (Feb. 27, 2025) ................... 59

DAN M. CLARK, *DAs File Constitutional Challenge to NY*
    *Prosecutorial Conduct Commission,* New York Law Journal
    (Oct. 17, 2018) ....................................................... 59

ix

JOHN C. COFFEE, JR., *The Attorney as Gatekeeper: An Agenda for the SEC*, 103 COLUM. L. REV. 1293, 1316 (2003) ....................55

ANTHONY E. DAVIS, *Professional Liability Insurers as Regulators of Law Practice*, 65 FORDHAM L. REV. 209, 231 (1996)...................................................................................55

BRIAN FINKELSTEIN, *Should Permanent Disbarment Be Permanent?*, 20 GEO. J. LEGAL ETHICS 587, 594−95 (2007)...................................................................................55

TIM GANNON, *Judge at Sentencing: Hampton Murder Case Was 'Travesty of Justice'*, Riverhead News-Review (June 9, 2017, 7:47 PM) ...............................................................20

STEPHEN GILLERS, *Lowering the Bar: How Lawyer Discipline in New York Fails to Protect the Public,* 17 NYU J. Legis & Pub. Pol'y. 485 (2014) ................................................ 3, 4, 66

BRUCE GREEN & ELLEN YAROSHEFSKY, *Prosecutorial Accountability 2.0*, 92 Notre Dame L. Rev. 51, 65 (2017) ...................4

BRUCE A. GREEN, *Selectively Disciplining Advocates,* 54 Conn. L. Rev. 151, 193 (2022) .........................................................55

PETER A. JOY & KEVIN C. MCMUNIGAL, *New York Creates Commission on Prosecutor Conduct*, 34-FALL Crim. Just. 62, 63 (2019)...........................................................................59

LESLIE LEVIN, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1 ...............................................53, 54

CHARLES E. MACLEAN & STEPHEN WILKS, *Keeping Arrows in the Quiver: Mapping the Contours of Prosecutorial Discretion*, 52 Washburn L.J. 59, 81 (2012) ..........................................4

JESSE MCKINLEY, *A New Panel Can Investigate Prosecutors. They Plan to Sue to Block It.*, N.Y. Times (Aug. 23, 2018) ...............59

NINA MORRISON, *What Happens When Prosecutors Break the Law?*, N.Y. Times (June 18, 2018) J.A.146 ...........................................4

x

New York State Justice Task Force, Report on Attorney Responsibility in Criminal Cases (February 2017) ........................... 58

New York Times Editorial Board, *How Can You Destroy a Person's Life and Only Get a Slap on the Wrist?*, N.Y. TIMES (Dec. 4, 2021) ...................... 57

New York Times Editorial Board, *Prosecutors Need a Watchdog*, N.Y. Times (August 14, 2018) .......................... 59

RACHEL A. NOLAN, *Prosecutorial Conduct Commissions: A Possibility for Accountability,* 52 Fordham Urb. L.J. 251, 275-79 (2024) ...................... 59

KAY A. OSTBERG, *The Conflict of Interest in Lawyer Self-Regulation* ...................... 55

MARGARET ONYS RENTZ, *Laying Down the Law: Bringing Down the Legal Cartel in Real Estate Settlement Services and Beyond*, 40 GA. L. REV. 293, 307 (2005) .......................... 55

JOAQUIN SAPIEN, *Bill Proposes Greater Accountability for New York Prosecutors Who Break the Law*, ProPublica (Aug. 16, 2018) ...................... 58

JOAQUIN SAPIEN AND SERGIO HERNANDEZ, *Who Polices Prosecutors Who Abuse Their Authority? Usually Nobody*, ProPublica (April 3, 2013) ................ 5, 6

ANDREW SMITH, *Suffolk DA's Office Struggled to Comply with Key Legal Rule*, Newsday (May 14, 2017, 10:59 PM) ........................ 20

BRADLEY A. SMITH, *The Limits of Compulsory Professionalism: How the Unified Bar Harms the Legal Profession*, 22 Fla. St. U. L. Rev. 35, 63 (1994) ...................... 55

xi

LISA M. STERN, *Code of Professional Responsibility: New York Judiciary Law Section 90(10) Should Be Amended to Permit Public Access to Attorney Disciplinary Proceedings After a Prima Facie Determination Has Been Made that an Attorney Has Engaged in Conduct Violative of the Code of Professional Responsibility,* 70 St. John's L. Rev. 839, 840-42 (1996) ........................................................................... 4, 55

THOMAS P. SULLIVAN & MAURICE POSSLEY, *The Chronic Failure to Discipline Prosecutors for Misconduct: Proposals for Reform*, 105 J. CRIM. L. & CRIMINOLOGY 881, 890-95 ................... 5

Supreme Court of the State of New York, Appellate Division, Second Judicial Department, *Attorney Matters, How to Make a Complaint About a Lawyer* ....................................................... 3

Verified Petition to Unseal Disciplinary Proceedings, *In the Matter of the Application of The Innocence Project, Inc., v. Grievance Committee for the Tenth Judicial District, et al.*, May 22, 2019 ........................................................................ 20, 21, 29

FRED C. ZACHARIAS, *The Professional Discipline of Prosecutors*, 79 N.C. L. Rev. 721, 725 (2001) ........................................................ 4

## PRELIMINARY STATEMENT

New York's system of attorney discipline is broken, notable particularly for its failure to discipline rogue prosecutors. Meanwhile, its pervasive secrecy makes reform, or even public attention, difficult. The district court correctly found that the First Amendment provides some sunlight that can help address this problem. Under the district court's ruling, the plaintiff Law Professors (the "Professors")—and the public— have a presumptive right of access to discover information concerning the resolution of complaints the Professors filed nearly four years ago against 21 miscreant prosecutors.

The Professors' complaints all were based on judicial findings of prosecutorial misconduct by the 21 accused government attorneys and there is a legitimate public interest in their resolution. But to date, the State has refused to tell the Professors what happened to their complaints. It has steadfastly resisted disclosure of any information under New York's antiquated—and illegal—Judiciary Law Section §90(10). The State's defense, both in the district court and here, consists largely of procedural objections to resolving this dispute on the merits. On appeal, the State repeats such objections, none of which has merit. And when the merits are reached, the State fails seriously to grapple with

1

the body of caselaw defining attorney grievance proceedings—held in open court at the time of the founding—as judicial proceedings that implicate the First Amendment right of access. Nor does it meaningfully challenge the legitimate public interest in learning how serious misconduct charges against state prosecutors have been resolved.

## ISSUES PRESENTED

1.  Whether the district court erred in finding the case ripe for review where plaintiff Law Professors suffered a real, substantial injury by the State's denial of information and the other alleged avenue of relief would have been futile.

2.  Whether the district court erred in finding abstention under *O'Shea v. Littleton* unwarranted where the prospective relief requested is not so intrusive or interfering with the state courts as to prevent federal consideration of the First Amendment right at stake.

3.  Whether the district court erred in declaring a presumptive public right of access to the final dispositions by the grievance committee and to disciplinary trials in the Second Department, if any, related to twenty-one complaints against prosecutors who were publicly adjudged by a court to have committed prosecutorial misconduct.

2

## STATEMENT OF THE CASE

### A.    New York Fails To Discipline Rogue Prosecutors

The Appellate Division for the Second Department proclaims that it is committed to a worthy goal that it dismally fails to achieve: "[t]he purpose of the disciplinary system is to protect the public generally by enforcing the Rules of Professional Conduct, thereby helping to insure the honesty, integrity, and competence of the profession."[1]  *See In re Rowe*, 604 N.E.2d 728, 730 (N.Y. 1992) (the "primary concern" of disciplinary proceedings against attorneys "is the protection of the public in its reliance on the integrity and responsibility of the legal profession.") (citations omitted).    In New York, the responsibility for disciplining attorneys lies with four intermediate appellate courts, divided geographically, in conjunction with their respective Grievance Committees,[2] who operate as an arm of the courts to carry out various stages of the disciplinary proceedings.[3]

---

[1]Supreme Court of the State of New York, Appellate Division, Second Judicial Department, *Attorney Matters, How to Make a Complaint About a Lawyer,* https://www.nycourts.gov/courts/ad2/attorneymatters_complaintaboutala wyer.shtml.

[2]Stephen Gillers, *Lowering the Bar: How Lawyer Discipline in New York Fails to Protect the Public*, 17 NYU J. Legis & Pub. Pol'y. 485, 489, n. 9 (2014).

[3] *See Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S.

3

Despite its stated mission, New York's disciplinary system falls far short of protecting the public. The system has been called deficient in both "design and operation."[4] It prioritizes secrecy at the public's expense; its processes are painfully slow; and it often does nothing at all.[5] Nowhere are these deficiencies more glaring than in how the system handles—or more accurately, fails to handle—complaints relating to prosecutorial misconduct.

Prosecutors wield incredible power in the criminal justice system. Those who do not carry out their duties faithfully in accordance with the law are rarely, if ever, disciplined by the state's grievance system,[6] even

_____

423, 433 (1982).

[4] Gillers, *Lowering the Bar, supra* n.2 at 490.

[5]*Id.* at 490, 496-502*; see also* Lisa M. Stern, *Code of Professional Responsibility: New York Judiciary Law Section 90(10) Should Be Amended to Permit Public Access to Attorney Disciplinary Proceedings After a Prima Facie Determination Has Been Made that an Attorney Has Engaged in Conduct Violative of the Code of Professional Responsibility,* 70 St. John's L. Rev. 839, 840-42 (1996); Nina Morrison, *What Happens When Prosecutors Break the Law?*, N.Y. Times (June 18, 2018), https://www.nytimes.com/2018/06/18/opinion/kurtzrock-suffolk-county-prosecutor.html; J.A.146, 944.

[6]Charles E. MacLean & Stephen Wilks, *Keeping Arrows in the Quiver: Mapping the Contours of Prosecutorial Discretion*, 52 Washburn L.J. 59, 81 (2012) (citing "the small number of sanctions against prosecutors, relative to lawyers as a whole"); Fred C. Zacharias, *The Professional Discipline of Prosecutors*, 79 N.C. L. Rev. 721, 725 (2001) (describing the "rarity of discipline" of prosecutors); Bruce Green & Ellen Yaroshefsky, *Prosecutorial Accountability 2.0*, 92 Notre Dame L. Rev. 51, 65 (2017)

though discipline by the grievance committee is the most the public can expect. Unlike other practicing attorneys, prosecutors alone have "absolute immunity" from civil suit, a doctrine justified on the mistaken assumption that "associations of [] peers," the grievance committee, will regulate prosecutors through "professional discipline." *Imbler v. Pachtman*, 424 U.S. 409, 427, 429 (1976).

A 2013 analysis of ten years of state and federal decisions revealed 30 cases in which judges reversed convictions explicitly because of serious misconduct by New York City prosecutors. Yet, New York's disciplinary committees "almost never took serious action against prosecutors," and out of these 30 cases, publicly disciplined ***only one*** of the prosecutors judicially found to have committed misconduct.[7] None of the other 29

---

(citations omitted) ("[D]isciplinary agencies and the courts overseeing them largely gave prosecutors a pass."); Thomas P. Sullivan & Maurice Possley, *The Chronic Failure to Discipline Prosecutors for Misconduct: Proposals for Reform*, 105 J. CRIM. L. & CRIMINOLOGY 881, 890-95 ("Courts and ethics bodies rarely sanction prosecutors, and the rare disciplinary measures tend to be mere slaps on the wrist. This trend of inaction is consistent even in arguably the most egregious cases of prosecutorial misconduct: the suppression of exculpatory evidence.").
[7]Joaquin Sapien and Sergio Hernandez, *Who Polices Prosecutors Who Abuse Their Authority? Usually Nobody*, ProPublica (April 3, 2013), https://www.propublica.org/article/who-polices-prosecutors-whoabuse-their-authority-usually-nobody.

5

prosecutors was disbarred, suspended, or publicly censured.[8]    Chief Counsel for the Grievance Committee in this case, Diana Kearse, admitted that "complaints that come in against prosecutors infrequently result in any kind of discipline." J.A.425.

## B.    The Law Professors File Twenty-One Grievance Complaints Against Bad Prosecutors

In May 2021, the Appellee Law Professors, with support of the Appellee Civil Rights Corps, filed 21 complaints pursuant to New York Judiciary Law §90(10) against present or former prosecutors with the Queens District Attorney's Office.  They sought to bring attention to the plague of unchecked prosecutorial misconduct in New York and to seek public recourse for particular cases. J.A.66-68, 939. (The Professors later added 29 more complaints, J.A.978, but this appeal concerns the original 21. S.A.117.)

The Professors' complaints handed the Grievance Committees the evidence of misconduct on a silver platter.  Each complaint carefully marshalled public records and relied on judicial findings that the respondent prosecutor had committed professional misconduct during the course of a criminal prosecution. J.A.939. The complaints were well

---

[8]*Id.*

6

documented and did not rely on any private or off-the-record sources. Each requested that the respective grievance committees investigate and discipline each attorney for misconduct, and that they do so publicly. J.A.939. After the Professors' complaints were filed with the Grievance Committees, they were all published on the CRC-supported website, AccountabiltyNY.com. J.A.939. According to publicly-available records maintained by the New York State Unified Court System, not a single one of the accused prosecutors has been publicly disciplined to date—four years later.

The complaint against Charles Testagrossa is representative.[9] Testagrossa knowingly withheld exonerating evidence in a capital murder case, leading to the wrongful conviction of three defendants for a 1996 murder.[10] In 2021, after the defendants spent more than two decades in prison and after compelling evidence of Testagrossa's misconduct came to

---

[9]Complaint Regarding Att'y Charles Testagrossa, available at https://accountabilityny.org/wp-content/uploads/2023/10/grievance-complaint-regarding-attorney-Charles-Testagrossa-state-bar-number-1129485.pdf.
[10]David Brand, *Three Wrongfully Convicted Queens Men Freed After 'Egregious' Violations by Trial Prosecutors*, Queens Daily Eagle (Mar. 5, 2021), https://queenseagle.com/all/three-wrongfully-convicted-queens-men-freed-after-egregious-violations-by-trial-prosecutors.

light, the People agreed to support a motion to vacate the convictions.[11]
In exonerating the defendants, the court concluded that Testagrossa—
who was still a prosecutor 24 years later—had deliberately lied to the
court about his conduct.   The court called Testagrossa's explanation
"mindboggling" and concluded "[t]his was, in short, not a good-faith
misstatement; it was a deliberate falsehood." *People v. Bell*, 143 N.Y.S.3d
840, 853 (N.Y. Sup. Ct. 2021).  To date, so far as the public record reflects,
Testagrossa has not been sanctioned for his misconduct, and continues to
be eligible to practice law in New York State.[12]

## C.     Appellant's Obsession with Keeping Information about the Complaints and the Grievance Proceedings Secret

The reaction of the City and the State to the Professors' filing and
publication of their 21 complaints ignored the manifest public interest in
seeing rogue prosecutors disciplined for misconduct.    Rather, the
government agencies displayed an unrelenting interest in keeping the
resolution of the complaints secret, including relying on threats to achieve
that end.

---

[11] *See People v. Bell*, 143 N.Y.S.3d 840, 842 (N.Y. Sup. Ct. 2021).
[12]*See* Attorney Detail Report, Attorney Online Services -- Search, New
York Unified Court System,
available at https://iapps.courts.state.ny.us/attorneyservices.

The interest in secrecy derives, in the first instance, from Judiciary Law §90(10), enacted in 1945, which keeps confidential "all papers, records and documents . . . upon any complaint . . . relating to the conduct or discipline of any attorney. . ." unless charges are later sustained by the Appellate Division. As a consequence, almost all proceedings and almost all sanctions against attorneys occur in secret. As was undisputed by the State, ***ninety-eight percent of all complaints against attorneys received by the Second Department are resolved in secret***. J.A.146, 944. Most are just dismissed. J.A.944. Where any form of discipline occurs, it is five times more likely to occur in secret than to be made public. In the five years between 2016 and 2020, in the Second Department, 2513 cases ended with private discipline, while only 475 cases—about two percent of total complaints—resulted in public sanctions. J.A.944. And, as noted above, discipline for a prosecutor is a particular oddity, essentially a unicorn.[13]

---

[13]In the Second Department, only the 10th District reports data separately for prosecutors. According to the most recent report, in 2022 there were ***no prosecutors*** who were privately admonished by the 10th District Grievance Committee and ***no prosecutors*** who were publicly disciplined by the Appellate Division based on a referral from the Grievance Committee. J.A.943-44. In the First Department, according to the most recent data, ***no prosecutors*** were disciplined for misconduct in 2023. *See* Attorney Grievance Committee Supreme Court, Appellate

The Professors' complaints and their decision to publish them unleased a firestorm.  Although publication of complaints is on its face barred by the overbroad language of §90(10), the Professors relied on advice of counsel that the First Amendment protected their right to publish their own complaints, a position later upheld by the district court and not appealed by the State.  Nonetheless, shortly after the Professors' complaints were published, New York City Corporation Counsel James E. Johnson wrote an intemperate letter to the Professors and the Grievance Committee accusing the Professors of "misus[ing] and indeed abus[ing]" the grievance process and of violating the law by publishing the complaints. J.A.93-94.  In Mr. Johnson's view, everything connected to the process was top secret—including his own vituperative letter, which he forbade the Professors from publishing.  J.A.95.

One week after the Johnson correspondence, the Grievance Committee in this case, through its Chief Counsel Diana Kearse, responded to the Professors' Complaints in a letter labelled "Confidential" by advising the Professors that, because the complaints were "based on

---

Division First Judicial Department, 2023 Annual Report at 50, available at
https://www.nycourts.gov/courts/AD1/Committees&Programs/DDC/Annua lReport2023.pdf.

information derived from public sources," the Grievance Committee would initiate any investigation, if at all, *sua sponte* and everything—apparently including her letter—would remain confidential under §90(10). J.A.98.

Stymied by the lack of information from the Grievance Committee and the threatening letters they had received, on November 4, 2021, the Professors brought an action against the City and State Defendants for violations of federal and state laws, including the First Amendment. J.A.51-91. In accord with the demands of the City and State, the Professors filed the Johnson and Kearse letters under seal.

In the ensuing motion practice, the State made every effort to prevent the disclosure of any information relating to the complaints, relying on §90(10) to oppose even the Professors' motion to unseal the Johnson and Kearse letters themselves. J.A.35-38. The district court granted the motion to unseal, noting that the State had attempted to "weaponize[] a secrecy law in order to silence the plaintiffs on a matter of serious public concern." J.A.43-44. The State then opposed the Professors' motion for summary judgment on Count 3 of their Complaint, the claim that §90(10) impermissibly restrained their First Amendment right to publish their complaints. District Court Record, Dkt. No. 78. Meanwhile,

11

the State ignored a written request from the Professors for more information about the handling of their complaints.  S.A.21, J.A.987.

On June 13, 2022, the district court granted the Professors' motion for summary judgment on Count 3.  J.A.208.  The district court ruled that §90(10), as applied to the Professors' publication of the Grievance Complaints and related correspondence, violated the First Amendment. J.A.225-236. The State elected not to appeal the district court's decision, thus conceding that §90(10) is constitutionally overbroad.

With that result, the Professors returned to Ms. Kearse's cryptic "confidential" letter stating that because the complaints were "based on information derived from public sources," the Grievance Committee would initiate any investigation, if at all, *sua sponte* and that everything would remain confidential under §90(10) unless the Appellate Division imposed public discipline. J.A.98.  In Count 4, the Professors alleged a right to learn the dispositions of their complaints and public access to any ensuing trial before the Appellate Division.    J.A.85-87. With respect to the Grievance Committee dispositions, the Professors had assumed they were at least entitled to the rights the law provided for "complainants," who were clearly defined to include the Professors: "a person or entity that submits a complaint to a Committee." 22 N.Y.C.R.R. §1240.2(e).

12

Complainants were entitled to, *inter alia*, notification of the disposition of their complaint. *Id.* §1240.7(d), (e).

However, as discovery proceeded, the Professors learned that the Appellate Division had promulgated an unpublished rule further tightening the secrecy around the process and effectively denying them notice. According to the unpublished rule, where a complaint is based upon public information and the complainant lacks personal knowledge of the facts, the complainant is treated as lacking "standing" to make a complaint and is thus denied the information provided to complainants with standing. J.A.310-11. Such complaints are investigated, if at all, by the Committee acting *sua sponte*. *Id.* It was that secret rule to which Ms. Kearse referred in her "confidential" letter.

Because the Professors are, in the words of the unpublished rule, complainants without standing, they are entitled to no information at all. The State has not told them whether any of their complaints was dismissed, or resulted in private action by the grievance committee, or a private referral to the Appellate Division for a disciplinary hearing, which might be occurring in secret right now.

**D.   Adjudicatory Grievance Proceedings in the Second Department are All Secret**

New York's singular attorney disciplinary procedure operates entirely in secret unless public discipline is imposed by the Appellate Division. The Professors' claim is narrowly focused. Their claim is limited to the 21 complaints they filed. They seek only the final dispositions of the complaints by the Grievance Committee, not any investigative work. And they seek public access to any trials that occur in the Appellate Division.

### 1. Dispositions by the Grievance Committee

When a new complaint is filed, it is reviewed and may be dismissed by the Chief Counsel for a variety of reasons unrelated to its merits. J.A.307-13. If the complaint is not dismissed, the staff conduct a factual investigation and present their results to the Committee, which can dismiss the allegations, impose private discipline, or recommend public discipline. 22 N.Y.C.R.R. §1240.7(d)(2)(i),(iv),(v),and(vi). Staff provide the respondent attorney with notice of the allegations and an opportunity to respond in writing. J.A.949, 972. The Chief Counsel and staff may also interview witnesses, obtain records, direct the respondent attorney to appear, direct the respondent attorney to produce records, and—if necessary—request a subpoena or conduct a deposition of the respondent attorney. J.A.949, 972. When the investigation is complete, the Chief

14

Attorney compiles a report, which summarizes the parties' positions and the results of the staff investigation and provides analysis and recommendations. J.A.949, 973.

The report is presented to the Grievance Committee, which may ask questions of the staff and may also request additional materials. J.A.949-50, 973. Prior to reaching a decision, trial-type proceedings may occur in the Grievance Committee, whereby the Respondent is given a chance to appear. 22 N.Y.C.R.R. §1240.7(d)(2)(v). Once fact finding is complete, the Committee then deliberates as a body to determine the appropriate action. J.A.973.

The committee may determine that: (1) the complaint should be dismissed; (2) the respondent should receive a Letter of Advisement for "conduct requiring comment that, under the facts of the case, does not warrant imposition of discipline"; (3) the respondent should receive an Admonishment because, by "a fair preponderance of the evidence," "the respondent has engaged in professional misconduct, but that public discipline is not required to protect the public"; or (4) the respondent should be subject to a formal proceeding before the Appellate Division because "there is probable cause to believe that the respondent engaged in

professional misconduct warranting the imposition of public discipline." 22 N.Y.C.R.R. §1240.7(d)(2)(i),(iv),(v),and(vi).

Upon adjudication by the committee, notice of the results is given to both the complainant (with standing) and the respondent (J.A.951), each of whom is free to release the results publicly. *See* J.A.225-236. Both the respondent and complainant can seek reconsideration or review of committee dispositions, 22 N.Y.C.R.R. §1240.7(e), and adversely affected parties are entitled to a "brief description of the basis for the determination" of the reconsideration. *Id.* §1240.7(e)(4).

All this adjudicatory activity by the committee occurs behind closed doors, and the results are not disclosed to the public at large. Indeed, even when the committee concludes that the conduct warrants "public discipline . . .to protect the public," it does nothing publicly. Rather, it confidentially refers the matter to the Appellate Division, 22 N.Y.C.R.R. §1240.7(d)(2)(vi), where it remains secret, N.Y. Jud. Law §90(10), with public disclosure only in the two percent of cases where the Appellate Division acts, usually many years after the complaint was filed.

Unpublished findings of misconduct by the Committee do have consequences. They remain on the respondent's record forever and both Letters of Advisement and Admonitions have the potential to impact the

16

respondent professionally. J.A.952. For example, past disciplinary history is considered in resolving current complaints and may impact an attorney's application for a judgeship. J.A.952-53. But the public remains unaware of the misconduct.

In this action, the Professors seek only the formal dispositions of their 21 complaints by the Committee—essentially the Committee's final judgment about the accused prosecutors. They do not seek the underlying record or any of the internal staff or Committee work described below.

## 2.    Formal Disciplinary Proceedings in the Appellate Division

Where the grievance committee finds probable cause to believe the respondent engaged in professional misconduct "warranting the imposition of public discipline," the matter is referred to the Second Department to commence the next level of proceedings, with the committee acting as petitioner. In every respect, this a trial-type proceeding, but one conducted entirely in secret.

The disciplinary proceedings in the Appellate Division are "special proceeding[s]" governed by the C.P.L.R., which contains rules on pleadings, motions, hearings, trial, and judgment. 22 N.Y.C.R.R. §1240.8(a)(1); *see also* S.A.13-14; J.A.954. When trial ready, the Appellate

17

Division typically assigns a special referee to hear the case. 22 N.Y.C.R.R. §1240.8(b)(1). The hearing then proceeds like any other trial with openings, witness testimony, and summations. *See, e.g.,* J.A.667-843. The referee's findings then go to the Appellate Division, *see* 22 N.Y.C.R.R. §1240.8(b)(1), which may dismiss the complaint, remand it to the Committee for private discipline, or publicly censure, suspend, or disbar the respondent attorney. 22 N.Y.C.R.R. §1240.8(b)(1)-(2); N.Y. Jud. Law §90(2). J.A.956-57. Only discipline by the Appellate Division ever becomes public, and that is only after the trial, which is itself conducted in secret. N.Y. Jud. Law §90(10).

In this action, the Professors seek to make public the entirety of any trial held before the special master on any of their 21 complaints—live while it is occurring—and the Appellate Divisions rulings thereafter, along with any oral argument that may occur.

### 3. Secrecy & Good Cause

As required by §90(10), everything in connection with grievance committee proceedings takes place in secret, unless, and until, charges are sustained by the Appellate Division. There is a theoretical, but illusory, exception to this secrecy: "upon good cause being shown," the Appellate Division may permit the disclosure of "all or any part of [the]

18

papers, records and documents" of a grievance procedure. N.Y. Jud. Law §90(10). This is commonplace when a law enforcement agency seeks access to grievance committee records. App.Br.23. Otherwise, access to grievance proceedings almost never happens. The Professors are aware of only three such "good cause" orders in the 80 years since §90(10) was enacted. *See In re Aretakis*, 791 N.Y.S.2d 687 (App. Div. 2005), *In re Capoccia*, 453 N.E.2d 497 (N.Y. 1983), *In re N.Y. News, Inc.*, 495 N.Y.S.2d 181 (App. Div. 1985). In all three cases, the court deemed behavior by the respondent to have waived secrecy. Otherwise, in what few examples there are, the Appellate Division has denied good cause applications from the public with no explanation.

The most relevant example is a good cause application made by the Innocence Project, represented by undersigned counsel, to disclose the disciplinary proceedings against former prosecutor Glenn Kurtzrock.[14] The facts of *Kurtzrock* were almost identical to those here, only more egregious. In 2017, Kurtzrock, then a homicide prosecutor in Suffolk

---

[14]Verified Petition to Unseal Disciplinary Proceedings, *In the Matter of the Application of The Innocence Project, Inc., v. Grievance Committee for the Tenth Judicial District, et al.,* May 22, 2019, available at https://www.innocenceproject.org/wp-content/uploads/2019/05/Kurtzrock-Verified-Petition-and-Brief.pdf.

19

County, was found to have committed severe *Brady* violations.[15]  The facts were so extreme that the Suffolk County District Attorney fired Kurtzrock on the spot, mid-trial.[16]  All the charges were dismissed, with the presiding justice calling the proceeding "a travesty of justice."[17]  The District Attorney referred Kurtzrock to the Grievance Committee in the Second Department.  Less than a year later, another murder case was uncovered in which Kurtzrock had wrongly withheld *Brady* material—violations the judge said were "absolutely stunning."[18]

Nothing happened to Kurtzrock in the two years following the referral to the Grievance Committee, so in 2019 the Innocence Project filed a good cause application under §90(10), seeking the records of

---

[15]*See In re Kurtzrock*, 138 N.Y.S.3d 649, 653 (App. Div. 2020); *see also* Suffolk Cnty. Dist. Atty's Off. Conviction Integrity Bureau, A Review of the Disclosure Practices of Former Assistant Dist. Att'y Glenn Kurtzrock https://suffolkcountyny.gov/Portals/6/DA/PDFs/SCDAO%20Kurtzrock%20 Report%20Final.pdf.

[16]Andrew Smith, *Suffolk DA's Office Struggled to Comply with Key Legal Rule*, Newsday (May 14, 2017, 10:59 PM), https://www.newsday.com/long-island/suffolk/suffolk-da-s-office-struggled-to-comply-with-key-legal-rule-f52285.

[17]Tim Gannon, *Judge at Sentencing:  Hampton Murder Case Was 'Travesty of Justice'*, Riverhead News-Review (June 9, 2017, 7:47 PM), https://riverheadnewsreview.timesreview.com/2017/06/81350/judge-at-sentencing-hampton-murder-case-was-travesty-of-justice/.

[18]Order Dismissing Indictment, *People v. Lawrence*, Case No. 1095B-2012 (Sup. Ct. Suffolk Cnty. Feb. 15, 2018).

Kurtzrock's disciplinary proceedings.[19]  It made arguments equally applicable to the 21 complaints filed by the Professors here: (1) there were no relevant privacy interests since the criminal defendants, the victims of the misconduct, had been publicly charged; (2) there was no concern about injury to Kurtzrock's reputation by unfounded accusations, since his misconduct was already public and subject to judicial findings; and (3) the public had a strong interest in the operations of the criminal courts and the grievance committee and the integrity of public prosecutors.[20]  The Grievance Committee objected to disclosure and the Appellate Division denied the application, stating without explanation that "the petitioner has failed to establish good cause" to gain access to the Kurtzrock disciplinary proceedings.[21]  The Court of Appeals declined leave to appeal.

## E.  The District Court's Order

On July 28, 2023, the Professors moved for summary judgment, seeking declaratory judgment on Claim IV.  They argued, *inter alia*, that they have a presumptive First Amendment right to trial-type disciplinary

---

[19]Verified Petition to Unseal Disciplinary Proceedings, *supra* n.14.
[20]*Id.*
[21] J.A.652-57 (*In re The Innocence Project, Inc.*, No. 2019-05674, Decision & Order on Application (App. Div. 2d. Dep't July 12, 2019), *lv. denied*, 141 N.E.3d 954 (N.Y. 2020)).

21

proceedings in the Second Department and to the final dispositions of the Grievance Committee made in connection with their twenty-one complaints. District Court Record, Dkt. Nos.173, 175. The State opposed the Professors' motion and cross-moved for judgment in its favor. District Court Record, Dkt. Nos.191, 199.

In a 118-page opinion, the district court rejected the State's many procedural objections and held that §90(10), as applied to Plaintiffs' ability to learn the dispositions of the 21 complaints they had filed, violated the First Amendment. The district court ruled that the undisputed history of openness of attorney disciplinary proceedings and the substantial benefits of public access to the resolution of the Professors' complaints against prosecutors outweighed any interests in secrecy, so that the First Amendment presumption of access applies on the facts of this case to disciplinary hearings in the Second Department and to the final dispositions of the Grievance Committee pursuant to 22 N.Y.C.R.R. §1240.7(d)(2). S.A.74-118. The court emphasized the narrow scope of its ruling, noting in particular that the outcome might be different if the attorneys were not public prosecutors accused of misconduct. S.A.59.

## STANDARD OF REVIEW

In reviewing a grant of summary judgment, this Court reviews questions of law *de novo,* and the district court's factual findings for clear error. *Bessemer Tr. Co. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010). Legal determinations of ripeness and abstention are reviewed *de novo. Weiss v. New York,* No. 22-2326-CV, 2024 WL 2837623, at *1 (2d Cir. June 5, 2024); *Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, 10 F.4th 87, 99 (2d Cir. 2021).

## SUMMARY OF ARGUMENT

The district court correctly concluded that the Professors' claims are ripe for review because the State has denied, and will continue to deny, the Professors access to the records and proceedings at issue, and a good-cause application for such records would be futile. The State's ongoing refusal of access pursuant to State law constitutes a sufficient injury for standing and ripeness purposes.

The district court also correctly held that this case does not warrant abstaining under *O'Shea v. Littleton,* 414 U.S. 488 (1974) and departing from the court's duty to decide matters brought before it. Any impact that the court's order might have on State decision-making is no more than what is required by the First Amendment. There is no reason to think that compliance with the order will lead to any significant further federal

23

court litigation. Nor does the district court order dictate anything about the scope and nature of State recordkeeping, which the court made clear the State may decide how to manage on its own. Finally, the fact that the Professors could have brought their constitutional challenge in State Court is not by itself a reason for *O'Shea* abstention, particularly when First Amendment rights are at stake.

On the merits, attorney disciplinary proceedings in the Second Department are judicial proceedings to which the qualified First Amendment right of access attaches when the respondents are prosecutors and the charges against them are already public. The district court confirmed this result in holding that the extensive history of openness of attorney discipline in this nation ("experience") and the significant positive role the public plays in the functioning of process ("logic") require public access to these prosecutor disciplinary proceedings and records.

## ARGUMENT

### POINT I

### This Case is Ripe for Decision

"Constitutional ripeness . . . is really just about the first [standing] factor"—i.e., whether the plaintiff's claimed injury is "actual or imminent"

24

or instead "conjectural or hypothetical." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) (quotation marks and citation omitted). In the First Amendment context, claims are assessed "under somewhat relaxed standing and ripeness rules" to avoid an irreparable chilling effect on protected speech; "a real and imminent fear of such chilling is enough." *Id.* at 689; *see also Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) ("[I]n the First Amendment context, the ripeness doctrine is somewhat relaxed.").

The Professors' claims are ripe because §90(10) keeps secret all disciplinary proceedings in the grievance committee and the Second Department as a matter of controlling state law and, consistent with its obligation under state law and "at the direction of Justice LaSalle," S.A.40, the State has denied, and will continue to deny, the Professors access to the records and proceedings at issue. The State's immediate response to the filing of the complaints was to tell the Professors that their resolution would be secret and the State thereafter ignored a follow-up query from the Professors for more information. S.A.21, J.A.987. This ongoing refusal of access pursuant to State law constitutes a sufficient injury for standing and ripeness purposes. *See N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012) ("NYCTA")

25

(holding that denial of access to administrative hearings constituted an actual injury).[22]

Indeed, the State has even taken the affirmative step of denying the Professors the limited information available to complainants by state law based upon the Appellate Division's unpublished interpretation of that law as requiring information to be provided only to complainants with "standing," *i.e.*, personal knowledge of the facts underlying the complaint. *See* J.A.310. As the district court concluded, the Professors "are suffering an ongoing injury, which is certain to continue." S.A.40. No more is needed for ripeness. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d. Cir. 2006) (recognizing the "separate and cognizable infringement of the First Amendment" with "[e]ach passing day") (quotation marks and citations omitted)).

The State acknowledges that there is no exhaustion requirement for ripeness, but then inconsistently argues that to have sustained an injury, the Professors needed to exhaust their state court remedies not as

---

[22] *See also Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) ("The 'injury in fact' that respondents have suffered consists of their inability to obtain information"); *Public Citizen v. Dep't of Just.*, 491 U.S. 440, 449 (1989) (acknowledging "a sufficiently distinct injury to provide standing" where plaintiffs were denied information that would allow them to "scrutinize" the activities of government).

26

"complainants," but as "members of the public." App.Br.36-38. Based on this metaphysical distinction the State says the dispute is not ripe because the Professors did not file a petition with the Appellate Division to allow access based on a showing of "good cause." But the Professors sought access under the First Amendment and First Amendment injury occurred the moment the State denied the Professors' access under color of a state law alleged to be unconstitutional. More delay just means more injury. Judge Marrero correctly found not only that such exhaustion is not required, but that there was every reason to conclude that a "good cause" application would be "futile." S.A.41-42.

The State does not dispute that it is extremely rare for good cause exceptions to be granted except to law enforcement agencies, with only three examples over the last 80 years. Nor does it dispute that in those three cases, unlike this one, the respondent attorney's conduct constituted a waiver of the law's protection. *See In re Aretakis*, 791 N.Y.S. 2d 687 (App. Div. 2005), *In re Capoccia*, 453 N.E.2d 497 (N.Y. 1983), and *In re New York News, Inc.*, 495 N.Y.S. 2d 181 (App. Div. 1985). Nor does the State dispute its own demonstrated commitment to keeping grievance proceedings secret. Notably, it does not suggest that it would join with the Professors to support a good cause application in court or that the

27

defendant, Justice LaSalle, would be inclined to grant such a motion. There is thus nothing to support the State's suggestion that such a motion by the Professors might prevail. *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 691 (reaching the same conclusion, as it was "disingenuous for [the] [d]efendants to insinuate that [they] might not enforce [the statute] against [the plaintiff]" when it applied to the plaintiff's activities, and the defendants had enforced the statute against others like the plaintiff).

More important, there is every reason to think it would be denied. The arguments for access made, and denied, in *Kurtzrock* are no different from those the Professors might make here.[23] In *Kurtzrock*, the applicant argued that there was good cause because the facts were already public, the lawyer's reputation was already injured by the publicity, and the lawyer was a prosecutor whose behavior was of public interest.[24] The 21 complaints here are on all fours with *Kurtzrock*. "It would be an academic exercise to ask Plaintiffs to first make Good Cause Applications before they can bring a civil rights action under Section 1983." S.A. 42.

The State inaptly relies on *Kentucky Press Ass'n v. Kentucky*. App.Br.36 (citing 454 F.3d 505 (6th Cir. 2006)). There, the plaintiff press

---

[23] *See* Verified Petition to Unseal Disciplinary Proceedings, *supra* n.14.
[24] *Id.*

28

organization brought a facial challenge to Kentucky law that denied access to state juvenile court proceedings. *Id.* at 507. In that facial challenge, unlike the Professors' as-applied challenge, the Kentucky plaintiff admitted that it was not seeking access to any particular case, leading the court to find that the plaintiff was not suffering any particular hardship. *Id.* at 510. Meanwhile, there was an unknown interpretation of Kentucky law that might moot the constitutional challenge. *Id.* Here, precedent shows that the Appellate Division will deny a good cause application on these facts and the Professors are injured every day as they seek First Amendment access to 21 particular grievance proceedings. *See NYCTA*, 684 F.3d at 295; *Lugosch,* 435 F.3d at 126. In any event, the *Kentucky Press* court was not bound by the relaxed ripeness rules that apply to First Amendment claims in this Circuit.[25]

Finally, prudential ripeness concerns do not warrant dismissal. Prudential ripeness requires the court "to evaluate both the fitness of the

---

[25] The other cases the State cites are even less relevant. In *Marchi*, "withholding judicial decision . . . [wa]s not likely to result in significant hardship for [the plaintiff]" since there was no credible fear of enforcement on the facts alleged. *Marchi v. Bd. of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 478-79 (2d Cir. 1999). In *Coffran*, "the ultimate decisionmaker . . . ha[d] not rendered its decision" and there was no evidence that the decision would be necessarily unfavorable. *Coffran v. Bd. of Trs. Of N.Y.C. Pension Fund*, 46 F.3d 3, 4 (2d Cir. 1995)

29

issues for judicial decision and the hardship to the parties of withholding court consideration." *Nat'l Org. for Marriage, Inc.*, 714 F.3d at 691 (quotation marks and citations omitted). Here, the claims are fit for judicial decision because the Professors are expressly denied access to the records by §90(10), and it would be an academic exercise to demand that they first file 21 different Good Cause applications. *See id.* at 690-91. Likewise, the "hardship" requirement is satisfied because the longer the Professors are deprived access to the records and proceedings at issue, the longer their constitutional rights are violated.

## POINT II

### *O'Shea* Abstention Is Not Warranted in This Case

The Supreme Court has long held that "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 368 (1989). The State nonetheless argues that the Court should abstain under *O'Shea v. Littleton*, 414 U.S. 488 (1974). *O'Shea* applied the *Younger* doctrine, which itself directs federal courts to abstain from deciding cases only in three "exceptional" circumstances, which are not met here and which must be narrowly construed. *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 70, 73, 78, 82 (2013) (noting that the three

30

categories "define *Younger*'s scope" and that *Younger* extends "no further") In *O'Shea*, as in *Younger*, the plaintiff could raise his federal claim in the related state proceeding. 414 U.S. at 496. That was true also in this Court's decision applying *O'Shea* in *Kaufman v. Kaye*, 466 F.3d 83, 87 (2d Cir. 2006). Here, as Judge Marrero recognized, the Professors are not parties to the state grievance proceedings and so cannot raise their constitutional claim in that forum—if they even knew about them.[26] J.A.181-82.

*O'Shea* is at most a narrow and rarely-applied extension of *Younger*. It directs federal courts to abstain only where a failure to do so would result in "a major continuing intrusion of equitable power of the federal courts into the daily conduct of state criminal proceedings." 414 U.S. at 502. This does not change the general rule that "a federal court's obligation to hear and decide a case is virtually unflagging." *Sprint,* 571 U.S. at 77. Moreover, courts must be especially wary of abstaining in the

---

[26]In a footnote of astonishing doubletalk, the State argues that *Younger* abstention would be appropriate *if* there were pending state grievance proceedings, presumably because the Professors could somehow raise their constitutional objections in that forum even though they are not parties, but in the next sentence says that the existence of such proceedings is confidential, so the Professors would never know about them. App.Br.41 n.44. The State wisely did not appeal Judge Marrero's decision that *Younger* abstention was inappropriate here.

31

First Amendment context because "forc[ing] the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota*, 389 U.S. 241, 252 (1967); *see also Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 100 (2d Cir. 2004) (reasoning in part that "the weight of the First Amendment issues involved counsel[ed] against abstaining"); *Dombrowski v. Pfister*, 380 U.S. 479, 489-90 (1965) (discussing the danger of abstention when the constitutionality of state statutes are attacked on their face or as applied).

*O'Shea* was not a First Amendment case and the State vastly overstates the scope of its holding. In *O'Shea*, the Supreme Court abstained because, rather than seek to "strike down a single state statute, either on its face or as applied," the plaintiffs sought to enjoin two state judges from conducting proceedings in a racially discriminatory way, including with respect to bail and sentencing proceedings—relief that would necessitate "continuous supervision by the federal court" over a state court. 414 U.S. at 500-01. This case is not only a First Amendment case, but the relief sought is vastly narrower than in *O'Shea*. Here the Professors brought an as-applied challenge to §90(10) seeking access in

"only twenty-one specific cases, rather than every future case." S.A.63, J.A.187.

The State tries to exaggerate the applicability of this ruling, but the district court was careful to note its limitations. "Section 90(10) may well be consistent with the First Amendment applied in other circumstances— for instance, if a plaintiff had notice rights as a complainant, or where a case does not involve alleged misconduct of state law enforcement officials, which implicates core First Amendment interests that 'counsel[] against abstaining.'" S.A.59 (quoting *Pellegrino*, 380 F.3d at 100). Even if this ruling were held to apply to other similar complaints the Professors have filed, as they hope it will, that expands the universe from 21 prosecutors to 50. This is vastly different from the "major," "continuing," and "daily" impact of the ruling at issue in *O'Shea*. *O'Shea,* 414 U.S. at 502.

## A.  The Relief Granted Does No More Than Necessary to Comply with the First Amendment

For the first time on appeal, the State argues that abstention is warranted because the relief granted would impact the *substance* of state disciplinary decisions by forcing it to make public decisions that it might otherwise prefer to remain private. To the extent the Court considers this

33

argument (which was forfeited below),[27] it is meritless. The State's desire to maintain a form of discipline that keeps certain records secret in violation of the First Amendment is not reason to abstain—rather, it is reason for the court to act. *See Courthouse News Serv. v. New Mexico Admin. Off. of Cts.*, 53 F.4th 1245, 1262 (10th Cir. 2022) (rejecting defendants' argument that court should abstain because relief would "redefine what constitutes a court record subject to public access, . . . [R]ather, [it] would prohibit an unconstitutional practice.").

The relief granted affects the severity of the discipline no more than what is required by the First Amendment in this case, where the charges are against prosecutors and are already public. If there are reasons permitted under the First Amendment for keeping a decision secret, the district court's order permits that. Thus, it presumes the public has a

---

[27]This argument should be disregarded because it was not raised before the district court. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 130 (2d Cir. 2012) ("[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal." (quotation marks and citation omitted)). In the district court, the State's cursory *O'Shea* argument focused on the supposed need to make a good cause application and alleged incorrectly that the relief requested would disregard the Second Department's exclusive authority over its own records and disciplinary processes and position federal courts to issue orders on an ongoing basis. There was no suggestion that a ruling for the Professors would affect the *substance* of grievance committee rulings. *See* District Court Record, Dkt. No. 199 at 21-24.

34

right of access, but allows that presumption to be overcome "by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" S.A.76 (quoting *In re Grand Jury Subpoena*, 103 F.3d 234, 242 (2d Cir. 1996) (quotation marks omitted)). That the State (undoubtedly correctly) assumes it cannot meet this burden with respect the disciplinary records at issue is not a reason to abstain.

The State complains that the district court's order would impose "personal and professional consequences that attend the publication of dispositions, including outright dismissals of meritless accusations that would otherwise remain private." App.Br.46. This argument, which shows up throughout the State's brief, App.Br.1, 29, 33, 54, 63, is irrelevant on the facts of this case, complaints against 21 prosecutors. The complaints have already been filed publicly and the prosecutors are all the subject of prior judicial decisions finding misconduct. Whatever might embarrass these prosecutors is already public. Indeed, given the adverse findings against them, the accused prosecutors could only benefit from the vindication of any hypothetical "outright dismissals."

In any event, as the district court recognized, to the extent public access "may embarrass state prosecutors, the Supreme Court long ago

35

acknowledged that public officials' reputations are not of a higher value that supersedes the First Amendment." S.A.113-14 (citing *Press-Enterprise Co. v. Super. Ct.*, 478 U.S. 1, 13-14 (1986) ("Press-Enterprise II"); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S 829, 841-42 (1978); *United States v. Erie Cnty.*, 763 F.3d 235, 241 (2014)). Any impact that the district court's order might have on State decision-making is no more than what is required by the First Amendment.

## B. The Relief Granted Differs in Nature and Scope than that Contemplated by *O'Shea*

Straining to compare this case to *O'Shea*, the State argues that the district court's order "encourages continued federal-court intervention" and "highly burdensome" "case-by-case oversight." App.Br.47-48. That is exaggerated in the extreme. *O'Shea* was unique, a challenge to the local criminal justice system, seeking ongoing injunctions about bail, sentencing, fines and a federal audit of all of those. 414 U.S. at 492. Here, there isn't even an injunction, just declaratory relief. Meanwhile, the district court ordered the State only to make 21 decisions about public access using well-settled, clear and readily applied First Amendment principles. The State does not suggest any problem with understanding and applying the district court's test.

36

In any event, there is no reason to believe that discipline imposed on the 21 accused prosecutors would be entitled to remain private under the First Amendment, and the State does not say otherwise. Indeed, with the facts and the complaints already public, all that the Professors seek to learn is the final decision—do the facts alleged in the complaints warrant discipline? Applying the law to known facts does not present a reason for secrecy and, to the contrary, just builds a body of relevant precedent.

There is thus no reason to think that compliance with the order will lead to further federal court litigation. If, as expected, the Grievance Committee allows the dispositions to become public, only the respondent prosecutor could object and he could challenge the Grievance Committee's unsealing decision both in the committee and on appeal to the Appellate Division under existing rules. 22 N.Y.C.R.R. §§1240.7; 1240.8(c).[28] He would have no federal claim for relief.

It is true that, in the unlikely event that the Grievance Committee or the Appellate Division makes on-the-record findings that its disposition of one or more complaints must be sealed, further federal court litigation might ensue. But the scope of any such disputes is utterly unlike *O'Shea*.

---

[28] *See also Hill v. Comm. on Pro. Standards of the Third Jud. Dep't*, 5 A.D.3d 835, 836.

37

The only issue is whether to make public the final dispositions of up to 21 grievance complaints—and perhaps 29 more—out of the 8000 or so complaints the Second Department Grievance Committee resolves every year. Whatever disagreements might arise between the Professors and State over compliance with the district court's declaratory judgment, that will hardly lead to the "major continuing intrusion . . . into the daily conduct of state [] proceedings" condemned in *O'Shea*. *O'Shea*, 414 U.S. at 502. The mere possibility that some additional litigation may arise in the future is no reason to abstain from deciding a constitutional claim. *Courthouse News Serv. v. Planet*, 750 F.3d 776, 792 (9th Cir. 2014). To the contrary, "[a]ny plaintiff who obtains equitable relief under 42 U.S.C. § 1983 enforcing his constitutional rights . . . may need to return to court to ensure compliance with the judgment." *Id.*

## C. The Relief Granted Does Not Undermine the State's Ability to Manage Their Records

The relief granted does not undermine the State's ability to manage its own records. The Professors were granted a presumptive right of access to the final dispositions of 21 grievance proceedings. State systems now permit these final dispositions to be routinely forwarded to the respondent and to any complainant with standing, and they are

maintained permanently by the State. J.A.951,953. It does not matter where they are docketed; they are within the possession and control of the State and compliance with the court order should not be difficult. Nor should it be difficult to open to the public trial-type proceedings and associated records now filed in the clerk's office.[29] Notably, the State has offered no sworn testimony disputing any of this.

Most important, the district court did not dictate in any way how the State should manage its records. Rather, as the court made clear, the State may decide on its own how to organize its records and procedures to comply with the First Amendment. "The procedural mechanism by which the State complies with the Constitution is not material." S.A.57.. As the district court correctly found, federal oversight of State recordkeeping—if any at all is needed—is "far smaller" than in *O'Shea* and does not represent the "continuous, indefinite, and intrusive oversight that runs counter to *O'Shea*." S.A.60.

All the State cites in support of its argument is the minority view of the Seventh Circuit that a court order forcing a court clerk immediately to

---

[29] Records of trial-type proceedings in the Appellate Division are housed in the Clerk's Office. In June 2023, an attorney representing the Professors was able to review the records of the *Kurtzrock* case in the Clerk's Office. J.A.262-266.

39

make public new civil complaints interferes with the states' "significant interest in running their own clerks' offices and setting their own filing procedures." App.Br.49-50 (citing *Courthouse News Serv. v. Brown*, 908 F.3d 1063 (7th Cir. 2018)). This decision is decidedly an outlier, with four other circuits[30] and many district courts disagreeing.[31] The same issue is now pending before this Court in *Courthouse News Serv. v. Gabel*, No. 21-cv-3098. Whatever its outcome, *Gabel* should not affect the propriety of Judge Marrero's order here. In *Gabel*, the district court issued an injunction telling the state how to manage its records. At oral argument, members of this Court indicated that a declaratory judgment would have been preferable because it would have allowed the state the opportunity

---

[30] *See Courthouse News Serv. v. N.M. Admin. Offe.*, 53 F.4th 1245 (10th Cir. 2022); *Courthouse News Serv. v. Gilmer*, 48 F.4th 908 (8th Cir. 2022); *Courthouse News Serv. v. Schaefer*, 2 F.4th 318 (4th Cir. 2021); *Courthouse News Serv. v. Planet*, 750 F.3d 776 (9th Cir. 2014).

[31] *See Courthouse News Serv. v. Gabel*, No. 21-cv-132, 2021 WL 5416650 (D. Vt., Nov. 19, 2021); *Courthouse News Serv. v. Tingling*, 2016 WL 8739010 (S.D.N.Y. Dec. 16, 2016) (Transcript of Oral Decision); *see also Courthouse News Serv. v. Omundson*, No. 16-cv-8742, 598 F. Supp. 3d 929 (D. Idaho Apr. 14, 2022); *Courthouse News Serv. v. O'Shaughnessy*, 2022 WL 17476835 (S.D. Ohio Dec. 22, 2022).

to craft its own lawful record-keeping practices.[32]   Of course, that is exactly what Judge Marrero's declaratory judgment does.[33]

## D.   The Possibility of Alternative Avenues of Relief Is Not Sufficient To Warrant Abstention

Finally, the State complains that the Professors could have brought their constitutional challenge in State court.   That is not, by itself, a reason for *O'Shea* abstention because it is true of every constitutional challenge.   State courts are courts of general jurisdiction and can always entertain a First Amendment claim.   But as the Supreme Court has observed, "[w]e would defeat th[]e purposes [of 42 U.S.C. § 1983] if we held that assertion of a federal claim in a federal court must await an attempt to vindicate the same claim in a state court."   *McNeese v. Bd. of Ed. For Cmty. Unit Sch. Dist.* 187, Cahokia, Ill., 373 U.S. 668, 672 (1963). That is because "Congress created federal courts as the chief—though not always the exclusive—tribunals for enforcement of federal rights."   *Id.*

---

[32]*See Courthouse News Serv. v. Gabel*, No. 21-3098, Oral Argument (2d Cir. Apr. 10, 2023).

[33]The State suggests the declaratory judgment here is akin to an injunction; this is not so.   *Disability Rights,* which it cites, merely acknowledged that the fact that a grant of declaratory relief, rather than injunctive relief, is not alone reason to not abstain under *O'Shea*.   916 F.3d at 173.

41

This is especially true where First Amendment rights are at stake. "[Abstention] principles have particular significance when, as in this case, the attack upon the statute on its face is for repugnancy to the First Amendment" because "to force the plaintiff who has commenced a federal action to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *See Zwickler*, 389 U.S. at 252 There is nothing about the facts at hand that warrant an exception to these general rules.

## POINT III

### There is a Qualified Right of Access to The Disciplinary Proceedings of the 21 Prosecutors

The First Amendment right of access to civil judicial proceedings and adjudications is well-established in this Court. *See Westmoreland v. CBS, Inc.*, 752 F.2d 16, 23 (2d Cir. 1984) ("[T]he First Amendment does secure to the public and to the press a right of access to civil proceedings . . . .") (quotation marks and citations omitted); *see also Joy v. North,* 692 F.2d 880, 893 (2d Cir. 1982) ("An adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny."). The right of the public to access civil proceedings goes to the core of the First Amendment "because public

42

access . . . enhances the quality and safeguards the integrity of the factfinding process, fosters an appearance of fairness, and heightens public respect for the judicial process, while permitting the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Westmoreland*, 752 F.2d at 23 (quotation marks and citations omitted).

The constitutional public right of access to civil trials and adjudications applies to the 21 grievance complaints filed by the Professors.

### A. Disciplinary Proceedings in The Grievance Committee and The Appellate Division Are Judicial Proceedings

Attorney disciplinary proceedings in the grievance committee and the Appellate Division are judicial proceedings to which the qualified right of access under the First Amendment attaches on the facts of this case. At their core, these proceedings are "judicial proceedings" because they seek "the compliance of [a] person, subject to judicial control, with standards imposed upon his conduct in the public interest." *Doe v. Rosenberry*, 255 F.2d 118, 120 (2d Cir. 1958). They are not legislative, ministerial, or administrative, but involve a "judicial inquiry" in which the committee and, if applicable, the Appellate Division are "called upon

43

to investigate, declare, and enforce liabilities as they [stood] on present or past facts and under laws supposed already to exist." *D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 479 (1983) (quotation marks and citations omitted).

In New York, "the filing of [a] complaint [with a grievance committee] initiate[s] a judicial proceeding." *Wiener v. Weintraub*, 22 N.Y.2d 330, 331-32 (1968); *see id.* (holding that proceedings before a "Grievance Committee[] of a Bar Association" "constitute[] a judicial proceeding," as the Committee is functioning as "an arm of the Appellate Division."). This Court has adopted the same analysis, finding that "[p]etitions or complaints charging professional misconduct of an attorney, which in the past were presented to the General Term of the Supreme Court are now usually filed with the Grievance Committee of a bar association. . . [A] proceeding before such a committee constitutes a 'judicial proceeding.'" *Anonymous v. Ass'n of the Bar of City of N.Y.*, 515 F.2d 427, 433 (2d Cir. 1975).

The Appellate Division's delegation of adjudicatory powers to the grievance committee does not change the judicial nature of the committee's work. To the contrary, that delegation makes bar disciplinary committees an "arm of the court in performing the function of

44

receiving and investigating complaints and holding hearings," whose actions are of an "essentially judicial nature." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 434 n.13 (1982). Indeed, a state court's delegation of "disciplinary proceedings with respect to those admitted to practice before it amounts to a judicial inquiry. . . . Although the court, for practical reasons, invokes the assistance of bar associations and their committees . . . , the disciplinary power continues to rest exclusively with the court." *Erdmann v. Stevens*, 458 F.2d 1205, 1208-09 (2d Cir. 1972); *see also Mosby v. Ligon*, 418 F.3d 927, 931–32 (8th Cir. 2005) ("Because the Committee is created and appointed by the Arkansas Supreme Court, operates pursuant to rules promulgated by that court, and is subject to review by that court, the Committee's decision to discipline [the respondent attorney] is the functional equivalent of a state-court judgment.").

The grievance committee's role in reaching final dispositions is part and parcel of the judicial proceeding. The State admitted as much: "state-initiated attorney disciplinary proceedings for violations of state ethics rules are an example of civil enforcement proceedings." District Court Record, Dkt. No. 78, at 28. Indeed, as the district court found below, the Committee's issuance of dispositions, on a completely

45

developed factual record and after considering arguments from both sides, is an exercise of its adjudicative function. S.A.96-97. The Committee proceedings are "a forum that resembles an adversarial trial where attorneys within its geographical jurisdiction confront the power of their government to judge and penalize their actions as members of the legal profession." S.A.97 (quotations omitted). The public knows about the charges the Professors filed and, under the First Amendment, it is entitled to know and evaluate the Committee's decisions about the fate of the 21 accused prosecutors resulting from this adversarial, trial-like forum. *In re Demetriades*, 58 F.4th 37, 45–46 (2d Cir. 2023) (there is a "strong presumption under the First Amendment that judicial documents—and especially judicial decisions, which are used to determine litigants' substantive legal rights—should be subject to public scrutiny." (quotation marks and citations omitted) (cleaned up)).

When the grievance committee determines probable cause exists, it authorizes "special proceedings" before the Appellate Division, which are formal trial-type proceedings often heard first by a special referee. *See* 22 N.Y.C.R.R. §1240.8(a)(1); J.A.954. "A special proceeding is a civil judicial proceeding in which a right can be established or an obligation enforced in summary fashion. Like any other civil action, it ends in a judgment, but

46

the procedure is similar to that on a motion." *Martinez v. Cap. One Bank, N.A.*, No. 10-CV-8028 (RJS), 2016 WL 54686, at *2 (S.D.N.Y. Jan. 4, 2016) (citations omitted).

These special proceedings have all the features of any other civil proceeding, including a complaint and an answer, then discovery and a trial featuring openings, witness testimony and summations. *See* 22 N.Y.C.R.R. §1240.8(a)(1)(i), (a)(2)–(a)(4); J.A.954-956. The referee's findings may be affirmed or sustained by the Appellate Division, and sustained charges may result in public censure, suspension, or disbarment. *See* 22 N.Y.C.R.R. §1240.8(b)(1); J.A.956. Under the First Amendment, the public is entitled to access to these trials while they are underway and to any decisions that are reached. *See Westmoreland,* 752 F.2d at 23; *Hardy v. Equitable Life Assurance Soc'y of United States*, 697 F. App'x 723, 725 (2d Cir. 2017) ("It should go without saying that the judge's opinions and orders belong in the public domain.") (citations omitted). That is certainly true with respect to any trials of the 21 accused prosecutors.

## B. Experience & Logic Confirm a Presumptive Right of Public Access to Disciplinary Proceedings Involving the 21 Prosecutors

The standards set forth in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596 (1982), and *Press-Enterprise Co. v. Super. Ct.* ("Press-Enterprise I"), 464 U.S. 501 (1984), confirm the presumptive right of access to dispositions of the complaints against the 21 accused prosecutors.

Under this jurisprudence, there is a qualified right to public access to some government proceedings and records "to ensure that th[e] constitutionally protected discussion of governmental affairs is an informed one." *Globe Newspaper Co.*, 457 U.S. at 604-605 (quotations and citation omitted). To determine whether the First Amendment applies to a particular government proceeding, the Court considers experience, namely, "whether the place and process have historically been open to the press and general public," and logic, *i.e.*, "whether public access plays a significant positive role in the functioning of the particular process in question." *Hartford Courant Co., LLC v. Carroll*, 986 F.3d 211, 219 (2d Cir. 2021) (quoting *Press-Enterprise II*, 478 U.S. at 8)).

Applying this guidance, the district court properly determined that there is a presumptive right of access to proceedings and records of the Appellate Division and to the Grievance Committees' final dispositions with respect to the 21 accused prosecutors.

48

### 1. Experience: There is a Deeply Rooted History of Openness for Attorney Disciplinary Proceedings

Under the "experience" prong, foremost consideration is given to whether the proceeding was open at the time of the founding, since the constitution "carries the gloss of history." *See Richmond Newspapers,* 448 U.S. at 589 (Brennan J., concurring). Courts also consider the historical practice at English common law, as well as the ensuing tradition in the states through the American early-Republic period. Contrary to the State's argument, App.Br.at 53, the tradition of openness need not be "unbroken" and "continuous" for a constitutional right of access to attach. *See, e.g., Press-Enterprise II,* 478 U.S. at 10-11 (acknowledging a practice of openness for preliminary hearings that was not, at the time, entirely uniform amongst all states, and still finding a presumptive right of access to such proceedings); *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 700-03 (6th Cir. 2002) (same for deportation proceedings); *California First Amend. Coal. v. Woodford*, 299 F.3d 868, 875-76 (9th Cir. 2002) (same for execution proceedings, which had been initially conducted in public and then were moved to prisons where no right of access exists).

The focus is "not on formalistic descriptions of the government proceeding but on the kind of work the proceeding actually does and on

the First Amendment principles at stake." *NYCTA*, 684 F.3d at 299. Moreover, the analysis is not limited to the history of one state. *El Vocero de Puerto Rico v. Puerto Rico*, 508 U.S. 147, 150–51 (1993).

### a. Attorney Discipline in the Courtroom

The long history of open attorney disciplinary proceedings was developed in great detail by the district court and is not disputed by the State. Since the time of this Nation's founding, through the mid-twentieth century, disciplinary proceedings were conducted in open court. This practice only changed with the involvement of bar associations in the early-twentieth century. In New York, the procedure became completely secret in 1945, making it today, a national outlier.

The State does not meaningfully dispute this. App.Br.at 5-7. Most importantly, it acknowledges that "during the colonial and post-revolutionary period . . . [a]ttorneys were regulated through ad hoc proceedings in open court conducted as equity suits or contempt proceedings." *Id.*; *see also id.* at 67 ("[A]ttorney disbarment proceedings were carried out in public in early American history . . . because such proceedings were a species of regular civil litigation[.]").

In New York specifically, as the State admits, "prior to 1895, attorney licensing and discipline were handled by the General Term of the

50

Supreme Court, and that in 1921, the legislature directed that local district attorneys . . . prosecute all proceedings for the removal or suspension of attorneys." J.A.958-59, 965; *see also Wiener*, 22 N.Y.2d at 331. These proceedings were considered "quasi-criminal" matters "of a public nature." *In re Kelly*, 59 N.Y. 595, 596 (1875); *see also In re Spencer*, 122 N.Y.S. 190, 192 (1st Dep't 1910). Such proceedings were like civil trials in every respect. *See, e.g., Youmans v. Smith*, 153 N.Y. 214, 220 (1897).

Today, as was true in New York until 1945, public disciplinary trials are the national norm after a finding of probable cause that misconduct has occurred. As of 2015, forty-one states open disciplinary proceedings upon such a finding. *See* Chief Judge's Comm. on Statewide Att'y Discipline, Enhancing Fairness and Consistency, Fostering Efficiency and Transparency 12, 62 (2015) ("2015 Chief Judge Report"). Today, according to the State, the number is forty-six. App.Br.11. The antiquated and unnecessary secrecy imposed by §90(10) on such trials in New York makes this state a national outlier and its secret trials contrary to the public interest. Just compare the nationally televised disbarment proceedings against Rudolph Giuliani in Washington, D.C. in 2024 with

51

the totally secret star chamber trial in New York, both reaching the same result.

### b. Secret Discipline by Grievance Committee

Starting in the late nineteenth century, some states began delegating to bar associations the task of investigating disciplinary actions. *See* Leslie Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1 at 13-14 (collecting sources). These investigations were conducted entirely in secret unless the bar association took allegations of misconduct to a court. *Id.* at 15; *see also Karlin v. Culkin*, 248 N.Y. 465, 493 (N.Y. 1928) (acknowledging the practice of secrecy "in the stage of preliminary investigation"). But, critically, the bar associations' power was limited. They conducted investigations but could not affect coercive discipline until the 1930s. Levin at 14 & nn. 78-79, 15 & nn. 86-88.

Unsurprisingly, as bar associations became more involved in the disciplinary process, the system became more secret, and in 1945, New York adopted a system of complete secrecy enacting what is now §90(10). *See* N.Y. Jud. Law §88(8) (now codified at N.Y. Jud. Law §90(10), Bill Jacket, L. 1909 (1945)). New York went well beyond merely keeping

52

grievance committee proceedings secret. It even directed that disciplinary trials in the Appellate Division be kept secret.

The transfer of open-court regulation to secret decision-making by bar committees turned out not to be such a good idea. Rather, critics have increasingly recognized that the move to private, secret adjudication is unhealthy and contrary to the public interest. Professor Coffee calls "private self-regulation of attorneys" by bar associations no more than "government of the guild, by the guild, and for the guild."[34] Or in Professor Green's words, "the public sees lawyers regulating lawyers, effectively giving scofflaws a pass, in secret and without any justification," reinforcing the perception "that the fox is guarding the henhouse but not doing a conscientious job of it."[35]

---

[34] *The Attorney as Gatekeeper: An Agenda for the SEC*, 103 COLUM. L. REV. 1293, 1316 (2003).

[35] *Selectively Disciplining Advocates,* 54 Conn. L. Rev. 151, 193 (2022). *See also* Anthony E. Davis, *Professional Liability Insurers as Regulators of Law Practice*, 65 FORDHAM L. REV. 209, 231 (1996) ("[T]he bar has proved itself to be supremely self-serving in regulating itself . . . ."); Brian Finkelstein, *Should Permanent Disbarment Be Permanent?*, 20 GEO. J. LEGAL ETHICS 587, 594−95 (2007) ("The public perception that lawyers, members of a self regulated profession, are merely 'protecting themselves' by not utilizing permanent disbarment, is a real threat to the reputation of all lawyers."); Kay A. Ostberg, *The Conflict of Interest in Lawyer Self-Regulation*, 1 PROF. LAW 1, Summer 1989, at 6, 7 (characterizing the ABA and state bar associations as "trade organizations charged with advancing the interests of lawyers."); Margaret Onys Rentz, *Laying Down

Slowly, the organized bar and the courts have recognized the problem. Since at least 1986, the American Bar Association has recommended, as the Professors urge here, that the ***disposition*** of lawyer discipline should be public in cases of disbarment, suspension, probation, and reprimand, even in cases of "relatively minor misconduct." ABA, Model Rules of Lawyer Disciplinary Enforcement Rules 10D, Commentary (2020); *see also* ABA Commission on Evaluation of Disciplinary Enforcement, Lawyer Regulation for a New Century: Report of the Commission on Evaluation of Disciplinary Enforcement 33, 34-38 (1992) (recommending that "all records of the lawyer disciplinary agency, except the work product of disciplinary counsel, should be available to the public from the time of the complainant's initial communication with the agency"). Even before then, the ABA recommended that attorney disciplinary proceedings should also be public upon determination of

---

*the Law: Bringing Down the Legal Cartel in Real Estate Settlement Services and Beyond*, 40 GA. L. REV. 293, 307 (2005) ("[L]eniency in disciplinary action—a product of the bar's self-regulation—is no doubt part of what fuels public contempt for the profession."); Bradley A. Smith, *The Limits of Compulsory Professionalism: How the Unified Bar Harms the Legal Profession*, 22 Fla. St. U. L. Rev. 35, 63 (1994) ("Placing the public power to discipline attorneys into the hands of what is basically a private, autonomous organization is problematic, at best. . . . [T]he association may unreasonably seek to protect members from punishment or exposure.").

probable cause that the lawyer committed misconduct. ABA Model Rule 16A; *see also* N.Y. State Bar Ass'n Comm. on Prof'l Discipline, A Comprehensive Study of the State of Discipline in New York 50 (June 1985) (warning that New York's secrecy rules are "too stringent, have created undue suspicion, and have raised doubts about the integrity in the minds of the public."); The Confidentiality of Discipline Proceedings, 47 Rec. Ass'n B. City N.Y. 48, 59 (1992) (same).[36]

Meanwhile, the flaws associated with secret attorney discipline by grievance committee apply with even more force to committee discipline of prosecutors, which is close to non-existent. New York's routine and secret dismissal of allegations of prosecutorial misconduct, publicly dubbed the "prosecutor-protection racket,"[37] has generated tremendous public criticism and discussion. In recent years, two advisory bodies created by

---

[36] The State notes that this Court's rules and those of the district courts provide that "proceedings and records" of attorney disciplinary matters in the federal courts are presumptively confidential. App.Br.11-12. Because there is no record about these proceedings, we do not know whether the discipline actually imposed by the federal courts is kept confidential. In any event, the constitutionality of those rules has never been decided, either on their face or as applied to prosecutors already found by the court to have engaged in misconduct.
[37] New York Times Editorial Board, *How Can You Destroy a Person's Life and Only Get a Slap on the Wrist?*, N.Y. TIMES (Dec. 4, 2021), https://www.nytimes.com/2021/12/04/opinion/prosecutor-misconduct-new-york-doj.html.

the Chief Judge of the New York Court of Appeals have addressed the issue, suggesting that grievance committees take on a more proactive role with respect to prosecutorial misconduct.

In September 2015, the Commission on Statewide Attorney Discipline recommended that the disciplinary process be made "more accessible to the public" to offset the "atmosphere of public suspicion and skepticism." 2015 Chief Judge Report at 12, 67. It focused on prosecutors in particular, recommending putting in place a process "to ensure that judicial determinations of prosecutorial misconduct are promptly referred to the appropriate disciplinary committee" and that any sanctions meted out for misconduct are "publicly released" because "the public has every right to scrutinize the conduct of those it entrusts with public office." *Id.* at 78-79. And in 2017, a State Justice Task Force recommended that grievance committees "proactively review available court decisions" and undertake investigations "where a finding of attorney misconduct has been made in a court decision."[38] Needless to say, none of these recommendations have been implemented.

---

[38]New York State Justice Task Force, Report on Attorney Responsibility in Criminal Cases (February 2017), 5, available at http://www.nyjusticetaskforce.com/pdfs/2017JTF-AttorneyDisciplineReport.pdf.

Beginning in 2018, New York State attempted to create a first-in-the-nation State Commission on Prosecutorial Conduct.[39] That reform effort was met with unrelenting opposition from the District Attorney Association of New York. After two lawsuits, the law enacting the Commission was twice amended and watered-down, reducing the Commission's role to be solely advisory.[40] Even so, the new law faces resistance from prosecutors to this day.[41] Ironically, opponents of the Commission have argued that the solution is not a State Commission, but rather increased oversight from the grievance committees.[42] But, as the

---

[39] *See* Joaquin Sapien, *Bill Proposes Greater Accountability for New York Prosecutors Who Break the Law*, ProPublica (Aug. 16, 2018), https://www.propublica.org/article/bill-proposes-greater-accountability-for-new-york-prosecutors-who-break-the-law.

[40] *See* Dan M. Clark, *DAs File Constitutional Challenge to NY Prosecutorial Conduct Commission,* New York Law Journal (Oct. 17, 2018), https://www.law.com/newyorklawjournal/2018/10/17/das-file-constitutional-challenge-to-ny-prosecutorial-conduct-commission/; *see also* Rachel A. Nolan, *Prosecutorial Conduct Commissions: A Possibility for Accountability,* 52 Fordham Urb. L.J. 251, 275-79 (2024).

[41] *See* Dan Clark, *N.Y.'s prosecutor watchdog panel finally begins its work – 7 years later,* Times Union (Feb. 27, 2025), https://www.timesunion.com/state/article/ny-prosecutors-now-investigated-misconduct-20173372.php.

[42] *See* Jesse McKinley, *A New Panel Can Investigate Prosecutors. They Plan to Sue to Block It.*, N.Y. Times (Aug. 23, 2018), https://www.nytimes.com/2018/08/23/nyregion/cuomo-prosecutors-oversight-commission.html; *see also* Clark, *supra* n.41; Peter A. Joy & Kevin C. McMunigal, *New York Creates Commission on Prosecutor Conduct*, 34 FALL Crim. Just. 62, 63 (2019).

record in this case demonstrates, that is just a recipe for continued inaction. The unfortunate reality in this State is that "there [is] no reliable system for holding prosecutors accountable for their misconduct," let alone one that does so in public.[43]

### c. Trial-Type Proceedings in the Appellate Division

The district court easily found that the trial-type proceedings in the Appellate Division, kept secret by §90(10), have their direct antecedent in the eighteen and nineteenth century public trials to disbar or suspend attorneys. "Modern-day disciplinary proceedings in the Second Department bear almost all the same key features as their historical antecedents," both procedural and substantive. S.A.80. All begin with a complaint, proceed through discovery and trial to a judgment, and result in attorney discipline or vindication. *Id.*

The State does not dispute this history but argues that it is not the correct historical analogue to today's formal disciplinary proceedings because New York law separately permits a private cause of action by an

---

[43]New York Times Editorial Board, *Prosecutors Need a Watchdog*, N.Y. Times, (August 14, 2018),
https://www.nytimes.com/2018/08/14/opinion/new-york-prosecutors-cuomo-district-attorneyswatchdog.html.

aggrieved party against an attorney. App.Br.67-68. That is true, but those private disputes for money damages are not the right comparison. As the district court recognized, only a secret trial in the Appellate Division can result in attorney disbarment or suspension. S.A.78. Only those secret proceedings do the same "kind of work" as the trials historically conducted in open court: "government discipline of attorneys and maintenance of the integrity of the bar for public benefit." S.A.82-83.

The relevant history of openness of attorney disciplinary proceedings mandates the same public access today for formal proceedings in the Second Department involving the 21 prosecutors, including live access to any hearings and related submissions and decisions. *See ABC, Inc. v. Stewart*, 360 F.3d 90, 99 (2d Cir. 2004) ("The ability to see and to hear a proceeding as it unfolds is a vital component of the First Amendment right of access."). This would bring New York practice in conformity with that of 46 other states.

### d. Adjudicative Decisions by the Grievance Committee.

Much work goes on in private in the Grievance Committee that is **not** the subject of the Professors' claim. The Chief Counsel and her staff review complaints, conduct investigations, and prepare reports. J.A.948-

949, 972-73. The Committee itself may conduct further proceedings, including hearing in person from the respondent. 22 N.Y.C.R.R. §1240.7(d)(2)(v).

The Professors do not seek access to any of that. They seek **only** the final adjudication in writing by the Grievance Committee of their 21 complaints, whether it is a dismissal, a letter of advisement or admonition. These decisions are adjudicative in nature, issued under the aegis of the Appellate Division, finally decide the misconduct allegations against the attorney, and form part of the attorney's permanent record.

As the district court found, the "record leaves no dispute," that when the Grievance Committee issues dispositions, it sits as a neutral body to make authoritative determinations on accusations of misconduct, and therefore acts in its adjudicative role, not in its prosecutorial role, and certainly not in any investigatory role. S.A.96-97, 99; *see also* J.A.418-419 (Chief Counsel acknowledging the grievance committee, "sits in judgment" and "renders a ruling" after reviewing the evidence). These final dispositions constitute the "last and most important step in nearly every proceeding to handle suspected attorney misconduct, for the simple reason that very few matters are ever recommended for public discipline in the Second Department." S.A.97-98.

60

"These features of the Committee's dispositions render them far different from mere prosecutorial recommendations or charges." S.A.99. They are judicial proceedings adjudicating attorney misconduct, and their historical antecedent is therefore the same historically public practice of attorney discipline set forth above. *See, e.g.*, *In re Kelly*, 59 N.Y. at 596 ("The proceeding is of a public nature."); *In re Spencer*, 122 N.Y.S. at 192; ("These [disbarment] proceedings have been spoken of as being of a public nature."); *Hardy*, 697 F. App'x at 725 ("There is a long tradition of public access to court orders.").

The State does not grapple with the above facts. Instead, it argues, without factual basis, that the Committee's dispositions are part of an "investigatory" process and a "classic exercise of prosecutorial discretion" that does not "resemble an adversarial trial" and is "by no means . . . neutral." App.Br.58, 60, 62. On the undisputed facts, the district court found none of that was true. S.A.96-101 ("the Committee does its work as a neutral party"). The State does not explain why that conclusion was wrong. Nor does it address the extensive body of caselaw finding that grievance committee proceedings are "judicial proceedings," *Doe,* 255 F.2d at 120, and their actions are "essentially judicial in nature." *Middlesex,* 457 U.S. at 434, n.13.

61

In any event, the State's arguments are unpersuasive. It compares the Committee's final decision, on the merits and after an adversary proceeding, to the work of prosecutors and grand juries. But unlike the work of prosecutors and grand juries, the adjudicative decisions of the Committee are final and binding decisions with permanent effects and made on a full record. They are "formal" decisions in every sense of the word. Even less persuasively, the State compares the right of access to committee decisions to cases denying access to monitors' reports under deferred prosecution agreements "because courts lack supervisory power over such agreements." App.Br.61. But the Appellate Division **does** have supervisory power over the work of the grievance committee, and that is the point. *See Mosby,* 418 F.3d at 932 (observing that a disciplinary board's decision to impose discipline is the "functional equivalent of a state-court judgment"). Any grievance committee censure—or vindication—of an attorney is an adjudicative decision by the government that goes on the attorney's permanent record; such decisions were always public in New York until 1945.

62

### 2. Logic: Public Access Would Play a Significant Positive Role in Prosecutor Discipline.

Under the "logic" prong of the analysis, the court examines "whether public access plays a significant positive role in the functioning of the particular process in question." *NYCTA*, 684 F.3d at 297 (quoting *Press–Enterprise II*, 478 U.S. at 8). The district court correctly described the many significant benefits in making public disciplinary proceedings in the Appellate Division and the dispositions by the Grievance Committee of prosecutors accused of misconduct. S.A.84-93, 106-109. There are no countervailing interests warranting their blanket secrecy in this case.

At the simplest level, any discipline proceedings of the accused prosecutors are essentially the same as trial proceedings and, therefore, implicate all the same interests in promoting fairness, adherence to procedure, impartiality of adjudicators, and an enhanced performance of all involved in the process. *See Richmond Newspapers, Inc.*, 448 U.S. at 569 (noting that openness "gave assurance that the proceedings were conducted fairly to all concerned, and it discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality") (plurality opinion); *Press-Enterprise I*, 464 U.S. at 508 ("The value of openness lies in the fact that people not actually attending trials

can have confidence that standards of fairness are being observed; the sure knowledge that anyone is free to attend gives assurance that established procedures are being followed and that deviations will become known."); *Westmoreland*, 752 F.2d at 23 (same).

Public access to the prosecutors' disciplinary dispositions by the Grievance Committee and trials in the Appellate Division plays a "significant positive role" in enhancing the system and ensuring that the intended beneficiaries of a well-regulated bar—the public—are able to assess the integrity of these critical players in the legal profession. *Press-Enterprise II*, 478 U.S. at 8. Public access also enhances the quality and consistency of a notoriously inconsistent system. *See* Gillers, *Lowering the Bar*, *supra* n.2 at 503–04.

The fact that the respondents are all present or former prosecutors accused of misconduct in their government role is of paramount importance in assessing the public interest. These are, after all, government employees with no client other than the public and the public has a legitimate interest both in the behavior of its public servants and the behavior of the elected District Attorneys who employ them. Meanwhile, with the accusations already public in the Professors' complaints and already the subject of public notice, *see* NYT Editorial

Board, *supra* n.37, the public has a legitimate interest in knowing the outcome and assessing whether the Grievance Committee is doing its job. *See e.g., F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987) ("The appropriateness of making court files accessible is accentuated in cases where the government is a party: in such circumstances, the public's right to know what the executive branch is about coalesces with the concomitant right of the citizenry to appraise the judicial branch."); *see also Richmond Newspapers*, 448 U.S. at 575 ("Plainly it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted.") (plurality opinion).

There are no overriding state interests that warrant sealing the Grievance Committee's dispositions of the 21 complaints at issue here or any trials in the Appellate Division. The confidentiality provisions of Section 90(10) are meant to (1) encourage complainants to come forward and (2) protect the professional's reputation from unfounded accusations. *See Matter of Johnson Newspaper Corp. v. Melino,* 564 N.E.2d 1046, 1051 (N.Y. 1990); *see also Matter of Aretakis*, 791 N.Y.S.2d 687, 688 (N.Y. App. Div. 2005). Neither purpose is served here.

65

The 21 complaints are all based on public determinations of prosecutor misconduct; the identities of the witnesses and aggrieved individuals are already known through the public record. Further, as the district court observed, "[t]he testimony of witnesses in civil and criminal courts is obtained regularly on sensitive personal matters," S.A.91,n.20, and full and frank testimony is more reliably obtained in a public forum than in a private one. *See Richmond Newspapers, Inc.*, 448 U.S. at 569 (noting that openness "discouraged perjury, the misconduct of participants, and decisions based on secret bias or partiality") (plurality opinion). There is also no real danger that the publication of Committee dispositions of these 21 complaints or public trials in the Appellate Division will discourage plaintiffs from filing complaints—the opposite is more likely—and mere speculation this could occur is not a "basis for a restriction of the public's First Amendment rights." *See NYCTA,* 684 F.3d at 303 (quotation marks and citation omitted) (cleaned up); *see also Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 543 (1980) ("[M]ere speculation of harm does not constitute a compelling state interest.").

Meanwhile, the interest in avoiding reputational harm, even if a genuine value, is not compelling here. The 21 complaints are against current and former prosecutors and are based on findings of misconduct

66

already in the public record. *Landmark Commc'ns, Inc.*, 435 U.S. at 841–42 ("[I]njury to official reputation is an insufficient reason for repressing speech that would otherwise be free." (quotation marks and citation omitted)); *see also In re Demetriades*, 58 F.4th 37, 46 (2d Cir. 2023) (interest in avoiding "reputational harm" "cannot meet the 'weighty' standard for overriding the presumptions of open records and public access" (citation omitted)).

The State's other stated interests in promoting administrative flexibility, protecting personal information, and rehabilitation and public protection, all through confidentiality, are not persuasive. Administrative flexibility takes second place to public scrutiny, which ensures that relevant actors exhibit a "conspicuous respect for the rule of law." *See Richmond Newspapers*, 448 U.S. at 595 (Brennan, J., concurring). Personal information can be protected through other means (like redactions) and does not require keeping everything secret. And the goal of "rehabilitating" the profession is most logically accomplished through public accountability: as Justice Brandeis memorably observed, "[s]unlight is the best disinfectant." *Other People's Money* 13 (1913).

## CONCLUSION

This Court should affirm the district court's judgment.

Dated:     New York, New York
             March 5, 2025

                             Respectfully submitted,
                             By:  *Gregory L. Diskant*
                                 Gregory L. Diskant

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Shelley Attadgie, an Associate at Patterson Belknap Webb & Tyler, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,989 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Shelley Attadgie*