# 24-2251

## In the United States Court of Appeals for the Second Circuit

CIVIL RIGHTS CORPS, CYNTHIA GODSOE, NICOLE SMITH FUTRELL, DANIEL S. MEDWED, JUSTIN MURRAY, ABBE SMITH, STEVEN ZEIDMAN,

*Plaintiffs-Appellees*,

*v.*

HECTOR D. LASALLE, in his official capacity, Presiding Justice of the Second Judicial Department of the Appellate Division of the Supreme Court of the State of New York,

*Defendant-Appellant*.

*(caption continues inside front cover)*

On Appeal from the United States District Court for the Southern District of New York

### *AMICI CURIAE* BRIEF OF NEW YORK MEDIA COALITION IN SUPPORT OF APPELLEES AND AFFIRMANCE

David A. Schulz
  *Counsel of Record*
Tobin Raju
MEDIA FREEDOM & INFORMATION
  ACCESS CLINIC
YALE LAW SCHOOL
127 Wall Street
New Haven, CT 06511
(212) 663-6162
schulzd@ballardspahr.com

*Counsel for Amici Curiae*

March 12, 2025

*(caption continues from front cover)*

GEORGIA PESTANA, in her personal capacity; STEVEN STEIN CUSHMAN, in his official capacity as Corporation Counsel of the City of New York; MELINDA KATZ, in her personal capacity and in her official capacity as the District Attorney of Queens County; ANDREA E. BONINA, in her personal capacity and in her official capacity as Chair of the State of New York Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts; DIANA MAXFIELD KEARSE, in her personal capacity and in her official capacity as Chief Counsel of the State of New York Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts.

*Defendants*.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 29, *amici* certify as follows:

## Advance Publications

Advance Publications, Inc. is a privately held company and no publicly held corporation owns 10% or more of Advance Publications, Inc.

## The Associated Press

The Associated Press has no parents, subsidiaries, or affiliates that have any outstanding securities in the hands of the public, has no publicly held stock, and no publicly held company owns 10% or more of its stock.

## Daily News, L.P.

Daily News, L. P. is a limited partnership, the general partner of which is TRX Pubco LLC, a private entity. Daily News, L.P. has one direct subsidiary, Kearney Property Corp.

## Dow Jones Corporation

Dow Jones & Company, Inc. ("Dow Jones") is an indirect subsidiary of News Corporation, a publicly held company. Ruby Newco, LLC, an indirect subsidiary of News Corporation and a non-publicly held company, is the direct parent of Dow Jones. News Preferred Holdings, Inc., a subsidiary of News Corporation, is the direct parent of Ruby Newco, LLC. No publicly traded corporation currently owns ten percent or more of the stock of Dow Jones.

i

## Gannett Co., Inc.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned. No publicly held company holds 10% or more of its stock.

## Hearst Corporation

Hearst Corporation is privately held and no publicly held corporation owns 10% or more of Hearst Corporation.

## New York Press Association

The New York Press Association has no parents, subsidiaries, or affiliates that have any outstanding securities in the hands of the public, has no publicly held stock, and no publicly held company owns 10% or more of its stock.

## New York News Publishers Association

The New York News Publishers Association has no parents, subsidiaries, or affiliates that have any outstanding securities in the hands of the public, has no publicly held stock, and no publicly held company owns 10% or more of its stock.

## The New York Times Company

The New York Times Company is a publicly traded corporation. It has no parent company, no affiliates or subsidiaries that are publicly owned, and no publicly held corporation owns 10 percent or more of its stock.

**Newsday LLC**

Newsday LLC is privately held and no publicly held corporation owns 10% or more of Newsday LLC.

**Pro Publica, Inc.**

Pro Publica, Inc. is a Delaware not-for-profit organized under § 501(c)(3) of the Internal Revenue Code. It has no parents, subsidiaries, or affiliates that have any outstanding securities in the hands of the public, has no publicly held stock, and no publicly held company owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF CONTENTS ........................................................................ iv

TABLE OF AUTHORITIES ....................................................................v

INTEREST OF AMICI ........................................................................1

BACKGROUND ..............................................................................2

ARGUMENT ................................................................................5

I.     PRESS AND PUBLIC ACCESS TO ATTORNEY DISCIPLINARY PROCEEDINGS SERVES SIGNIFICANT PUBLIC INTERESTS ..............5

     A.   Press and Public Access Makes the Attorney-Disciplinary Process Work Better ............................................................6

     B.   Access to Attorney Discipline Proceedings Assures the Public That Ethical Standards Are Properly Enforced and Sustains Public Confidence in the Judicial System ...............................10

     C.   The Public Interest in Access Is Only Heightened When Misconduct Complaints Are Lodged Against Prosecutors ........................14

     D.   The Public Interest in Access to Attorney Disciplinary Proceedings Vastly Outweighs the Privacy and Reputational Interests Presented .....18

II.    THE DISTRICT COURT CORRECTLY HELD THAT THE FIRST AMENDMENT ACCESS RIGHT EXTENDS TO ATTORNEY DISCIPLINARY PROCEEDINGS AND RECORDS .................................21

CONCLUSION ..............................................................................26

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABC, Inc. v. Stewart,*
  360 F.3d 90 (2d Cir. 2004)................................................................. 7, 22

*Butterworth v. Smith,*
  494 U.S. 624 (1990) ........................................................................ 15

*In re Braccini,*
  195 N.Y.S.3d 560 (N.Y. App. Div. 2023) ........................................ 12

*In re Demetriades,*
  58 F.4th 37 (2d Cir. 2023)................................................................ 22

*Globe Newspaper Co. v. Superior Court,*
  457 U.S. 596 (1982) ................................................................... 21, 25

*Guzik v. Albright,*
  2018 WL 6011612 (S.D.N.Y. Nov. 16, 2018) ................................. 21

*Hartford Courant Co. v. Pellegrino,*
  380 F.3d 83 (2d Cir. 2004)............................................................... 22

*Imbler v. Pachtman,*
  424 U.S. 409 (1976) ........................................................................ 15

*In re Kahn,*
  328 N.Y.S.2d 87 (App. Div. 1972) .................................................. 10

*In re Kurtzrock,*
  138 N.Y.S.3d 649 (N.Y. App. Div. 2020) ........................................ 17

*Lugosch v. Pyramid Co. of Onondaga,*
  453 F.3d 110 (2d Cir. 2006)...............................................20-21, 22, 26

*N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.,*
  684 F.3d 286 (2d Cir. 2012)........................................................ 22, 23

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ............................................................. 5

*In re N.Y. Times Co.*,
  828 F.2d 110 (2d. Cir. 1987)............................... 20, 21, 22

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ........................................................ 15

*Press-Enter. Co. v. Superior Court* (*Press-Enterprise II*),
  478 U.S. 1 (1986) ...............................................20, 21-22, 25

*Press-Enter. Co. v. Superior Court* (*Press-Enterprise I*),
  464 U.S. 501 (1984) ....................................................... 22

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) .............................................. *passim*

*The Florida Star v. B.J.F.*,
  491 U.S. 524 (1989) ....................................................... 20

*United States. v. Suarez*,
  880 F.2d 626 (2d Cir. 1989)........................................... 22

*United States v. Alcantara*,
  396 F.3d 189 (2d Cir. 2005)............................................. 7

*United States v. Amodeo*,
  71 F.3d 1044 (2d Cir. 1995).................................... 7, 24

*United States v. Erie County*,
  763 F.3d 235 (2d Cir. 2014)........................................... 25

*Westmoreland v. Columbia Broad. Sys., Inc.*,
  752 F.2d 16 (2d Cir. 1984)............................................. 22

*Young v. United States ex rel. Vuitton et Fils S.A.*,
  481 U.S. 787 (1987) ....................................................... 15

**Statutes**

N.Y. Cnty. L. art. 24, § 926 ................................................................ 15

N.Y. Jud. Law § 90(10) ............................................................... *passim*

**Rules**

Ariz. R. Sup. Ct. 70 ............................................................................ 14

D.C. Bar R. XI, § 17(a) ...............................................................................

Ind. R. Att'y Adm. & Discip. 23, § 22(a) ........................................... 14

*New York Rules of Professional Conduct*, N.Y. State Bar Ass'n (Jan. 1, 2017),
    https://perma.cc/QE6J-WEFC ..................................................... 13

*Rule 3.3: Candor Toward the Tribunal*, Am. Bar. Ass'n (2025),
    https://perma.cc/TW7M-WLMW ................................................. 13

**Regulations**

22 N.Y.C.R.R. § 1240 ........................................................................... 2

27 N.C. Admin. Code 01B .0116 ....................................................... 14

**Other Authorities**

Aimee Ortiz, *Police or Prosecutor Misconduct Is at Root of Half of Exoneration
    Cases, Study Finds*, N.Y. Times (Sept. 16, 2020),
    https://perma.cc/ES8P-K2HL .................................................... 16

Att'y Grievance Comm., App. Div. First Jud. Dep't,
    *2023 Annual Report* (2023), https://perma.cc/FGE7-YXRN ............. 19

Att'y Grievance Comm., App. Div., First Judicial Dep't,
    *How to File a Complaint* 3-5 (July 30, 2020), https://perma.cc/3HVB-QE77 ...... 7

Benjamin Weiser, *Giuliani Disbarred From the Practice of Law in New York*,
    N.Y. Times (July 2, 2024), https://perma.cc/5VZV-W39T ................ 13

Bill Parry, *Former Flushing Attorney Sentenced for Stealing Millions from Real Estate Clients in the Korean-American Community: Feds*, QNS (Feb. 11, 2025), https://perma.cc/2UVZ-83EV ............................................................................... 11

Brandon Smith, *New Disciplinary Charges Filed Against Attorney General Todd Rokita*, IPB News, (Jan. 31, 2025), https://perma.cc/EL3E-FVY7 .................... 14

Brittny Mejia, *Tom Girardi Found Guilty of Wire Fraud: 'It Wasn't a Hard Decision,' Juror Says*, L.A. Times (Aug. 27, 2024), https://perma.cc/3PBW-EJP5.............................................................................. 12

Cassandra B. Robertson, *Online Reputation Management in Attorney Regulation*, 29 Geo. J. Legal Ethics 97 (2016)......................................................................... 11

Chelsia Rose Marcius, *New York Pays $206 Million to Settle Misconduct Suits, the Most Since 2018*, N.Y. Times (Feb. 18, 2025), https://perma.cc/9HLV-25LR .............................................................................. 17

Dan Clark, *N.Y.'s Prosecutor Watchdog Panel Finally Begins Its Work—7 Years Later*, Albany Times-Union (Feb. 27, 2025), https://perma.cc/RAS5-KMWW ......................................................................... 16

David Brand, *Top Prosecutor Quits After Queens Judge Accuses Him of Lying in Death Penalty Case*, Queens Daily Eagle (Mar. 11, 2021), https://perma.cc/YE79-W4DP ............................................................................ 16

David Thomas, *N.Y. Lawyer Used Law Firm as 'Personal Gold Mine,' Prosecutors Charge*, Reuters (Apr. 13, 2022), https://perma.cc/7TXW-TK7T................................................................................ 11

DOJ, Press Release, *Lawyer Michael Avenatti Sentenced to 14 Years in Federal Prison for Stealing Millions of Dollars from Clients and Tax Fraud* (Dec. 5, 2022), https://perma.cc/2P47-MXQG.................................................................. 11

Eduardo Medina, *Michael Avenatti Gets 14-Year Sentence for Stealing Millions from Clients*, N.Y. Times (Dec. 5, 2022), https://perma.cc/H75A-C8BK .......... 10

Jenny Gross, *Former High-Profile Lawyer Is Charged with Embezzling More Than $18 Million*, N.Y. Times (Feb. 2, 2023), https://perma.cc/NE74-YSVY............ 10

Gary Craig, *Three New York Judges Resign After Misconduct Investigations*, Rochester Democrat &amp; Chron. (Feb. 6, 2025), https://perma.cc/AR82-52QH ............................................................. 17

Haidee Chu, *Four Queens Prosecutors Who Discriminated Against Minority Jurors Are Still On the Job*, The City (March. 21, 2023), https://perma.cc/DB6Q-3W3H .............................................................. 18

1 J. Bentham, Rationale of Judicial Evidence 524 (1827)........................................ 9

Jacob Kaye, *Judge Lifts Veil on Group Investigating Complaints Against Queens Prosecutors*, Queens Daily Eagle (July 26, 2024), https://perma.cc/U56E-BYTT.............................................................. 18

Jacob Kaye, *Six Queens Prosecutors Named in New Batch of Misconduct Complaints*, Queens Daily Eagle (March. 22, 2023), https://perma.cc/K3ZW-YXDJ .............................................................. 18

Joaquin Sapien &amp; Sergio Hernandez, *Who Polices Prosecutors Who Abuse Their Authority? Usually Nobody*, ProPublica (Apr. 3, 2013), https://perma.cc/3F3T-LHJ9 .................................................... 3, 16, 17

Joaquin Sapien, *Trial and Error: Report Says Prosecutors Rarely Pay Price for Mistakes and Misconduct*, Pro Publica (Mar. 29, 2016), https://perma.cc/ET33-FE3G .............................................................. 16

Jonah Bromwich, *They Publicized Prosecutors' Misconduct. The Blowback Was Swift.*, N.Y. Times (Nov. 10, 2021), https://perma.cc/6FZX-99GL ............... 8, 18

Jonathan Rose, *The Legal Profession in Medieval England: A History of Regulation*, 48 Syracuse L. Rev. 1 (1998) ............................................. 23

Julia Coin, *In 8th Run-in with State Bar, Charlotte Attorney Who Shared False Drama Avoids Suspension*, Charlotte Observer (Feb. 22, 2024), https://perma.cc/W65T-ZEXE .............................................................. 14

Keith L. Alexander, *Giuliani 'Weaponized' Law License in Trump Election Suit, D.C. Bar Argues*, Wash. Post (Dec. 6, 2022), https://perma.cc/GN47-LBZE .... 13

Kelly Garrity, *Giuliani Defends 2020 Election Challenge at D.C. Bar Hearing*, Politico (Dec. 5, 2022), https://perma.cc/3ZPQ-2MGH ...................................... 13

ix

*L.A. Times Commc'ns, LLC v. State Bar of California*, No. S269401 (Cal. Sup. Ct. June 12, 2023), https://perma.cc/QG76-H3SB ................................................... 12

*Lawyer Referral & Information Service*, N.Y. State Bar Ass'n (n.d.), https://perma.cc/VQY4-A7VQ ........................................................................... 11

Leslie Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1, 14-17 (2007) ...................................................................................... 23

*Lowering the Bar: How Lawyer Discipline in New York Fails to Protect the Public*, 17 N.Y.U. J. Legis. & Pub. Pol'y 485 (2014) .......................................... 9

Maia Spoto, *New York Judge Peels Back Curtain on Attorney Misconduct Cases*, Bloomberg Law (July 22, 2024), https://perma.cc/MCJ5-VSRY ...................... 18

N.Y. State Comm'n on Statewide Att'y Discipline, *Enhancing Fairness and Consistency, Fostering Efficiency and Transparency* 72 (2015), https://perma.cc/J8RV-HADP ............................................................................... 8

N.Y. Times Law Reports, *William H. Gale Disbarred: An Attorney's Outrageous Conduct Towards a Woman Client in a Divorce Case*, N.Y. Times (Mar. 13, 1877), https://perma.cc/JEC6-WNUP .................................................................. 23

N.Y.C. Bar Ass'n, *Statement of New York City Bar Association Concerning Grievance Complaints Filed Against Rudolph Giuliani* (Feb. 23, 2021), https://perma.cc/6GXF-XLSK ........................................................................... 12

Nina Morrison, *What Happens When Prosecutors Break the Law?*, N.Y. Times (June 18, 2018), https://perma.cc/4PDG-CC9J ................................................... 16

*Online Reputation Management in Attorney Regulation*, 29 Geo. J. Legal Ethics 97 (2016) ........................................................................ 11

Robert Abruzzese, *Disbarred Attorney Sentenced for Role in Queens Deed-Theft Ring*, Brooklyn Daily Eagle (Sept. 16, 2024), https://perma.cc/AG4Q-23EJ ..... 11

Robert Gavin, *Schenectady Lawyer Disbarred for Giving Client Forged Divorce Papers*, Albany Times Union (Aug. 31, 2023), https://perma.cc/R79B-3HD7 .. 12

Robert Jackson, *The Federal Prosecutor*, 24 J. Am. Judicature Soc'y 18 (1940) . 14

Roy Simon, *Confidential Disciplinary Proceedings &amp; First Amendment—Part 1*, N.Y. L. Ethics. Rep. (Dec. 2005), https://perma.cc/LL77-PE4V ............ 10

Special Dispatch to the Tribune, *Infamous Shystering: A New York Attorney Disbarred for Extraordinary and Anomalous Treachery Towards His Client*, *Chicago Trib.* (Mar. 13, 1877), https://perma.cc/HCP8-TCKP ......................... 23

Stacey Barchenger, *Trio of Kari Lake Election Lawyers Set to Face Disciplinary Proceedings. Here's Why*, Ariz. Republic (Dec. 13, 2023), https://perma.cc/VY3D-KT2T ................................................................ 14

Stephen Gillers, *Lowering the Bar: How Lawyer Discipline in New York Fails to Protect the Public*, 17 N.Y.U. J. Legis. &amp; Pub. Pol'y 485 (2014) ............... 9

Suffolk Cnty. Dist. Att'y's Off. Conviction Integrity Bureau, *A Review of the Disclosure Practices of Former Assistant District Attorney Glenn Kurtzrock* (2021), https://perma.cc/LU22-H57C ................................................... 17

Tara Smith, *In New Report, District Attorney Details Decades of Misconduct by Former Prosecutor*, Riverhead News-Rev. (Nov. 24, 2021), https://perma.cc/7UCZ-W7EG ................................................................ 17

The Editorial Board, *Better Rules for Bad Lawyers*, N.Y. Times (Apr. 15, 2014), https://perma.cc/3HT8-Q6LE ................................................................ 8

*The Legal Profession in Medieval England: A History of Regulation*, Jonathan Rose, *The Legal Profession in Medieval England: A History of Regulation*, 48 Syracuse L. Rev. 1 (1998) ............................................... 23

Tierney Sneed, *Giuliani Pressed on Role in Trump 2020 Election Reversal Legal Gambits during Attorney Discipline Hearing*, CNN (Dec. 5, 2022), https://perma.cc/MPU7-JN36 .............................................................. 13

Troy Closson, *They Spent 24 Years Behind Bars. Then the Case Fell Apart*, N.Y. Times (Mar. 5, 2021), https://perma.cc/PQ98-B2YF ........................................ 16

## INTEREST OF AMICI[1]

*Amici* are nine news organizations that gather and report news in New York and two associations of daily and weekly newspaper publishers whose members cover the news across this State.[2] *Amici* regularly rely on the First Amendment access right at issue in this appeal in their newsgathering and have a vital interest in its proper judicial enforcement. Indeed, because reporters "serve[] as the 'agent' of interested citizens," the Supreme Court has recognized that the press is the "chief beneficiary" of the access right. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 586 n.2 (1980) (Brennan, J., concurring).

*Amici* report regularly on instances of misconduct by prosecutors. They have a direct interest in a resolution of this appeal that upholds the district court's conclusion that the First Amendment affords a right of public access to (1) orders of the Grievance Committee adjudicating those allegations of attorney misconduct deemed worthy of investigation and (2) Appellate Division proceedings and records concerning claims of misconduct referred for possible imposition of more severe sanctions. *Amici* submit this Brief to underscore the substantial press and public interests advanced by the limited First Amendment access right recognized by the

---

[1] No party or its counsel had any role in authoring this brief. No person or entity— other than *amici curiae* and their counsel—contributed money to fund the preparation or submission of this Brief.

[2] A complete identification of *amici* is provided in the Addendum to this Brief.

district court. The constitutional access right extends to these records and proceedings for the same reasons it extends to judicial records and proceedings more generally: It promotes public confidence that parties are acting properly, rules are being enforced, and justice is being done in attorney disciplinary proceedings.

Pursuant to Federal Rule of Appellate Procedure 29(a)(2), *amici* have authority to file this brief because all parties have consented to the filing.

## BACKGROUND

All attorney-disciplinary proceedings in New York are conducted under the authority and supervision of the Appellate Divisions of the New York Supreme Court. *See* 22 N.Y.C.R.R. § 1240. Each Appellate Division specifies its own rules, but the process generally involves two stages of litigation. *First*, adversarial proceedings are conducted before a Grievance Committee appointed by the Appellate Division with respect to those misconduct allegations deemed worthy of investigation by the Committee's staff. SA4-8. These proceedings can involve the presentation of evidence and argument by counsel, after which the Grievance Committee may dismiss the complaint, issue Letters of Advisement or Admonitions, or refer the complaint to the Appellate Division. SA8-9; *see* 22 N.Y.C.R.R. 1240.7(d)(2). *Second*, if a complaint is referred to the Appellate Division, a formal evidentiary hearing is conducted to determine whether a more serious sanction is appropriate. SA8-14.

All Grievance Committee and Appellate Division proceedings are currently conducted *entirely* in secret.  New York Judiciary Law § 90(10) provides that "all papers, records and documents . . . upon any complaint, inquiry, investigation or proceeding relating to the conduct or discipline of an attorney or attorneys, shall be sealed and be deemed private and confidential."  Records are only retroactively made public in those rare cases where the Appellate Division ultimately imposes a public sanction.[3] SA14-15.

Under this secretive process, very few New York attorneys accused of misconduct ever suffer any sanction.[4]  Of 91,000 complaints received by the First and Second Department grievance committees from 2001 to 2009, just one percent resulted in public sanctions, and only five percent resulted in private Letters of Advisement or Admonitions. *Id.*  Prosecutors seem even less likely to face sanctions, even where judges have found prosecutorial misconduct so egregious that convictions must be thrown out.  In one review of 30 cases involving prosecutorial misconduct, only one prosecutor was publicly disciplined.  *Id.*  Although the records

---

[3] Disciplinary proceedings can be made public on a showing of good cause or upon an attorney's waiver of confidentiality.  N.Y. Jud. Law § 90(10).

[4] *See* Joaquin Sapien & Sergio Hernandez, *Who Polices Prosecutors Who Abuse Their Authority? Usually Nobody*, ProPublica (Apr. 3, 2013), https://perma.cc/3F3T-LHJ9.

were incomplete, no others faced reprimand—at least seven even received promotions and raises despite judicial findings of misconduct. *Id*.

Plaintiffs-Appellees ("Plaintiffs") are several law professors and a nonprofit civil-rights organization who seek access to records concerning misconduct complaints they filed with the Second Department's Grievance Committee against several Queens County prosecutors whom judges had found to have committed serious misconduct in pursuing criminal convictions. SA18-20. The named Defendant-Appellant ("Defendant") is the Presiding Justice of the Second Department, who refused to disclose whether the Grievance Committee imposed any discipline in response to Plaintiffs' complaints. SA20-22.

On cross-motions for summary judgment, the district court applied the now-familiar "experience-and-logic" test to determine that the First Amendment extends a qualified right of public access to (1) any attorney disciplinary proceedings and related records in the Appellate Division concerning Plaintiffs' complaints and (2) any written dispositions by the Grievance Committee on those complaints. SA93, 109. Rejecting Defendants' argument that broad confidentiality serves a higher interest, the district court concluded that the blanket secrecy imposed by Section 90(10) violates the First Amendment because it is not narrowly tailored to serve an overriding governmental interest. SA112-17.

## ARGUMENT

## I. PRESS AND PUBLIC ACCESS TO ATTORNEY DISCIPLINARY PROCEEDINGS SERVES SIGNIFICANT PUBLIC INTERESTS

The constitutional right of access to government proceedings and records is rooted in "the principle that debate on public issues should be uninhibited, robust, and wide-open" and its "antecedent assumption that valuable public debate—as well as other civic behavior—must be informed." *Richmond Newspapers,* 448 U.S. at 587 (Brennan, J., concurring) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Our "republican system of self-government" and democratic accountability depend upon this structural right to inform the public about the actions of their government. *Id.* at 586. The First Amendment thus extends a qualified right of access to those government proceedings that traditionally have been open and where openness supports their proper functioning, a two-part inquiry known as the "experience-and-logic" test. *See id.* at 589.

Substantial public interests are advanced by the district court's recognition that this First Amendment access right attaches to the small portion of attorney misconduct complaints that are investigated and adjudicated by the Grievance Committee and to the proceedings and records of the even smaller number of complaints adjudicated in the Appellate Division. This access right promotes the fair and effective functioning of the attorney disciplinary process and supports public confidence in the integrity of the bar and the judicial system itself. The importance

of these interests is only heightened when, as here, attorney disciplinary proceedings involve misconduct by prosecutors—attorneys uniquely vested with tremendous authority over the lives of ordinary citizens.

Section 90(10) denies public and press access to attorney discipline without any adequate justification. In its zeal to shield lawyers' reputations, the shroud of secrecy draped over attorney disciplinary proceedings undermines informed public discourse and erodes public confidence that ethical standards are being enforced and lawyers are performing as they should.

## A. Press and Public Access Makes the Attorney-Disciplinary Process Work Better

The First Amendment access right exists to promote the proper functioning of government proceedings, sustain public confidence in their outcomes, and support democratic accountability. *See Richmond Newspapers*, 448 U.S. at 569. This access right attaches to most judicial proceedings because openness improves the functioning of adjudicated fact-finding and promotes "public acceptance of both the process and its results." *Id.* at 571. The transparency it affords is crucial to press coverage, which "serves to guarantee the fairness of trials" and engenders the "beneficial effects of public scrutiny upon the administration of justice." *Id.* at 593 (Brennan, J., concurring) (cleaned up).

These same interests are served directly by public access to the attorney disciplinary proceedings at issue on this appeal. Just as with other judicial

proceedings, access to attorney disciplinary proceedings improves the functioning of "that very process." *See Richmond Newspapers*, 448 U.S. at 589 (Brennan, J., concurring). Public access enhances the performance of all involved and discourages perjury and abuse of authority. *See id.* at 595 (observing that openness encourages government officials to act with "conspicuous respect for the rule of law"); *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995). Open proceedings that can be reported freely by the press assure the public that decisions are not based on secret bias or favoritism. *See, e.g.*, *ABC, Inc. v. Stewart*, 360 F.3d 90, 102 (2d Cir. 2004); *United States v. Alcantara*, 396 F.3d 189, 195 (2d Cir. 2005).

Section 90(10) renders the system less reliable and makes it impossible for the public to assess its effectiveness. Once a complaint is brought to the Grievance Committee for adjudication, the outcomes can range from dismissal to private admonition to further review in the Appellate Division, potentially leading to public punishment. The Grievance Committee uses an adversarial fact-finding process to decide the course of events based on factors such as "insufficient evidence," a determination that "serious ethical violations" are not involved, or a finding "that further investigation is warranted."[5] Decisions reached are inherently fact-specific and impose discretionary judgments that cannot be evaluated without access to the

---

[5] Att'y Grievance Comm., App. Div., First Judicial Dep't, *How to File a Complaint* 3-5 (July 30, 2020), https://perma.cc/3HVB-QE77.

proceedings and their outcomes—sporadically publishing summary data that reports resolutions by anodyne category serves no oversight function. As Chief Justice Burger notably observed, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Richmond Newspapers*, 448 U.S. at 572.

As *amici* have long reported, the secrecy imposed by Section 90(10) makes it impossible to know if the attorney discipline system is functioning properly.[6] In 2013, *ProPublica* described how Section 90(10) prevents any independent comparison of the complaints that resulted in public sanctions to those that resulted in only private sanctions or to those that resulted in no discipline at all. *See* Sapien & Hernandez, *supra*, note 4. Just a year later, *The New York Times* highlighted[7] a public denunciation of New York's attorney discipline process by NYU Law Professor Stephen Gillers, who declared the process "deficient in design and

---

[6] Jonah Bromwich, *They Publicized Prosecutors' Misconduct. The Blowback Was Swift.*, N.Y. Times (Nov. 10, 2021), https://perma.cc/6FZX-99GL (noting the "highly obscure" grievance process done by "court-appointed committees that conduct their work in private"); *see also* N.Y. State Comm'n on Statewide Att'y Discipline, *Enhancing Fairness and Consistency, Fostering Efficiency and Transparency* 72 (2015), https://perma.cc/J8RV-HADP (noting the "disclosure issue has lingered for decades… without legislative resolution").

[7] The Editorial Board, *Better Rules for Bad Lawyers*, N.Y. Times (Apr. 15, 2014), https://perma.cc/3HT8-Q6LE.

operation," bemoaned the inability to assess performance of the "broken" system, and called for a comprehensive review.[8]

*Amicus* New York State Bar Association ("NYSBA") claims that the limited access afforded by the district court order will "undermine the integrity" of the process and "erode public confidence in the legal profession." NYSBA Br. at 18. The opposite is true—transparency is essential for the public to know "the proceedings were conducted fairly to all concerned." *Richmond Newspapers*, 448 U.S. at 569. If secrecy actually served the fact-finding process as the bar association contends, criminal charges would still be adjudicated in Star Chamber proceedings, and civil complaints would be sealed until their allegations were proven true. They are not because our legal tradition has long recognized—dating back at least to Blackstone and Bentham—that openness is "the keystone" to the competent conduct of judicial proceedings. *See Id.* at 569 & n.7 (quoting 1 J. Bentham, Rationale of Judicial Evidence 524 (1827)).

A decade ago, a Commission on Statewide Attorney Discipline proposed a significant move towards public disclosure, reasoning that "the public would be better served" by a disciplinary process "more accessible to the public." *See* N.Y. State Comm'n, *supra* note 6, at 67, 70-71. Yet, at every turn, transparency has met

---

[8] Stephen Gillers, *Lowering the Bar: How Lawyer Discipline in New York Fails to Protect the Public*, 17 N.Y.U. J. Legis. & Pub. Pol'y 485, 490, 510 (2014).

strong opposition from New York bar associations,[9] and so the secrecy of Section 90(10) continues to this day—preventing public assessment of the system's performance, shielding disciplinary officials from scrutiny, and keeping open a door to inequitable treatment and abuse.

## B. Access to Attorney Disciplinary Proceedings Assures the Public That Ethical Standards Are Properly Enforced and Sustains Public Confidence in the Judicial System

The attorney discipline system exists to "protect the public in its reliance upon the presumed integrity and responsibility of lawyers." *In re Kahn*, 328 N.Y.S.2d 87, 96 (App. Div. 1972), *aff'd sub nom.*, *Kahn v. Ass'n of Bar of City of New York*, 290 N.E.2d 435 (N.Y. 1972). Widely reported examples of destructive actions by attorneys underscore the substantial public interest in knowing that misconduct complaints are investigated and discipline imposed when wrongdoing has occurred.[10] Conducting the discipline process in secret undermines its ability to fulfill this central purpose.

---

[9] *See* Roy Simon, *Confidential Disciplinary Proceedings & First Amendment—Part 1*, N.Y. L. Ethics. Rep. (Dec. 2005), https://perma.cc/LL77-PE4V (noting that, contrary to recommendations of the ABA, New York courts, *and its own policy committees*, the NYSBA has consistently opposed public disciplinary proceedings).

[10] *See, e.g.*, Jenny Gross, *Former High-Profile Lawyer Is Charged with Embezzling More Than $18 Million*, N.Y. Times (Feb. 2, 2023), https://perma.cc/NE74-YSVY; Eduardo Medina, *Michael Avenatti Gets 14-Year Sentence for Stealing Millions from Clients*, N.Y. Times (Dec. 5, 2022), https://perma.cc/H75A-C8BK.

Licensed attorneys function as officers of the court and provide essential access to the legal system. Yet the public has few tools to assess the integrity of attorneys. They may turn to online reviews,[11] or their state bar's referral service,[12] or even comb court records for instances of contempt or sanctions. But in New York State, those inadequate resources are all the public has. The established system for policing licensed attorneys—the grievance process—is kept secret from them except in those rare instances where a case-by-case exception applies. *See* N.Y. Jud. Law § 90(10); *see also* SA15-18 (explaining the exceptions).

Recent headlines provide far too many examples of the problems magnified by New York's secret discipline processes. A client might employ a seemingly reputable advocate, only to learn too late that the lawyer has stolen millions over many years.[13] An attorney might manage secretly to seize and sell your home,[14] or

---

[11] *But see* Cassandra B. Robertson, *Online Reputation Management in Attorney Regulation*, 29 Geo. J. Legal Ethics 97 (2016) (discussing the drawbacks of online reviews).

[12] *See Lawyer Referral & Information Service*, N.Y. State Bar Ass'n (n.d.), https://perma.cc/VQY4-A7VQ.

[13] *See, e.g.*, DOJ, Press Release, *Lawyer Michael Avenatti Sentenced to 14 Years in Federal Prison for Stealing Millions of Dollars from Clients and Tax Fraud* (Dec. 5, 2022), https://perma.cc/2P47-MXQG; David Thomas, *N.Y. Lawyer Used Law Firm as 'Personal Gold Mine,' Prosecutors Charge*, Reuters (Apr. 13, 2022), https://perma.cc/7TXW-TK7T.

[14] *See* Robert Abruzzese, *Disbarred Attorney Sentenced for Role in Queens Deed-Theft Ring*, Brooklyn Daily Eagle (Sept. 16, 2024), https://perma.cc/AG4Q-23EJ; *see also* Bill Parry, *Former Flushing Attorney Sentenced for Stealing Millions from*

clients could learn too late that their attorney had previously been disciplined in private for the same wrongful conduct that harmed them.[15] In one out-of-state example, the renowned plaintiffs' attorney and Real Housewives star Tom Girardi was accused—and recently convicted—of siphoning millions of dollars from a settlement fund for air crash victims.[16] It took a two-year legal battle over access to records of disciplinary proceedings waged by the *Los Angeles Times* for the public to learn how Girardi avoided discipline for years by bribing California bar officials with private jet rides, lavish meals, and free legal representation.[17] The secrecy imposed on attorney discipline in New York creates the very conditions here that allowed such abuses in California.

Secrecy also limits the ability of the press to report on matters of public concern. Following the January 6, 2021, attack on the U.S. Capitol, for example, Rudy Giuliani faced grievance complaints in both New York and Washington,

---

*Real Estate Clients in the Korean-American Community: Feds*, QNS (Feb. 11, 2025), https://perma.cc/2UVZ-83EV.

[15] *See In re Braccini*, 195 N.Y.S.3d 560, 563 (N.Y. App. Div. 2023); *see also* Robert Gavin, *Schenectady Lawyer Disbarred for Giving Client Forged Divorce Papers*, Albany Times Union (Aug. 31, 2023), https://perma.cc/R79B-3HD7.

[16] Brittny Mejia, *Tom Girardi Found Guilty of Wire Fraud: 'It Wasn't a Hard Decision,' Juror Says*, L.A. Times (Aug. 27, 2024), https://perma.cc/3PBW-EJP5.

[17] *L.A. Times Commc'ns, LLC v. State Bar of California*, No. S269401 (Cal. Sup. Ct. June 12, 2023), https://perma.cc/QG76-H3SB.

D.C.[18] But unlike New York, the District of Columbia presumes openness in attorney disciplinary cases.[19] While the details of the New York proceeding remained secret until after an appellate court suspended Giuliani's law license,[20] the press and public could scrutinize the process unfolding in D.C., assess its fairness, and have confidence that the outcome was just. This transparency allowed accurate reporting when it was most relevant to the public.[21]

The integrity of individual attorneys, moreover, bears directly on the integrity of the court system. Every licensed attorney has a duty of candor before the tribunals in which they practice.[22] But when ethical rules are not transparently enforced, misrepresentations and half-truths can flourish, and public confidence in the system's fairness can be eroded. Section 90(10) has just this effect. In states where

---

[18] *See* N.Y.C. Bar Ass'n, *Statement of New York City Bar Association Concerning Grievance Complaints Filed Against Rudolph Giuliani* (Feb. 23, 2021), https://perma.cc/6GXF-XLSK.

[19] D.C. Bar R. XI, § 17(a).

[20] *See* Benjamin Weiser, *Giuliani Disbarred From the Practice of Law in New York*, N.Y. Times (July 2, 2024), https://perma.cc/5VZV-W39T.

[21] *See, e.g.*, Keith L. Alexander, *Giuliani 'Weaponized' Law License in Trump Election Suit, D.C. Bar Argues*, Wash. Post (Dec. 6, 2022), https://perma.cc/GN47-LBZE; Kelly Garrity, *Giuliani Defends 2020 Election Challenge at D.C. Bar Hearing*, Politico (Dec. 5, 2022), https://perma.cc/3ZPQ-2MGH; Tierney Sneed, *Giuliani Pressed on Role in Trump 2020 Election Reversal Legal Gambits during Attorney Discipline Hearing*, CNN (Dec. 5, 2022), https://perma.cc/MPU7-JN36.

[22] *See, e.g.*, *New York Rules of Professional Conduct*, N.Y. State Bar Ass'n 113-14 (Jan. 1, 2017), https://perma.cc/QE6J-WEFC; *Rule 3.3: Candor Toward the Tribunal*, Am. Bar. Ass'n (2025), https://perma.cc/TW7M-WLMW.

attorney disciplinary proceedings are open, the press can timely inform the public of such newsworthy events as dishonesty charges filed against the Indiana attorney general;[23] a prominent North Carolina attorney who frequently escaped suspension from the bar;[24] or a "dishonest" Arizona attorney's accusation of political bias against the state bar.[25]  In New York, when such serious ethical complaints are lodged against attorneys, the system goes dark.

So long as Section 90(10) requires discipline to be meted out secretly, public confidence in the integrity of lawyers and the judicial system is undermined.

### C. The Public Interest in Access Is Only Heightened When Misconduct Complaints Are Lodged Against Prosecutors

This case presents the public interest at its zenith, because "[t]he prosecutor has more control over life, liberty and reputation than any other person in America." Robert Jackson, *The Federal Prosecutor*, 24 J. Am. Judicature Soc'y 18 (1940).

---

[23] *See* Brandon Smith, *New Disciplinary Charges Filed Against Attorney General Todd Rokita*, IPB News, (Jan. 31, 2025), https://perma.cc/EL3E-FVY7, reporting in Indiana which allows public access to discipline proceedings. *See* Ind. R. Att'y Adm. & Discip. 23, § 22(a).

[24] *See* Julia Coin, *In 8th Run-in with State Bar, Charlotte Attorney Who Shared False Drama Avoids Suspension*, Charlotte Observer (Feb. 22, 2024), https://perma.cc/W65T-ZEXE. North Carolina allows access to discipline proceedings. 27 N.C. Admin. Code 01B .0116.

[25] *See, e.g.*, Stacey Barchenger, *Trio of Kari Lake Election Lawyers Set to Face Disciplinary Proceedings. Here's Why*, Ariz. Republic (Dec. 13, 2023), https://perma.cc/VY3D-KT2T. *See also* Ariz. R. Sup. Ct. 70 (proceedings and records open upon finding of probable cause or dismissal, *inter alia*).

Prosecutors have the "power to employ the full machinery of the state," and the public "must have assurance that those who would wield [prosecutorial] power will be guided solely by their sense of public responsibility for the attainment of justice." *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 814 (1987). In New York, moreover, the district attorneys who oversee prosecutors are elected. N.Y. Cnty. L. art. 24, § 926. Section 90(10) not only undermines public confidence in the fairness of criminal trials, it degrades the democratic oversight that elections are meant to provide.

The Grievance Committee's disposition of prosecutorial misconduct complaints is of intense public interest because it bears directly on the fairness of criminal trials. As the Supreme Court has underscored, "it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted. . . ." *Richmond Newspapers*, 448 U.S. at 575; *see Butterworth v. Smith*, 494 U.S. 624, 632 (1990) (observing that allegations of governmental misconduct lie "at the core of the First Amendment"). Section 90(10) directly contravenes this interest.

The adjudication of complaints of prosecutorial misconduct provides a critical mechanism for inhibiting bad behavior and bolstering confidence in the criminal justice system. Notably, prosecutors are absolutely immune from civil damages suits, *Imbler v. Pachtman*, 424 U.S. 409, 422-23 (1976), so unless a prosecutor's

action rises to the level of criminal (*i.e.*, willful) misconduct, *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974), the attorney discipline process is the only lever of accountability when wrongdoing is discovered after a prosecution ends. Secret discipline inevitably erodes public trust.

This is not a theoretical concern. As reflected in *amici*'s news coverage,[26] the extent of prosecutorial misconduct is alarming—nearly one-third of exonerations from 1989 to 2019 were linked to prosecutorial misconduct.[27] Take Charles Testagrossa, for example. He suppressed exculpatory evidence and misled both the trial court and the defendants to secure the wrongful convictions of three innocent men, who spent twenty-four years behind bars for a robbery and murder they did not commit.[28] Despite this egregious misconduct, Testagrossa ascended to the position of Chief of Investigations for Nassau County.[29]

---

[26] *See*, *e.g.*, Dan Clark, *N.Y.'s Prosecutor Watchdog Panel Finally Begins Its Work— 7 Years Later*, Albany Times-Union (Feb. 27, 2025), https://perma.cc/RAS5-KMWW; Nina Morrison, *What Happens When Prosecutors Break the Law?*, N.Y. Times (June 18, 2018), https://perma.cc/4PDG-CC9J; Joaquin Sapien, *Trial and Error: Report Says Prosecutors Rarely Pay Price for Mistakes and Misconduct*, Pro Publica (Mar. 29, 2016), https://perma.cc/ET33-FE3G.

[27] Aimee Ortiz, *Police or Prosecutor Misconduct Is at Root of Half of Exoneration Cases, Study Finds*, N.Y. Times (Sept. 16, 2020), https://perma.cc/ES8P-K2HL.

[28] Troy Closson, *They Spent 24 Years Behind Bars. Then the Case Fell Apart*, N.Y. Times (Mar. 5, 2021), https://perma.cc/PQ98-B2YF.

[29] *See*, *e.g.*, Sapien & Hernandez, *supra* note 4; Closson, *supra* note 28; David Brand, *Top Prosecutor Quits After Queens Judge Accuses Him of Lying in Death Penalty Case*, Queens Daily Eagle (Mar. 11, 2021), https://perma.cc/YE79-W4DP.

Such prosecutorial misconduct is by no means unusual.[30]  In another recent example, former Suffolk County Assistant District Attorney Glenn Kurtzrock suppressed forty-eight items of exculpatory evidence in the murder trial of Messiah Booker.  *In re Kurtzrock*, 138 N.Y.S.3d 649 (N.Y. App. Div. 2020).  It was only after Kurtzrock's misconduct became public through press coverage[31] that watchdog groups prepared a report detailing his manifold violations of *Brady* obligations in twenty prosecutions dating back to 2004.  *See* Suffolk Cnty. Dist. Att'y's Off. Conviction Integrity Bureau, *A Review of the Disclosure Practices of Former Assistant District Attorney Glenn Kurtzrock* (2021), https://perma.cc/LU22-H57C.

It bears reemphasis that concealing prosecutorial misconduct undermines public trust in the fairness of the criminal justice system.  While some cases *might* come to light through open-court proceedings, complaints of misconduct in other cases would typically never surface. Under Section 90(10), the "effective restraint on possible abuse of judicial power" provided by contemporaneous review of

---

[30] *See, e.g.*, Sapien & Hernandez, *supra* note 4 (noting at least two dozen instances in a twelve year period where judges found misconduct by New York city prosecutors—none of whom were disbarred, suspended, or censured); Gary Craig, *Three New York Judges Resign After Misconduct Investigations*, Rochester Democrat & Chron. (Feb. 6, 2025), https://perma.cc/AR82-52QH; Chelsia Rose Marcius, *New York Pays $206 Million to Settle Misconduct Suits, the Most Since 2018*, N.Y. Times (Feb. 18, 2025), https://perma.cc/9HLV-25LR.

[31] *See, e.g.*, Tara Smith, *In New Report, District Attorney Details Decades of Misconduct by Former Prosecutor*, Riverhead News-Rev. (Nov. 24, 2021), https://perma.cc/7UCZ-W7EG.

adjudicated proceedings "in the forum of public opinion" does not exist. *Richmond Newspapers*, 448 U.S. at 592 (Brennan, J., concurring).

But the implications of secret discipline for New York prosecutors are broader still, because their misconduct can only occur under the watch of elected district attorneys. *See* N.Y. Cnty. L. art. 24, § 926. Plaintiffs' grievance complaints, once released to the public by the district court, received extensive and sustained press coverage and public attention.[32] Without access to such complaints or to the discipline ultimately imposed, the public is denied information critical to the evaluation of its elected officials.

### D. The Public Interest in Access to Attorney Disciplinary Proceedings Vastly Outweighs the Privacy and Reputational Interests Presented

Defendant and his amicus defend the debilitating secrecy imposed by Section 90(10) as necessary to limit reputational harm to attorneys subjected to unfounded misconduct complaints. *See* Appellant's Br. at 1; NYSBA Br. at 3. This concern is an invalid basis for denying access to the disposition of misconduct complaints

---

[32] *See, e.g.*, Bromwich, *supra* note 6; Haidee Chu, *Four Queens Prosecutors Who Discriminated Against Minority Jurors Are Still On the Job*, The City (March. 21, 2023), https://perma.cc/DB6Q-3W3H; Jacob Kaye, *Six Queens Prosecutors Named in New Batch of Misconduct Complaints*, Queens Daily Eagle (March. 22, 2023), https://perma.cc/K3ZW-YXDJ; Maia Spoto, *New York Judge Peels Back Curtain on Attorney Misconduct Cases*, Bloomberg Law (July 22, 2024), https://perma.cc/MCJ5-VSRY; Jacob Kaye, *Judge Lifts Veil on Group Investigating Complaints Against Queens Prosecutors*, Queens Daily Eagle (July 26, 2024), https://perma.cc/U56E-BYTT.

investigated and adjudicated by the Grievance Committee and any subsequent proceedings in the Appellate Division—and certainly not on a categorial basis.

Most complaints filed with a Grievance Committee are disposed of during initial screening by the Chief Attorney.[33] The confidentiality of this process is not affected by the district court's recognition of a First Amendment right of access to the dispositions of complaints adjudicated by the full Grievance Committee, which represent a small fraction of complaints lodged each year. For example, in the most recent year for which First Department data is available, 2023, just 905 complaints were adjudicated by the First Department Grievance Committee, and only a third of those, 301, were referred to the Appellate Division. Att'y Grievance Comm., App. Div. First Jud. Dep't, *2023 Annual Report* 48 (2023), https://perma.cc/FGE7-YXRN. In comparison, the First Department's Chief Attorney that same year disposed of 2,122 complaints at the screening stage. *Id*. at 48. No prosecutors were disciplined for misconduct in the First Department in 2023. *Id.* at 50.

As this data reflects, the Chief Attorney's screening process is well-structured to prevent the "premature disclosure" of baseless complaints that might inflict unwarranted damage on an attorney's reputation. *Contra* NYSBA Br. at 2. The

---

[33] The precise percent is impossible to ascertain from the few publicly available reports. The Second Department has not recently reported Grievance Committee disposition data, the most recent Third Department data is from 2022, and none of the reports indicate the year in which resolved complaints were first filed.

district court's ruling does not require disclosure of complaints disposed of by the Chief Attorney, SA112, it only finds an access right to those complaints presented for adjudication by the Grievance Committee and those referred on to the Appellate Division. Whatever reputational and privacy interests may exist in these complaints as a general matter, they are vastly outweighed by the substantial public interests advanced by public access to the Grievance Committee dispositions and Appellate Division proceedings. Issues of public concern that are afforded First Amendment protection do not generally yield to privacy interests. *See, e.g.*, *The Florida Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (finding mass distribution of information "not an acceptable" justification for restrictions on First Amendment interests). In the rare case where the reputational or privacy interests at stake are unusually acute or compelling the State or parties to the proceeding can seek limited sealing in compliance with First Amendment standards.

The interests in reputation and privacy said to justify secret attorney-discipline proceedings are no different in kind or degree from the interests present in criminal prosecutions, where the constitutional access right incontrovertibly adheres from the moment charges are brought. *See, e.g.*, *Press-Enter. Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1, 10 (1986); *In re N.Y. Times Co.*, 828 F.2d 110, 116 (2d. Cir. 1987). These same interests are present in civil litigation, too, where the access right applies to both proceedings and judicial records. *See, e.g.*, *Lugosch v. Pyramid*

*Co. of Onondaga*, 453 F.3d 110, 120 (2d Cir. 2006). Indeed, an attorney malpractice suit is a mere filing away for members of the bar, but "the mere '[b]road and general' invocation of a privacy interest" would not justify sealing those proceedings. *Guzik v. Albright*, No. 16-CV-2257, 2018 WL 6011612, at *3 (S.D.N.Y. Nov. 16, 2018) (quoting *In re N.Y. Times Co.*, 828 F.2d at 116). It does not justify sealing attorney disciplinary proceedings either.

As in criminal prosecutions and civil litigation, the First Amendment permits limitations on access to attorney disciplinary proceedings only on a specific showing of likely harm to a compelling interest and not on the categorical basis employed by Section 90(10). *See Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606-07 (1982); *Press-Enterprise II*, 478 U.S. at 13-14.

## II. THE DISTRICT COURT CORRECTLY HELD THAT THE FIRST AMENDMENT ACCESS RIGHT EXTENDS TO ATTORNEY DISCIPLINARY PROCEEDINGS AND RECORDS

The First Amendment access right extends to those government proceedings that have a tradition of openness and where openness "plays a significant positive role in the functioning of the particular process in question." *Press-Enterprise II*, 478 U.S. at 8. The Supreme Court developed this "experience-and-logic" test to define the scope of the First Amendment access right in a series of cases finding that the right attaches to various judicial proceedings. *See, e.g.*, *Richmond Newspapers*, 448 U.S. at 576-78 (finding right of access to criminal trials); *Press-Enter. Co. v.*

*Superior Ct. (Press-Enterprise I)*, 464 U.S. 501, 505 (1984) (*voir dire* proceedings); *Press-Enterprise II*, 478 U.S. at 9 (preliminary hearings in a criminal prosecution).

The district court's determination that the First Amendment access right attaches to certain attorney disciplinary proceedings and records faithfully applies this Court's extensive body of precedent applying the access right. This Court has used the "experience and logic" test to find a host of governmental proceedings subject to the right. *See, e.g.*, *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth. (NYCTA)*, 684 F.3d 286, 301-03 (2d Cir. 2012) (administrative adjudicative hearings); *ABC, Inc. v. Stewart*, 360 F.3d 90, 100 (2d Cir. 2004) (jury selection); *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 23 (2d Cir. 1984) (civil trials). It has also applied the test in finding a right of access to the records of judicial proceedings.[34] *See, e.g.*, *Lugosch*, 453 F.3d at 120 (civil motion papers); *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 92, 94-96 (2d Cir. 2004) (court dockets); *In re N.Y. Times Co.*, 828 F.2d at 114 (motion papers in criminal prosecutions). This Court has also held that a compelling need for access under the logic prong, alone, can estabish the First Amendment access right in the absence of an extensive history of access. *See United States. v. Suarez*, 880 F.2d 626, 631 (2d Cir. 1989).

---

[34] This Court has alternatively held that the access right attaches to records "derived from or a necessary corollary of the capacity to attend" open proceedings. *Lugosch*, 435 F.3d at 120, 124; *see also In re Demetriades*, 58 F.4th 37, 45-47 (2d Cir. 2023) (right of access to judicial opinions and other judicial records in appeal from federal grievance committee's order finding ethical violations).

The district court correctly applied this well-established precedent in finding a First Amendment right of public access to the Grievance Committees' dispositional records and attorney disciplinary proceedings and records in the Appellate Division. *See* SA93, SA109. The experience prong is satisfied because attorney disciplinary proceedings were open to the public for centuries. SA77-84; *see also* Jonathan Rose, *The Legal Profession in Medieval England: A History of Regulation*, 48 Syracuse L. Rev. 1, 91-92 (1998) (finding that attorney discipline occurred in public courts since at least the thirteenth century). Likewise, the press historically reported on these open proceedings.[35] Only relatively recently did organized bar associations begin advocating for secrecy for the adjudication of attorney misconduct allegations. *See* Leslie Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1, 14-17 (2007).

A shift in New York's procedures during the twentieth century does not lessen the weight of this historical precedent. *See NYCTA*, 684 F.3d at 299 (holding that experience and logic test does not rest on "formalistic descriptions of the government proceeding but on the kind of work the proceeding actually does"); SA80-84.

---

[35] *See, e.g.*, N.Y. Times Law Reports, *William H. Gale Disbarred: An Attorney's Outrageous Conduct Towards a Woman Client in a Divorce Case*, N.Y. Times (Mar. 13, 1877), https://perma.cc/JEC6-WNUP; Special Dispatch to the Tribune, *Infamous Shystering: A New York Attorney Disbarred for Extraordinary and Anomalous Treachery Towards His Client*, Chicago Trib. 5 (Mar. 13, 1877), https://perma.cc/HCP8-TCKP.

Because the roles of the Grievance Committee and the Appellate Division in adjudicating attorney misconduct fully align with the long tradition of attorney discipline being handled in open court, the district court properly found the experience prong satisfied. SA102-106.

Logic also overwhelmingly supports the district court's limited application of the access right to certain attorney disciplinary proceedings and records. *See supra* Part I. As the district court found, public access to Appellate Division disciplinary proceedings plays an important role in reinforcing trust in the judicial system, where lawyers are key actors. SA84-85; *see also Richmond Newspapers*, 448 U.S. at 569 (observing that publicity gives provides "assurance that the proceedings were conducted fairly to all concerned"). Access promotes the proper functioning of those proceedings by "'diminish[ing] the possibilities for injustice, incompetence, perjury, and fraud.'" SA86 (quoting *Amodeo*, 71 F.3d at 1048).

Public access to Grievance Committee dispositions similarly also serves a vital role by promoting accountability for attorney misconduct and supporting trust in the legal profession. The Committee's dispositions resolve the majority of investigated and adjudicated misconduct complaints, SA42, and directly influence public confidence in the integrity of the bar, SA84. Those dispositions are permanent records guiding future conduct, rendered by a neutral party on a developed factual record, and "function as the State's 'judgment' on the attorney's conduct." SA96-

99. The Grievance Committee's dispositions are not properly characterized as investigative or prosecutorial records, but rather mirror the judgments resolving allegations of wrongdoing generally required to be open. SA96-101.

The State's speculative interests in protecting witnesses and shielding attorneys from meritless accusations do not outweigh the benefits of transparency. SA90-93. The district court was plainly correct in finding that experience and logic compel recognition of a qualified right of public access to the attorney disciplinary proceedings and records at issue.

While this access right is not absolute, Defendants failed to make the specific evidentiary showings required to limit the access right. They could not overcome the Supreme Court's rejection of the type of categorical exceptions to the access right imposed by Section 90(10). *See Globe Newspaper*, 457 U.S. at 606-07. Nor could they demonstrate that the access right was properly overcome with respect to prosecutorial misconduct complaints at issue here. This required a showing that permitting access to the records and proceedings at issue would create a substantial probability of prejudice to an overriding governmental interest, no reasonable alternative to the denial of access could adequately protect against the threatened prejudice, and their proposed restriction on access is narrowly tailored to minimize harm to the constitutional right. *See Press-Enterprise II*, 478 U.S. at 13-14; *United*

*States v. Erie County*, 763 F.3d 235, 243 (2d Cir. 2014); *Lugosch*, 453 F.3d at 124-26. Defendants made no such showing. *See* SA113.

The district court correctly applied the controlling legal standards and did not abuse its discretion in finding Section 90(10) far too broad to protect any need for secrecy sufficiently compelling to overcome the public's First Amendment right of access. SA112-116.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's holding that the First Amendment right of public access extends to the New York attorney disciplinary proceedings and records at issue.

Dated: March 12, 2025

Respectfully submitted,

  /s/ *David A. Schulz*
David A. Schulz
Tobin Raju
MEDIA FREEDOM & INFORMATION
  ACCESS CLINIC
YALE LAW SCHOOL[36]
127 Wall Street
New Haven, CT 06511
(212) 663-6162
schulzd@ballardspahr.com

*Attorneys for New York Media Coalition*
*as Amici Curiae*

---

[36] Yale Law students Anthony Cosentino, Nick Jones, and Raymond Perez contributed significantly to the drafting of this Brief. The views expressed herein do not purport to represent the institutional views of Yale Law School, if any.

## **ADDENDUM**

**Advance Publications, Inc**. is a global media company that publishes the *Staten Island Advance* and the *Post Standard*.  *The Staten Island Advance* is a daily newspaper serving Staten Island covering the latest local news, sports, and breaking updates, available in print and at www.silive.com.  *The Post-Standard* provides extensive coverage of local news, sports, and culture in Syracuse and Central New York, available at www.syracuse.com and thrice weekly in print

**The Associated Press** is a global news agency, organized as a mutual news cooperative under the New York Not-for-Profit Corporation Law, with its headquarters and main news operations in New York City.

**Daily News, L.P.,** publishes the *New York Daily News,* a daily newspaper that serves primarily the New York City metropolitan area and is one of the oldest media companies in the country, with its first issue dating back to 1919.

**Dow Jones & Company** is the world's leading provider of news and business information. Through *The Wall Street Journal*, *Barron's*, *MarketWatch*, *Dow Jones Newswires*, and other publications, Dow Jones has produced journalism of unrivaled quality for more than 130 years and today has one of the world's largest newsgathering operations.

**Gannett Co., Inc**. is a leading news and information company which publishes *USA Today* and some 200 local media properties, including *The*

*Binghamton Press & Sun Bulletin*, *The Elmira Star Gazette*, *The Ithaca Journal*, *The Rochester Democrat and Chronicle*, *The Poughkeepsie Journal*, *The Utica Observer-Dispatch,* and *The Journal News* (Westchester County). Each month more than 150 million unique visitors access content from *USA Today* and Gannett's local media organizations in New York and elsewhere.

**Hearst Corporation** publishes the *Times Union*, which serves the Capital Region of New York with daily news coverage through its print edition and website, www.timesunion.com.

**New York Newspaper Publishers Association** is a trade association representing daily newspapers across New York State, advocating for press freedom, legislative issues, and industry advancement.

**New York Press Association** is a non-profit membership organization representing and supporting weekly newspapers across New York State through advocacy, training, and resources.

**The New York Times Corporation** publishes *The New York Times* and www.nytimes.com.

**Newsday LLC** publishes *Newsday*, one of the nation's largest daily newspapers, and serves New York and Long Island through a portfolio of print and digital products, available in print and at www.newsday.com.

**Pro Publica, Inc**. is a Pulitzer Prize-winning non-profit news organization that produces investigative journalism in the public interest.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29 and 32, undersigned counsel certifies that the foregoing brief:

1. Complies with the type-volume limitation of Local Rules 29.1(c) and 32.1(a)(4)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,067 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: Mach 12, 2025                          By: /s/ *David A. Schulz*_____
                                                   David A. Schulz