

**Office of the New York State
Attorney General**

**Letitia James
Attorney General**

May 22, 2026

Catherine O'Hagan Wolfe
Clerk of Court
U.S. Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY 10007

Re: *Civil Rights Corps v. Cushman*, No. 24-2251

Dear Ms. Wolfe:

Pursuant to Rule 28(j), I write on behalf of defendant-appellant Hector D. LaSalle (i) to address *Christian v. James*, which confirms the important role of post-enactment history in constitutional interpretation, Nos. 24-2847, 25-384, 2026 WL 1378796, at *7, 9-12 (2d Cir. May 18, 2026); and (ii) to respond to plaintiffs' May 13 letter about a grievance committee matter.

First, in *Christian*, this Court considered a Second Amendment challenge to New York's prohibition on gun possession in certain sensitive locations. *Id.* at *1. The Court explained that post-enactment history can clarify original meaning and that "a regular course of practice may settle a constitutional debate at *any* point in our history." *Id.* at *12 (quotation marks omitted). The Court relied on numerous regulations prohibiting gun possession in public parks, spanning from 1858 to the early 1900s, in upholding the State's similar regulation. *Id.* at *9-12.

Although there are important differences between First and Second Amendment challenges,[1] *Christian*'s analysis further supports reversal here. Like the public park

---

[1] In the Second Amendment context, the government must establish that its regulation of protected conduct is consistent with the nation's historical tradition. *Christian*, 2026 WL 1378796, at *3. Here, *plaintiffs* must establish that experience and logic support deviating from the default rule of no public access. See Opening Br. at 51-52; Reply Br. at 17.

regulations in *Christian*, there is a history of confidential grievance committee proceedings tracing to the inception of investigatory bodies in the late nineteenth century. And States commonly maintained the confidentiality of formal disciplinary proceedings after such proceedings proliferated alongside codes of conduct. See Opening Br. at 8-9, 53-56, 68-70; Reply Br. at 21-22, 28-30. Beforehand, neither type of proceeding "exist[ed] in significant numbers," making the post-Founding history especially pertinent. *See Christian*, 2026 WL 1378796, at *12.

Second, plaintiffs' May 13 letter (ECF No. 61) identifies no relevant authority. Plaintiffs' desire for more information than what was provided to a complainant about the disposition of an unrelated disciplinary matter before a different grievance committee has no bearing on the constitutional question before this Court.

Respectfully submitted,

/s/ *Stephen J. Yanni*

Stephen J. Yanni
Assistant Solicitor General
(212) 416-6184
stephen.yanni@ag.ny.gov

cc (via ACMS):  All counsel of record

Word count: 343

2

2026 WL 1378796

2026 WL 1378796
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Brett CHRISTIAN, Firearms Policy Coalition, Inc., Second Amendment Foundation, Plaintiffs-Appellees, John Boron, Plaintiff,

v.

Steven G. JAMES, in his Official Capacity as Superintendent of the New York State Police, Defendant-Appellant, Michael J. Keane, in his Official Capacity as District Attorney for the County of Erie, New York, Defendant. Brett Christian, Firearms Policy Coalition, Second Amendment Foundation, Plaintiffs-Appellants, John Boron, Plaintiff,

v.

Steven G. James, Michael J. Keane, Acting District Attorney, Defendants-Appellees.

Nos. 24-2847, 25-384
|
August Term 2024
|
Argued: June 25, 2025
|
Decided: May 18, 2026

**Attorneys and Law Firms**

Peter A. Patterson (David H. Thompson and William V. Bergstrom, on the brief), Cooper & Kirk, PLLC, Washington, District of Columbia; Nicolas J. Rotsko, Fluet & Associates PLLC, Tysons, Virginia, for Plaintiffs-Appellees and Plaintiffs-Appellants.

Sarah Coco, Assistant Solicitor General (Barbara D. Underwood, Solicitor General, and Ester Murdukhayeva, Deputy Solicitor General, on the brief), for Letitia James, Attorney General for the State of New York, New York, New York, for Defendant-Appellant and Defendant-Appellee.

Before: Bianco, Menashi, and Lee, Circuit Judges.

**Opinion**

Joseph F. Bianco, Circuit Judge:

**\*1** These two appeals involve Plaintiffs' Second Amendment challenge to New York's Concealed Carry Improvement Act ("CCIA") provisions prohibiting firearm possession in two types of locations: (1) private property "where [a] person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of [guns] on their property is permitted or by otherwise giving express consent[,]" N.Y. Penal L. § 265.01-d(1) (the "Private Property Provision"); and (2) "sensitive locations," including "public parks," *id*. § 265.01-e(2)(d) (the "Public Parks Provision"). Plaintiffs challenge the Private Property Provision, as applied to private property open to the public. Plaintiffs asserted only a facial challenge to the Public Parks Provision in the district court, but now also seek to raise an as-applied challenge based upon its application to rural parks.

The district court (John L. Sinatra, Jr., *Judge*) permanently enjoined Defendant Steven G. James, the Superintendent of the New York State Police (the "State"), from enforcing the Private Property Provision, as applied to private property open to the public, deeming it unconstitutional because it is inconsistent with our Nation's historical tradition of firearms regulation. However, the district court granted summary judgment in favor of the State on the Public Parks Provision, concluding that it is facially constitutional because it is relevantly similar to the historical analogues proffered by the State.

We conclude that the Private Property Provision, as applied to private property open to the public, is unconstitutional because the State did not carry its burden of demonstrating that the restriction falls within our Nation's historical tradition of gun regulations, as required under the framework set forth in *New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. 1, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022)*. On the other hand, we conclude that the Public Parks Provision survives Plaintiffs' facial challenge because the State has carried its burden of showing that regulation is consistent with our Nation's historical tradition of banning gun possession in urban public parks. Finally, we decline to address any as-applied challenge to the Public Parks Provision, to the extent it applies to rural parks, because Plaintiffs failed to raise that challenge in the district court.

Accordingly, we **AFFIRM** the permanent injunction against the Private Property Provision, as applied to private property

open to the public, and **AFFIRM** the judgment in favor of the State on the Public Parks Provision.

## BACKGROUND

In July 2022, the New York State Legislature passed a sweeping set of new gun regulations through the CCIA. As relevant to this appeal, the CCIA criminalizes gun possession in "restricted locations," which it defines as "private property where [a] person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or by otherwise giving express consent." N.Y. Penal L. § 265.01-d(1). This provision does not apply to certain law-enforcement officers, military personnel, certain security guards, or persons lawfully hunting. Id. § 265.01-d(2). The CCIA also prohibits gun carriage in certain "sensitive locations," which includes, among other locations, "public parks." [1] Id. § 265.01-e(2)(d). The provisions became effective on September 1, 2022.

[1]      The definition of "public parks" under this provision does "not include (i) any privately held land within a public park not dedicated to public use or (ii) the forest preserve as defined in subdivision six of [S]ection 9-0101 of the [E]nvironmental [C]onservation [L]aw." Id.

 **\*2** Plaintiffs—Brett Christian and two gun advocacy organizations, Firearms Policy Coalition and Second Amendment Foundation [2] —filed this lawsuit on September 13, 2022. Relevant to these appeals, Plaintiffs brought a claim, pursuant to 42 U.S.C. § 1983, alleging that the Private Property Provision, as applied to places open to the public, and the Public Parks Provision, on its face, are unconstitutional under the Second and Fourteenth Amendments.

[2]      An additional plaintiff, John Boron, entered a notice of voluntary dismissal on September 28, 2022.

Plaintiffs then moved for a preliminary injunction. The district court granted the motion with respect to the Private Property Provision, as applied to private property open to the public, but stayed the resolution of the motion with respect to the Public Parks Provision. The State filed an interlocutory appeal of the preliminary injunction against the Private Property Provision.

On December 8, 2023, in a consolidated opinion addressing four appeals, a panel of this Court affirmed the district court's preliminary injunction decision, explaining that "the State has failed to situate [the Private Property Provision]," as applied to private property open to the public, within the Nation's historic tradition of firearms regulation. *Antonyuk v. Chiumento*, 89 F.4th 271, 386 (2d Cir. 2023) ("*Antonyuk I*"), *cert. granted, judgment vacated sub nom. Antonyuk v. James,* —— U.S. ——, 144 S. Ct. 2709, 219 L.Ed.2d 1315 (2024), *and reinstated in part by Antonyuk v. James,* 120 F.4th 941 (2d Cir. 2024) ("*Antonyuk II*"). [3] The panel also concluded in the same opinion that the Public Parks Provision was likely to survive a facial challenge because, at least as it applies to urban parks, the State "carried its burden by placing the regulation within a National tradition of regulating firearms in often-crowded public squares, including, specifically, city parks." *Antonyuk I,* 89 F.4th at 363; *accord Antonyuk II,* 120 F.4th at 1026 (same). The panel emphasized that the "affirmance or vacatur of the district courts' [preliminary] injunctions does not determine the ultimate constitutionality of the challenged CCIA provisions, which await further briefing, discovery, and historical analysis, both in these cases as they proceed and perhaps in other cases." *Antonyuk I,* 89 F.4th at 388 n.116.

[3]      The plaintiffs in *Antonyuk* filed a petition for certiorari with the Supreme Court following our decision in *Antonyuk I*. After the Supreme Court decided *United States v. Rahimi,* 602 U.S. 680, 144 S.Ct. 1889, 219 L.Ed.2d 351 (2024), it granted the petition, vacated our judgment, and remanded the case for further consideration in light of that opinion. We substantially reaffirmed our *Antonyuk I* decision in a subsequent opinion, *Antonyuk II*. As we explained in *Antonyuk II*, because the parties in this case did not petition for certiorari before the Supreme Court, the Supreme Court's summary vacatur of *Antonyuk I* "did not vacate the judgment[ ]" with respect to this case. 120 F.4th at 955 n.3. Thus, *Antonyuk I* "remains binding on the parties in" this case with respect to the Private Property Provision. *Id.* Accordingly, our discussion of the Private Property Provision below principally quotes from *Antonyuk I*, while elsewhere in this opinion we quote and rely on *Antonyuk II*.

Christian v. James, --- F.4th ---- (2026)

2026 WL 1378796

After the case was remanded to the district court, the parties cross-moved for summary judgment on the Private Property and Public Parks Provisions. On October 10, 2024, the district court granted summary judgment in favor of the Plaintiffs on their Private Property Provision claim and permanently enjoined the State from enforcing that provision. *See generally Christian v. James*, 753 F. Supp. 3d 273 (W.D.N.Y. 2024) ("*Christian I*"). Based on the expanded summary judgment record, it concluded, as we did in *Antonyuk I* on a preliminary record, that the State failed to establish that the Private Property Provision, as applied to private property open to the public, fell within our Nation's historical tradition of gun regulations. *Id.* at 292.

**\*3** A few months later, the district court granted summary judgment in favor of the State on the Public Parks Provision. *See generally Christian v. James*, No. 22-cv-695 (JLS), 2025 WL 50413, at *1 (W.D.N.Y. Jan. 8, 2025) ("*Christian II*"). The district court concluded that our determination in *Antonyuk II* that a facial challenge to the provision was unlikely to succeed "require[d] that Plaintiffs' motion be denied as to the parks issue and Defendants' corresponding cross motion be granted." *Id.* at *1. Although Plaintiffs argued in their summary judgment motion for the first time that they also brought an as-applied challenge against the Public Parks Provision as it applied to rural parks, the district court declined to consider that claim and instead stated that it "is best presented to the Second Circuit for [ ] resolution." *Id.* It subsequently entered final judgment on the Public Parks Provision claim pursuant to Federal Rule of Civil Procedure 54(b).

The State appeals from the district court's permanent injunction order. The Plaintiffs, in turn, appeal from the district court's judgment in favor of the government on the Public Parks Provision.

## DISCUSSION

"We review a district court's grant of a permanent injunction for abuse of discretion." *Shain v. Ellison*, 356 F.3d 211, 214 (2d Cir. 2004). "A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Id.* "We review a district court's order granting summary judgment *de novo*, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-moving party." *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016).

## I. Second Amendment Principles

The Second Amendment guarantees that "the right of the people to keep and bear [a]rms [ ] shall not be infringed," U.S. CONST. amend. II, and is made applicable to the States through the Fourteenth Amendment, *see McDonald v. City of Chicago*, 561 U.S. 742, 750, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).

We follow a two-step framework to evaluate Second Amendment challenges, as articulated by the Supreme Court in *Bruen*. Under that framework, the plaintiff bears the initial burden of establishing that "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24, 142 S.Ct. 2111. If the plaintiff makes that showing, the burden shifts to the government to prove that the challenged law is "consistent with the Nation's historical tradition of firearm regulation." *Id.*

Under the historical tradition analysis at step two, we "must ascertain whether the [challenged] new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *United States v. Rahimi*, 602 U.S. 680, 692, 144 S.Ct. 1889 (2024) (alteration adopted) (internal quotation marks and citation omitted). "Why and how the regulation burdens the right are central to this inquiry." *Id.* This analogical reasoning "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*" or a "dead ringer." *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111 (emphases in original).

We further clarified the proper methodology for this inquiry in opinions of our own. In *Antonyuk II*, we explained that "courts must be particularly attuned to the reality that the issues we face today are different than those faced in medieval England, the Founding Era, the Antebellum Era, and Reconstruction." *Antonyuk II*, 120 F.4th at 970; *see Bruen*, 597 U.S. at 27, 142 S.Ct. 2111 ("[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."). Thus, a lack of similar historical regulations during one or more of those time periods "may not be reliably dispositive in Second Amendment challenges to laws addressing modern concerns." *Antonyuk II*, 120 F.4th at 970. It may simply be the "natural consequence" of the absence of the particular issue during those time periods. *Frey v. City of New York*, 157 F.4th 118, 136 (2d Cir. 2025). "Reasoning from historical silence is [also] risky" because "[l]egislatures past and present have not generally legislated

to their constitutional limits[,]" and it is thus "not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such regulation inconsistent with the right to bear arms." *Antonyuk II*, 120 F.4th at 969 (footnote omitted).

**\*4** We also underscored that it is "not dispositive whether comparable historical regulations exist in significant numbers." *Id.* at 971 (emphasis omitted). "[W]here there is a lack of constitutional dispute regarding a type of gun regulation, or if courts during that period upheld similar governmental practices against similar constitutional challenges, comparable historical laws need not proliferate to justify a modern prohibition." *Frey*, 157 F.4th at 128 (internal quotation marks and citation omitted).

We have further held that, "[b]ecause the CCIA is a state law, the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis," and that "[t]he time periods in close proximity to 1791 and 1868 are also relevant to our analysis." *Antonyuk II*, 120 F.4th at 972–73 (footnote omitted). We have since clarified that, even where there is an absence of Founding-era evidence supporting a historical tradition, "we may focus on later evidence, especially from the Reconstruction era, to ascertain [the] scope" of the Second Amendment right. *Frey*, 157 F.4th at 131 (footnote omitted). We explained this is so because the dearth of evidence "does not point with some certainty in one direction or another" as to the existence of a historical tradition. *Id.* at 130. Making conclusions based on later evidence therefore cannot "be characterized as *contradicting* the understanding of the right in 1791." *Id.* (emphasis in original). Moreover, relying chiefly on later history is perfectly consistent with "the originalist and liquidation theories espoused by the [Supreme] Court in *Heller* and *Bruen*." *Id.*; *see id.* (explaining that 19th century evidence is "instructive" to the original meaning as understood in 1791 and may settle debates on ambiguous constitutional terms through liquidation); *see also Rahimi*, 602 U.S. at 738, 144 S.Ct. 1889 (Barrett, *J.*, concurring) (explaining that "postenactment history can be an important tool" because "it can reinforce our understanding of the Constitution's original meaning; liquidate ambiguous constitutional provisions; [and] provide persuasive evidence of the original meaning") (internal quotation marks and citation omitted).

Bearing these principles in mind, we analyze the constitutionality of the Private Property and Public Parks Provisions.

## II. Private Property Provision

We first address the constitutionality of the Private Property Provision as applied to private property held open to the public. Section 265.01-d(1) makes it a class E felony to possess firearms in a "restricted location":

> A person is guilty of criminal possession of a weapon in a restricted location when such person possesses a firearm, rifle, or shotgun and enters into or remains on or in private property where such person knows or reasonably should know that the owner or lessee of such property has not permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or by otherwise giving express consent.

N.Y. Penal Law § 265.01-d(1). In other words, this provision "create[s] a default presumption that carriage on any private property is unlawful ... unless the property owner has indicated by 'clear and conspicuous signage' or express verbal consent that carriage is allowed." *Antonyuk I*, 89 F.4th at 379. Plaintiffs challenge the constitutionality of Section 265.01-d(1) only as it applies to private property that is held open to the public, like a gas station or grocery store.

**\*5** We have previously held that, "to the extent the [Private Property Provision] applies to private property open to the public, the regulated conduct falls within the Second Amendment right to carry firearms in self-defense outside the home." *Antonyuk I*, 89 F.4th at 383. The State does not dispute this conclusion. The burden is therefore on the State to demonstrate a historical tradition that supports the Private Property Provision.

The State comes forward with ten statutes from nine states that it argues are relevantly similar to the Private Property Provision: (1) a 1715 Maryland law barring people "convicted of [certain crimes] ... or ... of evil fame, or a vagrant, or dissolute liver," from "shoot[ing], kill[ing] or hunt[ing], or ... carry[ing] a gun, upon any person's land, whereon there shall

be a seated plantation, without the owner's leave," Joint App'x at 1223 (1715 Md. Laws 90); (2) a 1721 Pennsylvania law and 1722 New Jersey law that both prohibit gun carriage or hunting "on the improved or inclosed lands of any plantation other than his own, unless he have license or permission from the owner of such lands or plantation," *id.* at 1228 (1721 Penn. Laws 255); *see also id.* at 1234 (1722 N.J. Laws 101); (3) a 1763 New York law prohibiting "carry[ing], shoot[ing] or discharg[ing]" any firearm in any "Orchard, Garden, Corn-Field, or other inclosed Land ... without License in Writing" from the owner, *id.* at 1239 (1763 N.Y. Laws 442); (4) a 1771 New Jersey law making it unlawful for anyone "to carry any Gun on any Lands not his own, and for which the Owner pays Taxes, or is in his lawful Possession, unless he hath License or Permission in Writing from the Owner," *id.* at 1242 (1771 N.J. Laws 344); (5) a 1790 Massachusetts law prohibiting the possession of "any gun or guns upon" certain islands, "except such as shall have the special license of the proprietors of the said islands," *id.* at 1744 (1790 Mass. Acts 259); (6) an 1865 Louisiana law and 1866 Texas law prohibiting carriage on the "premises or plantations of any citizen, without the consent of the owner or proprietor," *id.* at 1252 (1865 La. Acts 14); *see id.* at 1259 (1866 Tex. Gen. Laws 1321); (7) an 1865 Florida law making it unlawful to "hunt or range with a gun within the enclosed land or premises of another without the permission of the owner," *id.* at 1536 (1865 Fla. Laws 27); and (8) an 1893 Oregon law prohibiting anyone "other than an officer on lawful business, being armed ... [from] go[ing] or trespass[ing] upon any enclosed premises or lands without the consent of the owner," *id.* at 1266 (1893 Or. Laws 79).

In *Antonyuk I*, we reviewed seven of these statutes and preliminarily concluded that they were not relevantly similar to the Private Property Provision, as applied to private property open to the public. *See* 89 F.4th at 382 (listing the 1715 Maryland law, the 1721 Pennsylvania law, the 1722 New Jersey law, the 1763 New York law, the 1865 Louisiana law, the 1866 Texas law, and the 1893 Oregon law). We determined that three of these statutes—the 1721 Pennsylvania statute, the 1722 New Jersey statute, and the 1763 New York Statute—"were explicitly motivated by a substantially different reason (deterring unlicensed hunting) than the [Private Property Provision] (preventing gun violence)." *Id.* at 385. We also pointed out that the 1715 Maryland Statute prohibited only "convicted criminals from carrying a firearm on 'any person's land, whereon there shall be a seated plantation, without the owner's leave.'" *Id.*. We further observed that all of these proffered analogues "appear to, by their own terms, have created a default presumption

against carriage only on private lands *not open to the public*," and that "[t]he State has produced no evidence that those terms were in fact otherwise understood to apply to private property open to the public or that the statutes were in practice applied to private property open to the public." *Id.* at 385–86 (emphasis in original). Therefore, we concluded that "the State's analogues fail to establish a National tradition motivated by a similar 'how' or 'why' of regulating firearms in property open to the public in the manner attempted by § 265.01-d." *Id.* at 386.

 **\*6** As we explain below, having considered the additional evidence and arguments the State has proffered on summary judgment, we reaffirm our conclusion in *Antonyuk I* that the Private Property Provision, as applied to private property open to the public, does not fall within our Nation's historical tradition of gun regulations.

First, the pre-ratification statutes cited by the State are not relevantly similar in their "why." We discern a statute's purpose through its plain text and structure. *See Alexander v. Sandoval*, 532 U.S. 275, 288, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) ("We ... begin ... our search for [the legislature's] intent with the text and structure of [the statute]."). The text and structure of the State's pre-ratification analogues make clear that the purpose of those statutes was to deter unlawful or unlicensed hunting. *See Antonyuk I*, 89 F.4th at 385 (reading the statutes as "motivated by a substantially different reason (deterring unlicensed hunting) than the [Private Property Provision] (preventing gun violence)"). Each of the laws prohibits gun carriage in the context of forbidding hunting on certain property. For example, the 1715 Maryland law begins with the prefatory clause that the law is aimed at "prevent[ing] the abusing, hurting or worrying of any stock of hogs, cattle or horses," and then proceeds to prohibit "shoot[ing], killing[ing] or hunt[ing], or ... carry[ing] a gun" on another's plantation without the owner's leave. Joint App'x at 1223. Thus, the plain purpose of prohibiting the carriage of guns on another's land was to curb the hunting of livestock on that land. The other laws similarly prohibited carriage in the context of banning hunting on certain lands. *See id.* at 1228 (the 1721 Pennsylvania law prohibited a person from "carry[ing] any gun or hunt[ing]"); *id.* at 1234 (same for the 1722 New Jersey law); *id.* at 1238–39 (the 1763 New York Law prohibited "carry[ing], shoot[ing], or discharg[ing]" firearms in order to more effectively "punish and prevent" persons from "hunt[ing] with Fire-Arms"). Moreover, although the prohibition on the carriage of "any Gun on any Lands not his own" in the 1771 New Jersey law

appears in a standalone section of the statute, *id.* at 1242, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme," *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); *see also King v. Burwell*, 576 U.S. 473, 486, 135 S.Ct. 2480, 192 L.Ed.2d 483 (2015) ("Our duty, after all, is to construe statutes, not isolated provisions.") (internal quotation marks and citation omitted). In the New Jersey law, the above-referenced provision, which is heavily relied upon by the State, sits among other sections that are all aimed at preventing unlawful hunting. *See* Joint App'x at 1242–44 (other sections including those prohibiting the "hunt[ing] or watch[ing] for Deer with a Gun ... on any Lands not his own," listing the penalties for killing or destroying deer, explaining who may hunt on unimproved lands, the penalties for setting traps, and the rewards for destroying such traps).

That the purpose of these statutes was to regulate hunting is further buttressed by the titles or preambles of these statutes. *See Bittner v. United States*, 598 U.S. 85, 98 n.6, 143 S.Ct. 713, 215 L.Ed.2d 1 (2023) ("A preamble, purpose clause, or recital is a permissible indicator of meaning.") (quoting A. SCALIA & B. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 217 (2012)). The 1721 Pennsylvania law, for example, is titled "An Act to Prevent the Killing of Deer Out of Season, and Against Carrying of Guns or Hunting by Persons Not Qualified," and explains that the "abuses, damages and inconveniences" the statute seeks to remedy "have arose by persons carrying guns and presuming to hunt on other people's lands." Joint App'x at 1227–28; *see id.* at 1233–34 (the 1722 New Jersey law has an identical title and seeks to remedy the "great Damages and Inconveniences arisen by Persons carrying of Guns and presuming to hunt on other Peoples Land"); *id.* at 1238 (the 1763 New York law is titled "An Act to prevent hunting with Fire-Arms in the City of New York, and the Liberties thereof" and the purpose clause explains that the statute seeks to prevent "disorderly Persons in and about the City of New-York ... [from] hunt[ing] with Fire-Arms"); *id.* at 1737–38 (the 1771 New Jersey Law contains a statement of purpose in a preamble recognizing that previous laws in New Jersey "for the Preservation of Deer and other Game, and to prevent trespassing with Guns, Traps and Dogs, have, by Experience, been found insufficient."); *id.* at 1743 (the 1790 Massachusetts law is titled "An Act for the Protection of the Sheep and other Stock" on certain islands and the preamble states its concern with the "great depredations made by gunners and hunters [on these islands] by which great

numbers of sheep and deer have been killed"). It is thus confirmed by the statutory context that these prohibitions on gun carriage were prophylactic measures to more effectively prevent the abuse of unlawful hunting on another's land.

**\*7** In addition, these pre-ratification laws differed in their "how." As we explained in *Antonyuk I*, we read these laws as applying to "private lands *not open to the public*." 89 F.4th at 385 (emphasis in original). These laws, by their terms, prohibited hunting and gun carriage on, for example, "plantation[s]," Joint App'x at 1223, "improved or inclosed lands of any plantation other than his own," *id.* at 1228; *accord id.* at 1234, or "any Lands not his own," *id.* at 1242. The word "plantation" denotes a "cultivated estate" or a "farm." *Plantation*, WEBSTER'S AM. DICTIONARY OF THE ENGLISH LANG. (1828), *available at* https://webstersdictionary1828.com/Dictionary/plantation [https://perma.cc/6DG8-QTFQ]. The State does not offer persuasive evidence that privately owned estates or farms were traditionally held open to the public. In addition, the reference to "lands" is specific to those "other than his own" or "not his own," which also suggests that the premises at issue are those that an ordinary individual would possess— that is, one's own private home or farm, rather than a property generally open to the public, such as an inn or shop.

Similarly, the 1771 New Jersey law, on which the State places great weight, was aimed at preventing "*trespassing with Guns, Traps and Dogs.*" *Christian I*, 753 F. Supp. 3d at 289 (emphasis added) (internal quotation marks and citation omitted). However, at common law, it was not a trespass to enter into properties held open to the public, such as "an inn or public house, without the leave of the owner first specially asked; because, when a man professes the keeping of such inn or public house, he thereby gives a general licence to any person to enter his doors." 3 WILLIAM BLACKSTONE, COMMENTARIES \*212; *cf. State v. Boone*, 297 N.C. 652, 256 S.E.2d 683, 687 (1979) (overturning a felonious entry conviction because the "defendant entered the store at a time when it was open to the public" and therefore had "consent, implied if not express, of the owner"); *State v. Martin*, 149 S.C. 464, 147 S.E. 606, 614 (1929) (noting that "the general public have an implied license to enter a retail store, and, perhaps, many other places of business"), *overruled on other grounds by State v. Belcher*, 385 S.C. 597, 685 S.E.2d 802 (2009). The statute's reference to trespass therefore indicates that the 1771 New Jersey law was focused on trespass on private property that was *not* open to the public.

Although the State cites dictionary definitions and *other* statutes in an attempt to persuade us that these statutory terms *could* also encompass private property open to the public, we decline to read these words in isolation and out of context. *See, e.g.*, *Hibbs v. Winn*, 542 U.S. 88, 101, 124 S.Ct. 2276, 159 L.Ed.2d 172 (2004) (declining to assess a statutory term "in isolation," as "the cardinal rule [is] that statutory language must be read in context [since] a phrase gathers meaning from the words around it") (internal quotation marks and citation omitted). Moreover, the State has failed to point to any contemporaneous evidence that these laws were understood or enforced in that expansive manner. This "barren record of enforcement" is "one additional reason to discount [the] relevance" of these pre-ratification statutes. *Bruen*, 597 U.S. at 58 n.25, 142 S.Ct. 2111.

Our conclusion that none of the State's pre-ratification statutes are relevantly similar does not necessarily doom the State's case. As we explained in *Frey*, because silence in the Founding-era does not provide a full measure of clarity into the existence or absence of historical tradition in "this Nation's *whole* tradition," the State may still rely on post-enactment history to demonstrate an established tradition. 157 F.4th at 130 (emphasis in original) (internal quotation marks and citation omitted); *see id.* (explaining that post-enactment history can "provide persuasive evidence of original meaning" and also liquidate the meaning of an ambiguous constitutional term) (internal quotation marks and citation omitted).

However, the State's four 19th-century laws are not enough to carry the day. To begin with, the 1866 Florida law, like the pre-ratification laws we rejected *supra*, plainly applies to hunting. The section at issue is titled "Persons may not hunt on the premises of another without permission," and prohibits a person from "hunt[ing] or rang[ing] with a gun within the enclosed land or premises of another." Joint App'x at 1536. The 1893 Oregon law also suffers from the same flaw as the 1771 New Jersey law in that it prevents "*trespass* upon any enclosed premises or lands without the consent of the owner." *Id.* at 1266 (emphasis added). Thus, as explained above, this law prohibits gun carriage on those private properties *not* open to the public, where an individual could commit trespass.

**\*8** That leaves the State with just the 1865 Louisiana law and the substantially similar 1866 Texas law. Plaintiffs contend that these two laws were passed after the Civil War as part of the South's attempt "to limit the rights of former slaves and

to reduce them, as nearly as possible, to their former state." Plaintiffs-Appellees' Br. at 52. They argue that because, "[a]fter 1866, the states could no longer enact explicitly racial laws," they instead "used the pretense of game laws to restrict hunting and fishing by blacks. Laws requiring landowner permission were the most transparent limits." Brian Sawers, *Race and Property After the Civil War: Creating the Right to Exclude*, 87 MISS. L.J. 703, 749 (2018); *see also McDonald*, 561 U.S. at 771, 130 S.Ct. 3020 ("After the Civil War, many of the over 180,000 African-Americans who served in the Union Army returned to the States of the old Confederacy, where systematic efforts were made to disarm them and other blacks."). Although the State suggests that "the history of gun regulation in southern States after the Civil War is more complex than plaintiffs acknowledge," they later concede that "the unfortunate reality" is that these laws were "often enacted by racist legislatures and codified prejudices that existed at the time." State-Appellant's Reply Br. at 16–17. Nevertheless, they contend that courts should treat "such laws as relevant to the historical inquiry." *Id.* at 17.

We disagree that the facially neutral but racially motivated laws at issue here can properly serve as meaningful analogues for our historical inquiry. To be sure, we have relied on historical precedents "rooted in prejudiced stereotypes and racial, religious, or class bigotry" that are "offensive to contemporary morals" as analogies for "class-based prohibitions on firearms." *Zherka v. Bondi*, 140 F.4th 68, 90 (2d Cir. 2025). However, those historical laws were relevant in that context because they evinced a "historical tradition of broad categorical restrictions on firearms possession" based on people the legislature perceived, even if wrongly so, as dangerous to society. *Id.* By contrast, facially neutral laws born from racial animus are often enforced in ways that predictably—and perhaps exclusively—fall on the very racial groups the legislature set out to target. Thus, they do not necessarily evince a historical tradition of limiting the right against *all* individuals across the board in the same manner. Instead, unless the government can show that these laws were enforced equally against all citizens, they merely tend to highlight this sorry history of *departing* from norms and traditions when racial minorities are in the legislature's crosshairs. *Cf. Bruen*, 597 U.S. at 58, 142 S.Ct. 2111 (noting that an enforcement record exclusively "involving black defendants who may have been targeted for selective or pretextual enforcement" was "surely too slender a reed on which to hang a historical tradition"). Here, the State has failed to demonstrate that the 1865 Louisiana law and the substantially similar 1866 Texas law were part of

some broader effort to restrict firearms possession against all individuals in the same manner, rather than targeting a racial minority for selective enforcement. Thus, we do not view these statutes as providing support for the State's position. In any event, even if the statutes were given some weight, we doubt that two statutes alone, without more, are sufficient to evince a robust national tradition. *See Bruen*, 597 U.S. at 46, 142 S.Ct. 2111 ("[W]e doubt that three colonial regulations could suffice to show a tradition of public-carry regulation.") (emphasis omitted).

To the extent the State relies on the Ninth Circuit's decision in *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), reversing the district court's decision to enjoin a Hawaii law similar to the Private Property Provision that bans carrying firearms on private property held open to the public unless the owner or operator of that property consents orally, in writing, or by posting an appropriate sign, we respectfully disagree with the analysis set forth in that opinion. [4] There, the Ninth Circuit determined that "the Nation has an established tradition" that the states "freely arrang[ed] the default rules" for regulating the "carrying of firearms onto private property." *Wolford*, 116 F.4th at 995. In support of its determination, the Ninth Circuit explained that Section 1 of the 1771 New Jersey law and the 1865 Louisiana law were "dead ringers" for this national tradition because, in its view, consistent with Hawaii's law, the New Jersey and Louisiana laws "simply prohibited the carry of firearms on private property without consent," without reference to another purpose, such as regulating hunting or poaching. *Id.*

[4]     Hawaii's version of the Private Property Provision provides that "[a] person carrying a firearm pursuant to a license ... shall not intentionally, knowingly, or recklessly enter or remain on private property of another person while carrying a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, unless the person has been given express authorization to carry a firearm on the property by the owner, lessee, operator, or manager of the property," through "[u]nambiguous written or verbal authorization" or "[t]he posting of clear and conspicuous signage at the entrance of the building or on the premises." Haw. Rev. Stat. § 134-9.5(a), (b).

**\*9** As an initial matter, we disagree with the Ninth Circuit's analysis regarding whether portions of the 1771 New Jersey

and the 1865 Louisiana law demonstrate a national tradition of regulating the carrying of firearms onto private property without consent. As we explained *supra*, although we agree that Section 1 of the 1771 New Jersey law makes no reference to hunting or game, as the Ninth Circuit recognizes, Section 2 of that same law does, and these sections must be read together to properly determine the law's overall purpose. In any event, Section 1's reference to trespass indicates that New Jersey's law was focused on private property that was not open to the public, not *any* private property, as the Ninth Circuit suggests. *See id.* (concluding that "New Jersey's 1771 law applied to *all* private property") (emphasis in original).

As for the 1865 Louisiana law, the Ninth Circuit failed to consider how the racial animus imbued in that law makes it a troubling analogue for our historical inquiry and ignored the Supreme Court's caution that reliance on such a law "is surely too slender a reed on which to hang a historical tradition." *Bruen*, 597 U.S. at 58, 142 S.Ct. 2111. Thus, we disagree with the Ninth Circuit that these state laws are "dead ringers" and that there is, on this record, a national tradition in support of such regulations.

Indeed, not only is this type of regulation not readily identifiable in the context of our Nation's long history of protecting the "general right to public carry arms for self-defense" under the Second Amendment, *id.* at 31, 142 S.Ct. 2111, but also the likely practical effect of the enforcement of the Private Property Provision will be to significantly hinder the ability of individuals to meaningfully exercise that Second Amendment right to defend themselves in public. In other words, because many private property owners will likely not post signs indicating whether firearms are permitted or forbidden on their premises, rules like the ones promulgated by New York and Hawaii will effectively prohibit individuals from carrying firearms on any private property, even private property that is open to the general population. Thus, "only those who aimlessly wander streets and sidewalks without ever planning to enter a store, park, or other private or public establishment will be able to carry a firearm." *Wolford v. Lopez*, 125 F.4th 1230, 1235–36 (9th Cir. 2025) (VanDyke, *J.*, dissenting from denial of rehearing *en banc*). Such a rule could "dramatically curtail[ ] an individual's practical ability to be prepared in public to defend themselves—'the *central component* of the Second Amendment right.' " *Id.* (alteration adopted) (emphasis in original) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)).

In sum, we conclude that the State did not carry its burden of establishing a national tradition of regulating firearms in the manner attempted by the Private Property Provision, as it applies to private property open to the public. Accordingly, we affirm the district court's permanent injunction against the enforcement of the Private Property Provision.

### III. Public Parks Provision

We turn next to Plaintiffs' facial challenge to the Public Parks Provision. As explained *supra*, that provision makes it a class E felony to possess firearms "in a sensitive location," which, as relevant here, includes "public parks." N.Y. Penal Law § 265.01-e(2)(d).

As with the Private Property Provision, there is no dispute that the Public Parks Provision implicates conduct that falls within the plain text of the Second Amendment. We therefore proceed to the historical analysis under step two of *Bruen*.

In support of the Public Park Provision's constitutionality, the State has amassed a record of more than one hundred historical laws it asserts are relevantly similar. Chief among them are more than sixty regulations from cities and towns in more than twenty States, spanning from 1858 to the early 1900s, that expressly forbade carriage of firearms in public parks. *See* Joint App'x at 374, 399 (1858 N.Y.C., N.Y.); 375, 413 (1867 Brooklyn, N.Y.); 418 (1868 Phila., Pa.); 424 (1872 S.F., Cal.); 429 (1866 Chi., Ill.); 436 (1874 Buffalo, N.Y.); 443 (1875 Hyde Park, Ill.); 449 (1878 Phoenixville, Pa.); 468 (1883 Danville, Ill.); 463 (1883 St. Louis, Mo.); 472 (1886 Bos., Mass.); 479 (1887 Reading, Pa.); 485 (1888 St. Paul, Minn.); 490 (1888 Salt Lake City, Utah); 493 (1890 Trenton, N.J.); 498 (1890 Berlin, Wis.); 506 (1890 Williamsport, Pa.); 510 (1891 Grand Rapids, Mich.); 516 (1891 Milwaukee, Wis.); 521 (1891 Springfield, Mass.); 525 (1892 Cincinnati, Ohio); 530 (1891 Lynn, Mass.); 534 (1892 Peoria, Ill.); 540 (1892 Spokane, Wash.); 544 (1893 Pittsburgh, Pa.); 552 (1893 Wilmington, Del.); 562 (1894 Canton, Ill.); 569 (1895 Detroit, Mich.); 575 (1896 Centralia, Ill.); 579 (1896 Indianapolis, Ind.); 586 (1896 Rochester, N.Y.); 596 (1898 Kan. City, Mo.); 601 (1898 New Haven, Conn.); 605 (1898 Boulder, Colo.); 611 (1902 Hartford, Conn.); 616 (1902 New Bedford, Mass.); 622 (1902 Springfield, Ill.); 628 (1903 Lowell, Mass.); 633 (1903 N.Y.C., N.Y.); 637 (1903 Pasadena, Cal.); 643 (1903 Troy, N.Y.); 649 (1904 Hou., Tex.); 655 (1904 Neligh, Neb.); 663 (1904 Pueblo, Colo.); 671 (1905 Harrisburg, Pa.); 676 (1905 Haverhill, Mass.); 682 (1905 Saginaw, Mich.); 694 (1906 Denver, Colo.); 702 (1906 L.A., Cal.); 708 (1907 Portland, Or.); 713 (1907 Oil City, Pa.); 719 (1907 Olean, N.Y.); 728 (1907 Seattle, Wash.); 747 (1909 Memphis, Tenn.); 754 (1909 Oakland, Cal.); 762 (1909 Paducah, Ky.); 768 (1910 Jacksonville, Ill.); 773 (1910 Staunton, Va.); 778 (1911 Colo. Springs, Colo.); 819 (1917 Birmingham, Ala.); 825 (1917 Joplin, Mo.); 840 (1921 Burlington, Vt.); 845 (1922 Chattanooga, Tenn.). In addition, the State puts forward statutes from nine states that it contends together establish a tradition of prohibiting firearms in quintessentially crowded places and public forums. *See* Defendants-Appellees' Br. at 23 (citing 1792 North Carolina law, 1786 Virginia law, 1869 Tennessee law, 1870 Texas law, 1870 Georgia law, 1889 Arizona law, 1883 Missouri law, 1889 Idaho law and 1890 Oklahoma law).

**\*10** In *Antonyuk II*, we found that these state statutes were part of a "long, unbroken line" indicating "that the tradition of regulating firearms in often-crowded public forums is part of the immemorial custom of this Nation." 120 F.4th at 1021 (internal quotation marks and citations omitted). We further concluded that the eight local ordinances banning firearms in urban public parks that were part of the preliminary record demonstrated that "[w]ith the rise of urban America, cities continued this tradition and began regulating firearms in a newly emerging public forum: the urban park." *Id.* at 1023. We concluded that whether the Public Parks Provision, at least as applied to urban parks, "is consistent with this Nation's tradition is a straightforward inquiry" because "[i]t is obvious that [the provision] burdens Second Amendment rights in a distinctly similar way (*i.e.*, by prohibiting carriage) and for a distinctly similar reason (*i.e.*, maintaining order in often-crowded public squares) as do the plethora of regulations provided by the State." *Id.* at 1024. This conclusion was enough to defeat plaintiffs' facial challenge to the Public Parks Provision, we explained, because "[t]o mount a successful facial challenge, the plaintiff must establish that no set of circumstances exists under which the law would be valid." *Id.* at 1026 (alteration adopted) (internal quotation marks and citation omitted).

As a threshold matter, Plaintiffs urge us to flip the facial challenge standard on its head. They contend that we should hold the Public Parks Provision facially unconstitutional so long as they can demonstrate that it "exceeds in its scope *any* possible historical justification." Plaintiffs-Appellants' Reply Br. at 26 (emphasis added). That argument is squarely foreclosed by *Rahimi* as well as our Circuit precedents.

In *Rahimi*, the Supreme Court made clear that to succeed on a facial challenge in the Second Amendment context, the

challenger must, as in other contexts, "establish that no set of circumstances exists under which the Act would be valid." 602 U.S. at 693, 144 S.Ct. 1889 (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Indeed, in reversing the Fifth Circuit's conclusion that Section 922(g)(8) violated the Second Amendment, the Court noted that the Fifth Circuit "did not correctly apply our precedents governing facial challenges" because "[r]ather than consider the circumstances in which Section 922(g)(8) was most likely to be constitutional, the panel instead focused on hypothetical scenarios where Section 922(g)(8) might raise constitutional concerns. That error left the panel slaying a straw man." *Id.* at 701, 144 S.Ct. 1889 (internal citations omitted).

Following *Rahimi*, we have applied this facial challenge standard repeatedly in our Second Amendment cases. *See Antonyuk II*, 120 F.4th at 983 ("To mount a successful facial challenge, the plaintiff must establish that no set of circumstances exists under which the law would be valid, or show that the law lacks a plainly legitimate sweep.") (alteration adopted) (internal quotation marks and citations omitted); *Giambalvo v. Suffolk Cnty.*, 155 F.4th 163, 182 (2d Cir. 2025) (same); *Frey*, 157 F.4th at 141 (same). We therefore continue to apply here this well-established standard for a facial challenge. [5]

[5] Plaintiffs also counter that applying this standard to the facial challenges in *Heller* and *Bruen* would have prevented the Court in those cases from striking down the statutes at issue on their face. *See* Plaintiffs-Appellants' Reply Br. at 27 (contending that "the fact that there were *certain* handguns that might have been lawfully banned by D.C. consistent with history did not save the law in *Heller* from facial invalidation" (emphasis in original)). However, neither *Heller* nor *Bruen* directly addressed the proper facial challenge standard. Moreover, a law may also be struck down as unconstitutional on its face if it "lacks a plainly legitimate sweep." *Antonyuk II*, 120 F.4th at 983 (internal quotation marks and citation omitted). Plaintiffs do not contend here that the Public Parks Provision lacks a plainly legitimate sweep.

In the alternative, Plaintiffs contend that they also brought a challenge to the Public Parks Provision as applied to "parks outside of urban settings." Plaintiffs-Appellants' Br. at 51–52. Their complaint plainly does not raise such a challenge.

The complaint seeks a "declaratory judgment that N.Y. Penal Law [ ]§ 265.01-e(2)(d) (public parks) ... infringe[s] upon Plaintiffs' right to bear arms," and "[i]njunctive relief restraining Defendants ... from enforcing N.Y. Penal Law [ ]§ 265.01-e(2)(d) (public parks)." Joint App'x at 42; *see John Doe No. 1 v. Reed*, 561 U.S. 186, 194, 130 S.Ct. 2811, 177 L.Ed.2d 493 (2010) (explaining that a claim has "as applied" characteristics if it "does not seek to strike [the statute down] in all its applications"). This is in stark contrast to the as-applied relief Plaintiffs seek with respect to the Private Property Provision in the same breath. *See* Joint App'x at 42 (seeking a "declaratory judgment that N.Y. Penal Law [ ]§ ... 265.01-d (default anti-carry rule) *with respect to places open to the public* ... infringe[s] upon Plaintiffs' right to bear arms," and "[i]njunctive relief restraining Defendants ... from enforcing N.Y. Penal Law [ ]§ ... 265.01-d (default anti-carry rule) *with respect to places open to the public*") (emphases added). Nor did Plaintiffs articulate an as-applied theory in their preliminary injunction motion. Indeed, it was not until after the summary judgment stage, and after we decided *Antonyuk II*, that Plaintiffs indicated for the first time that they were also bringing an as-applied challenge to the Public Parks Provision. The district court declined to consider that challenge in granting summary judgment in favor of the State. *See Christian II*, 2025 WL 50413, at *1. We, too, decline to consider such a challenge. [6]

[6] Plaintiffs contend that nothing forecloses us from considering such a challenge *sua sponte*. For that proposition, Plaintiffs cite *Citizens United v. FEC*, 558 U.S. 310, 331, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010), with no explanation. However, *Citizens United* involved the converse question—whether the Court could *sua sponte* consider a facial challenge to a statute where the plaintiffs brought only an as-applied challenge. *See id.* Faced with that question, the Supreme Court concluded that "no general categorical line bars a court from making broader pronouncements of invalidity in properly as-applied cases." *Id.* (internal quotation marks and citation omitted). *Citizens United* therefore provides no support for considering an as-applied challenge where a complaint brings only a facial one and, in any event, we decline to exercise our discretion to do so here, especially where the issue—including the definition of a "rural park"—has not been adequately developed.

**\*11** Plaintiffs cannot "establish that no set of circumstances exists under which [the Public Parks Provision] would be valid," *Rahimi*, 602 U.S. at 693, 144 S.Ct. 1889 (quoting *Salerno*, 481 U.S. at 745, 107 S.Ct. 2095), because the State has demonstrated that the Public Parks Provision as applied to urban parks is part of a well-established tradition of prohibiting firearms in those parks. *See id.* ("[T]o prevail, the Government need only demonstrate that [the provision] is constitutional in some of its applications."). The more than sixty regulations that directly prohibit firearm carriage in urban public parks across the country alone are "dead ringers" that evidence such a robust historical tradition. Starting in 1858, with the plan to build Central Park in New York City, came a regulation requiring signage that it was "forbidden ... [t]o carry fire-arms" inside the park. Joint App'x at 399–400.

> [F]ollowing the success of [New York's] Central Park, cities across the United States began building parks to meet recreational needs of residents[;] and during the second half of the 19th century, [Frederick Law] Olmsted and his partners [who planned Central Park] designed major parks or park systems in thirty cities.

*Antonyuk II*, 120 F.4th at 1022 (first alteration added) (internal quotation marks and citation omitted). With the explosion of urban parks came contemporaneous regulations that, like the Central Park regulation, flat out prohibited gun carriage inside those parks. *See, e.g.*, Joint App'x at 413 (1867 Prospect Park ordinance forbidding persons from "carry[ing] firearms"); 418 (1868 Pennsylvania law prohibiting persons from "carry[ing] fire arms" in Philadelphia's Fairmount Park); 443 (1875 Hyde Park law stating that "[a]ll persons are forbidden to carry fire arms"). As we noted in *Antonyuk II*, "[n]one of those city ordinances were invalidated by any court; indeed, we have not located any constitutional challenges to any of them." 120 F.4th at 1022. This "deliberate and sustained course of post-enactment action" spanning over 60 years in major urban areas without any known constitutional challenge comfortably "settle[s] the meaning of" whether the scope of the Second Amendment right can be limited in this way. *Frey*, 157 F.4th at 129; *see also Antonyuk II*, 120 F.4th at 1023 (explaining that the eight regulations in the preliminary record covered "five of the most populous cities" with a total population of almost 5 million people,

"resulting in at least 37.7% of the urban population living in cities where firearms were prohibited in their parks"); *Wolford*, 116 F.4th at 982–83 ("As soon as green spaces began to take the shape of a modern park, in the middle of the 19th century, municipalities and other governments imposed bans on carrying firearms into the parks.... Because many laws prohibited carrying firearms in parks, and the constitutionality of those laws was not in dispute, we agree with the Second Circuit and several district courts that the Nation's historical tradition includes regulating firearms in parks.") (citations omitted).

Plaintiffs do not seriously quarrel with whether this mountain of regulations is relevantly similar to the Public Parks Provision. In passing, Plaintiffs suggest that some of the State's proffered restrictions "are not similar in 'why' they restrict the right to carry arms in public" because the regulations' motivations "appear[ ] almost always to have been for the protection of wildlife or birds in the park." Plaintiffs-Appellants' Br. at 50. Plaintiffs point out, for example, that the "many firearms restrictions were paired with prohibitions on shooting birds." *Id.* However, read in context, these lists of prohibitions, which also forbade "throw[ing] ston[e]s or other missiles," Joint App'x at 418, were meant to keep urban public parks as peaceable recreational spaces. That is at least one purpose for the enactment of the Public Parks Provision. *See* State-Appellee's Br. at 17–18 (stating that the purpose of the Public Parks Provision is "to protect public safety and order and to ensure that public parks remain peaceable spaces for contemplation of nature and recreation").

**\*12** Instead, Plaintiffs' main contention is that these regulations, which began to proliferate starting from 1858, came too late, and that post-Founding era history "cannot alone establish the historical tradition of regulation required by *Bruen*." Plaintiffs-Appellants' Br. at 20. However, we expressly rejected such a view in *Frey*. There, we explained that the absence of Founding-era law is not dispositive because "it is not necessarily the case that, if no positive legislation from a particular time or place is in the record, it must be because the legislators then or there deemed such a regulation inconsistent with the right to bear arms." *Frey*, 157 F.4th at 130 (quoting *Antonyuk II*, 120 F.4th at 969). We may rely on later history to discern the historical tradition because it can "provide persuasive evidence of the original meaning" in 1791. *Id.* (quoting *Rahimi*, 602 U.S. at 738, 144 S.Ct. 1889 (Barrett, *J.*, concurring)). Later history is also relevant under a liquidation theory, we explained, because a "regular course

of practice may settle a constitutional debate at *any* point in our history." *Id.*

Moreover, the lack of Founding-era history is an especially weak indicator of constitutionality where, as here, the case concerns "new circumstances" and "modern regulations that were unimaginable at the founding." *Antonyuk II*, 120 F.4th at 970 (quoting *Bruen*, 597 U.S. at 27–28, 142 S.Ct. 2111). As explained above, the lack of similar regulations prior to 1858 is a "natural consequence" of the fact that modern urban public parks in the mold of Olmstead's Central Park did not yet exist in significant numbers before that time. *See* Joint App'x at 363–66 (the State's expert witness opining that "America's tradition of public parks was launched in the 1850s" and discussing the rise of urban public parks in the latter half of the 19th century). Plaintiffs rejoin that, at the Founding, there were in fact urban spaces, such as the Boston Common, that were used for recreational purposes. Plaintiffs-Appellants' Br. at 43. However, Plaintiffs also acknowledge that "Boston Common's long history show a variety of uses, both practical and recreational." *Id.* Indeed, "cattle and sheep continued to roam the [Boston] Common ... until the 1830s," and public executions were believed to have continued there until the early 1800s. *See Boston Common*, NAT'L GALLERY OF ART, https://heald.nga.gov/mediawiki/index.php/Boston_Common [https://perma.cc/ARC5-BDVR]. The Boston Common therefore is not akin to the Olmstead vintage of urban parks that were principally created as dedicated spaces for peaceful recreation and quiet contemplation of natural scenery. *See* Joint App'x 364–68; *Wolford*, 116 F.4th at 982 ("[M]odern parks differ from the green spaces that existed in 1791. Plaintiffs point to Boston Common as an example of a 'park' at the time of the Founding, but the record ... establishes that Boston Common was used primarily for grazing animals and for holding military exercises and was not akin to modern parks. Nor does the record ... contain evidence of any other public green space akin in use and purpose to a modern park. We agree with the Second Circuit, and at least one district court, that such examples from the Founding were not relevantly similar to parks in their modern form.").

In short, the State has more than carried its burden, by demonstrating a long, unbroken history of prohibiting gun carriage in urban public parks and placing the Public Parks Provision, at least as applied to urban parks, within that tradition.[7] We therefore conclude that the Public Parks Provision is facially constitutional because the State has demonstrated that it "is constitutional in some of its

applications." *Rahimi*, 602 U.S. at 693, 144 S.Ct. 1889. Accordingly, we affirm the district court's judgment in favor of the State on the Public Parks Provision claim.

[7]  We therefore need not consider the State's additional arguments that the Public Parks Provision falls within a historical tradition of prohibiting firearms in quintessentially crowded places and public forums, or locations frequented by children.

**CONCLUSION**

**\*13** For the foregoing reasons, we **AFFIRM** the permanent injunction against the enforcement of the Private Property Provision and **AFFIRM** the judgment of the district court with respect to the Public Parks Provision.

Judge Menashi concurs in part and dissents in part in a separate opinion.

Menashi, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that as applied to private property open to the public, the Private Property Provision, N.Y. Penal Law § 265.01-d(1), infringes the right to keep and bear arms codified in the Second Amendment. I concur insofar as the majority opinion concludes that the Private Property Provision is not relevantly similar to historical laws that form a national tradition of firearms regulation. I write separately to add that—because it applies to all types of private property open to the public—the Private Property Provision does not reflect a determination that particular circumstances create a specific risk implicating firearms but instead disapproves of the carriage of firearms itself. New York cannot disfavor the bearing of arms in general because "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller*, 554 U.S. 570, 636, 128 S.Ct. 2783 (2008).

I disagree with the majority that the Public Parks Provision, N.Y. Penal Law § 265.01-e(2)(d), is consistent with the nation's historical tradition of firearms regulation. Regulations during the founding period restricted the misuse of firearms and the manner of carriage but did not prohibit carriage in public parks or other places reserved for recreation

and public gatherings. The majority disregards this history on the ground that contemporary public parks are so different from founding-era public parks that the principles of firearms regulation from the founding period cannot be applied to current circumstances. Instead, the majority identifies a regulatory tradition of restricting the carriage of firearms in parks that emerged in the late nineteenth century.

In my view, the historical evidence from the founding period cannot be discounted. The public parks of that period were not so different from contemporary parks that it is impossible to identify relevant principles of firearms regulation. The Second Amendment was "intended to endure for ages to come," *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 415, 4 L.Ed. 579 (1819), and our task is to apply its "fixed" meaning even "to circumstances beyond those the Founders specifically anticipated," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 28, 142 S.Ct. 2111 (2022).

The majority is correct that in the late nineteenth century, a new practice of restricting carriage in public parks emerged. That new practice, however, means that unlike in prior cases, the regulatory traditions relevant to this case diverged between 1791 and 1868. I would resolve the conflict in favor of 1791. "[I]ndividual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37, 142 S.Ct. 2111. To determine the scope of the Second Amendment as against the federal government, "we look to the prevailing understanding of the right to bear arms in 1791," *United States v. Vereen*, 152 F.4th 89, 99 (2d Cir. 2025) (internal quotation marks and alteration omitted), because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634-35, 128 S.Ct. 2783. The scope of the right to keep and bear arms is the same as against the federal and state governments. We therefore prioritize the understanding of the right that prevailed in 1791. Here, the tradition of firearms regulation in 1791 did not prohibit the carriage of firearms in public parks. I would reverse the judgment of the district court declining to enjoin the enforcement of the Public Parks Provision. I dissent from the majority opinion insofar as it refuses to do so.

## I

**\*14** The Private Property Provision violates the Second Amendment. The Second Amendment "presumptively guarantees ... a right to 'bear' arms in public for self-defense." *Bruen*, 597 U.S. at 33, 142 S.Ct. 2111. The New York law reverses that presumption by creating a default rule that a person may not carry a gun on "private property," even property open to the public, unless the "owner or lessee" has "permitted such possession by clear and conspicuous signage indicating that the carrying of firearms, rifles, or shotguns on their property is permitted or has otherwise given express consent." N.Y. Penal Law § 265.01-d(1). The law applies to any type of private property the public might visit, such as "a gas station or grocery store," *ante* at ——, or a church or plaza. Our court previously estimated that the Private Property Provision covers "over 91 percent of land in New York." *Antonyuk v. James* (*Antonyuk II*), 120 F.4th 941, 1044 (2d Cir. 2024). Other provisions of the law apply to a specific "sensitive location," such as a polling place or a court. *See* N.Y. Penal Law § 265.01-e(2). The Private Property Provision, by contrast, applies "broadly to all property, including property open to the public," in order to "protect public safety and to vindicate the rights of property owners." State Appellant's Br. 2.

The history of American firearm regulations includes laws that aimed to protect public safety, *see United States v. Rahimi*, 602 U.S. 680, 698, 144 S.Ct. 1889 (2024) (discussing "surety and going armed laws"), or property rights, *see ante* at —— – —— (discussing founding-era laws prohibiting unlicensed hunting and trespass). But those "focused regulations" addressed particular circumstances in which the introduction of a firearm might create a specific "credible threat to the physical safety of others." *Rahimi*, 602 U.S. at 700, 144 S.Ct. 1889. These regulations do not support "a broad prohibitory regime" aimed at firearms in general. *Id.*

The Private Property Provision treats the firearm itself—in all circumstances—as the risk to be avoided. The vast sweep of the Private Property Provision means that the law does not regulate the bearing of arms in certain specified circumstances. Instead, New York has concluded that across all the varied types of property the public might frequent, the carrying of a firearm should be restricted because guns are dangerous.

But the Second Amendment does not tolerate regulations that merely disapprove of firearms. "When the people ratified the Second Amendment, they surely understood an arms-bearing citizenry posed some risks. But just as surely they believed that the right protected by the Second Amendment was itself vital to the preservation of life and liberty," and "[w]e have

no authority to question that judgment." *Rahimi*, 602 U.S. at 709, 144 S.Ct. 1889 (Gorsuch, J., concurring). At oral argument, New York agreed that the state cannot "restrict firearms ownership if you just disagree with the value of the Second Amendment."[1] That concession makes sense. A state cannot "restrict a right simply out of disagreement with the value of the right"[2] because the codification of a constitutional right "excludes some government interests as impermissible," namely those interests "based on government hostility toward or unwillingness to value the constitutional interest."[3] The Supreme Court has emphasized that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636, 128 S.Ct. 2783.[4] "The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26, 142 S.Ct. 2111 (quoting *Heller*, 554 U.S. at 635, 128 S.Ct. 2783). As a result, the guarantee of the Second Amendment imposes "*limits*" on the ability of a state "to devise solutions to social problems that suit local needs and values." *McDonald v. City of Chicago*, 561 U.S. 742, 785, 130 S.Ct. 3020 (2010) (plurality opinion).

[1] Oral Argument Audio Recording in No. 24-2847 at 1:30.

[2] William Baude & Robert Leider, *The General-Law Right to Bear Arms*, 99 Notre Dame L. Rev. 1467, 1491 (2024).

[3] Stephanie Hall Barclay, *Constitutional Rights as Protected Reasons*, 92 U. Chi. L. Rev. 1179, 1190, 1243 (2025).

[4] *Cf. United States v. Stevens*, 559 U.S. 460, 470, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010) ("The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it.").

**\*15** The nation's tradition of firearms regulation does not include regulations designed to disfavor the right to keep and bear arms. To evaluate the constitutionality of a contemporary firearms regulation, we identify historical regulations that are "relevantly similar" by examining "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29, 142 S.Ct. 2111.[5] That analysis might reveal an historically permissible justification for burdening the right in a particular way. *See Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889 (explaining that a law must "regulate[ ] arms-bearing for a permissible reason"). But our tradition has never permitted pretextual regulations intended to inhibit the right to keep and bear arms. A constitutional right might historically have been regulated in the name of the public good, but "[c]oncern for the public good had to be genuine; it could not be a mere formal recitation that served as pretext for an illegitimate end."[6] St. George Tucker observed, for example, that "[i]n England, the people have been disarmed, generally, under the *specious pretext* of preserving the game: a never failing lure to bring over the landed aristocracy to support any measure, under that mask, though calculated for very different purposes."[7] Joseph Story explained that "under various pretences" the right to keep and bear arms had been rendered "more nominal than real" in England.[8] And William Rawle wrote that "[a]n arbitrary code for the preservation of game in that country has long disgraced them," repeating the observation of Blackstone that "the prevention of popular insurrections and resistance to government by disarming the people, is oftener *meant* than *avowed*, by the makers of forest and game laws."[9] These authorities reflect the principle that a regulation of firearms cannot serve "a pretextual repressive purpose."[10]

[5] *See also* Oral Argument Audio Recording in No. 24-2847 at 1:40 (the state agreeing that, to defend a contemporary law, "the how and why have to be consistent with the how and why of the historical law").

[6] Daniel D. Slate, *Infringed*, 3 J. Am. Const. Hist. 381, 391 (2025).

[7] St. George Tucker, View of the Constitution of the United States 165 (1803) (Liberty Fund 2010) (emphasis added).

[8] 3 Joseph Story, Commentaries on the Constitution of the United States § 1891, at 747 (1833).

[9] William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829) (emphasis added).

10  Slate, *supra* note 6, at 441.

The Supreme Court has recognized that a constitutional right "protects against governmental hostility which is masked, as well as overt." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). [11] "Apart from the text, the effect of a law in its real operation is strong evidence of its object." *Lukumi*, 508 U.S. at 535, 113 S.Ct. 2217. In this case, the sweeping Private Property Provision acts "to prohibit one from exercising the Second Amendment's central component nearly everywhere that ordinary human action occurs, and wherever 'people typically congregate.' " *Koons v. Att'y Gen.*, 156 F.4th 210, 276 (3d Cir. 2025) (Porter, J., concurring in the judgment part and dissenting in part) (quoting *Bruen*, 597 U.S. at 30-31, 142 S.Ct. 2111), *reh'g en banc granted*, 162 F.4th 100 (3d Cir. 2025). I agree with the historical analysis of the majority opinion, but I would additionally conclude that the Private Property Provision—as applied to private property open to the public—is unconstitutional because it reflects an impermissible purpose to disapprove of arms-bearing in general.

11  This is as true for the Second Amendment as for other constitutional guarantees. *See, e.g.*, *Lukumi*, 508 U.S. at 533, 113 S.Ct. 2217 (explaining that when "the object or purpose of a law is the suppression of religion or religious conduct," it violates the Free Exercise Clause); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566, 131 S.Ct. 2653, 180 L.Ed.2d 544 (2011) (explaining that the First Amendment forbids laws with the "purpose to suppress speech"); *Kelo v. City of New London*, 545 U.S. 469, 478, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) (explaining that the Takings Clause does not allow a taking "under the mere pretext of a public purpose").

## II

The Public Parks Provision also violates the Second Amendment. In evaluating the constitutionality of the law on a preliminary record, earlier panels in this litigation determined that the state was likely to demonstrate that the banning of "firearms in often-crowded public squares, including, specifically, city parks," is consistent with a tradition reflected in medieval English laws, carried through to the founding period, and further expressed in parks

regulations in the nineteenth century. *Antonyuk v. Chiumento* (*Antonyuk I*), 89 F.4th 271, 363 (2d Cir. 2023); *Antonyuk II*, 120 F.4th at 1026. Our court made sure to "emphasize," however, that it was "reviewing facial challenges to these provisions at a very early stage of this litigation," that it had not reached "a full merits decision" that would "determine the ultimate constitutionality of the challenged ... provisions," and that a final decision would "await further briefing, discovery, and historical analysis." *Antonyuk I*, 89 F.4th at 388 n.116; *Antonyuk II*, 120 F.4th at 1048 n.126.

**\*16** Since then, another panel of our court has concluded that *Antonyuk* misinterpreted the statutes from England and the founding period. *See Frey v. City of New York*, 157 F.4th 118, 133 n.6 (2d Cir. 2025) ("Although *Antonyuk* read the Northampton and North Carolina statues 'to have prohibited firearm carriage in general at fairs and markets regardless of conduct,' *Bruen* undermines that interpretation.") (citation omitted) (quoting *Antonyuk II*, 120 F.4th at 1020 n.82). The majority in this case similarly concludes that the evidence from the early English and founding periods does not support the Public Parks Provision. [12] Yet the majority sustains the Public Parks Provision based entirely on a "tradition" of firearms regulation in public parks that emerged "in the latter half of the 19th century." *Ante* at ——.

12  I agree that it is appropriate for the merits panel to reevaluate earlier conclusions made in a preliminary posture. *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 107 (2d Cir. 2012) ("A decision on a preliminary injunction is, in effect, only a prediction about the merits of the case; thus, findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding and do not preclude reexamination of the merits.") (internal quotation marks and citations omitted); *see also Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 149 (2d Cir. 1999) ("[T]he law of the case doctrine does not deprive an appellate court of discretion to reconsider its own prior rulings, even when the ruling constituted a final decision in a previous appeal.").

I agree with the majority that regulations of public parks from "the latter half of the 19th century," *id.*, "flat out prohibited gun carriage inside those parks," *id.* at ——. But these prohibitions reflected a conscious departure from an earlier tradition that allowed the carriage of firearms in parks and analogous public spaces. The evidence from the founding

period indicates that a prohibition on such carriage would be impermissible. In short, the historical evidence from the eighteenth and nineteenth centuries offers conflicting answers to the constitutional question in this case.

The Supreme Court has acknowledged "an ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope" or on "the public understanding of the right when the Bill of Rights was adopted in 1791." *Bruen*, 597 U.S. at 37, 142 S.Ct. 2111. It has not entered that debate because in prior cases "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same." *Id.* at 38, 142 S.Ct. 2111. In this case, however, the public understanding was not the same in 1791 and in 1868. A flat-out prohibition of firearms in a park was unknown to the public of 1791. But by the late nineteenth century, a new tradition allowing such a prohibition had emerged. The question therefore arises as to whether the tradition in 1791 or in 1868 should govern.

Despite the scholarly debate, the case law provides an answer. The Supreme Court has "abandoned 'the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights' " and has instead decided "that it would be 'incongruous' to apply different standards 'depending on whether the claim was asserted in a state or federal court.' " *McDonald*, 561 U.S. at 765, 130 S.Ct. 3020 (majority opinion) (quoting *Malloy v. Hogan*, 378 U.S. 1, 10-11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964)). The Court has "decisively held that incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.' " *Id.* (quoting *Malloy*, 378 U.S. at 10, 84 S.Ct. 1489). Indeed, even as it noted a debate among legal scholars, the Supreme Court in *Bruen* reiterated that it had "made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 597 U.S. at 37, 142 S.Ct. 2111.

**\*17** And our court has recognized that the understanding in 1791 determines the scope of the Second Amendment as against the federal government. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Heller*, 554 U.S. at 634-35, 128 S.Ct. 2783, we have said that "we look to the prevailing understanding of the right to bear arms in 1791 and time periods in close proximity to 1791," *Vereen*, 152 F.4th at 99 (internal quotation marks and alteration omitted). The right to keep and bear arms has the same scope against a state government as against the federal government, so we must prioritize the understanding in 1791. Other circuits agree. [13]

[13] *See Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) ("[T]he constitutional right to keep and bear arms should be understood according to its public meaning in 1791, as that meaning is fixed according to the understandings of those who ratified it.") (internal quotation marks and alteration omitted); *Hirschfeld v. ATF*, 5 F.4th 407, 419 (4th Cir. 2021) ("When evaluating the original understanding of the Second Amendment, 1791—the year of ratification—is 'the critical year for determining the amendment's historical meaning.' ") (quoting *Moore v. Madigan*, 702 F.3d 933, 935 (7th Cir. 2012)), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021); *United States v. Connelly*, 117 F.4th 269, 281 (5th Cir. 2024) ("[B]ecause post-Civil War discussions of the right to keep and bear arms took place 75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources.") (internal quotation marks omitted) (quoting *Bruen*, 597 U.S. at 36, 142 S.Ct. 2111); *Worth v. Jacobson*, 108 F.4th 677, 692-96 (8th Cir. 2024) (noting that "*Bruen* strongly suggests that we should prioritize Founding-era history" and that "it is questionable whether the Reconstruction-era sources have much weight"); *United States v. Harrison*, 153 F.4th 998, 1010 (10th Cir. 2025) ("Evidence from the founding era—or the years surrounding 1791, when the Second Amendment was first ratified—is most probative."); *NRA v. Bondi*, 133 F.4th 1108, 1116 (11th Cir. 2025) ("The Second Amendment was ratified, and its meaning fixed, in 1791.").

In this case, the state has failed to establish that the Public Parks Provision is consistent with the nation's history and tradition of firearms regulation based on analogous laws from the founding period. A late-nineteenth-century understanding that contradicted the earlier tradition does not suffice. Accordingly, I would reverse the judgment insofar as

the district court declined to enjoin the enforcement of the Public Parks Provision.

**A**

The historical evidence from the founding period shows that the Public Parks Provision is inconsistent with the tradition of firearms regulation. Contrary to the suggestion of the majority that public parks were unknown to the founding generation, "there is ample historical evidence of public parks used for recreational purposes in the colonial and Founding eras." *Wolford v. Lopez*, 125 F.4th 1230, 1242 (9th Cir. 2025) (VanDyke, J., dissenting from the denial of rehearing en banc). Boston Common was established in 1634. It "was used for drilling militiamen, but it 'also served as a site for informal socializing and recreation,' including 'strolling,' 'horse-and-carriage riding,' 'sports,' 'entertainment,' and 'raucous celebrations.' " *Id.* (alterations omitted) (quoting Anne Beamish, *Before Parks: Public Landscapes in Seventeenth-and Eighteenth-Century Boston, New York, and Philadelphia*, 40 Landscape J. 1, 4-6 (2021)). One traveler in the eighteenth century described Boston Common "as a place where 'every afternoon, after drinking tea, the gentlemen and ladies walk, and from thence adjourn to one another's houses to spend the evening. It is a fine green common with two rows of young trees planted opposite to each other, with a fine footway between, in imitation of St. James Park; and part of the bay forms a beautiful canal, in view of the walk.' " *Kipke v. Moore*, 165 F.4th 194, 239 n.14 (4th Cir. 2026) (Agee, J., concurring in part and dissenting in part) (alterations omitted) (quoting Carl Bridenbaugh, Cities in the Wilderness: The First Century of Urban Life in America 1625-1742, at 325 (1964)). "[F]rom time immemorial," Boston Common has been "used as a place of public resort for the recreation of the people." *Steele v. City of Boston*, 128 Mass. 583, 583 (1880).

**\*18** There are other examples. "In 1733 New York joined the other northern towns in setting aside a tract of land for its first public park," Bridenbaugh, *supra*, at 325, when "Bowling Green was established as a place for the 'Recreation & Delight of the Inhabitants of this City,' " *Wolford*, 125 F.4th at 1242 (VanDyke, J., dissenting from the denial of rehearing en banc) (quoting N.Y.C. Dep't of Parks and Recreation, *The Earliest New York City Parks*, https://perma.cc/MBM5-FWRZ). There were also public parks in Philadelphia, Newark, Savannah, and Charleston. *See id.*; *Kipke*, 165 F.4th at 240-41 (Agee, J., concurring in part and dissenting in part); *Koons*, 156 F.4th

at 306 (Porter, J., concurring in the judgment in part and dissenting in part).

Visitors used these public parks for different purposes—as parkgoers do today—but a common purpose was recreation. In 1797, Trinity Church sold New York City the land that would become Duane Park "specifically for use as a public park" with the express "condition that it be fenced and landscaped 'as promotive of health and recreation.' " N.Y.C. Dep't of Parks, *supra*. The notion that contemporary parks are so unique as to have no analogue in the founding period "is counterfactual and nonsensical." *Kipke*, 165 F.4th at 239 n.14 (Agee, J., concurring in part and dissenting in part).

Public parks in the founding period did not feature prohibitions on the carriage of firearms. Visitors to Boston Common could carry arms. A municipal ordinance provided that "no person shall hereafter fire or discharge any Gun or Pistol from ... the Commons ... unless in the just and legal defence of himself," his family, or his property.[14] That ordinance shows both that a firearm generally could be carried in Boston Common for self-defense and that the restriction was limited to an offensive discharge; it was not a flat-out prohibition on carriage.

14    By-Laws and Town-Orders of the Town of Boston 50 (1786), *available at* https://perma.cc/HA9T-ST5M.

The laws during this period "regulated the discharge of firearms within city limits and the storage of gunpowder to prevent fires" but did not prohibit carriage.[15] The "[l]aws restricted where a person could *shoot* a gun."[16] The state identifies three statutes from the founding period that purportedly restricted carriage in "crowded public forums like 'fairs' and 'markets.' " State Appellee's Br. 23. Each of the statutes mirrored the Statute of Northampton, which posed "no obstacle to public carry for self-defense in the decades leading to the founding." *Bruen*, 597 U.S. at 45, 142 S.Ct. 2111. Instead, the statutes provided that "conduct 'will come within the Act' " only when marked by "evil intent or malice." *Id.* at 44, 142 S.Ct. 2111 (quoting *Rex v. Sir John Knight*, 90 Eng. Rep. 330, 330 (K.B. 1686)). The North Carolina Supreme Court "acknowledged 'that the carrying of a gun' for a lawful purpose '*per se* constitutes no offence.' Only carrying for a 'wicked purpose' with a 'mischievous result constituted a crime.' " *Id.* at 51, 142 S.Ct. 2111 (citation and alterations omitted) (quoting *State v. Huntly*, 25 N.C. 418, 422-23 (1843)). Other decisions reflected the same

"authoritative interpretation" that the Statute of Northampton "only applied to arms carriers who deliberately terrorized the public."[17] The restriction applied to "the manner of bearing arms, and not on the place for bearing arms."[18] These founding-era laws did not categorically prohibit the carriage of firearms in parks and crowded areas.

[15] Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L. J. 1587, 1598 (2014).

[16] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 515 (2004) (emphasis added).

[17] David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 Charleston L. Rev. 205, 241-42 (2018).

[18] *Id.* at 242.

**\*19** Nor did the founding-era laws restrict carriage in places of religious assembly. Like parks, churches served as places for public gathering and reflection. But "[m]any colonial statutes *required* individual arms bearing" at religious gatherings, "such as the 1770 Georgia law that ... required those men who qualified for militia duty individually 'to carry fire arms' 'to places of public worship.' " *Heller*, 554 U.S. at 601, 128 S.Ct. 2783 (emphasis added) (quoting 19 Colonial Records of the State of Georgia 137-39 (Allen D. Candler ed., 1911 (pt. 1))).[19] "[T]he historical evidence demonstrates that six out of the thirteen original colonies required their citizens to go armed when attending religious services or public assemblies." *Koons v. Platkin*, 673 F. Supp. 3d 515, 629 (D.N.J. 2023). Although "a carry mandate is distinct from a permissive right to carry," the history shows that "a public assembly where people are required to be armed is not a place so 'sensitive' that arms can be prohibited." *Koons*, 156 F.4th at 304 (Porter, J., concurring in the judgment in part and dissenting in part).

[19] *See also* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy*, 8 Liberty Univ. L. Rev. 653, 697 (2014) (identifying other "colonial laws that required men to bear arms to church").

"For Founding-era Americans, armed assembly was typical." *Id.* The laws of the founding period regulated the conduct of those bearing arms but did not prohibit the bearing of arms in parks, markets, fairs, or religious spaces. There might have been some " 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111. But neither public parks nor spaces resembling parks were included in that category. Despite the existence of parks and other gathering places, founding-era regulations did not impose a blanket ban on carriage but rather "aimed at the 'manner' of bearing arms."[20]

[20] Kopel & Greenlee, *supra* note 17, at 244 ("Of course *misconduct* with arms could be prohibited.") (emphasis added).

**B**

The majority opinion jumps about seventy years past the adoption of the Second Amendment to collect "more than sixty regulations from cities and towns in more than twenty States, spanning from 1858 to the early 1900s, that expressly forbade carriage of firearms in public parks." *Ante* at ——. These laws, the majority says, "are 'dead ringers' that evidence such a robust historical tradition" of "prohibiting firearms in those parks." *Id.* at ——. These regulations were enacted with the introduction of "the modern urban public parks in the mold of Olmstead's Central Park," parks that "were principally created as dedicated spaces for peaceful recreation and quiet contemplation of natural scenery." *Id.* at —— – ——.

The expert testimony in the record explains that "the American public park movement arose with the appearance of Romanticism and urban expansion." J. App'x 368. Early proponents of the movement believed that "American urban society was flawed and that parks could repair and reform it." *Id.* at 363. In this way, "urban parks were devices for social reform" that could affect the norms of a "public [that] did not necessarily know how to behave in their new park[s]." *Id.* at 371, 375. As part of the reform agenda, "the commissioners adopted rules to prompt proper behavior and decorum," including a prohibition on carrying firearms. *Id.* at 375. Municipal governments prohibited "carrying firearms for self-defense in urban parks" because "[s]uch encouragement would have been inconsistent with romantic and rationalist ideals and antithetical to the social purpose of urban parks as promoted by those ideals." *Id.* at 380.

The ban on carriage was one of several prohibitions designed "to control and direct visitors in order to allow nature to reform society." *Id.* at 375. In Boston in 1886, it was "forbidden" in the public parks "to play musical instruments; to have any intoxicating beverages; to sell, offer or expose for sale, any goods or wares; to post or display signs, placards, flags, or advertising devices; ... to make orations, harangues or loud outcries; to enter into political canvassing of any kind; to utter profane, threatening, abusive, or indecent language," and "to solicit the acquaintance of, or follow, or otherwise annoy other visitors." *Id.* at 472. In New York in 1903, it was "forbidden" for parkgoers to "play upon any musical instrument" and to "take into, carry or display any flag, banner, target, or transparency." *Id.* at 632. The ordinance stated that "[n]o one shall fire or carry any firearm" but added in the same sentence: "nor make any oration, nor conduct any religious or other ceremony within any of the parks ... in The City of New York." *Id.* at 633. In 1909, Memphis similarly made it illegal "[t]o fire or carry any firearms ... or make any oration, or conduct any religious or other meeting or ceremony within any of the parks ... without special permission." *Id.* at 747.

**\*20** The emergence of these "romantic and rationalistic ideals" that defined a new "social purpose of urban parks," *id.* at 380, leads to two conclusions. First, the late-nineteenth-century urban park is not actually a "dead ringer" for contemporary parks. While public parks during the founding period might have featured some uses that are unfamiliar to contemporary parkgoers, the reformed public park of the nineteenth century featured *restrictions* that are unfamiliar: bans on instruments, flags, religious meetings, and introducing oneself to others. The public parks of the founding period and the public parks of the nineteenth century are both imperfect analogues that help to ground an historical tradition. There is no justification for dismissing the parks of the founding period as different in kind from contemporary parks.

Second, the nineteenth-century regulations represented a self-conscious *departure* from an earlier regulatory tradition. In particular, the emergence of regulations prohibiting the carriage of firearms in public parks reflected a changed attitude toward the right to keep and bear arms. In the antebellum period, state supreme courts responded to "the public clamor[ ] for legislative solutions to high crime rates" by "compromising on the scope of the right to bear arms. ... Most courts recognized a robust right to carry arms in public ... but nevertheless recognized the state's police power

to regulate the right for public safety."[21] At this time, some states enacted constitutional provisions that emphasized the authority of the legislature to regulate the right.[22] In the "post-Civil War period," when "[f]aced with *new* pressures to allow legislatures to regulate guns more extensively, courts largely *altered* the scope of the right to bear arms."[23] The understanding of "[t]he right to bear arms following the Civil War" involved "a broad right to keep arms in the home, but a very limited right to have arms in public."[24] In this environment, prohibitions on carriage in places such as parks emerged:

> Courts also reconstructed the "regulation/prohibition" distinction to fit the new legislative framework. Total prohibitions on carrying guns in certain places would be "regulations"—not prohibitions—provided they were not overbroad. This supplanted the old theory that prohibitions on concealed weapons did not restrict the right to bear arms because such laws merely prescribed the manner in which arms were borne.[25]

The "modern collective rights argument also began to take hold in the late-1870s," alongside "[n]ew legislation [that] strictly regulat[ed] guns," including "prohibitions on ... the possession of guns in certain locations."[26] As our court recounted in *Antonyuk II*, during this period "new institutions and ideas" about policing and governance "shaped the response to increasingly lethal guns in increasingly populous cities" and "reflected the developing philosophy of proactive local government." 120 F.4th at 993. And as part of those changing norms "courts held that complete bans on the possession of firearms in narrowly defined areas, such as ... public gatherings, were permissible regulations of the right to bear arms, not complete prohibitions on exercising the right."[27] These developments provide support for a late-nineteenth-century regulatory tradition, but that tradition supplanted the regulatory principles that had previously prevailed.

21     Leider, *supra* note 15, at 1601-06.

22     *See* Eugene Volokh, *State Constitutional Rights to Keep and Bear Arms*, 11 Tex. Rev. L. & Pol. 192, 195-204 (2006); *see also Andrews v. State, 50 Tenn. 165, 177 (1871)* ("That the citizens of this State have a right to keep and bear arms for their common defense. *But the Legislature shall have power by law, to regulate the wearing of arms, with a view to prevent crime.*") (emphasis added) (quoting Tenn. Const. of 1870, art. I, § 26); *English v. State*, 35 Tex. 473, 478 (1872) ("Every person shall have the right to keep and bear arms in the lawful defense of himself or the state, *under such regulations as the legislature may prescribe.*' ") (emphasis added) (quoting Tex. Const. of 1868, art. I, § 13); Ga. Const. of 1868, art. I, § 14 ("A well-regulated militia being necessary to the security of a free people, the right of the people to keep and bear arms shall not be infringed; *but the general assembly shall have power to prescribe by law the manner in which arms may be borne.*") (emphasis added).

23     Leider, *supra* note 15, at 1619.

24     *Id.*

25     *Id.* at 1620.

26     *Id.* at 1622-23; *see also* Michael P. O'Shea, *The Second Amendment Wild Card: The Persisting Relevance of the "Hybrid" Interpretation of the Right to Keep and Bear Arms*, 81 Tenn. L. Rev. 597, 614-17 (2014).

27     Leider, *supra* note 15, at 1628.

### C

**\*21** The majority addresses the divergence in historical traditions between 1791 and 1868 by asserting that there is "an *absence* of Founding-era evidence supporting a historical tradition," which justifies the exclusive reliance on later history. *Ante* at —— (emphasis added). To support that assertion, the majority assumes that public parks in the founding period were so unlike parks today that no lessons can be drawn from the founding-era history. But, as explained above, that is not true. Contemporary public parks are not so unique as to be unknown to the founding generation. Their parks were at least analogous to ours:

> In principle, there is no difference between Colonial-era park-goers fishing, watching cockfighting, or playing whist; Victorian-era park-goers playing tennis, riding horse-drawn carriages, or doing whatever one does to foster solidarity across social classes; and modern park-goers playing pickleball, hiking, or riding hoverboards. Each is engaged in a type of recreation or leisure in a public location that sometimes doubles as a place of public assembly.

*Koons*, 156 F.4th at 307 (Porter, J., concurring in the judgment in part and dissenting in part). Moreover, the excessively regulated environment of the romantic "public park movement" of the nineteenth century also does not exactly match contemporary practices. J. App'x 368. Earlier practices, however, "need not be a 'dead ringer' or a 'historical twin' " in order to illustrate "the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889 (quoting *Bruen*, 597 U.S. at 30, 142 S.Ct. 2111).

The premise of the history-and-tradition approach is that we can "look[ ] at historical gun regulations to identify the contours of the right" that "the people enshrined in our fundamental law." *Rahimi*, 602 U.S. at 739, 144 S.Ct. 1889 (Barrett, J., concurring). "Traditions are *reflected in* practices, but they are not *reducible to* practices," so "practices can change while still being continuous with a tradition" as long as "the new practices are consistent with the principle(s) undergirding the previous practices."[28] "[I]t is the principles, not the practices, that constitute the tradition."[29] We must decide "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692, 144 S.Ct. 1889 (emphasis added).

28     J. Joel Alicea, *Bruen Was Right*, 174 U. Pa. L. Rev. 13, 35-36 (2025).

29     *Id.* at 36.

The history of firearm regulation in parks and similar spaces during the founding period is not so alien that it is impossible to identify relevant principles. As described above, the regulatory tradition of that period featured restrictions on the misuse of firearms in certain public spaces but no prohibitions on carriage. The majority insists that "modern urban public parks" are so different from the public parks of the founding period that such parks were "unimaginable at the founding." *Ante* at ——. Instead of identifying the principles that animated founding-era firearm regulations in recreational and gathering places, the majority sees only "silence in the Founding-era," *id.* at ——, "an absence of Founding-era evidence," *id.* at ——, and a "dearth of evidence," *id.*, due to the "absence of the particular issue during those time periods," *id.* at ——.

The majority therefore concludes that current problems are so unlike those of the founding period as to make the founding-era principles inapplicable to contemporary legal questions. That conclusion repackages the familiar criticism that an original understanding of the Constitution is unable to address current problems.[30] Our court has sometimes assumed that founding principles have been rendered obsolete by such innovations as a "new urban environment," an "increased lethality of firearms," an "increasing complexity of government," or "a degree of administrative sophistication typical of the late-nineteenth century cities but unusual in the Founding Era." *Antonyuk II*, 120 F.4th at 992-94. Our job, however, is to decide how "the Second Amendment's historically fixed meaning applies to new circumstances." *Bruen*, 597 U.S. at 28, 142 S.Ct. 2111. That inquiry requires us to accept both that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it" and that it "can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

[30] *See, e.g.*, William J. Brennan Jr., *The Constitution of the United States: Contemporary Ratification*, 27 S. Tex. L. Rev. 433, 435-36 (1986) ("[O]ur distance of two centuries cannot but work as a prism refracting all we perceive. ... Those who would restrict claims of right to the values of 1789 specifically articulated in the Constitution turn a blind eye to social progress and eschew adaption of overarching principles to changes of social circumstance."); Lawrence Lessig, *Fidelity in Translation*, 71 Tex. L. Rev. 1165, 1266 (1993) (" 'Language' is more than words people use; it is their ideals, their hopes, their prejudices, their

enlightenments—in short, it is their world. As the distance to that world increases, so too does the difficulty of the task of translation, not just in the sense that it becomes more and more difficult to understand who the Framers were, but also in the sense that it becomes more and more difficult to accept what they were about.").

**\*22** Applying that analysis here, I disagree that the historical record reflects "silence" in 1791 and a "robust historical tradition" in 1868 that might have reflected the original meaning of the Second Amendment or served to "liquidate the meaning of an ambiguous constitutional term." *Ante* at ——, ——. Instead, the regulatory tradition of 1791 allowed restrictions on the misuse of firearms or the manner of bearing arms but did not categorically prohibit carriage in a recreational or gathering place such as a public park. In 1868, however, an emergent ideological movement led to a new tradition of restricting carriage and other conduct in public parks. At that time, "courts reconceptualized the purpose and scope of the right to keep and bear arms."[31] At least some of the laws in the record that emerged from this later tradition clearly violate the Second Amendment.[32]

[31] Leider, *supra* note 15, at 1623.

[32] *See, e.g.*, J. App'x 1523 (a provision of the penal code of Idaho of 1901 that criminalized the carrying of arms "within the limits or confines of any city, town or village or in any public assembly of the State of Idaho"); *id.* at 1586 (a law adopted by the Legislative Assembly of the Territory of Arizona in 1889 making it a punishable offense for "any person within any settlement, town, village or city within this Territory" to "carry on or about his person ... any pistol").

In the context of other constitutional guarantees, the Supreme Court has rejected the suggestion that an historical tradition that first emerged in the late 1800s reflects the original meaning of the Constitution. In a First Amendment challenge to the exclusion of religious private schools from a state scholarship program, the Supreme Court addressed the contention that "a tradition *against* state support for religious schools arose in the second half of the 19th century, as more than 30 States—including Montana—adopted no-aid provisions." *Espinoza v. Montana Dep't of Revenue*, 591 U.S. 464, 482, 140 S.Ct. 2246, 207 L.Ed.2d 679 (2020). The Supreme Court explained that "[s]uch a development, of course, cannot by itself establish an early American tradition."

*Id.* Instead, "such evidence may reinforce an early practice but cannot create one." *Id.* In *Espinoza*, as in this case, the Supreme Court interpreted a provision of the Bill of Rights that "applies to the States under the Fourteenth Amendment." *Id.* at 475, 140 S.Ct. 2246. But even though the Fourteenth Amendment was adopted in 1868, that was not the time in which the scope of the right was fixed. [33]

[33] Some scholars focus on the understanding of the right as of 1868 rather than 1791 because "the Privileges or Immunities Clause is the more plausible textual vehicle for the incorporation of the Bill of Rights" and the scope of the rights protected by that clause turns on what was meant "when the people of 1868 declared that states cannot abridge 'the privileges or immunities of citizens of the United States.' " Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L. J. 1439, 1448 (2022). Doctrinally, however, "the question of the rights protected by the Fourteenth Amendment against state infringement has been analyzed under the Due Process Clause of that Amendment and not under the Privileges or Immunities Clause," *McDonald*, 561 U.S. at 758, 130 S.Ct. 3020 (plurality opinion), and under that process of incorporation, "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government," *Bruen*, 597 U.S. at 37, 142 S.Ct. 2111. There is an alternative scholarly argument which accords with that approach. *See* William Baude, Jud Campbell & Stephen E. Sachs, *General Law and the Fourteenth Amendment*, 76 Stan. L. Rev. 1185, 1249 (2024) ("[I]t may be that Fourteenth Amendment privileges or immunities—and, indeed, many of the first eight amendments—were inherently backward-looking. ... [T]he general-law privileges or immunities the Fourteenth Amendment secures may be a closed set—a somewhat *Washington-v.-Glucksberg*-like category of rights, 'deeply rooted in this Nation's history and tradition,' stretching from the Founding through Reconstruction to today.") (footnote omitted).

**\*23** In this case, I would reach the same conclusion the Supreme Court has reached with respect to the First Amendment: A tradition of regulation that arose in the late nineteenth century cannot restrict the scope of the right to keep and bear arms as it was understood when the Second Amendment was adopted in 1791. The regulatory tradition of prohibiting carriage in public parks that emerged in the late nineteenth century contradicted the understanding of the Second Amendment in 1791 as reflected in analogous regulations during the founding period. Accordingly, I would hold that the state has failed to carry its burden of establishing that the Public Parks Provision is consistent with the relevant historical tradition of firearms regulation. "[E]vidence of 'tradition' unmoored from original meaning is not binding law." *Rahimi*, 602 U.S. at 738, 144 S.Ct. 1889 (Barrett, J., concurring) (quoting *Vidal v. Elster*, 602 U.S. 286, 324, 144 S.Ct. 1507, 219 L.Ed.2d 56 (2024) (Barrett, J., concurring in part)).

\* \* \*

"[T]he right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.' " *Rahimi*, 602 U.S. at 690, 144 S.Ct. 1889 (quoting *McDonald*, 561 U.S. at 778, 130 S.Ct. 3020 (majority opinion)). Such "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. at 634-35, 128 S.Ct. 2783. In this case, I would adhere to the Second Amendment as it was understood when adopted in 1791. Accordingly, I would hold that (1) the state may not enforce a restriction on carriage that reflects disapproval of the right to keep and bear arms, and (2) the state may not enforce a restriction on carriage in public parks that conflicts with the regulatory tradition during the founding period. Because the majority reaches a different conclusion on the second issue, I concur in part and dissent in part.

**All Citations**

--- F.4th ----, 2026 WL 1378796

---

End of Document          © 2026 Thomson Reuters. No claim to original U.S. Government Works.