24-2251-cv
*Civil Rights Corps v. LaSalle*

# In the
# United States Court of Appeals
# For the Second Circuit

————————————————————————

August Term 2024
Argued: June 26, 2025
Decided: July 29, 2026

Docket No. 24-2251-cv

————————————————————————

CIVIL RIGHTS CORPS, CYNTHIA GODSOE, NICOLE SMITH FUTRELL,
DANIEL S. MEDWED, JUSTIN MURRAY, ABBE SMITH, STEVEN ZEIDMAN,

*Plaintiffs-Appellees*,

*v.*

HECTOR D. LASALLE, in his official capacity as Presiding Justice of
the Second Judicial Department of the Appellate Division of
the Supreme Court of the State of New York,

*Defendant-Appellant*.[*]

————————————————————————

Appeal from the United States District Court
for the Southern District of New York
No. 21-CV-9128, Victor Marrero, District Court Judge.

————————————————————————

Before:      MENASHI, LEE, and NATHAN, *Circuit Judges*.

———————————

[*] The Clerk of Court is respectfully directed to amend the case caption as set forth above.

Defendant-Appellant Presiding Justice Hector D. LaSalle of the Second Judicial Department of the Appellate Division of the Supreme Court of the State of New York ("Justice LaSalle" or "the State") appeals from a judgment entered on July 22, 2024, in the United States District Court for the Southern District of New York (Victor Marrero, *District Judge*).  In 2021, Plaintiffs-Appellees filed grievance complaints against purportedly unethical New York state prosecutors with the Attorney Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts of the Second Judicial Department of the Appellate Division of the Supreme Court of the State of New York.  After the Grievance Committee informed them that any resulting proceedings against the twenty-one prosecutors would remain confidential, Plaintiffs-Appellees brought suit under 42 U.S.C. § 1983, asserting that Section 90(10) of the New York Judiciary Law, which by default seals and mandates confidentiality of attorney grievance matters, violates their First Amendment right of access as applied to their complaints.  At summary judgment, the district court ruled that a First Amendment presumption of access does attach to formal disciplinary hearings in the Second Department, to records necessary to understand those hearings, and to final dispositions by the Grievance Committee. Because Section 90(10) impermissibly interferes with that right, the district court found the statute to be unconstitutional as applied against Plaintiffs-Appellees' complaints.

On appeal, we find that, despite the State's contentions otherwise, Plaintiffs-Appellees' claims are ripe and abstention, pursuant to *O'Shea v. Littleton*, 414 U.S. 488 (1974), is unwarranted.  Upon *de novo* review, we conclude that the experience-and-logic test supports a qualified, presumptive First Amendment right of access to formal disciplinary hearings in the Second Department, including all pertinent records, and select dispositions of the Grievance Committee.  Consequently, the State may not prohibit Plaintiffs-Appellees' access to such proceedings and records pertaining to their complaints without making specific, on-the-record findings justifying confidentiality.  Therefore, we **AFFIRM** the judgment of the district court.

_____

GREGORY L. DISKANT, Patterson Belknap Webb & Tyler LLP, New York, NY, *for Plaintiffs-Appellees*.

2

STEPHEN J. YANNI, Assistant Solicitor General (Barbara D. Underwood, Solicitor General; Judith N. Vale, Deputy Solicitor General, *on the brief*), *for* Letitia James, Attorney General, State of New York, New York, NY, *for Defendant-Appellant*.

David A. Schulz, Tobin Raju, Media Freedom & Information Clinic, Yale Law School, New Haven, CT, *for New York Media Coalition, amici curiae in support of Plaintiffs-Appellees.*

Domenick Napoletano, New York State Bar Association, Albany, NY; Rolando T. Acosta, Dante W. Apuzzo, Catherine Perez, Pillsbury Winthrop Shaw Pittman, LLP, New York, NY, *for New York State Bar Association, amicus curiae in support of Defendant-Appellant.*

_____

EUNICE C. LEE, *Circuit Judge*:

Defendant-Appellant Presiding Justice Hector D. LaSalle of the Second Judicial Department of the Appellate Division of the Supreme Court of the State of New York ("Justice LaSalle" or "the State") appeals from a judgment entered on July 22, 2024, in the United States District Court for the Southern District of New York (Victor Marrero, *District Judge*). In 2021, Plaintiffs-Appellees Civil Rights Corps ("CRC") and law professors Cynthia Godsoe, Nicole Smith Futrell, Daniel S. Medwed, Justin Murray, Abbe Smith, and Steven Zeidman (collectively, "the Law Professors") filed twenty-one grievance complaints against purportedly

3

unethical New York state prosecutors with the Attorney Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts of the Second Judicial Department ("Second Department") of the Appellate Division of the Supreme Court of the State of New York ("Appellate Division").  After the Grievance Committee informed them that any resulting proceedings against the twenty-one prosecutors would remain confidential, Plaintiffs-Appellees brought suit under 42 U.S.C. § 1983, asserting that Section 90(10) of the New York Judiciary Law, which by default seals and mandates confidentiality of attorney grievance matters, violates their First Amendment right of access as applied to their complaints.  At summary judgment, the district court ruled that a First Amendment presumption of access does attach to formal disciplinary hearings in the Second Department, to records necessary to understand those hearings, and to final dispositions by the Grievance Committee.  Because Section 90(10) impermissibly interferes with that right, the district court found the statute to be unconstitutional as applied against Plaintiffs-Appellees' complaints.

On appeal, we find that, despite the State's contentions otherwise, Plaintiffs-Appellees' claims are ripe and abstention, pursuant to *O'Shea v. Littleton*, 414 U.S. 488 (1974), is unwarranted.  Upon *de novo* review, we conclude that the experience-

4

and-logic test supports a presumptive First Amendment right of access to formal disciplinary hearings in the Second Department, including all pertinent records, and select dispositions of the Grievance Committee. Consequently, the State may not prohibit Plaintiffs-Appellees' access to such proceedings and records pertaining to their complaints without making specific, on-the-record findings justifying confidentiality. Therefore, we **AFFIRM** the judgment of the district court.

## BACKGROUND

### I.      Attorney Grievance Process Overview

Before turning to the specifics of the grievance complaints filed by Plaintiffs-Appellees, we begin with an overview of New York's system for regulating the practice of law, including disciplining attorneys for behavior that violates the Rules of Professional Conduct (the "Rules"), which are applicable to all members of the New York Bar. *See* N.Y. Jud. Law § 90(2); 22 N.Y.C.R.R. § 1200.8.4. Responsibility over attorney affairs is vested in each of the four state Appellate Divisions, which in turn may appoint attorney grievance committees that consist of at least twenty-one voluntary members with a minimum of three non-lawyers. *See* 22 N.Y.C.R.R. § 1240.4. The Appellate Divisions also employ staff, principally

chief attorneys and other subordinate counsel, to assist each of the attorney grievance committees. *Id.* § 1240.5.

## A.    Second Department's Grievance Procedure

Although New York's grievance procedures are virtually identical across Appellate Divisions, we focus on the entities relevant to this appeal: the Second Department and the Attorney Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts (the "Committee"), which is one of three such committees for the Second Department.  Presiding Justice LaSalle appoints members of the Committee, as well as its Chief Attorney.

Before an attorney is publicly disciplined in the Second Department, any allegations of their misconduct must pass through three stages of review: (1) an initial screening of the submitted complaint by the Chief Attorney and other staff; (2) a factual investigation culminating in a report from the staff to the Committee, which then determines whether there is probable cause of professional misconduct "warranting the imposition of public discipline," 22 N.Y.C.R.R. § 1240.7(d)(2)(vi); and (3) if authorized by the Committee, formal proceedings before the Second Department that may sustain the charges.  Each step of the process is governed by both public regulations and the internal Second Department Grievance Committee

Manual & Forms (the "Manual").

The system kicks into gear with the filing of a complaint. Although often submitted by a current or former client, anyone—with or without personal knowledge of the alleged misconduct—can submit a complaint against an attorney. Per the regulations, the person or entity that submits a complaint is referred to as the "complainant." 22 N.Y.C.R.R. § 1240.2(e). In the initial screening phase, Committee staff assign a file number to the complaint, access the named attorney's registration information and disciplinary history, and then assess whether the complainant's allegations satisfy the "threshold conditions" of jurisdiction (i.e., that the allegations concern a New York attorney), venue (i.e., that the attorney's primary office is within the Committee's territorial bounds), and "standing." J. App'x at 971–72. Complaints without jurisdiction or filed in an improper venue are typically dismissed or transferred. Although not publicly defined, the Manual explains that a lack of "standing" is found when the complainant has (1) "no connection" to the named attorney or the underlying matter, or (2) no "personal knowledge of the underlying facts" (e.g., "simply relaying to the Committee information . . . learned from some other source"). J. App'x at 310. When the sender of the complaint lacks standing, an investigation

might still be initiated "if there is a sufficient basis to open a *sua sponte* complaint," but the sender is not "designate[d]" as the "complainant," *id.*, and will be "den[ied] . . . any further information" regarding the complaint's status, *id.* at 970.

After these threshold inquiries, staff provide a recommendation to the Chief Attorney on how to proceed. The Chief Attorney can decide to "decline to investigate" a complaint if (1) the person or conduct are not covered by the Rules, (2) the complaint's allegations do not amount to a prima facie claim of professional misconduct, (3) the remedy sought by the complaint is more appropriately sought in another forum, or (4) the allegations relate to a pending legal action. *Id.* at 972; *see also* 22 N.Y.C.R.R. § 1240.7(d)(1)(i). Alternatively, in certain circumstances, the Chief Attorney could refer the complaint to another forum. For any of these outcomes, the complainant must be notified. 22 N.Y.C.R.R. § 1240.7(d)(1)(ii).

If the Chief Attorney decides to open an investigation, a complaint enters the second stage of review. The respondent attorney is informed of the allegations and given an opportunity to respond—typically, any written response is reviewable by the complainant. To build a fulsome record, the Chief Attorney and staff may, *inter alia*, interview witnesses, issue a subpoena, or depose the respondent attorney. *Id.* § 1240.7(b). The respondent attorney must comply or

8

potentially face sanctions, including the interim suspension of their law license. *Id.* § 1240.9(a). After gathering facts, the Chief Attorney and staff "comprehensive[ly]" document their findings in a report, catalogue evidence for both sides, and provide the Committee with their recommendation of "possible dispositions." J. App'x at 973 (citation modified). The Committee reviews the report, asks follow-up questions, and requests additional information if needed. After deliberation, the Committee votes and, based on the majority's views, issues its resolution of the complaint.

As relevant here, the Committee may choose between four dispositions: (1) a dismissal, (2) a "Letter of Advisement," (3) a "written Admonition," or (4) an authorization for a formal proceeding.[1] *See* 22 N.Y.C.R.R. § 1240.7(d)(2). A dismissal is warranted when "no misconduct occurred." J. App'x at 950. A letter of advisement is appropriate when the respondent "engaged in conduct requiring comment [but] that, under the facts of the case, does not warrant imposition of discipline." 22 N.Y.C.R.R. § 1240.7(d)(2)(iv). A written admonition reflects that,

---

[1] The Committee may also (1) "refer the complaint to a suitable alternative forum upon notice to the respondent and the complainant" if the complaint "involves a fee dispute, a matter suitable for mediation, or a matter suitable for review by a bar association grievance committee," 22 N.Y.C.R.R. § 1240.7(d)(2)(ii), or (2) "make an application for diversion" to a monitor program for, e.g., substance abuse or mental health issues, *id.* §§ 1240.7(d)(2)(iii), 1240.11.

"by a fair preponderance of the evidence," the respondent "engaged in professional misconduct, but that public discipline is not required to protect the public . . . or deter the commission of similar misconduct." *Id.* § 1240.7(d)(2)(v). Lastly, the Committee may authorize the Chief Attorney to prosecute the respondent in a formal disciplinary proceeding before the Second Department if the Committee finds "probable cause . . . that the respondent engaged in professional misconduct warranting the imposition of public discipline." *Id.* § 1240.7(d)(2)(vi). All of these dispositions are presumptively confidential. *See* N.Y. Jud. Law § 90(10) ("[A]ll papers, records and documents upon the application or examination of any person for admission as an attorney and counsellor at law and upon any complaint, inquiry, investigation or proceeding relating to the conduct or discipline of an attorney or attorneys, shall be sealed and be deemed private and confidential.").

The Committee's disposition is memorialized in a closing letter. In separate transmittals, the complainant is notified of the determination in "general terms," whereas the respondent attorney is provided with a recital of the "facts that support the Committee's determination" and advised of their "right to seek review or reconsideration." J. App'x at 867. Although the Committee cannot suspend or

10

disbar an attorney, its letters of advisement and written admonitions are not inconsequential. Both become a part of an attorney's perpetual disciplinary record. For example, the Committee or Second Department could consider instances of such private discipline in "determining the action to be taken or the discipline to be imposed upon a subsequent finding of misconduct." 22 N.Y.C.R.R. § 1240.2(b), (i).

If authorized by the Committee's finding of probable cause, a complaint moves on to the third and final stage: a formal disciplinary proceeding in the Second Department. The process starts when the Committee files a "notice of petition" in the Second Department and serves the petition, detailing specific charges and allegations, on the respondent attorney.[2] *See id.* § 1240.8(a)(1). By default, the attorney has 20 days to answer and reply. *Id.* As a "special proceeding[]" under New York law, *id.*, the *de facto* adversaries are the Committee, as the "petitioner" represented by the Chief Attorney and staff, and the respondent attorney, who may also be represented by counsel. *See* N.Y. Jud. Law § 90(6). The two sides exchange statements of fact and engage in discovery as needed and

---

[2] Once the filing of a petition is authorized, the staff report informing the Committee's deliberations is not made available to the Second Department, the respondent attorney, or the complainant.

permitted. 22 N.Y.C.R.R. § 1240.8(a)(2). At any time after the petition has been filed and served, the parties to the proceeding may file a joint motion with the Second Department stipulating to certain facts and requesting the imposition of discipline by consent. *Id.* § 1240.8(a)(5).

Otherwise, to the extent facts are disputed, the Second Department may refer unresolved issues to a special referee for a hearing. *See id.* § 1240.8(b)(1). The hearings begin with opening statements, followed by witness examinations, and conclude with summations. After consideration of any "post-hearing submissions," the referee must file in the Second Department a "written report setting forth the referee's findings and recommendations," which the parties may then move to "affirm or disaffirm." *Id.* The Second Department "may" sustain the charges if the referee found, "by a fair preponderance of the evidence, each essential element of the charge," or it may reject the referee's findings. *Id.* As for remedy, the Second Department is broadly empowered to "impose discipline or take other action" that is "appropriate to protect the public, maintain the honor and integrity of the profession, or deter others from committing similar misconduct." *Id.* § 1240.8(b)(2). Ultimately, the Second Department will either dismiss the complaint, remand the matter back to the Committee for private

discipline (e.g., a letter of advisement or written admonition), or impose public discipline via censure, suspension, or disbarment.

## B.    Confidentiality Requirements

Virtually everything connected with the grievance procedure is kept out of the public eye.  Pursuant to N.Y. Judicial Law § 90(10), "all papers, records and documents . . . upon any complaint, inquiry, investigation or proceeding relat[ed] to the conduct or discipline of an attorney . . . shall be sealed and be deemed private and confidential."  N.Y. Jud. Law § 90(10).  The veil may be pierced in a limited number of ways.  By statute, if the Second Department sustains a charge that results in public discipline, "the records and documents in relation thereto shall be deemed public records."  *Id.*   But interested parties cannot contemporaneously access the disciplinary proceedings (e.g., sit in on a hearing).  Instead, the records are retrospectively available upon request.[3]

New York Judicial Law § 90(10) also permits the Second Department to discretionarily "divulge[] all or any part of" the disciplinary record "upon good

---

[3] Though not germane to this appeal, information regarding the grievance proceedings can be disclosed in two other ways.  First, the complainant and respondent attorney are notified of the Committee's dispositions in the distinct letters discussed earlier.  Second, a respondent attorney can obtain records of their own disciplinary history or, if permitted by the Second Department, can choose to waive confidentiality.

13

cause being shown." *Id.* Any interested party, including a member of the public, may file a good-cause application. Each application must explain why disclosure is requested, identify the records or proceedings sought, and detail why other methods for obtaining the information "are unavailable or impractical." 22 N.Y.C.R.R. § 1240.18(d). The Presiding Justice can require that good-cause applications be made upon notice to the Committee and/or the respondent attorney. From 2013 to 2023, the Second Department received around 160 good-cause applications, largely from law enforcement agencies conducting criminal investigations. The Second Department "rarely receives" requests for other purposes. J. App'x at 855.

## II. Factual Background

On May 3, 2021, the Law Professors[4] filed twenty-one complaints (the "Grievance Complaints") against attorneys currently and formerly associated with the Queens County District Attorney's Office for their misconduct, substantiated by judicial findings and public information, while serving as

---

[4] The Law Professors have backgrounds and practices that span legal ethics, professional responsibility, and criminal law and procedure. All are duly licensed lawyers, and all except one are members of the New York Bar.

14

assistant district attorneys.[5]  The Grievance Complaints were publicly posted by the Law Professors on AccountabilityNY.org, a website sponsored by CRC.  Each complaint asks that the named attorney be publicly disciplined.[6]

Within a month of the complaints being filed, James Johnson, then-Corporation Counsel for New York City, sent a letter (the "Johnson Letter") on June 2, 2021, on behalf of the Queens District Attorney's Office to the Committee, criticizing the Law Professors' "very public campaign" as "contrary to both the law and the principles on which the grievance process is based," and accused the Law Professors of engaging in "misuse and indeed abuse of the grievance process

---

[5] Since then, the Law Professors have filed twenty-nine additional complaints.  Those complaints are not at issue in this appeal.

[6] By way of example, consider the complaint requesting the disbarment of Charles Testagrossa.  Corralling only public sources and disclaiming any personal knowledge, the Law Professors summarized in a 21-page dossier how, in violation of the Rules, Testagrossa suppressed exculpatory evidence and deliberately misled the Queens County Supreme Court in the 1999-2000 trials of George Bell, Gary Johnson, and Rohan Bolt for the murders of Ira Epstein and off-duty police officer Charles Davis.  *See generally People v. Bell*, 143 N.Y.S.3d 840 (N.Y. Sup. Ct. 2021).  Testagrossa's violations of constitutional and ethical obligations led to the wrongful conviction and unjustified imprisonment of Bell, Johnson, and Bolt for over two decades.  *Id.* at 852–55.  In March 2021, the Queens County Supreme Court vacated the convictions, noting that "[t]hese three defendants were undoubtedly wronged by [Testagrossa's] misconduct," including his on-the-record "misrepresentation[s]" and "deliberate falsehood[s]."  *Id.* at 853. Nonetheless, the Second Department has not yet publicly disciplined Testagrossa, who remains a licensed New York attorney.

15

to promote a political agenda [that] is harmful to the profession." J. App'x at 93–95. Disclaiming any view on the merits of the allegations, Johnson requested only that the Committee "consider the manner in which the [Grievance Complaints were] filed" in their review process. *Id*. at 93. The letter was simultaneously transmitted to the Law Professors but warned that "any disclosure of this letter . . . without proper court permission would [also] be unlawful under the Judiciary Law." *Id.* at 95 n.4.

About a week after the Johnson Letter, the Grievance Committee's Chief Attorney, Diana Kearse, acknowledged receipt of the "complaints against current or former Assistant District Attorneys" in a letter sent to the Law Professors (the "Kearse Letter").[7] *Id.* at 98. However, the Kearse Letter stated that, since the Grievance Complaints openly admitted that the petitioners lacked personal knowledge, the "allegations would be initiated by the Grievance Committee, *sua sponte*, and remain confidential pursuant to New York State Judiciary Law § 90, unless they resulted in public discipline imposed by the Appellate Division." *Id.* The letter did not confirm "whether any investigations will or will not be

---

[7] Although some Grievance Complaints initially had been sent to other appropriate Grievance Committees, the complaints were all transferred to the Grievance Committee for the Second, Eleventh, and Thirteenth Judicial Districts.

16

pursued." *Id.* In effect, because the Law Professors were deemed not to have standing under the Manual, they would not be informed of any updates regarding the Grievance Complaints.

To date, none of the Grievance Complaints have resulted in public discipline. It is not known if the Grievance Complaints have been dismissed, resulted in nonpublic discipline, or are otherwise still pending. Neither the Law Professors nor CRC have filed good-cause applications. Although the Law Professors requested updates on each of the Grievance Complaints via letter to the Committee, that request did not prompt a response.

## III. Procedural History and the District Court Decision

CRC and the Law Professors (collectively, "Plaintiffs") initiated the instant action, arising under 42 U.S.C. § 1983, in November 2021 against the Corporation Counsel of the City of New York, the Queens County District Attorney, the Chair of the Committee, the Chief Attorney of the Committee, and the Presiding Justice of the Second Department (collectively, "Defendants"), all in their official and personal capacities. Plaintiffs asserted five claims: (1) retaliation in violation of the Law Professors' First Amendment right to make and publicize the Grievance Complaints (the "First Claim"); (2) violation of the Fourteenth Amendment's

17

Equal Protection Clause by denying the Law Professors standing as "complainants" (the "Second Claim"); (3) as-applied and facial challenges to Section 90(10) for violating the First Amendment and its New York State Constitution analogue because the provision operates as a content-based speech restriction that prevents publicizing the Grievance Complaints, the Johnson and Kearse Letters, and any future information that the Committee may share (the "Third Claim"); (4) violation of a qualified public right of access to government proceedings and records under the First Amendment, as applied to the Grievance Complaints (the "Fourth Claim"); and (5) a declaratory finding of "good cause" with respect to the Grievance Complaints so that the public would be apprised of any developments (the "Fifth Claim").[8]

Along with the complaint, Plaintiffs attached various exhibits, including the Johnson and Kearse Letters, under seal to avoid violating Section 90(10). But, in January 2022, the district court granted Plaintiffs' motion to unseal those documents. The district court held that that both a common law and First Amendment right of access attached to the exhibits because they were "judicial

---

[8] The First Claim was against Corporation Counsel, the Queens District Attorney, and the Committee Chair and Chief Attorney. The Second Claim was against the Committee Chair and Chief Attorney. The latter three claims were against all Defendants.

18

documents" filed in an Article III court, and no countervailing interest justified continued secrecy. *See Civil Rights Corps v. Pestana,* No. 21-cv-9128, 2022 WL 220020, at *4–6 (S.D.N.Y. Jan. 25, 2022). Subsequently, the district court largely denied the Defendants' motion to dismiss. *See Civil Rights Corps v. Pestana*, No. 21-cv-9128, 2022 WL 1422852, at *12 (S.D.N.Y. May 5, 2022).

In June 2022, the district court granted in part Plaintiffs' motion for partial summary judgment as to their Third Claim, regarding the First Amendment challenges to the restrictions on their ability to publicize the Grievance Complaints and related documents. Without reaching Plaintiffs' facial challenge, the district court determined that Section 90(10) was unconstitutional as applied because it improperly restrained the publication of a "complainant's own grievance complaint related to attorney discipline" and all related correspondence. *Civil Rights Corps v. Pestana*, No. 21-cv-9128, 2022 WL 2118191, at *10 (S.D.N.Y. June 13, 2022). The State raises no challenge to that ruling on appeal. Later, through stipulations in March 2023 and April 2024, the parties agreed to voluntarily dismiss with prejudice all claims against all defendants except for the Fourth Claim—an as-applied First Amendment qualified right of public access claim to all proceedings and records associated with the Grievance Complaints—as against

19

Justice LaSalle.

In a thoughtful and well-reasoned July 2024 order and opinion spanning over a hundred pages, the district court granted in part and denied in part Plaintiffs' motion for summary judgment on the one remaining claim and denied in full Justice LaSalle's cross-motion for summary judgment.[9] *Civil Rights Corps v. LaSalle*, 741 F. Supp. 3d 112, 128 (S.D.N.Y. 2024). To reach the merits of Plaintiffs' First Amendment right-of-access claim, the district court first reaffirmed its subject-matter jurisdiction and then explained why abstention was unnecessary under the circumstances. *Id.* at 137–52. The district court rejected the State's contention that the Plaintiffs' claims were unripe as a constitutional and prudential matter.[10] Because Plaintiffs "are suffering an ongoing injury, which is certain to

---

[9] In recapping the district court's decision, we focus on its holdings and pertinent reasoning as relevant to the issues raised by the parties on appeal. All other contentions have been forfeited. *See, e.g., McCarthy v. SEC,* 406 F.3d 179, 186 (2d Cir. 2005) ("[I]t is not our obligation to ferret out a party's arguments.").

[10] Regarding subject-matter jurisdiction, the district court also rejected the State's claims that Plaintiffs had not suffered an injury-in-fact that satisfied Article III's standing requirement and that Justice LaSalle was entitled to state sovereign immunity as reflected in the Eleventh Amendment. *See Civil Rights Corps,* 712 F. Supp. 3d at 137–41, 144–46. The district court also rejected Justice LaSalle's affirmative defenses of absolute judicial immunity and absolute legislative immunity, given that Plaintiffs do not seek damages and their claim is not focused on Justice LaSalle's role as a policymaker, only his role in following Section 90(10)'s command to keep attorney disciplinary matters confidential. *Id.* at 152–55.

continue," by reason of the denial of their access, the district court found that the Plaintiffs' Fourth Claim was constitutionally ripe. *Id.* at 142. The district court explained that Plaintiffs' failure to file good-cause applications was immaterial, seeing as "[i]t is well-established that exhaustion of remedies under state law is not required to make a Section 1983 claim ripe." *Id.* (citing *Knick v. Township of Scott*, 588 U.S. 180, 185 (2019)). Moreover, because the applicability of a First Amendment right of access to the Grievance Complaints presents a purely legal question, there was no prudential reason to wait for the filing of a good-cause application before determining the issue. *Id.* at 143. Similarly, the district court reasoned that prudence did not require it to wait to address the right of access issue until after the relevant disciplinary hearings because Section 90(10) "does not allow the State to disclose even the pendency of disciplinary proceedings until they end in disbarment or suspension," and thus the court had no way of knowing "the stage to which those proceedings have progressed to date" or whether those hearings will ever happen. *Id*.

The district court found the State's invocation of abstention similarly unavailing.[11] *Id.* at 147. Though a federal court may not ordinarily abstain from

---

[11] The district court had earlier held, in its ruling on the State's motion to dismiss, that the

exercising its subject-matter jurisdiction, the Supreme Court has recognized that a court still retains some discretion regarding whether to grant certain forms of relief. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans* ("*NOPSI*"), 491 U.S. 350, 358–59 (1989). Most relevant for present purposes, the State claimed that abstention was required under *O'Shea v. Littleton*, 414 U.S. 488 (1974), wherein the Supreme Court cautioned that federal courts should not grant injunctive relief that effectively supervises "the operation of state court functions" and so "is antipathetic to established principles of comity," *id.* at 501. The State argued that Plaintiffs' requested relief would work such an intervention by "usurp[ing] the

---

*Younger*, *O'Shea*, and *Pullman* abstention doctrines were inapplicable. *Civil Rights Corps*, 2022 WL 1422852, at *3–7. *See generally Younger v. Harris*, 401 U.S. 37 (1971); *O'Shea v. Littleton*, 414 U.S. 488 (1974); *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). In its summary judgment motion, the State again raised *Younger* and *O'Shea* abstention and raised anew the *Rooker-Feldman* doctrine. *Civil Rights Corp.*, 741 F. Supp. 3d at 147. *See generally D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Tr. Co.*, 263 U.S. 413 (1923). In reiterating that *Younger* abstention, which "warn[s] of federal injunctions dictating the course of ongoing state criminal proceedings," does not apply, the district court reasoned that although "disciplinary proceedings are of a sufficiently similar character to criminal proceedings" such that *Younger* abstention's concerns of "comity and federalism" are triggered, Plaintiffs did not ask for any direct intervention into the proceedings themselves—only access. *Civil Rights Corps*, 741 F. Supp. 3d at 147–48. As for *Rooker-Feldman* abstention, which proscribes a district court's "review [of] 'state court decisions in particular cases arising out of judicial proceedings,'" the district court found that the sealing of attorney grievance proceedings and records "cannot be fairly said to be a judicial function" because it does not concern "a dispute between parties." *Id.* at 151–52 (quoting *Feldman*, 460 U.S. at 486). Because the State does not challenge these rulings on appeal, we focus on *O'Shea* abstention.

22

state court's role" in deciding good-cause applications and by "requir[ing] an extensive revamp" of the Second Department's recordkeeping protocol for disciplinary proceedings. *Civil Rights Corps*, 741 F. Supp. 3d at 148 (citation modified).

Nevertheless, the district court found *O'Shea* abstention unwarranted under the circumstances. *Id.* at 151. It reasoned that a state court's role in adjudicating good-cause applications was irrelevant to a potential declaratory judgment that a First Amendment right of access attaches to the Grievance Complaints, since the "affirmative requirement of 'good cause' to access public records falls among the provisions of Section 90(10) that Plaintiffs find constitutionally offensive to the First Amendment's presumption of access." *Id.* at 149. Assuming Plaintiffs prevail, the State would have latitude in devising a constitutionally compliant procedure. The district court also was not convinced that the relief would necessarily require a wholesale restructuring of recordkeeping procedures, given that Plaintiffs only sought access to records associated with the twenty-one Grievance Complaints. But even if such a revamp were necessary, it would be a mild intrusion on state courts' affairs as compared to the relief in *O'Shea*, where "a sweeping permanent injunction that prohibited two state judges from doing their

23

work in a racially discriminatory way" would have subjected "every future decision by the defendant judges" to "re-litigat[ion in federal court] (with no clear legal standard) for compliance with the federal injunction." *Id.* Here, the district court found that the scope and nature of federal court involvement would be narrower and less intrusive, homed in on only "a state court's recordkeeping policies and the closure of a hearing room to the public." *Id.* at 150.

Arriving at the merits, the district court began by explaining the relevant law. Whether a First Amendment qualified right of access attaches to "a particular government proceeding or record," *id.* at 155, turns on the experience-and-logic test announced by the Supreme Court in *Press-Enterprise Co. v. Superior Court of California* ("*Press-Enterprise II*"), 478 U.S. 1, 9 (1986); *see Civil Rights Corps*, 741 F. Supp. 3d at 155–56. That test requires assessing "(1) 'whether the place and process have historically been open to the press and general public,' and (2) 'whether public access plays a significant positive role in the functioning of the particular process in question.'" *Hartford Courant Co. v. Carroll*, 986 F.3d 211, 219 (2d Cir. 2021) (quoting *Press-Enterprise II*, 478 U.S. at 8). Once a First Amendment presumption is established under the experience-and-logic test, it may still be overcome "based on findings that closure is essential to preserve higher values

24

and is narrowly tailored to serve that interest." *Press-Enterprise II*, 478 U.S. at 9 (quoting *Press-Enterprise Co. v. Superior Ct. of Cal.* ("*Press-Enterprise I*"), 464 U.S. 501, 510 (1984)).

The district court then assessed whether a right of access attaches at each stage of the grievance process. Starting with formal Second Department proceedings that might lead to the imposition of public discipline—the most severe sanction—the district court found that both experience and logic confirm that the First Amendment requires presumptive open access to both the "hearings and any documents necessary to understand those hearings." *Civil Rights Corps*, 741 F. Supp. 3d at 156. On experience, the district court explained that, since the English common law of the founding period, judges have been empowered to discipline attorneys in open court, and proceedings to disbar or suspend an attorney "were historically prosecuted by private parties as ordinary equity suits or contempt proceedings." *Id.* at 157. Modern Second Department proceedings retain "almost all the same key features"—initiation by petition, service on the respondent, and an adversarial hearing with potential witnesses. *Id.* Until the early 20th century, attorney disbarment proceedings were public and mentioned in newspapers as spectacles. *Id.* at 158. The district court rejected the State's

25

contention that any historical survey should start in 1945, when the New York Judicial Law was first passed and shifted the mode of inquiry from adversarial to inquisitorial; instead, the district court focused on longstanding tradition from common-law England through the early days of the Republic. *Id.* at 156–58.

For the district court, logic reinforced permitting public access. The principal "concern of a disciplinary proceeding is the protection of the public in its reliance on the integrity and responsibility of the legal profession," *id.* at 159 (quoting *In re Rowe*, 80 N.Y.2d 336, 341 (1992)), but the public cannot place its "faith in a process that it cannot see," *id.* Although "misconduct of [any] attorney[] is uniquely harmful to administration of justice," the district court also found that the First Amendment interests in this case are amplified because the Grievance Complaints seek clarity on how prosecutors—charged by the public to fairly conduct criminal trials—are disciplined for their misconduct. *Id.* at 160–61. Accordingly, the district court concluded that a presumptive First Amendment right of access attaches to disciplinary hearings in the Second Department, as well as to documents related to those hearings.

Turning to the Committee's role at the stages prior to formal proceedings, the district court assessed whether a qualified right of public access attaches to, as

narrowed by Plaintiffs' request, dispositions under 22 N.Y.C.R.R. § 1240.7(d)(2). *Id.* at 162–63. First, the district court reasoned that experience counsels in favor of default access because the historical antecedent of Committee dispositions is adjudication of attorney misconduct—not, as the State suggested, investigation of allegations—because "when the Committee issues dispositions, it makes an authoritative determination." *Id.* at 163–64. The Committee only acts on a "completely developed factual record and after considering the positions of both its staff and the respondent attorney." *Id.* at 164. Often, a complaint is wholly resolved by the Committee, in its function as a neutral arbiter, through private discipline such as a letter of advisement, and those dispositions are permanent. *Id.* at 164–65. Although there is more recent history of "private bar association proceedings," the district court found that it was "outweighed by the preceding centuries of public discipline." *Id.* at 167.

As for logic, the district court found that the same "benefits that flow from public monitoring of judicial work" with respect to Second Department proceedings apply to the Committee's dispositions. *Id.* However, the district court admitted that some "differences" between the Second Department's work and that of the Committee gave it "pause." *Id.* at 168. The district court acknowledged that

there is some "risk" that innocent attorneys may have their reputations needlessly tarred if all dispositions were publicized, given that some outcomes do not require any "evidentiary finding that actionable misconduct has occurred." *Id.* (contrasting, *inter alia*, dismissals and letters of advisement, which do not require any evidentiary finding under 22 N.Y.C.R. § 1240.7(d)(2), with written admonitions and authorizations for formal proceedings, which do). Yet, that does not necessarily counsel in favor of sealing every disposition. In the district court's view, a dismissal, referral to another forum, or a stay pending diversion, *see* 22 N.Y.C.R.R. § 1240.7(d)(2)(i)–(iii), would "communicate nothing" about the merits, *Civil Rights Corp.*, 741 F. Supp. 3d at 168. And although a letter of advisement does not require a "finding of professional misconduct," it still requires "a finding that 'the respondent has engaged in conduct requiring comment'"—a finding that the district court determined should not necessarily be secret by default. *Id.* (quoting 22 N.Y.C.R.R. § 1240.7(d)(2)(iv)). Overall, the district court was persuaded that the public should be able to review the Committee's dispositions not only to understand its affirmative action but also its inaction. *Id.* And so the district court concluded that a presumptive First Amendment right of access attaches to Committee dispositions as well.

28

Finally, in a ruling unchallenged on appeal, the district court found that the Chief Attorney's role is "purely investigatory," and therefore any dismissals based on "the Chief Attorney's determination that there is nothing she can or should investigate"—plus related proceedings and documents—are not subject to the First Amendment's right of access. *Id.* at 169. Neither experience nor logic warrant interfering with the Chief Attorney's ability to "develop the factual record and attain truth" without public scrutiny. *Id.* The Chief Attorney cannot "make any substantive decision about what the appropriate action is for a grievance complaint," but can only decline to investigate under 22 N.Y.C.R.R. § 1240.7(d)(1). *Id.*

Having found that the First Amendment requires presumptively publicizing some portions of New York's attorney disciplinary process, the district court considered whether the State had met its high burden of overcoming that presumption by justifying the confidentiality of Second Department proceedings and Committee dispositions. *Id.* at 169–70. It had not. According to the district court, the State had not explained why its "asserted privacy and confidentiality" interests in the lives of attorneys, their clients, and witnesses trumped the First Amendment's "presumption of openness." *Id.* at 170. Even though the Plaintiffs

brought as-applied challenges with respect to their Grievance Complaints specifically, the State failed to offer any "defense of its sealing process" with respect to those "twenty-one specific cases." *Id.*

Ultimately, the district court entered a declaratory judgment that a presumptive First Amendment right of access attaches to (1) all Second Department disciplinary hearings regarding the Grievance Complaints and any documents necessarily implicated, and (2) all dispositions of the Grievance Complaints by the Committee, rendered pursuant to 22 N.Y.C.R.R. § 1240.7(d)(2). *Id.* at 172. To restrict access by CRC and the Law Professors, the Second Department or Committee would need to provide on-the-record findings regarding the higher values served by the restrictions, that the restrictions are narrowly tailored, and that no alternative to confidentiality would suffice. *Id*

The State timely appealed.

## DISCUSSION

### I. Standard of Review

"We review the district court's grant of summary judgment *de novo*, construing the facts in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor." *Knox v. CRC Mgmt. Co.*, 134 F.4th

30

39, 47 (2d Cir. 2025) (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)). We also review the district court's legal conclusions concerning ripeness and abstention *de novo*. *See Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA* ("*RACER*"), 10 F.4th 87, 99 (2d Cir. 2021) (*de novo* review of ripeness); *Disability Rts. N.Y. v. New York* ("*DRNY*"), 916 F.3d 129, 133 (2d Cir. 2019) (*de novo* review of abstention).

## II. Ripeness & Abstention

On appeal, the State asks that we reverse the district court's exercise of jurisdiction and dismiss the lawsuit entirely for two reasons. First, it argues that Plaintiffs bring an unripe claim that a federal court, as a matter of law, cannot hear and, as a matter of prudence, should not hear. Second, it contends that the requested relief mandates *O'Shea* abstention because, if permitted, it would place the State's internal court processes under a federal court's oversight. We are unpersuaded. For the reasons that follow, we affirm the district court's lawful and prudent exercise of its jurisdiction.

### A. Ripeness

"Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract

31

disagreements.'" *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807 (2003) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)). There are "two overlapping threshold criteria" concerning "whether a case has been brought prematurely"—constitutional ripeness and prudential ripeness. *Simmonds v. I.N.S.*, 326 F.3d 351, 356–57 (2d Cir. 2003). Constitutional ripeness is "drawn from Article III limitations on judicial power." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 109 (2d Cir. 2013). It "overlaps with the standing doctrine, 'most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.'" *Id.* at 110 (quoting *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 226 (2d Cir. 2008)).

The Supreme Court has previously identified a ripeness doctrine based on "prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808 (quoting *Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 58 n.18 (1993)). More recently, however, it has cast doubt on "the continuing vitality of the prudential ripeness doctrine." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014). Our own court has "not directly addressed whether the prudential ripeness doctrine remains good law," but we have emphasized that "the Supreme Court's cautious approach to prudential ripeness is a reminder that the doctrine

32

constitutes a narrow exception to the strong principle of mandatory exercise of jurisdiction." *RACER*, 10 F.4th at 102. Assuming that such an exception is available, prudential ripeness is comparatively "flexible" and serves as a "tool that courts may use to enhance the accuracy of their decisions and to avoid becoming embroiled in adjudications that may later turn out to be unnecessary or may require premature examination of, especially, constitutional issues that time may make easier or less controversial." *Simmonds*, 326 F.3d at 357. To determine if a claim is prudentially ripe, a court asks two questions: (1) "whether the claim is fit for judicial resolution" and (2) "whether and to what extent the parties will endure hardship if decision is withheld." *RACER*, 10 F.4th at 100 (quoting *In re MBTE Prods. Liab. Litig*, 725 F.3d at 110).

Before us, the State contends that any First Amendment right-of-access claim to the Grievance Complaints' dispositions is unripe because CRC and the Law Professors have not pursued the pathway for access readily permitted by Section 90(10): good-cause applications. According to the State, because the Plaintiffs have not filed any good-cause applications, and thus have not yet been denied the opportunity to obtain access, there has been no "completed constitutional violation" enabling Article III jurisdiction. Appellant's Br. at 37. In

33

the State's view, the district court erred by misunderstanding this argument to impose an administrative exhaustion requirement. Instead, the argument is that Plaintiffs have not yet suffered a First Amendment injury because they have not been denied access to any records pursuant to Section 90(10). The State also takes umbrage with the district court's focus on Plaintiffs' injury that resulted from the Chief Attorney's finding that Plaintiffs lacked standing as complainants, arguing that whether Plaintiffs had a right to access information regarding the disciplinary proceedings as parties to those proceedings is "irrelevant to their First Amendment claim based on a purported right of public access." *Id.* at 38. And, it adds that the district court was wrong to credit Plaintiffs' speculative argument that submission of good-cause applications would likely be futile.

In short, the State argues that Plaintiffs' claims are constitutionally and prudentially unripe for the same reason: the Plaintiffs' failure to file good-cause applications. That failure, the State says, means that Plaintiffs have not yet suffered a cognizable injury—but even if they have, their claims are not prudentially ripe because the grant of a future good-cause request would moot the claim and a denial would permit New York courts to address the "novel constitutional issue of first impression." *Id.* at 39.

34

We disagree and hold that Plaintiffs' First Amendment right-of-access claim is ripe.[12]  As a constitutional matter, the State is mistaken that there is no First Amendment injury to any public right of access because "plaintiffs never sought public access through the available statutory procedure," i.e., Section 90(10)'s good-cause application process.  Appellant's Reply Br. at 5.  Section 90(10) imposes a blanket default of sealed and confidential proceedings and records.  As an exception, the provision allows that, "upon good cause being shown, the justices of the appellate division . . . are empowered, in their discretion, by written order, to permit to be divulged all or any part of such papers, records and documents." N.Y. Jud. Law § 90(10).  But, as the district court correctly found, this exception is no answer to Plaintiffs' claim that Section 90(10) causes ongoing harm by imposing nondisclosure in the first instance.  *See N.Y. C.L. Union v. N.Y.C. Transit Auth.*

---

[12] Preliminarily, we note that CRC and the Law Professors are correct that, at least with respect to the pre-enforcement context, the Second Circuit has applied "somewhat relaxed standing and ripeness rules" to First Amendment claims. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 689 (2d Cir. 2013).  Although our case law in this area has often focused on pre-enforcement free-speech claims, our precedent is not so expressly limited. For instance, in *Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2005), we cited our less stringent ripeness standard approvingly in the context of a First Amendment right-of-access claim. We found the plaintiff's claim, predicated on yet-to-be-enforced trespass notices that threatened prosecution if he entered courthouse grounds, to be "ripe for our review." *Id.* at 80 n.27.  Regardless, we need not and do not decide whether a relaxed form of ripeness applies in this case because Plaintiffs' claim is ripe under the typical standard.

("*NYCTA*"), 684 F.3d 286, 295–96 (2d Cir. 2012) (holding that a policy preventing "the public's access to the [administrative] hearing . . . on an ongoing basis" is sufficient to establish a constitutional injury).

The State fundamentally misunderstands the nature of Plaintiffs' injury. A statutory provision vesting discretion in the Second Department to potentially alleviate the injury does not unripen a claim. Plaintiffs' First Amendment right-of-access claim was ripe upon non-notice of any adjudicative activity regarding the Grievance Complaints, as required by Section 90(10). Compounding the harm, the State denied the Law Professors any status as "complainants" for their Grievance Complaints and thereby denied even limited information that they may have been otherwise entitled to.

The State also fails to persuasively explain why requiring a good-cause application to effectuate a right of access is different from imposing a *de facto* state administrative exhaustion requirement. "[T]he settled rule is that exhaustion of state remedies is *not* a prerequisite to an action under 42 U.S.C. § 1983." *Knick*, 588 U.S. at 185 (citation modified). To evade that principle, the State points to *Kentucky Press Association v. Kentucky*, 454 F.3d 505 (6th Cir. 2006), in which the Sixth Circuit dismissed as unripe a challenge to the confidentiality of Kentucky courts' juvenile

36

proceedings and records, in part because the plaintiff "never petitioned for access" under the relevant law. Appellant's Br. at 36 (citing 454 F.3d at 510). But *Kentucky Press* is distinguishable: there, faced with a facial challenge rather than an as-applied challenge, the Sixth Circuit held that the dispute was unripe because state courts had yet to interpret the challenged state statutes to bar access to juvenile proceedings at all. *See* 454 F.3d at 510 ("[T]here is one fact of crucial importance that has yet to be determined: whether Kentucky law, as interpreted by the Kentucky courts, completely closes juvenile proceedings and records to the media[.]").[13] If the state court later interpreted the statute to allow *some* media access, Kentucky Press's constitutional claim "would transform . . . into just the type of 'abstract disagreement' that the ripeness doctrine . . . prevents [courts] from adjudicating." *Id.* (alteration adopted) (quoting *Thomas v. Union Carbide Agr. Prods. Co.*, 473 U.S. 568, 580 (1985)).

---

[13] The Kentucky Press Association filed a facial challenge to "four provisions of the Kentucky Uniform Juvenile Code." *Kentucky Press*, 454 F.3d at 507. The relevant provision required "that all juvenile records remain confidential, allowing disclosure only to [(1)] a limited class of individuals," specifically those that "have a direct interest in the case or in the work of the court," and (2) "in situations ordered by the court for good cause." *See id.* at 507–08 (citation modified). But unhelpful to Justice LaSalle, the Sixth Circuit relied not on a potential reasonable interpretation of the "good cause" clause but that of the "direct interest" clause to find that the Association's claim may be obviated. *Id.*

In contrast, Section 90(10)'s text permits no alternative interpretation that, by default, opens public access to some portion of the grievance procedures. Nor does the State argue that there exists an alternative interpretation of the provision. The *only* potential route to access is the good-cause application, but if we were to require a good-cause application before an actionable constitutional claim could arise, we would unravel the settled rule of non-exhaustion for § 1983 claims and, in doing so, perpetuate the harm that a First Amendment right-of-access claim seeks to vindicate.[14] *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 126 (2d Cir. 2006) (explaining that, in the context of delayed access, "[e]ach passing day may constitute a separate and cognizable infringement of the First Amendment" (quoting *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir.

---

[14] Because we hold that there is no exhaustion requirement in the form of a good-cause application, we need not reach Plaintiffs' alternative argument that filing such an application would have been futile. We note, however, that the State did not dispute before the district court—and does not dispute now—that only three good-cause applications stemming from an interested member of the public, rather than law enforcement agencies or another jurisdiction's attorney disciplinary authority, "have been granted since 1945." *Civil Rights Corps*, 741 F. Supp. 3d at 142. In fact, a prior effort by a nonprofit to unseal all disciplinary records associated with a state prosecutor, who had resigned for withholding exculpatory evidence in a murder trial that resulted in an improper conviction, failed to prompt public access. *See In re Innocence Project, Inc.*, No. 2019-05674, Decision & Order on Appl. (App. Div. 2d Dep't July 12, 2019). *See generally In re Kurtzrock*, 138 N.Y.S.3d 649, 653 (App. Div. 2d Dep't 2020) (discussing particulars of the state prosecutor's misconduct).

1994)); *see also Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975) (Blackmun, J., in chambers).

As a prudential matter, we see no reason for further delay. Time will not "make [it] easier or less controversial" to determine whether there is an as-applied, presumptive right of access under the First Amendment to the disposition of the Grievance Complaints. *See Simmonds*, 326 F.3d at 357. Because the merits issue is a purely legal question, it is "fit for judicial decision." *RACER*, 10 F.4th at 100. And for the reasons discussed above, Plaintiffs "would suffer hardship if required to wait" any longer, *id.* at 101, given the "present detriment" to their purported First Amendment rights, *Simmonds*, 326 F.3d at 360.

## B.    Abstention

We next address whether the district court should have abstained "in light of principles of comity, equity, and federalism." *Courthouse News Serv. v. Corsones*, 131 F.4th 59, 77 (2d Cir. 2025); *see also Mitchum v. Foster*, 407 U.S. 225, 243 (1972). In the main, "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). Even as the Supreme Court has "carefully defined" the rare occasions when "abstention is

39

permissible," it has cautioned that abstention "remains the exception, not the rule." *NOPSI*, 491 U.S. at 359 (citation modified).

The State urges that one such exception—*O'Shea* abstention—militates in favor of dismissal to avoid a federal court unduly interfering with the State's attorney disciplinary regime. As we have previously explained, "[i]n *O'Shea*, the plaintiffs sought to enjoin state court judges from carrying out allegedly unconstitutional policies and practices relating to bond setting, sentencing, and jury fees." *DRNY*, 916 F.3d at 134 (citing *O'Shea*, 414 U.S. at 491–92). However, the Supreme Court found that there was no adequate "basis for equitable relief," pointing to the principles undergirding its decision in *Younger v. Harris*, 401 U.S. 37 (1971), wherein the Court held that federal courts should not interfere in pending state criminal prosecutions. *See O'Shea*, 414 U.S. at 677–78 (citing *Younger*, 401 U.S. at 43–44). Expanding from *Younger*'s focus on a specific, pending state criminal prosecution to a state court's broader practices, the Supreme Court held that "courts must abstain where failure to do so would result in 'an ongoing federal audit of state criminal proceedings'" more generally. *DRNY*, 916 F.3d at 134 (quoting *O'Shea*, 414 U.S. at 500).

Since its pronouncement, *O'Shea* abstention has been extended to civil cases

40

and potentially implicated whenever an equitable remedy might affect "the operations of state courts." *Id.* Yet, we have recently clarified that when the remedy sought is a "bright-line rule," the "mere possibility that a finding of unconstitutionality of the originally challenged [s]tate procedure may be followed by a further challenge to the subsequently developed, ameliorative [s]tate procedure does not make it an 'ongoing federal audit.'" *Courthouse News Serv.*, 131 F.4th at 77 (quoting *O'Shea*, 414 U.S. at 500).

The State asserts that the district court's order impermissibly alters the State's disciplinary scheme in at least three ways: 1) by requiring on-the-record findings before private discipline can be imposed; 2) by subjecting any on-the-record findings to potential further litigation in federal courts; and 3) by forcing a revamp of the Second Department's recordkeeping protocols. We are unpersuaded that these consequences require *O'Shea* abstention, primarily because Plaintiffs sought—and received—declaratory relief that permits the State to structure its attorney disciplinary regime as it pleases to conform to the First Amendment.

To be sure, whether the relief ordered is declaratory or injunctive is not dispositive of whether *O'Shea* abstention is applicable. *See Kaufman v. Kaye*, 466

41

F.3d 83, 86 (2d Cir. 2006) (finding that *O'Shea* abstention is warranted even if the plaintiff "seeks only a declaratory judgment that the non-transparent, non-random assignment procedures in the Second Department violate" constitutional guarantees of due process). But the abstention inquiry takes into consideration the specific right that a plaintiff asserts. *See Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 100 (2d Cir. 2004) ("[T]he weight of the First Amendment issues involved counsels against abstaining."); *see also Courthouse New Serv.*, 131 F.4th at 78 ("Another factor weighing against abstention here is the significance of the First Amendment right at issue.").

Here, the State's contention that the declaratory relief alters the "substantive criteria" the Committee must consider before imposing private discipline because of its requirement that the Committee must make specific findings supporting confidentiality in order to seal proceedings and records is inapposite.[15]

---

[15] CRC and the Law Professors argue that we should not consider this argument at all because it was not explicitly raised before the district court. Ordinarily, "an appellate court will not consider an issue raised for the first time on appeal." *Bogle-Assegai v. Connecticut*, 470 F.3d 498, 504 (2d Cir. 2006) (quoting *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994)). But on our review, the State appears to have raised the argument that *O'Shea* abstention may be required. *See* Mem. Supp. Cross-Mot. for Summ. J. at 2–3, 21–24, *Civil Rights Corps v. LaSalle*, No. 21-cv-9128, 741 F. Supp. 3d 112 (S.D.N.Y. 2024), Dkt. No. 199 (arguing that the requested relief would "interfere with the Appellate Divisions' prerogative to regulate attorney conduct"). The specific contention that the declaratory relief alters the substance of the available dispositions is "fairly encompassed within

Appellant's Br. at 45. Any change in the discipline options available to the State only reflects that its current regime of imposing private dispositions, without added justification, would be unconstitutional if a First Amendment right of access attaches. In other words, there is no change in the discipline options available to the State, but only to the findings required to sustain confidentiality of the proceedings. In its order of declaratory relief, the district court stated that any "confidential" disposition must be justified by "specific, on-the-record findings" regarding "higher values" secured by non-disclosure and narrow tailoring. *Civil Rights Corps.*, 741 F. Supp. 3d at 172. The district court could not have devised a laxer remedy because the Supreme Court has held that, when "a qualified First Amendment right of access attaches, . . . the proceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'" *Press-Enterprise II*, 478 U.S. at 13-14 (quoting *Press-Enterprise I*, 464 U.S. at 510). If *O'Shea* abstention were obligatory whenever a state insisted that its regime for private adjudication would be transformed once certain outcomes are no longer

---

the . . . broader argument" raised before the district court because it is not a "meaningfully distinct" contention. *In re TransCare Corp.*, 81 F.4th 37, 58 (2d Cir. 2023).

confidential, "federal courts could rarely consider constitutional challenges to [s]tate procedures" under the First Amendment. *Courthouse News Serv.*, 131 F.4th at 77.

The bright-line rule sought by the Plaintiffs distinguishes this case from both the relief sought in *O'Shea* itself and other forms of equitable relief that the Supreme Court has found problematic in light of the "delicate issues of federal-state relationships" that sometimes require abstention. *Rizzo v. Goode*, 423 U.S. 362, 380 (1976) (quoting *Mayor of Phila. v. Educ. Equal League*, 415 U.S. 605, 615 (1974)). In *O'Shea*, the Supreme Court recognized that the desired injunction would implicate federal court oversight in "specific events that might take place in the course of future state [adjudications]," from bond setting to sentencing, because the claimants there argued that state court judges had purportedly violated the Constitution by engaging in, *inter alia*, racial discrimination in those proceedings. 414 U.S. at 500. Unlike the CRC and the Law Professors' lawsuit, the Supreme Court noted that the claimants in *O'Shea* "d[id] *not* seek to strike down a single state statute, either on its face or as applied," but rather to impose a *de facto* federal monitorship. *Id.* (emphasis added). As such, the Plaintiffs' challenge here—to a "single state statute," *id.*—is meaningfully distinct. The declaratory relief Plaintiffs

seek does not impose ongoing intrusion into adjudications (e.g., by altering evidentiary standards or instituting review of substantive outcomes) but instead would simply apply a presumption of public access to the Grievance Complaints.

Our decision in *Disability Rights New York v. New York* provides another useful foil. There, the plaintiff brought a challenge attacking a state statute governing guardianship proceedings as unconstitutional writ large and requested, alongside sweeping injunctive relief which would have "affect[ed] the manner in which all [state guardianship] proceedings—present and future—are conducted," a declaration that the statute violates "the Constitution, the [Americans with Disabilities Act], and the Rehabilitation Act." *DRNY*, 916 F.3d at 132, 135. Although the State cites this precedent for support, the State misunderstands why we affirmed that district court's exercise of abstention even as to the declaratory relief. We did so because the declaration requested would "inevitably set up the precise basis for *future intervention* condemned in *O'Shea*." *Id.* at 137 (quoting *Miles v. Wesley*, 801 F.3d 1060, 1063–64 (9th Cir. 2015)). In other words, if the intervention "would amount to '*nothing less* than an ongoing federal audit of state proceedings,'" a district court should abstain. *Id.* at 134 (alteration adopted) (quoting *O'Shea*, 414 U.S. at 500). But Plaintiffs' declaration in this case would not

45

"unreasonably intrude upon the [state] judiciary's autonomy or risk the sort of 'monitoring of the operation of state court functions'" that *O'Shea* prohibits. *Courthouse News Serv.*, 131 F.4th at 77–78 (quoting *O'Shea*, 414 U.S. at 501). The State would retain its procedures for evaluating and determining how to dispose of the Grievance Complaints and would still retain discretion to impose private discipline against the implicated state prosecutors if it can meet the constitutional requirements for confidentiality.

It is of no moment that the declaration might invite "further challenge to the subsequently developed, ameliorative" grievance procedures or the State's specific, on-the-record findings for privacy in a particular disciplinary matter. *Id.* at 78; *see also Courthouse News Serv. v Planet*, 750 F.3d 776, 792 (9th Cir. 2014) (explaining, in the context of determining that *O'Shea* abstention does not apply to an injunction requiring same-day access to civil complaints under the First Amendment, "that *some* additional litigation may later arise to enforce an injunction does not itself justify abstaining from deciding a constitutional claim"). Despite the State's fear of opening the floodgates, Plaintiffs have asked only that Section 90(10) be declared unconstitutional as applied to them, not that wholesale reforms be imposed by a federal court sitting in equity.

We recognize that the State may incur costs associated with, for instance, its recordkeeping system to ensure compliance with the First Amendment, but the economics cannot override the Constitution. The factual record belies any notion that it would be unfeasible or unduly burdensome to make dispositions accessible, given that they are held and accessible by the Second Department and its staff in perpetuity. Moreover, the declaration that Plaintiffs sought and obtained does not tie the State's hands to a designated or onerous method of compliance. Under these circumstances, it cannot be said that the district court erred by exercising its jurisdiction over the Plaintiffs' Fourth Claim.

## III. First Amendment Right of Access

Reaching the merits, we agree with the district court, on *de novo* review, that a presumptive First Amendment right of access attaches to both Second Department proceedings, including all documents and records reasonably implicated in understanding those proceedings, and the Committee's dispositions. We start with the applicable law before turning to each of those stages in the order of the district court's discussion.

The First Amendment "secure[s] to the public and to the press a right of access to [certain] civil proceedings." *Westmoreland v. Columbia Broad. Sys., Inc.*, 752

47

F.2d 16, 23 (2d Cir. 1984). Public scrutiny "enhances the quality and safeguards the integrity of the factfinding process," "fosters an appearance of fairness, thereby heightening public respect for the judicial process," and "permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 606 (1982). But not all proceedings are subject to a First Amendment right of access. *See, e.g., In re N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials*, 577 F.3d 401, 410 n.4 (2d Cir. 2009) ("Nonpublic proceedings are common throughout the judiciary.").

There is a "two-step framework" for evaluating whether a First Amendment right of access applies to a "document or proceeding." *Courthouse News Serv.*, 131 F.4th at 66. At the first step, we apply the experience-and-logic test. *See Press-Enterprise II*, 478 U.S. at 9. "Under this test, a court must ask 'whether the place and process have historically been open to the press and general public' (the experience prong) and 'whether public access plays a significant positive role in the functioning of the particular process in question' (the logic prong)." *Courthouse News Serv.*, 131 F.4th at 66–67 (quoting *Press-Enterprise II*, 478 U.S. at 8). If both elements are satisfied, then a "qualified, presumptive First Amendment right of

48

public access" attaches, *id.* at 67, and the presumption "applies to judicial documents that are 'a necessary corollary of the capacity to attend the relevant proceedings.'" *United States v. Greenwood*, 145 F.4th 248, 255 (2d Cir. 2025) (quoting *Lugosch*, 435 F.3d at 120).

At the second step, a court considers whether the proponent of closure can overcome the presumption by "establish[ing] through 'specific, on the record findings that closure is essential to preserve higher values and is narrowly tailored.'" *Courthouse News Serv.*, 131 F.4th at 67 (alteration adopted) (quoting *Press-Enterprise II*, 478 U.S. at 13–14). Because the State does not claim that it has satisfied the second step and only argues that no First Amendment presumption applies, we focus our attention on the experience-and-logic test.[16]

## A.    Second Department Proceedings

The State contends that neither experience nor logic requires opening

---

[16] We have recognized that there also exists a distinct "qualified common law 'right to inspect and copy public records and documents,'" *In re N.Y. Times Co.*, 577 F.3d at 405 (quoting *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978))—especially "judicial documents," *Lugosch*, 435 F.3d at 119—but Plaintiffs' Fourth Claim did not seek access to the relevant proceedings or dispositions via a common law right. *See also Newsday LLC v. County of Nassau*, 730 F.3d 156, 163 (2d Cir. 2013) (noting that the common law and First Amendment provide "two related but distinct presumptions in favor of public access to court proceedings and records"). Therefore, we address only whether the First Amendment provides a qualified right of access.

Second Department proceedings to the public.  As to experience, given the sparsity

of its historical evidence and imprecision of its analogues, the State contends that

attorney regulation under codes of conduct had, by at least the 1970s, included

"formal disciplinary proceedings in private" in most states, severing any tradition

of openness.  Appellant's Br. at 68.  And as to logic, the State argues that the district

court misapprehended the prudence of private proceedings, which encourage

witness participation and avoid unfounded accusations against attorneys.

Starting with experience, we find that the robust history of open disciplinary

proceedings, wherein an attorney may be suspended or disbarred by a court

sitting in equity, strongly supports a presumptive First Amendment right of

access.  New York first instituted secrecy for Second Department proceedings with

the passage of Section 90(10) in 1945.  But prior to then, attorney discipline

proceedings "ha[d] historically been open to the press and general public"—

dating all the way back to common-law England.  *Press-Enterprise II*, 478 U.S. at 8.

England enacted the "first significant regulation of the . . . legal profession" in

1275, and from that time on, attorney misconduct was often punished in local (and

open) court.  Jonathan Rose, *The Legal Profession in Medieval England*, 48 Syracuse

L. Rev. 1, 49 (1998); *see also id.* at 60 n.260 (collecting dozens of court cases in 1200s–

1300s England adjudicating attorney misconduct).

Attorney discipline in America's early days largely mirrored the practices of English courts. *See Ex parte Burr*, 4 F. Cas. 791, 793 (C.C.D.D.C. 1823) (describing the power of courts to disbar attorneys as stemming from "the common law of England"). So, as it was in England, disbarment in America largely took place in public court proceedings. In the nineteenth century, "[a] typical disbarment proceeding began with charges of misconduct contained in an order to show cause issued to the lawyer," to which "the lawyer was required to respond . . . in the usual way of a civil litigant and the petitioning party was required to prove its case with evidence." Charles W. Wolfram, *Toward a History of the Legalization of American Legal Ethics*, 8 U. Chi. L. Sch. Roundtable 469, 474–75 (2001). In this way, a disbarment proceeding "was generally conducted as an equity suit or more specifically as a contempt proceeding." *Id.* And these courthouse contempt proceedings, open as they were, often captured the public's attention. Many contemporary newspapers "report[ed] the filing of charges against lawyers," and "[d]isciplinary proceedings were colorfully reported." Leslie C. Levin, *The Case for Less Secrecy in Lawyer Discipline*, 20 Geo. J. Legal Ethics 1, 12–13 (2007); *see also William H. Gale Disbarred*, N.Y. Times (Mar. 13, 1877); *The Disbarment Case: The*

*Defense Injects a Demurrer that Puts it Off*, L.A. Times (Oct. 14, 1888) (reporting that "[a] large crowd hung around the . . . [c]ourt room yesterday in the expectation of seeing a good legal fight" in a disbarment proceeding).

The same was true of attorney discipline proceedings in New York's early days. It is undisputed that "petitions or complaints charging professional misconduct of an attorney were presented publicly to the General Term of the Supreme Court in New York and adjudicated as equity suits or contempt proceedings." J. App'x at 958. In fact, the legislature "directed that local district attorneys, when so designated by the Appellate Division, had a duty to prosecute all proceedings for the removal or suspension of attorneys." *Id.* at 959 (citation modified). In the words of the New York Court of Appeals, "[t]he [disbarment] proceeding is of a public nature and *quasi* criminal." *In re Kelly*, 59 N.Y. 595, 596 (1875). Such actions were not limited to initiation by deputized officials; instead, private parties could also tap the judiciary's equitable powers to seek disbarment of an attorney. *See, e.g., Saxton v. Stowell*, 11 Paige Ch. 526, 526–27 (N.Y. Ch. 1845) (discussing that a "complainant" must first file "written charges against the solicitor who is accused of malpractice" in order for the solicitor to be "stricken from the rolls"). In light of this 700-year-plus tradition of openness, the force of

the First Amendment cannot be evaded on the basis that "disbarment . . . [is] now imposed through a separate process" (e.g., that previously public adjudications are now nested in "agencies"). Appellant's Br. at 67–68.

The State points to the advent of codes of conduct and the rise of state bar associations as a juncture at which time the process for attorney regulation transformed into a different category of proceeding, "rending the former types of proceedings poor historical referents." Appellant's Br. at 68. But our experience analysis "focus[es] not on formalistic descriptions of the government proceeding" to which access is sought, "but on the kind of work the proceeding actually does." *NYCTA*, 684 F.3d at 299. The type of adjudicative work that Second Department formal proceedings engage in today—i.e., imposing weighty sanctions after an adversarial presentation of evidence and argument—is a "direct continuation" of a tradition of removal or suspension of attorneys by judges exercising their "plenary authority" in "open court." *Civil Rights Corps*, 741 F. Supp. 3d at 156–57.

Furthermore, although the experience inquiry focuses on whether there is a "vital tradition of public [access] to particular proceedings or information," potentially harkening back to English common law, the experience prong does not require a wholly unbroken and uniform nationwide practice. *Richmond*

*Newspapers, Inc. v. Virginia*, 448 U.S. 555, 589 (1980) (Brennan, *J.*, concurring in the judgment); *see also Press-Enterprise II*, 478 U.S. at 10–11 (acknowledging disparate treatment of preliminary hearings by states yet finding a presumptive First Amendment right of access).  As pertinent here, "[p]rior to the last century, lawyer discipline was conducted in public in the United States and in England."  Levin, *The Case for Less Secrecy in Lawyer Discipline*, *supra*, at 10.  In the 1870s, bar associations began to play an increasingly critical role in lawyer discipline, functioning first as investigators, and by the 1930s, "courts or legislatures in many states had conferred on bar associations express authority . . . to impose certain types of discipline sanctions."  *Id.* at 14.  However, the State concedes that only four states today (including New York) maintain the confidentiality of disciplinary proceedings until formal charges are sustained; most states maintain confidentiality "only until a finding of probable cause."  Appellant's Br. at 11.  Accordingly, the last decades of unsettled confidentiality regimes do not override the preceding centuries of open proceedings.

The logic of public access to the Second Department's attorney disciplinary proceedings confirms what history demonstrates.  "[W]e have repeatedly found public censure or reprimand to be an appropriate and valuable 'corrective

54

measure' in attorney-misconduct cases, 'in order to protect the public, other attorneys and litigants, the Court, and the administration of justice.'" *In re Demetriades*, 58 F.4th 37, 46 (2d Cir. 2023) (quoting *In re Jaffe*, 585 F.3d 118, 121 (2d Cir. 2009)). Even if a Second Department proceeding does not ultimately lead to the imposition of public discipline, "the bright light cast upon the judicial process by public observation diminishes the possibilities for injustice, incompetence, perjury, and fraud," while fortifying the public's faith in the process. *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (citation modified).

We are unconvinced by the consternation of the State, as well as that of its amicus the New York State Bar Association, regarding the practical consequences of a presumptive right of access. Because Second Department proceedings require a finding of probable cause prior to initiation, *see* 22 N.Y.C.R.R. § 1240.7(d)(2)(vi), unsubstantiated accusations are unlikely to filter through. Moreover, if any proceeding implicates sensitive information, the concerning portions could be closed if the State is able to justify the closure in terms of the higher values served and narrow tailoring. The presumptive right is not an inexorable command nor an insurmountable hurdle. Because we find that the right attaches to Second Department proceedings generally, the right also encompasses all documents that

55

are necessary to effectuate that right. *See Greenwood*, 145 F.4th at 255.

### B. Grievance Committee Dispositions

The work done by the Committee differs in significant, meaningful ways from that of the Second Department. Whereas proceedings in the Second Department, prosecuted by the Chief Attorney against the respondent attorney, have, as we explained, the relevant indicia of equitable attorney misconduct proceedings that have historically been open to the public, the Committee operates in an investigatory, prosecutorial, and adjudicative capacity. However, Plaintiffs have narrowed their claim only to the Committee's ultimate resolution of the Grievance Complaints. Therefore, we first need to delineate what "kind of work" the Committee does when issuing dispositions and then determine if experience and logic suggest that a qualified First Amendment right of access attaches to that specific function. *NYCTA*, 684 F.3d at 299.

The State contends that because the Committee is not an adjudicator of grievance complaints, experience and logic do not compel a right of access. In its view, the Committee is a nonneutral investigator and prosecutor that works to enforce the Rules. To the State, the Committee and the Chief Attorney are functional equivalents for the First Amendment's inquiry, since both can enter

final dispositions such as dismissals that effectively resolve a complaint, and because the district court found that the Chief Attorney's work does not warrant public access, neither should the Committee's. On experience, the State urges us to consider the work done by the Committee, which cannot suspend or disbar any attorney on its own, to be akin to that of prosecutors and grand juries, which have been permitted to operate away from the public eye. *See, e.g.*, *In re Grand Jury Subpoena*, 103 F.3d 234, 242–43 (2d Cir. 1996) (concluding that grand jury proceedings may be closed without violating the First Amendment). As for logic, the State warns that opening the Committee's dispositions would prematurely tarnish an attorney's reputation, expose sensitive information, erase the option of private discipline, and undermine the Committee's investigatory ability by dissuading witnesses.

In response, Plaintiffs emphasize that their request is limited only to the results of the Committee's adjudication of the twenty-one Grievance Complaints, not internal reports or any investigatory work product. When the Committee issues a disposition, "it sits as a neutral body to make authoritative determinations on accusations" that are often "the 'last and most important step in nearly every proceeding'" regarding attorney misconduct. Appellees' Br. at 60 (quoting *Civil*

*Rights Corps,* 741 F. Supp. 3d at 164). Because the Committee is delegated authority to resolve attorney misconduct by the Second Department, the root "historical antecedent" remains the "public practice of attorney discipline." *Id.* at 61. Moreover, grand juries and prosecutors are inadequate comparators because the Committee issues a "final decision, on the merits and after an adversary proceeding." *Id.* at 62. Plaintiffs tailor their argument regarding logic to the Grievance Complaints, noting that how state prosecutors are regulated (or not) is of great public interest, and none of the State's rationales are applicable here because the Grievance Complaints were predicated on public information, with witnesses and victims already known.

So, as before the district court, "[t]he crux of the parties' dispute is how to characterize what kind of government 'process' the Committee carries out." *Civil Rights Corps*, 741 F. Supp. 3d at 163. While the Committee certainly has investigatory and prosecutorial functions, we find that the Committee's disposition of these Grievance Complaints in particular does not implicate those roles, but rather its function as an adjudicator operating under the Second Department's mandate—and that function relates back to the historically public attorney misconduct proceedings discussed earlier.

As the State notes, the Plaintiffs' exercise of labeling the Committee's dispositions as "judicial" does not operate as "some talisman" that triggers presumptive access under the First Amendment. *Butterworth v. Smith*, 494 U.S. 624, 630 (1990) (quoting *United States v. Dionisio*, 410 U.S. 1, 11 (1973)); *see Press-Enterprise II*, 478 U.S. at 7 ("[T]he First Amendment question cannot be resolved solely on the label we give the event."). Otherwise, various phases of the judicial process—such as preindictment proceedings—would be subject to the right of access. *See, e.g.*, *Butterworth*, 494 U.S. at 630 (discussing "grand jury secrecy"); *In re N.Y. Times Co.*, 577 F.3d at 410 & n.4 (discussing private wiretap applications and cataloging nonpublic judicial proceedings). Instead, we focus on the Committee's function here—the adjudicative work required to decide these twenty-one Grievance Complaints—to ascertain the appropriate historical analogue for the experience prong's focus on a "history of openness." *Lugosch*, 435 F.3d at 120 (quoting *Pellegrino*, 380 F.3d at 92).

As detailed above, we disagree with the State that the emergence of quasi-agency adjudication of attorney misconduct, either through state bar associations or the State's judiciary subcomponents, provides the appropriate starting point of the historical inquiry. *See* Appellant's Br. at 57 (noting that "the preliminary work

59

of attorney grievance committees has been private *since their inception*" (emphasis added)). To accept this premise, we would fall into the trap of formalism that we have previously rejected, especially since the State itself severed the otherwise-unbroken tradition of public misconduct proceedings by relocating attorney discipline into these committees in the first place. To permit the State to "immuniz[e] government proceedings from public scrutiny by placing them in institutions the Framers could not have imagined" would unravel the First Amendment's protections of "access to public participation and to government accountability." *NYCTA*, 684 F.3d at 299.

The record bears out that the Committee is an outgrowth of the historically public adjudication of attorney discipline. In her deposition, Chief Attorney Kearse agreed that, "[i]n general," the Committee "sits in judgment and it renders a ruling after it hears from both sides." J. App'x at 418–19. The Committee disposes of a complaint, by majority vote, after receiving a developed factual record and considering the positions of both sides. Even if the Committee cannot suspend or disbar attorneys on its own, its actions—unlike that of the State's preferred comparisons, the grand jury or the prosecutor—conclusively decide most matters that have passed the Chief Attorney and staff's initial screening. And

60

its dispositions—such as letters of advisement or written admonitions, which the Chief Attorney cannot authorize alone—are permanent records that follow an attorney's career.[17]  *Compare* 22 N.Y.C.R.R. § 1240.7(d)(1) (listing permissible "dispositions" available to the Chief Attorney, which are limited to a "declin[ation] to investigate" or "refer[ral]" to an alternative forum, neither of which involve a finding of misconduct), *with id.* § 1240.7(d)(2) (listing permissible dispositions available to the Committee, including situations wherein the Committee "finds" that "the respondent has engaged in professional misconduct").  Moreover, the Committee's dispositions are final decisions permanently kept on file in the Second Department that may be considered in future disciplinary proceedings, much like a final state court judgment (and unlike a prosecutor's recommendation).  *Cf. Doe v. Rosenberry*, 255 F.2d 118, 120 (2d Cir. 1958) (calling the "acts" of "the Grievance Committee of the City Bar Association . . . quasi judicial").  Therefore, in all material respects, the Committee's *dispositions*—not its preparatory or internal work—are part of the

---

[17] The Committee's dispositions are often the last step in the attorney discipline process. For example, in 2022, the Committee issued over two hundred letters of advisement or written admonitions and dismissed nearly a thousand complaints for failure to state a violation.  Only 15 matters were referred to the Second Department.

61

same historical arc of traditionally open-to-the-public attorney disciplinary proceedings to which we have earlier explained the Second Department's formal proceedings belong.

Logic reinforces our assessment of experience. Presumptively publicizing the Committee's dispositions would not unduly harm an attorney's reputation given the gatekeeping function of the Chief Attorney. As the Plaintiffs' amicus the New York Media Coalition[18] points out, many complaints are screened out by the Chief Attorney,[19] and those dispositions are not presumptively public under the district court's order of declaratory relief. We are also unconvinced that avoiding disclosure of witnesses or sensitive information warrants overriding the presumption writ large, seeing as any specific redactions could be justified by higher values and narrow tailoring on a case-by-case basis. *See Press-Enterprise II*, 478 U.S. at 13–14.

---

[18] The New York Media Coalition consists of Advance Publications, Inc., The Associated Press, Daily News, L.P., Dow Jones & Company, Gannett Co., Inc., Hearst Corporation, New York Newspaper Publishers Association, New York Press Association, The New York Times Corporation, Newsday LLC, and Pro Publica, Inc.

[19] According to the public reporting cited by the New York Media Coalition, although the Second Department's breakdown does not share the exact number, the Appellate Division's First Judicial Department reported that, in 2023, its Chief Attorney disposed of over two thousand complaints, whereas its Grievance Committee only adjudicated slightly over nine hundred complaints.

To be sure, not all dispositions, such as diversions, involve a finding of misconduct by the Committee, but those dispositions would not reasonably invite the intense public scrutiny the State and the New York State Bar Association decry. We also agree with the State that a presumptive First Amendment right of access would inhibit the Committee's ability to freely utilize private discipline, but those forms of lesser action or "inaction" still warrant public scrutiny to ensure the public's "confidence in the orderly administration of justice." *United States v. Erie County*, 763 F.3d 235, 240 (2d Cir. 2014). An interest in the faithful administration of justice is heightened when the misconduct of attorneys is at stake, especially so when the purported misconduct involves state prosecutors who may be subject to election or appointment and operate under the aegis of the State. *See, e.g.,* *Richmond Newspapers*, 448 U.S. at 575 ("Plainly it would be difficult to single out any aspect of government of higher concern and importance to the people than the manner in which criminal trials are conducted[.]").

\* \* \*

Both the State and the Plaintiffs raise weighty interests that the Court does not consider lightly. But applying afresh the First Amendment framework that governs Plaintiffs' as-applied claim, we hold that the district court did not err in

63

granting declaratory relief that would presumptively permit access to the Committee's dispositions of, and the Second Department's proceedings and documents regarding, the twenty-one Grievance Complaints against the former state prosecutors. To be sure, the presumption is only just that—it may be overcome if the State can sufficiently justify closure, in whole or in part, of any component of the relevant dispositions or proceedings. Yet, the State raises no argument on that ground and so we need not assess any purported higher values or the extent of narrow tailoring.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.